APPEAL NO. 24-3278

# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

CHRISTIN HEAPS,
*Plaintiff-Appellant,*

v.

DELAWARE VALLEY REGIONAL HIGH SCHOOL BOARD OF EDUCATION;
et al.,
*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of New Jersey
Case No. 3:24-cv-00107

## OPENING BRIEF OF PLAINTIFF-APPELLANT

John J. Bursch
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(616) 450-4235
jbursch@ADFlegal.org

Katherine L. Anderson
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
kanderson@ADFlegal.org

Ronald A. Berutti
Gwyneth K. Murray-Nolan
MURRAY-NOLAN BERUTTI LLC
136 Central Avenue
2nd Floor
Clark, NJ 07066
(980) 588-2111
ron@murray-nolanberutti.com
gwyneth@murray-nolanberutti.com

James A. Campbell
Vincent M. Wagner
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707-4655
jcampbell@ADFlegal.org
vwagner@ADFlegal.org

David A. Cortman
Chloe K. Jones
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Road NE,
Suite D-1100
Lawrenceville, GA 30043
(770) 339-0774
dcortman@ADFlegal.org
cjones@ADFlegal.org

*Attorneys for Plaintiff-Appellant*

## TABLE OF CONTENTS

Table of Authorities.................................................................iv

Statement Regarding Oral Argument ......................................ix

Statement of Jurisdiction.........................................................1

Statement of Issues .................................................................2

Related Cases and Proceedings ...............................................3

Introduction.............................................................................4

Statement of the Case .............................................................6

I.    Factual Background .........................................................6

    A.    Mr. Heaps's daughter struggles during her freshman year. .....................................................................................6

    B.    School employees begin to secretly treat Mr. Heaps's daughter as a boy. ..................................................................7

    C.    School employees do not notify Mr. Heaps of their actions or seek his consent; in fact, they actively conceal their actions from him...........................................................9

    D.    Mr. Heaps discovers school employees' actions and expressly objects to them. ..................................................10

    E.    New Jersey law, state guidance and district policy require continuing to override Mr. Heaps's objections. .......11

II.   Procedural History .......................................................14

    A.    Mr. Heaps files this lawsuit to protect his fundamental rights as a parent. ..............................................................14

    B.    The district court denies the preliminary-injunction motion..................................................................................16

Standard of Review ...............................................................18

Summary of Argument .......................................................................... 19

Argument ............................................................................................. 20

I.    Mr. Heaps is likely to succeed on the merits of his claim that
      Defendants violated his fundamental rights. ................................ 20

      A.    Mr. Heaps has a fundamental right to direct his
            daughter's upbringing, education, and healthcare. ............ 22

            1.    Supreme Court precedent establishes a broad
                  fundamental parental right that protects Mr.
                  Heaps. ........................................................................ 23

            2.    The "school setting" does not change that analysis
                  here. ........................................................................... 27

                  i.    Deeply rooted history and tradition protect
                        parents' rights including when their children
                        attend school. ................................................... 27

                  ii.   Parents' fundamental rights limit public
                        schools' power to "impose reasonable
                        regulations" on the school day. .......................... 31

      B.    Defendants infringed Mr. Heaps's fundamental rights. ....... 33

            1.    Defendants' secret social transition infringed Mr.
                  Heaps fundamental parental rights—and
                  threatens to keep doing so. .......................................... 34

                  i.    Defendants socially transitioned Mr.
                        Heaps's, daughter, Jane without notice and
                        insist they would do so again. ............................. 35

                  ii.   Defendants also socially transitioned Jane
                        without Mr. Heaps's consent and would
                        continue doing it. ............................................... 39

        iii.    Defendants actively concealed their social transition of Jane from Mr. Heaps and would conceal it again......................................................40

        iv.    Although Mr. Heaps need not prove conscience-shocking conduct, Defendants' conduct shocks the conscience. ...........................42

     2.    The district court was wrong to permit secret social transitions. .......................................................44

        i.    This Court's precedent supports Mr. Heaps's claims. ...............................................................45

        ii.    The government must not second-guess a parental decision simply because an adolescent dislikes it. ..........................................47

        iii.    Parents' fundamental right to make healthcare decisions doesn't turn on a particular diagnosis. ..........................................52

  C.    Mr. Heaps is likely to show that Defendants' law, guidance, policy, and conduct fail strict scrutiny.................54

II.    The remaining preliminary injunction factors weigh decidedly in Mr. Heaps's favor. ....................................................56

Conclusion ........................................................................59

Combined Certifications....................................................60

Certificate of Service .......................................................61

# TABLE OF AUTHORITIES

## Cases

*AmeriSteel Corp. v. International Brotherhood of Teamsters*,
    267 F.3d 264 (3d Cir. 2001) ............................................................ 19

*Anspach ex rel. Anspach v. City of Philadelphia, Department of Public Health*,
    503 F.3d 256 (3d Cir. 2007) ...................................................... passim

*Arnold v. Board of Education of Escambia County*,
    880 F.2d 205 (11th Cir. 1989) .................................................. 31, 41

*Barnette v. West Virginia State Board of Education*,
    47 F. Supp. 251 (S.D. W. Va. 1942) ............................................... 30

*C.N. v. Ridgewood Board of Education*,
    430 F.3d 159 (3d Cir. 2005) ...................................................... 33, 34

*County of Sacramento v. Lewis*,
    523 U.S. 833 (1998) ................................................................... 42, 44

*Delaware State Sportsmen's Association v. Delaware Department of Safety & Homeland Security*,
    108 F.4th 194 (3d Cir. 2024) ......................................................... 57

*Delaware Strong Families v. Attorney General of Delaware*,
    793 F.3d 304 (3d Cir. 2015) ........................................................... 18

*Department of State v. Muñoz*,
    602 U.S. 899 (2024) .............................................................. 21, 22, 55

*Dobbs v. Jackson Women's Health Organization*,
    597 U.S. 215 (2022) .............................................................. 24, 25, 45

*Doe ex rel. Doe v. Boyertown Area School District*,
    897 F.3d 518 (3d Cir. 2018) ...................................................... 55, 56

*Edwards v. Aguillard*,
    482 U.S. 578 (1987) ....................................................................... 51

*Farrington v. Tokushige,*
 273 U.S. 284 (1927) ...................................................................... 30

*Foote v. Ludlow School Committee,*
 128 F.4th 336 (1st Cir. 2025) ............................................... passim

*Fulton v. City of Philadelphia,*
 593 U.S. 522 (2021) ...................................................................... 55

*Gruenke v. Seip,*
 225 F.3d 290 (3d Cir. 2000) .................................................. passim

*H.L. v. Matheson,*
 450 U.S. 398 (1981) ............................................................... 23, 33

*Hardwick v. Board of School Trustees,*
 205 P. 49 (Cal. Dist. Ct. App. 1921) ........................................... 29

*Homar v. Gilbert,*
 89 F.3d 1009 (3d Cir. 1996) ......................................................... 43

*J.S. ex rel. Snyder v. Blue Mountain School District,*
 650 F.3d 915 (3d Cir. 2011) ..................................... 33, 34, 35, 41

*John & Jane Parents 1 v. Montgomery County Board of Education,*
 78 F.4th 622 (4th Cir. 2023) ........................................................ 38

*Kaltenbach v. Hilliard City Schools,*
 2025 WL 1147577 (6th Cir. Mar. 27, 2025) ........................... 46, 47

*Kanuszewski v. Michigan Department of Health & Human Services,*
 927 F.3d 396 (6th Cir. 2019) ................................................. 39, 53

*Littlejohn v. School Board of Leon County,*
 132 F.4th 1232 (11th Cir. 2025) .................................................. 43

*Mahanoy Area School District v. B.L. ex rel. Levy,*
 594 U.S. 180 (2021) ...................................................................... 51

*Mahmoud v. Taylor,*
 2025 WL 1773627 (U.S. June 27, 2025) ................................ passim

*Meyer v. Nebraska*,
  262 U.S. 390 (1923) ........................................................ 21, 23, 29

*Mirabelli v. Olson*,
  761 F. Supp. 3d 1317 (S.D. Cal. 2025) ........................................ 54

*Morrow v. Wood*,
  35 Wis. 59 (1874) ............................................................... 29

*Nicholas v. Pennsylvania State University*,
  227 F.3d 133 (3d Cir. 2000) .................................................. 42, 43

*Nken v. Holder*,
  556 U.S. 418 (2009) .............................................................. 58

*Parham v. J.R.*,
  442 U.S. 584 (1979) ......................................................... passim

*Pierce v. Society of Sisters*,
  268 U.S. 510 (1925) ........................................................ 24, 30, 31

*Planned Parenthood of Central Missouri v. Danforth*,
  428 U.S. 52 (1976) ............................................................... 45

*Planned Parenthood of Southeastern Pennsylvania v. Casey*,
  505 U.S. 833 (1992) ............................................................. 45

*Platkin v. Hanover Township Board of Education*,
  2025 WL 439969 (N.J. Super. Ct. App. Div. Feb. 10, 2025) ............ 3

*Platkin v. Middletown Township Board of Education*,
  2025 WL 440132 (N.J. Super. Ct. App. Div. Feb. 10, 2025) ............ 3

*Prince v. Massachusetts*,
  321 U.S. 158 (1944) ............................................................. 32

*Regino v. Staley*,
  133 F.4th 951 (9th Cir. 2025) ............................................ 26, 27, 43

*Reno v. Flores*,
  507 U.S. 292 (1993) ............................................................. 21

*Ricard v. USD 475 Geary County, KS School Board,*
2022 WL 1471372 (D. Kan. May 9, 2022) .....................................56

*Roe v. Wade,*
410 U.S. 113 (1973) ......................................................................45

*Roper v. Simmons,*
543 U.S. 551 (2005) ......................................................................49

*Rulison v. Post,*
79 Ill. 567 (1875)...........................................................................29

*School Board District No. 18 v. Thompson,*
103 P. 578 (Okla. 1909) ................................................................29

*State v. Ferguson,*
144 N.W. 1039 (Neb. 1914) ..........................................................29

*State v. School District No. 1,*
48 N.W. 393 (Neb. 1891) ..............................................................29

*Troxel v. Granville,*
530 U.S. 57 (2000) ..........................................................21, 23, 34

*Trustees of Schools v. People ex rel. Van Allen,*
87 Ill. 303 (1877)...........................................................................29

*Washington v. Glucksberg,*
521 U.S. 702 (1997) ........................................................21, 25, 55

*West Virginia State Board of Education v. Barnette,*
319 U.S. 624 (1943) ......................................................................30

*Wisconsin v. Yoder,*
406 U.S. 205 (1972) ............................................................. passim

## Constitutional Provisions

U.S. Const. amend. XIV, § 1.................................................................20

## Statutes

20 U.S.C. § 3401 ..................................................................................30

28 U.S.C. § 1292 ...................................................................... 1

28 U.S.C. § 1331 ...................................................................... 1

28 U.S.C. § 1343 ...................................................................... 1

42 U.S.C. § 1983 ...................................................................... 1

N.J. Stat. Ann. § 10:5-12 ....................................................... 12

N.J. Stat. Ann. § 18A:38-25 .................................................. 50

N.J. Stat. Ann. § 18A:38-29 .................................................. 50

N.J. Stat. Ann. § 18A:38-31 .................................................. 50

N.J. Stat. Ann. §§ 10:5-1 to -50 .............................................. 3

## Other Authorities

1 William Blackstone, *Commentaries on the Laws of England* ........................................................... 28, 32, 58

2 James Kent, *Commentaries on American Law* (5th ed. 1844) ...... 28, 29

2 Joseph Story, *Commentaries on Equity Jurisprudence* § 1343 (2d. ed. 1839) ................................................................... 28

Eric A. DeGroff, *Parental Rights & Public School Curricula: Revisiting* Mozert *after 20 Years*, 38 J.L. & Educ. 83 (2009) ........ 27

Hilary Cass, *Independent review of gender identity services for children and young people: Interim report* (2022) ........................... 8

Joseph K. Griffith II, *Is the Right of Parents to Direct Their Children's Education "Deeply Rooted" in Our "History and Tradition"?* 28 Tex. Rev. L. & Pol. 795 (2024) ........................ 28, 29

William Baude, Jud Campbell, Stephen E. Sachs, *General Law and the Fourteenth Amendment*, 76 Stanford L. Rev. 1185 (2024) ...... 25

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff-Appellant Christin Heaps requests oral argument. This case is about whether Defendants-Appellees violated Mr. Heaps's fundamental right as a parent to direct his minor daughter's upbringing, education, and healthcare—a right the Supreme Court has long recognized as essential to ordered liberty. Pursuant to New Jersey law, state guidance, and official school-board policy, a school district treated his 14-year-old daughter as a boy for months, without notifying Mr. Heaps, without his consent, and while actively concealing its actions from him. This raises important questions under the Fourteenth Amendment to the U.S. Constitution about Mr. Heaps's fundamental rights as a parent.

Oral argument would help the Court resolve those questions. *See* 3d Cir. I.O.P. 2.4.2. Mr. Heaps respectfully requests 20 minutes per side.

# STATEMENT OF JURISDICTION

Plaintiff-Appellant Christin Heaps sued Defendants-Appellees under 42 U.S.C. § 1983 for deprivations of his federal constitutional rights, which gave the district court jurisdiction under 28 U.S.C. §§ 1331 and 1343. The district court denied Mr. Heaps's preliminary-injunction motion on November 27, 2024. JA.2. He timely appealed on December 6, 2024. JA.1. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF ISSUES

When Plaintiff-Appellant Christin Heaps's daughter started high school, she had already spent about a year-and-a-half under professional care for depression, anxiety, and gender confusion. Defendants-Appellees undermined that care. New Jersey state guidance interpreting a state statute and official school-district policy required school employees to treat Mr. Heaps's daughter as a boy—using a masculine name and male pronouns—without notifying Mr. Heaps or obtaining his consent, and while actively concealing it from him.

Months after this secret "social transition" had begun, Mr. Heaps discovered it only because another parent incidentally referred to his daughter by a masculine name. He then instructed school employees to stop. But they refused. Even when he placed his daughter in the school district's home-instruction program, employees insisted on referring to her by a masculine name and male pronouns. Defendants-Appellees continue to insist New Jersey law, state guidance, and district policy require them to socially transition Mr. Heaps's daughter in secret.

(1) Is Mr. Heaps likely to succeed on the merits of his claim that Defendants-Appellees are violating his fundamental right protected by the Fourteenth Amendment to direct the upbringing, education, and healthcare of his daughter? *See* JA.23–36.

(2) Do the other injunction factors weigh in favor of granting preliminary relief to Mr. Heaps? *See* JA.39.

## RELATED CASES AND PROCEEDINGS

In a related proceeding, Defendant-Appellee Attorney General Matthew Platkin filed administrative complaints with the New Jersey Division on Civil Rights, alleging that four other school boards violated the New Jersey Law Against Discrimination, N.J. Stat. Ann. §§ 10:5-1 to -50, by seeking to implement new policies that generally *require* parental notification before treating a student as the opposite sex. *Platkin v. Middletown Twp. Bd. of Educ.*, No. P2023-900005 (N.J. Div. on C.R. filed June 21, 2023); *Platkin v. Manalapan-Englishtown Reg'l Bd. of Educ.*, No. P2023-900004 (N.J. Div. on C.R. filed June 21, 2023); *Platkin v. Marlboro Twp. Bd. of Educ.*, No. P2023-900003 (N.J. Div. on C.R. filed June 21, 2023); *Platkin v. Hanover Twp. Bd. of Educ.*, No. P2023-900002 (N.J. Div. on C.R. filed May 17, 2023).

The Attorney General simultaneously sued in state court to enjoin those school boards from implementing their parental notification policies, pending resolution of the administrative proceedings. After state trial courts granted the Attorney General's motions, the state appellate court affirmed the injunctions. *Platkin v. Middletown Twp. Bd. of Educ.*, No. A-0037-23, 2025 WL 440132 (N.J. Super. Ct. App. Div. Feb. 10, 2025) (per curiam); *Platkin v. Hanover Twp. Bd. of Educ.*, No. A-0371-23, 2025 WL 439969 (N.J. Super. Ct. App. Div. Feb. 10, 2025) (per curiam).

## INTRODUCTION

Christin Heaps depends on New Jersey's public-school system to educate his daughter. His work keeps him too busy to homeschool full-time. And private school is too expensive. Because his daughter lost her mother at a young age, he has always paid special attention to her mental health. While she was still in middle school, he recognized she needed a mental health professional's help. Working with professional help, he took a cautious approach to his daughter's struggles, especially those related to gender confusion.

To his dismay, about halfway through his daughter's freshman year, Mr. Heaps discovered that the Delaware Valley Regional High School Board of Education had acted with less caution. Without notifying him or seeking his consent, staff at his daughter's high school had been treating her as a boy during the school day. For months, they used a masculine name and male pronouns to refer to her—a psychotherapeutic intervention often called "social transition." But employees continued using her given name and female pronouns with Mr. Heaps, which purposefully concealed their actions from him. He discovered the social transition only incidentally, when he overheard another parent refer to his daughter as a boy.

In a meeting with the school soon after this unwelcome discovery, Mr. Heaps learned that the counselor leading the social transition of his daughter knew nothing about her ongoing mental healthcare outside of

school. Yet the counselor instructed staff throughout the high school to participate in the social transition—and to keep Mr. Heaps in the dark.

At that meeting, Mr. Heaps told school administrators to stop. But they refused. They said that New Jersey's Law Against Discrimination and related guidance from the New Jersey Department of Education, which the School Board had adopted as its official policy, required employees to socially transition his daughter, upon her request, without seeking his consent. Not only that, the law, guidance, and policy required staff to keep it secret from Mr. Heaps, just as they had done.

Even now that Mr. Heaps has expressly objected, the School Board has made clear it would override his objection. It allowed Mr. Heaps to place his daughter in a district-run home-instruction program. But as part of that program, the School Board promised its employees would, on her request, socially transition her again without his consent.

Because of the School Board's ongoing commitment to secretly transition his daughter, Mr. Heaps sought a preliminary injunction in the district court. As the Supreme Court has held for over a century, he has the right as a parent to make key decisions about his daughter's upbringing, education, and healthcare. By socially transitioning Mr. Heaps's daughter in secret, Defendants infringed that fundamental right. Because the district court incorrectly ruled that he was unlikely to succeed in his claims, this Court should reverse the order denying his preliminary-injunction motion.

# STATEMENT OF THE CASE

## I.    Factual Background

### A.    Mr. Heaps's daughter struggles during her freshman year.

Christin Heaps is a plumber from New Jersey. JA.180, 267. In the fall of 2023, he enrolled his daughter at Delaware Valley Regional High School for her freshman year. JA.180. Throughout this litigation, the parties have referred to her as "Jane Doe" to protect her privacy.

Mr. Heaps had long worried about Jane's mental health. As a four-year-old, she lost her mother. JA.95, 181, 210. That loss has "always stayed with her and affected her emotionally and psychologically." JA.210. Mental health providers have diagnosed Jane with autism, Attention Deficit/Hyperactivity Disorder, depression, and anxiety. JA.181, 266; SealedApp.43. Mr. Heaps placed his daughter under a therapist's care for those diagnoses and also for gender confusion. JA.181. By the time she started at Delaware Valley, Jane had been seeing a therapist for around a year and a half. *Id.* Mr. Heaps and the mental health professionals treating Jane had already decided "to take a cautious approach to Jane's gender confusion given her underlying trauma and psychiatric comorbidities." *Id.*

When Jane entered high school, she was still "working through the trauma of her mother's death" and her "diagnoses of autism and

6

ADHD." JA.266. "[A]wkwardly looking for her place to fit in," Jane "was lonely, confused, vulnerable, easily led, [and] emotionally unstable." *Id.*

### B.    School employees begin to secretly treat Mr. Heaps's daughter as a boy.

At Delaware Valley, Jane looked for community in an extra-curricular club called Students Advocating for Equality, or "SAFE." JA.184. SAFE "promotes discussion and awareness about modern cultures and topics surrounding intersectionality." JA.120. Ashley Miranda, a school counselor at Delaware Valley, is the staff advisor for SAFE. JA.119.

Shortly after Jane's freshman year began, in September 2023, she attended a SAFE meeting about gender identity. JA.120. During the discussion, Jane became emotional. *Id.* When Ms. Miranda asked why, "Jane expressed that she identified as a transgender male." *Id.* So Ms. Miranda "then scheduled a time to speak privately to Jane." *Id.* And during that private meeting, Ms. Miranda "asked Jane if she would like to change her name and pronouns." JA.184. Jane agreed. *Id.* Ms. Miranda immediately began to refer to her as boy, with a masculine name and male pronouns. JA.121–22.

By referring to Jane as a boy, Ms. Miranda began a "psychosocial treatment" for gender dysphoria that is often called "social transition." JA.140. Social transition "involves a change in name, pronoun use, hair style, and clothing to more closely match the child's perceived sexual

identity." *Id.*; *accord* JA.78, 84 (School Board policy and New Jersey guidance adopting similar definition of "socially transition").

"Social transition is a psychotherapeutic intervention and is not a neutral act." JA.182 (citing Hilary Cass, *Independent review of gender identity services for children and young people: Interim report* (2022)[1]). Social transition is "an active intervention" that "may have significant effects on the child or young person in terms of their psychological functioning." Cass, *supra*, at 62–63. Notably, "social transitioning leads to persistence of gender dysphoria." JA.140. And as a result, socially transitioning a child brings "the likely consequence of subsequent (lifelong) biomedical treatments," including puberty blockers, cross-sex hormones, and surgeries. *Id.*; *see* JA.141–43 (describing the use of pharmaceutical and surgical procedures as part of gender transitions). No long-term studies demonstrate any benefits of social, medical, or surgical transition. JA.183.

Ms. Miranda knew nothing about Jane's mental-health treatment. JA.97. And in her private meeting with Jane, she didn't even ask—not about the girl's mental-health history, nor about whether Jane was under a mental health professional's care. JA.184. Instead, she immediately began to socially transition Jane. JA.121–22, 184.

---

[1] https://perma.cc/BE43-2EPX.

**C.    School employees do not notify Mr. Heaps of their actions or seek his consent; in fact, they actively conceal their actions from him.**

Ms. Miranda did not notify Mr. Heaps about, or seek his consent to, her decision to socially transition Jane. JA.121–22, 184. Just the opposite, Ms. Miranda made it a point not to "disclose Jane's gender identity or desire to social[ly] transition to" Mr. Heaps. JA.121.

To that end, Ms. Miranda emailed high-school staff to instruct them about socially transitioning Jane. JA.122, 185. That email informed staff of the social transition, including Jane's "preferred name and pronouns." JA.122. It instructed them "to use Jane's preferred name and pronouns while in class." *Id.* And it told them that Mr. Heaps "was not aware of the social transition and not necessarily supportive of it." *Id.* So Ms. Miranda instructed high-school staff "that Mr. [Heaps] was not to be informed." JA.185.

Ms. Miranda and other School Board employees took care to conceal their social transition from Mr. Heaps. For example, although staff generally referred to Jane by a masculine name, they did not do so "over the school's PA system." JA.122. They took that step to prevent Jane's sibling—also a student at the high school—from "learn[ing] of her social transition and … caus[ing] issues for her at home." *Id.*

Even more troublingly, to conceal the social transition from Mr. Heaps, School Board employees always referred to Jane by her given name when communicating with him—even while they referred to her

9

by a masculine name during the school day. JA.185. In this way, the
School Board and its employees, including Ms. Miranda and
Superintendent Scott McKinney, kept Mr. Heaps in the dark for months
about socially transitioning his daughter. *Id.*

Without knowing the true cause at the time, Mr. Heaps and Jane's
healthcare providers could tell something was wrong. He watched his
daughter "shut herself in her room" and "disengage[] from the family."
JA.117.[2] She "was noticeably depressed." *Id.* Jane's therapist echoed
Mr. Heaps's observations. During the period of Defendants' secret social
transition, "Jane began presenting to [the therapist] as exhibiting
greater confusion, lacking in motivation, demonstrating situational
depression, and feeling isolated." JA.211.

### D.    Mr. Heaps discovers school employees' actions and expressly objects to them.

In December 2023, months after the secret social transition began,
Mr. Heaps learned about it—but only by accident and not from the
School Board or any of its employees. JA.185. Mr. Heaps incidentally
overheard another parent refer to Jane by a masculine name. *Id.* He
asked that parent for an explanation. *Id.* The parent told Mr. Heaps
that staff at the high school were socially transitioning Jane. *Id.*

---

[2] The signature page for this declaration appears on the district court's
docket as ECF No. 24-2. *See* ECF No. 28.

This revelation greatly distressed Mr. Heaps. *Id.* Not sure what to do, he quickly switched his daughter to a home-instruction program provided by the School Board. *Id.* Soon after, Mr. Heaps met with Delaware Valley Regional High School's administration. JA.185–86. Ms. Miranda also attended that meeting. JA.121, 185. With the truth of the secret social transition revealed, she now "advised him of the situation." JA.121. She admitted that she had facilitated the social transition—although she knew nothing about Jane's mental-health diagnoses, nothing about Jane's ongoing mental-health treatment. JA.185–86.

In response, Mr. Heaps made his instructions clear: "he and Jane's therapist were not in agreement with Jane's social transition and [he] expressly denied his consent to the continuance of Jane's social transition at school." JA.186.

### E.    New Jersey law, state guidance and district policy require continuing to override Mr. Heaps's objections.

The School Board refused to honor Mr. Heaps's clear instructions about his own daughter. JA.186–87. Even once Mr. Heaps's objections became known, the School Board insisted that New Jersey state guidance and official board policy required it to socially transition Jane upon her request without notifying him or seeking his consent. *Id.*; *see* JA.181–82 (introducing copies of that guidance and policy, which are attached as exhibits to the initial complaint).

New Jersey promulgated its "Transgender Student Guidance for School Districts" pursuant to the New Jersey Law Against Discrimination ("NJLAD"). JA.83–89; *see generally* N.J. Stat. Ann. § 10:5-12. New Jersey's guidance disclaims efforts to seek parental consent to or notice of a social transition. According to the State, "parental consent is not required" to socially transition a student. JA.84. And New Jersey advises that "[t]here is no affirmative duty for any school district personnel to notify a student's parent or guardian of the student's gender identity or expression," including a decision by a school to socially transition a student. JA.85.

Not only does New Jersey swear off parental notice and consent, its guidance instructs school districts to disregard parents' wishes about their own children. Even when "[a] parent or guardian may object to the minor student's name change request … [s]taff should continue to refer to the student in accordance with the student's chosen name and pronoun at school." *Id.*

New Jersey's guidance cuts parents out of the entire process. Staff "should have an open, but confidential discussion with the student to ascertain the student's preference on matters such as chosen name, chosen pronoun to use, and parental communications." *Id.* Parents aren't included in that "confidential discussion."

In all relevant respects, the School Board adopted New Jersey's guidance as official district policy. *See* JA.78–81. Just like the state

guidance, the School Board's policy states that "parental consent is not required." JA.78. It also instructs employees they have "no affirmative duty … to notify a student's parent of the student's gender identity or expression." *Id.* It requires employees to socially transition a student even "[i]n the event a parent objects." *Id.* And it mandates a "confidential discussion" with students about whether to inform their parents of a social transition. JA.79. But like New Jersey's guidance, the School Board's policy doesn't include parents in that discussion. *Id.*

Based on NJLAD, state guidance, and district policy, the School Board and its employees told Mr. Heaps they would continue to socially transition Jane, notwithstanding his express refusal of consent. JA.186–87. In fact, even "during home instruction," the School Board's employees would continue to socially transition Jane without parental consent, if she requested it. JA.187.

Despite the School Board's disregard for Mr. Heaps's wishes, he was "unable to afford private school for Jane" and felt he had no choice but to leave her enrolled at Delaware Valley. JA.267. The School Board continued to allow Jane to participate in its online, home-instruction program to complete her assignments so long as Mr. Heaps submitted periodic notes from her primary care provider, which he did. *See* JA.115, 245, 265–66.

## II.   Procedural History

### A.   Mr. Heaps files this lawsuit to protect his fundamental rights as a parent.

Because the School Board insisted its employees would continue socially transitioning Jane—even during at-home instruction—and because Mr. Heaps had no other options, he filed this lawsuit in January 2024. JA.58. Mr. Heaps claimed that NJLAD, the state guidance, the School Board's policy, and their application to him violated his fundamental right to direct his daughter's upbringing, education, and healthcare. JA.72–74. And he sought a temporary restraining order preventing future social transitions of his daughter. *See* JA.155–57. The district court denied Mr. Heaps's motion for a temporary restraining order. JA.151.

Mr. Heaps then amended his complaint. JA.177–205. The amended complaint also claimed that Defendants had violated and were continuing to violate his fundamental rights as a parent.[3] JA.193–95. Afterwards, the parties conducted discovery related to Mr. Heaps's preliminary-injunction motion. *See* JA.8–10.

While the case proceeded in the district court, Mr. Heaps kept following the advice of his daughter's healthcare providers and educating her in the home-instruction program. JA.187, 214. Yet a short time

---

[3] He brought four other claims, too. JA.189–93, 196–205. While those claims remain live in the district court, Mr. Heaps does not pursue them in this preliminary-injunction appeal.

after he filed this lawsuit, the School Board threatened to deem Jane truant unless she completed her assignments "on school premises after school on a 1:1 basis with a staff member." JA.117. And during those lessons, the School Board told Mr. Heaps that staff would "continue socially transitioning Jane" if she requested it—despite Mr. Heaps's express objection. *Id.* The School Board's counsel even said it would "take action regarding [Jane's] attendance" if she did not appear for those one-on-one lessons. JA.103.

Two days after counsel's threat, employees from New Jersey's Department of Children and Families, Division of Child Protection, showed up on Mr. Heaps's doorstep and asked questions about Jane. JA.118; *see* JA.109. After talking with Mr. Heaps, they told him they were satisfied with his handling of the situation. JA.118.

A few months later, the School Board made new threats against Mr. Heaps and Jane. On the eve of final exams, Superintendent McKinney wrote Mr. Heaps to inform him the School Board intended to make Jane repeat her freshman year. JA.248. The School Board did not intend to permit Jane to sit for her finals. JA.244–46.

Mr. Heaps filed a second motion for a temporary restraining order to require the School Board to let Jane take finals. SealedApp.1. Though the district court refused to enter that temporary restraining order, JA.234, in the end, the parties negotiated an arrangement that allowed Jane to take "her final exams without incident," JA.271.

**B.    The district court denies the preliminary-injunction motion.**

In November 2024, the district court denied Mr. Heaps's motion for a preliminary injunction. JA.3.

As a threshold matter, the district court rejected Defendants' arguments against Mr. Heaps's standing. They had argued that, because he had already discovered Delaware Valley's secret transition of Jane, he lacked standing to seek prospective relief. JA.16–17. But the district court noted that Mr. Heaps intended to return Jane to Delaware Valley. JA.18. And he "established that upon Jane's return to school," School Board employees "will continue to comply with the Policy in the same way they did previously." *Id.* Those facts sufficed to demonstrate Mr. Heaps's standing. JA.19.

Based on similar reasoning, the district court rejected Defendants' mootness arguments. At the time of the preliminary-injunction decision, Jane no longer wished to socially transition. JA.20. But the School Board's "Policy remains in effect and Defendants' position is that the school will continue to comply with the Policy, regardless of whether Jane's preferences align or conflict with Plaintiff's preferences." JA.21. Because Mr. Heaps "intend[ed] for Jane to return to the same school, where the school will continue to refer to Jane by her preferred name and pronouns in accordance with the Policy," his claim for relief was not moot. JA.22.

Despite rejecting those justiciability arguments, the district court concluded that Mr. Heaps was not likely to succeed on the merits of his parental-rights claim. First, the district court inconsistently toggled between describing Mr. Heaps's asserted fundamental right as both too broad and too narrow. In one passage, for example, it criticized Mr. Heaps's asserted right as "unqualified" and "absolute." JA.25 & n.10. But then elsewhere the court described that right in narrow terms to conclude there is a "lack of legal authority recognizing any such right." JA.36. This inconsistent treatment of Mr. Heaps's asserted right arose in part from the district court's view that parents' fundamental rights apply differently "in a school setting" than elsewhere. JA.26.

Second, the district court relied extensively on this Court's decision in *Anspach ex rel. Anspach v. City of Philadelphia, Department of Public Health*, 503 F.3d 256 (3d Cir. 2007). *See* JA.27–32. It focused on *Anspach*'s discussion of "manipulative, coercive, or restraining conduct." JA.29 (quoting 503 F.3d at 266). But it didn't address *Anspach*'s discussion of how the school setting heightens the risk that the government might infringe parental rights. *See* 503 F.3d at 265–66.

Third and finally, the district court concluded that Mr. Heaps's right to control Jane's healthcare was not implicated. JA.33–34. It focused on the fact that Jane hadn't been formally diagnosed with gender dysphoria. *Id.* But it cited no decision by this Court limiting parents' healthcare decisionmaking to matters of a formal diagnosis.

17

Because the district court concluded that Defendants had not infringed Mr. Heaps's fundamental rights, it applied rational-basis review, which it ruled Defendants could satisfy. JA.35–36. Yet it went on to say that it thought secretly transitioning Jane would satisfy strict scrutiny. *Id.*

As a result, the district court denied Mr. Heaps's preliminary-injunction motion. JA.40. And he timely appealed. JA.1.

## STANDARD OF REVIEW

To obtain a preliminary injunction, a party must show that (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm without that relief, (3) the balance of equities tips in his favor, and (4) the injunction is in the public interest. *Mahmoud v. Taylor*, No. 24-297, 2025 WL 1773627, at *13 (U.S. June 27, 2025). And when reviewing a preliminary-injunction decision, this Court "employ[s] a tripartite standard of review: findings of fact are reviewed for clear error, legal conclusions are reviewed de novo, and the decision to grant or deny an injunction is reviewed for abuse of discretion." *Del. Strong Fams. v. Att'y Gen. of Del.*, 793 F.3d 304, 308 (3d Cir. 2015) (citation modified). "However, because an abuse of discretion exists where the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact," this Court applies "plenary review to the District Court's legal conclusions."

18

*AmeriSteel Corp. v. Int'l Bhd. of Teamsters*, 267 F.3d 264, 267 (3d Cir. 2001) (citation modified).

## SUMMARY OF ARGUMENT

Based on a series of legal errors, the district court denied Mr. Heaps's preliminary-injunction motion. This Court should reverse.

Mr. Heaps is likely to succeed on the merits. Over a century ago, the Supreme Court made clear that the Fourteenth Amendment protects parents' fundamental right to direct the upbringing, education, and healthcare of their children. That right applies both inside and outside the public-school setting. And that makes sense. Parents know their kids better—and love them more—than anyone else. So they're best positioned to make important decisions about their kids' lives.

By enforcing NJLAD, adopting and implementing state guidance and district policy that empowers government actors to socially transition children in secret, Defendants have infringed Mr. Heaps's fundamental rights—and have promised to keep infringing them. When socially transitioning Mr. Heaps's daughter, no one notified him, no one sought his consent, all overrode his directions to stop, and many school employees actively concealed the transition.

Based on that, the district court should have ruled that Mr. Heaps is likely to succeed. First, it incorrectly thought this Court's decision in *Anspach* required it to reject Mr. Heaps's claims. But *Anspach* arose in

a materially different factual context. And Mr. Heaps is likely to satisfy *Anspach*'s test regardless. Second, the district court thought it defeated Mr. Heaps's claim that his daughter requested the secret transition. But the Supreme Court has made clear that a child's objections don't empower the government to override her parents' decisions. Finally, the district court was wrong to limit Mr. Heaps's rights because his daughter had no formal diagnosis of gender dysphoria.

Because Defendants' law, guidance, policy, and conduct infringe Mr. Heaps's fundamental rights, they trigger strict scrutiny, which they cannot meet. And the other injunction factors favor Mr. Heaps. Defendants' infringement of his constitutional rights has already stolen two years of his daughter's high-school career. Without a preliminary injunction, that irreparable harm will continue while this case proceeds in the district court.

## ARGUMENT

### I.    Mr. Heaps is likely to succeed on the merits of his claim that Defendants violated his fundamental rights.

The Fourteenth Amendment prohibits state action that "abridge[s] the privileges or immunities of citizens of the United States" or "deprive[s] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. For over a century, the Supreme Court has repeatedly recognized that the Amendment "guarantees more than fair process" by "also includ[ing] a substantive component that

provides heightened protection against government interference with certain fundamental rights and liberty interests." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality op.) (citation modified); *see, e.g.*, *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923) (holding Fourteenth Amendment guarantees right "generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men"). The government may not infringe those "fundamental liberty interests *at all*, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) (citation modified).

The Supreme Court has rooted its substantive-due-process fundamental-rights jurisprudence in the Due Process Clause. *See Dep't of State v. Muñoz*, 602 U.S. 899, 909–10 (2024). That analysis proceeds in three steps.

It begins with "a 'careful description of the asserted fundamental liberty interest'" to determine whether it is "deeply rooted in this Nation's history and tradition." *Muñoz*, 602 U.S. at 910 (quoting *Glucksberg*, 521 U.S. at 720–21). If the asserted right, carefully described, is deeply rooted, then it is fundamental. Next, a court must ask whether the challenged government action "infringe[s]" that fundamental right. *Reno v. Flores*, 507 U.S. 292, 302 (1993); *see Foote v. Ludlow Sch. Comm.*, 128 F.4th 336, 349 (1st Cir. 2025) (per curiam) (determining plaintiffs had "adequately pled rights" and then asking

whether government action "actually restricted those fundamental rights"). If so, strict scrutiny applies: "the Government can act only by narrowly tailored means that serve a compelling state interest." *Muñoz*, 602 U.S. at 910.

Mr. Heaps is likely to succeed at each of the three steps of this analysis. (1) The Supreme Court has already determined that parents have a right, "deeply rooted" in our history and tradition, to direct their children's upbringing, education, and healthcare. And contrary to the district court's view, the "school setting" does not strip Mr. Heaps of that right. JA.25–26. Thus, the question is (2) whether secretly treating his daughter as a boy infringes or restricts that fundamental right. Because it does, (3) strict scrutiny applies. And Mr. Heaps is likely to succeed in showing that Defendants can't satisfy that standard.

## A.    Mr. Heaps has a fundamental right to direct his daughter's upbringing, education, and healthcare.

"The right of parents to raise their children without undue state interference is well established." *Gruenke v. Seip*, 225 F.3d 290, 303 (3d Cir. 2000). Longstanding Supreme Court precedent supports that conclusion. And another court of appeals recently agreed when it considered a similar Fourteenth Amendment claim. There, the First Circuit held that the claim "fell within the broader, well-established parental right to direct the upbringing of one's child." *Foote*, 128 F.4th at 348. The district court here was wrong to conclude that the "school

setting" undermined Mr. Heaps's fundamental rights. JA.25–26; *cf.*
*Mahmoud*, 2025 WL 1773627, at \*13 (parents' "First Amendment
rights" are "not shed at the schoolhouse gate" (citation modified)).

> **1.    Supreme Court precedent establishes a broad
> fundamental parental right that protects Mr.
> Heaps.**

Parents' fundamental right to direct their children's upbringing
"is perhaps the oldest of the fundamental liberty interests recognized
by" the Supreme Court. *Troxel*, 530 U.S. at 65 (plurality op.). Over a
century ago, it said that, "[w]ithout [a] doubt," the Due Process Clause
protected that right. *Meyer*, 262 U.S. at 399. Thus, the Court would say,
around 50 years later, that the "primary role of the parents in the
upbringing of their children is now established beyond debate as an
enduring American tradition." *Wisconsin v. Yoder*, 406 U.S. 205, 232
(1972). When it comes to "important decisions," the Court has long
protected parents' "guiding role." *H.L. v. Matheson*, 450 U.S. 398, 410
(1981) (citation modified).

That includes decisions about their children's upbringing, educa-
tion, and healthcare. Parents have a fundamental right to "make
decisions concerning the care, custody, and control of their children."
*Troxel*, 530 U.S. at 66 (plurality op.). They have the right to "bring up
children," including "the right of control" over those children. *Meyer*,
262 U.S. at 399–400. They have the right "to direct the upbringing and

education of children under their control." *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534–35 (1925); *accord Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 256 (2022). And they have the right to make judgments about their children's "need for medical care or treatment." *Parham v. J.R.*, 442 U.S. 584, 603 (1979).

Giving parents the right to make decisions for their children makes sense. For "pages of human experience … teach that parents generally do act in the child's best interests." *Id.* at 602–03. So our society presumes parents make decisions on behalf of their children— even over a child's objection. *Id.* at 603–04. And "[n]either state officials nor federal courts are equipped to review such parental decisions." *Id.* at 604. In our society, the "child is not the mere creature of the state." *Pierce*, 268 U.S. at 535.

In short, the Fourteenth Amendment guarantees parents' fundamental right to direct their children's upbringing, education, and healthcare. The Supreme Court's "cases define the parental right broadly as a fundamental right to direct the care, custody, and upbringing of one's children." *Foote*, 128 F.4th at 348. And they have rooted that fundamental right in substantive due process.[4] *See Dobbs*,

---

[4] Not without criticism. Some have argued instead "that the Privileges or Immunities Clause is the provision of the Fourteenth Amendment that guarantees substantive rights." *Dobbs*, 597 U.S. at 240 n.22. A "history and tradition" test would apply under both that approach and substantive due process. *Id.*; *see* William Baude, Jud Campbell, Stephen

597 U.S. at 240 n.22. Even as the Supreme Court has overruled other substantive-due-process decisions, it has not retreated from its parental-rights precedent. *See id.* at 256 (reaffirming parental rights while overruling decisions creating a right to abortion); *cf. Mahmoud*, 2025 WL 1773627, at *27–29 (Thomas, J., concurring).

Defendants' actions, along with the law, guidance, and policy that required them, "implicate a fundamental right." *Glucksberg*, 521 U.S. at 722. They require school staff to refer to Mr. Heaps's daughter with a masculine name and male pronouns, a controversial psychotherapeutic intervention known as "social transition." JA.182. Worse, Defendants require school staff to do that without notifying Mr. Heaps or obtaining his consent—even concealing it from him. JA.184–85. And once he objected to the School Board's social transition of his daughter, its employees told him that NJLAD, state guidance, and district policy require them to disregard his instructions about his child. JA.186–87.

The district court resisted the conclusion that those facts implicate the broad parental right reaffirmed time and again over the last century. According to the decision below, Mr. Heaps asserts "a substantive due process right to be notified and provide consent before the school district may refer to Jane by her own preferred name and

---

E. Sachs, *General Law and the Fourteenth Amendment*, 76 Stanford L. Rev. 1185, 1252 (2024) (discussing relationship of substantive due process with the Privileges or Immunities Clause).

pronouns." JA.36. Based on a supposed "lack of legal authority recognizing any such right," it concluded Mr. Heaps was unlikely to succeed on the merits of his parental-rights claim. *Id.* But the right is not so narrow.

That conclusion wrongly limits decisions like *Meyer* and *Pierce*. In its "parental rights cases," the Supreme Court has "never described an asserted right by reference to the specific conduct at issue." *Foote*, 128 F.4th at 348. As the First Circuit explained in *Foote*, *Meyer* "did not define the parents' asserted liberty interest as the right to allow their child to learn German before the eighth grade." *Id.* "Nor did *Pierce* describe the parental interest at stake as the right to send one's child to religious school." *Id.* In those decisions and elsewhere, "the Court instead considered whether the conduct at issue fell within the broader, well-established parental right to direct the upbringing of one's child." *Id.*

Defendants treated Mr. Heaps's daughter as a boy without parental notice or consent, while concealing it from him, and ultimately over his objection. JA.184–87. That implicates his right to direct his daughter's upbringing, education, and healthcare. The district court's approach would require him to point to a factually identical parental-rights case. JA.36. But that improperly "borrow[s] a standard from the qualified immunity context." *Regino v. Staley*, 133 F.4th 951, 961 (9th Cir. 2025). "[A] plaintiff asserting a substantive due process claim" need

not "show that existing precedent clearly establishes the asserted
fundamental right." *Id.* at 962.

By "plac[ing] an improper burden" on Mr. Heaps, the district court
here concluded that he had not identified any applicable fundamental
right. *Id.* So "this portion of the district court's order cannot stand." *Id.*

### 2. The "school setting" does not change that analysis here.

Because Mr. Heaps's parental-rights claim arose in the "school
setting," JA.25–26, the district court concluded it fell outside the
"broader, well-established parental right," *Foote*, 128 F.4th at 348. But
under history, tradition, and constitutional precedent, the decision to
send a child to public school does not strip parents like Mr. Heaps of the
fundamental right and duty to direct a child's upbringing, education,
and healthcare.

### i. Deeply rooted history and tradition protect parents' rights including when their children attend school.

At common law, parents had "the responsibility and the authority
to … make important decisions on their behalf." Eric A. DeGroff,
*Parental Rights & Public School Curricula: Revisiting* Mozert *after 20
Years*, 38 J.L. & Educ. 83, 108 (2009). This common-law parental right
eventually included a right to make educational decisions at public
school. *Id.* at 110–13 & n.178.

The common law vested parents with primary authority over their
children's education. Blackstone described parents' "duty" to give their
children an "education suitable to their station in life." 1 William
Blackstone, *Commentaries on the Laws of England* *450,
http://bit.ly/3TNe01g. And "to perform [that] duty," a parent must have
a correlative right to make educational decisions for that child. *Id.* at
*452. A parent might "delegate part of his parental authority, during
his life, to the tutor or schoolmaster, of his child; who is then *in loco
parentis*, and has such a portion of the power of the parent committed to
his charge." *Id.* at *453. A schoolmaster thus had only as much power
over a child as a parent might delegate. *Id.*

Early American sources echoed Blackstone's understanding.
Joseph K. Griffith II, *Is the Right of Parents to Direct Their Children's
Education "Deeply Rooted" in Our "History and Tradition"?* 28 Tex. Rev.
L. & Pol. 795, 799–800 (2024). For example, Justice Story recognized
that the "law ordinarily entrust[s]" parents "with the care of [their]
children," because parents "will best execute the trust reposed in
[them]." 2 Joseph Story, *Commentaries on Equity Jurisprudence* § 1343,
at 576 (2d. ed. 1839), http://bit.ly/4etjpnJ.

Chancellor James Kent included a discussion of state-funded
education in the later editions of his *Commentaries on American Law*.
That discussion appeared in his chapter on parental rights and duties. 2
James Kent, *Commentaries on American Law* *195–203 (5th ed. 1844),

http://bit.ly/45PnVL8. He rightly viewed the public school as helping parents exercise their right—and fulfill their duty—to educate their children. *Id.* at *201–02. Unlike the district court, *see* JA.26, Chancellor Kent did not treat parental rights as ending when a child entered a public schoolhouse.

The view that parents maintained the primary role in decisions about their children, even while those children attended public school, persisted through the Reconstruction Era and into the early 20th Century. Under the common law, state courts "protect[ed] the right of parents to opt-out their children from studying certain curricula." Griffith, *supra*, at 806. Those courts honored parental objections to diverse subjects, from geography to dancing.[5]

This common-law history culminated in the Supreme Court's early parental-rights decisions, all of which protected parents' rights "in a school setting." JA.25–26. *Meyer* rested partially on parents' right to engage a teacher to instruct their children in a foreign language—that is, this parental right existed in the school context. 262 U.S. at 400.

---

[5] *E.g.*, *Hardwick v. Bd. of Sch. Trs.*, 205 P. 49, 52, 54 (Cal. Dist. Ct. App. 1921) (dancing); *State v. Ferguson*, 144 N.W. 1039, 1040, 1044 (Neb. 1914) (domestic science); *Sch. Bd. Dist. No. 18 v. Thompson*, 103 P. 578, 582 (Okla. 1909) (singing); *State v. Sch. Dist. No. 1*, 48 N.W. 393, 394–95 (Neb. 1891) (grammar); *Trs. of Schs. v. People ex rel. Van Allen*, 87 Ill. 303, 308–09 (1877) (grammar); *Rulison v. Post*, 79 Ill. 567, 571 (1875) (bookkeeping); *Morrow v. Wood*, 35 Wis. 59, 65–66 (1874) (geography).

Similarly, in *Pierce*, parents' fundamental rights conflicted with a mandatory public-school requirement. 268 U.S. at 535. And in *Farrington v. Tokushige*, a scheme for regulating private schools violated parents' rights. 273 U.S. 284, 298 (1927).

Not long after, the Court made clear that parents don't forfeit the rights protected by those decisions in exchange for a *public* education. *See generally W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943). Although most often remembered for protecting public-school *students'* free-speech rights, *Barnette* also protected *parents'* rights. The plaintiffs were parents of "children attending the public schools of West Virginia." *Barnette v. W. Va. State Bd. of Educ.*, 47 F. Supp. 251, 252 (S.D. W. Va. 1942). They brought the lawsuit on "behalf of themselves and their children" to defend their "religious liberty." *Id.* So when *Barnette* protected the "right to differ as to things that touch the heart of the existing order," it not only protected public-school students from compelled speech. 319 U.S. at 642. It protected their parents, too.

Even Congress has acknowledged that public schools ought to affirm parental primacy in children's education. When it established the U.S. Department of Education, it found that "parents have the primary responsibility for the education of their children." 20 U.S.C. § 3401(3). "States, localities, and private institutions," by contrast, "have the primary responsibility for supporting that parental role." *Id.*

30

That history, tradition, and precedent explain why this Court and other courts of appeals have held that actions by public schools can implicate parents' fundamental right to direct their children's upbringing, education, and healthcare. In *Gruenke*, for example, this Court held that school officials violated parental rights by withholding information about a student's suspected pregnancy, indirectly pushing her to take a pregnancy test, and spreading gossip about her suspected pregnancy. 225 F.3d at 306–07. And *Gruenke* relied on an Eleventh Circuit decision holding that school officials who coerced a minor to have an abortion and not discuss it with her parents infringed parental rights. *Arnold v. Bd. of Educ. of Escambia Cnty.*, 880 F.2d 205, 313 (11th Cir. 1989).

ii.    *Parents' fundamental rights limit public schools' power to "impose reasonable regulations" on the school day.*

History, tradition, and precedent reveal an unbroken lineage—from Blackstone, through the Founding and the Reconstruction eras, to today—protecting parental rights in public schools. To that authority, the district court responded "that schools may impose reasonable regulations." JA.26. In support, it discussed the idea that the government may "reasonably … regulate all schools" so "that nothing be taught which is manifestly inimical to the public welfare." *Id.* (quoting *Pierce*, 268 U.S. at 534–35). Or that the government may "impose reasonable regulations for the control and duration of basic education." *Id.* (quoting *Yoder*, 406 U.S. at 213).

Far from challenging regulations like those, Mr. Heaps challenges the government's ability to covertly implement—even over his express objection—a controversial psychotherapeutic intervention affecting his daughter's core identity and sense of self. JA.182–87. Defendants' law, guidance, policy, and actions implicate his "responsibility to inculcate 'moral standards'" and "'elements of good citizenship.'" *Gruenke*, 225 F.3d at 307 (quoting *Yoder*, 406 U.S. at 233). And given the potential life-long healthcare ramifications of social transition, *see* JA.182–83, Defendants have also interfered with Mr. Heaps's right "to seek and follow medical advice" about his children, *Parham*, 442 U.S. at 602.

By hiding information from Mr. Heaps about his daughter and then refusing to follow his instructions, JA.182–87, Defendants exceeded the historical scope of their authority. Since Blackstone's day, our society has understood that schools exercise delegated authority over children. 1 Blackstone, *supra*, at *453. Thus, the government's authority over schoolchildren remains "only … secondary" to parental authority. *Gruenke*, 225 F.3d at 307. Parents "have primary rights in the upbringing of children," and public schools "must respect these rights." *Id.*; *see Prince v. Massachusetts*, 321 U.S. 158, 166 (1944) (holding that "the custody, care and nurture of the child reside first in the parents"). And when conflicts arise between public schools and parents, "[p]ublic schools must not forget that '*in loco parentis*' does not mean 'displace parents.'" *Gruenke*, 225 F.3d at 307.

Hiding information from Mr. Heaps and refusing to follow his instructions about his own daughter is inconsistent with "the supremacy of the parents' interest in matters of this nature." *Id.* at 306. And "the significance of the subject at issue" further heightens that interest here. *J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, 650 F.3d 915, 934 (3d Cir. 2011) (en banc). Guiding a young girl's developing sense of her identity as a woman "strike[s] at the heart of parental decision-making authority on matters of the greatest importance." *Id.* (quoting *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 184 (3d Cir. 2005)).

New Jersey law, its guidance, and School Board policy, and their application to Mr. Heaps, touch on the sort of "important decisions" reserved for parents to make. *Matheson*, 450 U.S. at 410. Because of that, Defendants' conduct implicates his fundamental right to direct his daughter's upbringing, education, and healthcare.

## B.    Defendants infringed Mr. Heaps's fundamental rights.

The next question is whether Defendants "actually restricted those fundamental rights" just discussed. *Foote*, 128 F.4th at 349. According to history, tradition, and precedent, "[s]chool-sponsored counseling and psychological testing that pry into private family activities can overstep the boundaries of school authority and impermissibly usurp the fundamental rights of parents to bring up their

children, as they are guaranteed by the Constitution." *Gruenke*, 225
F.3d at 307.

Acting according to NJLAD, state guidance, and official School
Board policy, school staff infringed Mr. Heaps's "right to make decisions
concerning" his daughter about a "matter[] of the greatest import-
ance"—her very identity as a young woman. *Blue Mountain*, 650 F.3d at
934 (quoting *Ridgewood*, 430 F.3d at 184). Because Defendants' law,
guidance, and policy require them to continue violating Mr. Heaps's
fundamental right to direct his daughter's upbringing, education, and
healthcare, the district court should not have denied his preliminary-
injunction motion.

### 1. Defendants' secret social transition infringed Mr. Heaps fundamental parental rights—and threatens to keep doing so.

Applying NJLAD, state guidance, and School Board policy, school
staff treated Mr. Heaps's daughter as a boy behind his back, subjecting
her to a "social transition." This Court has already expressed
"considerable doubt about" schools' authority "to withhold information
of this nature from the parents" of a minor student. *Gruenke*, 225 F.3d
at 307 (referring to information about a student's pregnancy). That
makes sense. Parents can't "make decisions concerning the care,
custody, and control of their children"—certainly not *good* decisions—
without accurate information. *Troxel*, 530 U.S. at 66 (plurality op.).

34

By socially transitioning Jane without (i) parental notice or
(ii) consent, and even disregarding his specific instructions to cease,
Defendants infringed Mr. Heaps's fundamental rights in two independent ways. And (iii) by actively concealing the social transition from
him, they committed a third infringement.

> i.  *Defendants socially transitioned Mr. Heaps's, daughter,*
> *Jane without notice and insist they would do so again.*

Defendants socially transitioned Jane without notifying Mr.
Heaps. And if she requests it again, they will continue to do so absent
court action. Treating a child as the opposite sex without notifying her
parents deprives them "of their right to make decisions concerning their
child" on a matter "of the greatest importance." *Blue Mountain*, 650
F.3d at 934 (citation modified). "Neither state officials nor federal courts
are equipped to [make] such parental decisions." *Parham*, 442 U.S. at
604. They are reserved to parents.

Whether a child is raised and treated consistent with her biological sex is the sort of important decision the Constitution presumptively
reserves for parents. That decision is critical to a child's care and
upbringing. *See* JA.182–84. It implicates parents' "duty to prepare the
child for 'additional obligations'" by directing her education, including
through "the inculcation of moral standards." *Yoder*, 406 U.S. at 233.
And because "social transitioning leads to persistence of gender
dysphoria," it carries "the likely consequence of subsequent (lifelong)

biomedical treatments." JA.140. That likely consequence certainly implicates a child's healthcare.

Because of the "natural bonds of affection" between parents and children, the Constitution presumes that parents get to "mak[e] life's difficult decisions" for their children, including those related to education and healthcare. *Parham*, 442 U.S. at 602. And not notifying parents about a social transition necessarily deprives them of the right to make the important decision about whether a transition is in their child's best interests. The lack of notice itself "transfer[s] the power to make that decision from the parents to some agency or officer of the state"—here, the School District and its employees. *Id.* at 603.

New Jersey law, its guidance, and the School Board's official policy both expressly deny parents' right to notice of the important decision to treat a child as the opposite sex. New Jersey instructs its school districts that they have "no affirmative duty … to notify a student's parent" when they socially transition a student or take any other action related to "the student's gender identity or expression." JA.85. And the School Board repeats that instruction to its own staff members in its official policy. JA.78. Both the State and the School Board openly refuse to notify parents when school district employees socially transition minor students.

Other aspects of the law, guidance, and policy make clear that New Jersey and the School Board have "transfer[red] the power to make

that decision"—whether to socially transition a child—"from the parents" to school district employees. *Parham*, 442 U.S. at 603. They require district staff to have a "*confidential* discussion with the student" regarding her "chosen name, chosen pronoun to use, and parental communications," among other topics. JA.85 (emphasis added); *accord* JA.79.

If district staff have a confidential discussion with a student about parental communications, then parents certainly aren't the ones making any decisions. District staff are. Indeed, New Jersey's guidance makes that clear. *See* JA.88 (remarking that it is "a district" who "changes a student's name or gender identity"). Yet the Constitution doesn't allow Defendants to take that decision from parents. *Parham*, 442 U.S. at 603–04.

Following New Jersey's law, its guidance, and district policy, the School Board transitioned Mr. Heaps's daughter without notifying him. *See* JA.184–87, 193–94. Ms. Miranda, a school counselor employed by the School Board, "asked Jane if she would like to change her name and pronouns and be known only as a male at school, to which Jane agreed." JA.184. Then Ms. Miranda emailed "the entire staff" at the high school. *Id.* That email instructed staff that they "were required thereafter to use the alternate male name" for Mr. Heaps's daughter. JA.185. And she instructed them "that Mr. [Heaps] was not to be informed of Jane's social transition." *Id.* To that end, the School Board's employees "use[d]

Jane's given female name" when communicating with Mr. Heaps, all the while referring to her as a boy during the school day. *Id.*

In a declaration filed below, Ms. Miranda confirmed all those facts. *See generally* JA.119. Specifically, she attested that she did not notify Mr. Heaps prior to socially transitioning his daughter. JA.121. And she attributed her decision not to notify him to the School Board's official policy. *Id.* Not only that, in her email instructing staff to socially transition Jane, Ms. Miranda told them Mr. Heaps "was not aware of the social transition." JA.122.

Consistent with NJLAD, state guidance, and School Board policy, everyone who received Ms. Miranda's email and participated in Jane's social transition did so with knowledge that no one had notified her father. And they participated without knowing about Jane's ongoing mental health treatment. *See* JA.185–86.

By socially transitioning Mr. Heaps's daughter, Defendants implicated "very personal decisionmaking about [her] health, nurture, welfare, and upbringing." *John & Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.*, 78 F.4th 622, 646 (4th Cir. 2023) (Niemeyer, J., dissenting). And by depriving Mr. Heaps of notice of the social transition—as a matter of NJLAD, state guidance, and official policy—Defendants deprived him of his fundamental right to make decisions directing his daughter's upbringing, education, and healthcare. JA.182–85.

38

ii.    *Defendants also socially transitioned Jane without Mr. Heaps's consent and would continue doing it.*

Along similar lines, Defendants treated Mr. Heaps's daughter as a boy without his consent. And socially transitioning a minor without her parents' consent is inconsistent with their "authority to decide what is best for the child." *Parham*, 442 U.S. at 604. When the government undertakes an action like social transition "without informed parental consent," it infringes parents' fundamental rights. *Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 927 F.3d 396, 420 (6th Cir. 2019). When a parent doesn't consent to a critical decision about his child's upbringing, education, or healthcare, then by definition he is not directing that aspect of his child's life. "[T]he power to make that decision" has been "transfer[red]" to someone else. *Parham*, 442 U.S. at 603.

New Jersey's guidance and the School Board's policy expressly transfer that authority to school-district employees. Both provide that "parental consent is not required" to socially transition a minor student. JA.78, 84. And when "[a] parent or guardian may object to the minor student's name change request," both the guidance and the policy require district employees to "continue to refer to the student in accordance with the student's chosen name and pronoun at school." JA.85 (guidance); *accord* JA.78 (policy). In such cases, a school board's attorney (not the child's parent) will ultimately decide whether to socially transition the child. JA.78, 85.

Applying that guidance and policy to Mr. Heaps, Defendants took from him "the power to make th[e] decision" whether to treat his daughter as a boy and "transfer[red]" that power to Ms. Miranda. *Parham*, 442 U.S. at 603. By her own admission, Ms. Miranda decided to socially transition Jane without Mr. Heaps's consent. JA.121–22; *accord* JA.184–85, 193. In fact, the School Board told Mr. Heaps that its employees "would continue to socially transition Jane"—even now that they knew of his clear objection. JA.117. Superintendent McKinney himself attested below that School Board policy continues to require him and other employees to socially transition Jane contrary to Mr. Heaps's instructions if she were to request it. JA.229.

Both the state guidance and the district policy empowered Ms. Miranda, Mr. McKinney, and other district employees—instead of Mr. Heaps—"to decide" whether a social transition was "best for [his] child." *Parham*, 442 U.S. at 604. The Constitution doesn't allow Defendants to take that away from him.

   iii. *Defendants actively concealed their social transition of Jane from Mr. Heaps and would conceal it again.*

Finally, Defendants actively concealed from Mr. Heaps their actions to socially transition his daughter. JA.185. That concealment also violates a parent's right to direct his child's upbringing, education, and healthcare. *See Gruenke*, 225 F.3d at 307 (noting this Court's

"considerable doubt about the[] right" of school counselors "to withhold information of this nature from the parents").

Indeed, that concealment resembles the officials in *Arnold* coercing the student not to tell her parents that she got an abortion. 880 F.2d at 313. And it's much worse than the official's conduct in *Gruenke* of not telling parents he suspected their daughter was pregnant, indirectly pushing her to take a pregnancy test, and spreading gossip of her suspected pregnancy. 225 F.3d at 306–07. It is "manipulative" conduct *intended* to deprive parents "of their right to make decisions concerning their child." *Blue Mountain*, 650 F.3d at 934 (citation modified). If that doesn't infringe parents' right to direct their children's care, upbringing, and healthcare, then it's hard to see what would.

Both New Jersey's guidance and the School Board's policy instruct district employees that, under NJLAD, they need not inform parents about a minor student's social transition and that parents' objections to it aren't relevant anyway. JA.78–79, 84–85. Taking that instruction to heart, Ms. Miranda attests that she "did not affirmatively disclose Jane's gender identity or desire to social[ly] transition to" Mr. Heaps. JA.121. And she emailed other district employees to ensure they knew that Mr. Heaps "was not aware of the social transition." JA.122. From then on, school staff always used Jane's given name in communications with Mr. Heaps, which concealed from him their ongoing social transition of his daughter. JA.185.

Months into Defendants' secret social transition of Jane, Mr. Heaps incidentally learned about it "when another parent called Jane by a boy's name in his presence." *Id.* He then met with Ms. Miranda and other district employees to express his objections. JA.185–86. That Mr. Heaps independently discovered the deception doesn't undo the multi-month concealment that preceded it. And Defendants' consistent position—even in correspondence with counsel—has been that New Jersey guidance and School Board policy would require them to secretly transition Jane again in the future if she were to request it, even though they know about Mr. Heaps's objections. *See* JA.78–79, 84–85, 97–98, 122, 126.

Defendants' insistence on cutting parents out of decisions about whether to treat their children as the opposite sex "overstep[s] the boundaries of school authority and impermissibly usurp[s] the fundamental rights of parents to bring up their children." *Gruenke*, 225 F.3d at 307.

> iv.    *Although Mr. Heaps need not prove conscience-shocking conduct, Defendants' conduct shocks the conscience.*

In a narrow category of substantive-due-process cases unlike this case, this Court applies a different test. It asks whether the challenged "government conduct [is] so egregious that it 'shocks the conscience.'" *Nicholas v. Pa. State Univ.*, 227 F.3d 133, 139 (3d Cir. 2000) (Alito, J.) (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)). But

42

that test only applies to "non-legislative or executive acts." *Id.* at 139 n.1. And its application depends on the *governmental function* exercised, not the *identity* of the actor. Thus, "executive acts, such as employment decisions, typically apply to one person or to a limited number of persons, while legislative acts, generally laws and broad executive regulations, apply to large segments of society." *Id.* (quoting *Homar v. Gilbert*, 89 F.3d 1009, 1027 (3d Cir. 1996) (Alito, J., concurring in part and dissenting in part)).

Neither the district court nor any of the parties analyzed Mr. Heaps's claim through the shocks-the-conscience test. For good reason: his challenge, which includes NJLAD, state guidance, and the School Board's policy, "better fits into the legislative bucket." *Foote*, 128 F.4th at 347; *see Regino*, 133 F.4th at 960 n.5 (analyzing a claim like Mr. Heaps's "solely under a fundamental rights theory," not "shocks the conscience"). In another recent challenge to a secret social transition, the Eleventh Circuit applied the shocks-the-conscience test, because the plaintiffs there had "waived their general challenges to the Guide, its adoption, and its broad implementation." *Littlejohn v. Sch. Bd. of Leon Cnty.*, 132 F.4th 1232, 1243 n.8 (11th Cir. 2025). But Mr. Heaps has not similarly waived his challenge to the law, guidance, or district policy in this case. So the Court should follow *Foote* and *Regino* and not apply the shocks-the-conscience standard.

Regardless, Defendants' law, guidance, and policy of intentionally making such decisions without parental notice or consent—not to mention intentionally concealing them from parents—would also satisfy that test. The School Board's secret social transition of Jane would shock the conscience, because it is inconsistent with "an understanding of traditional executive behavior" by school officials. *Lewis*, 523 U.S. at 847 n.8. Schools have traditionally lacked the power to "displace parents" like Mr. Heaps. *Gruenke*, 225 F.3d at 307.

### 2. The district court was wrong to permit secret social transitions.

The district court ruled that Mr. Heaps was unlikely to succeed in proving that Defendants' secret social transition infringes his fundamental right to direct his daughter's upbringing, education, and healthcare. *See* JA.23–34.

That ruling rested on three legal errors that should lead this Court to reverse. First, it failed to account for important distinctions between this case and *Anspach*, 503 F.3d 256. Second, the district court thought that Jane's own participation in the social transition absolved Defendants for infringing Mr. Heaps's fundamental rights. But even decisions that are "not agreeable to a child" remain a parent's responsibility. *Parham*, 442 U.S. at 603. And third, because Jane was not formally diagnosed with gender dysphoria, the district court thought Mr. Heaps had no right to make the decision whether to

44

socially transition her—although she was undergoing therapy for gender confusion. SealedApp.19.

    *i.    This Court's precedent supports Mr. Heaps's claims.*

The district court wrongly equated Mr. Heaps's claim with one this Court rejected in *Anspach*. JA.28–32. That case affirmed dismissal of a parental-rights claim against a city-run public health clinic that "provided [a girl] with emergency contraception without notifying her parents, or encouraging her to consult with them." 503 F.3d at 258. But the facts of that case make it inapplicable here.

As an initial matter, *Dobbs* cast doubt on the continued viability of *Anspach*. Throughout, *Anspach* relied on Supreme Court decisions overruled and undermined by *Dobbs. See id.* at 261 (relying on *Planned Parenthood of Cent. Mo. v. Danforth*, 428 U.S. 52 (1976)); *id.* at 271 (relying on *Danforth*, along with *Roe v. Wade*, 410 U.S. 113 (1973), and *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833 (1992)); *see also Dobbs*, 597 U.S. at 231 (overruling *Roe* and *Casey*); *id.* at 297 (criticizing *Danforth*).

Regardless of whether *Anspach* survives *Dobbs*, this case includes what the plaintiff in *Anspach* lacked: evidence of "manipulative, coercive, or restraining conduct by the State." JA.29 (quoting *Anspach*, 503 F.3d at 266). Ms. Miranda expressly instructed other School Board employees not to tell Mr. Heaps about socially transitioning Jane.

JA.185. And they exclusively used her given name when communicating with Mr. Heaps, which concealed their actions from him. *Id.* Ms. Miranda admits these facts in her declaration—and that School Board policy required them. JA.121–22. Even once Mr. Heaps discovered this and objected to the secret transition, the School Board insisted that it would continue transitioning Jane during home instruction. JA.186–87.

Those acts are "proactive, coercive interference with the parent-child relationship." JA.28; *see* JA.32. "While [Jane] was suffering" with identity distress, school employees "misled" Mr. Heaps. *Kaltenbach v. Hilliard City Schs.*, No. 24-3336, 2025 WL 1147577, at *2 (6th Cir. Mar. 27, 2025) (Thapar, J., concurring). The school treated Jane "as a male" during the school day but "as a girl whenever she was around her [father], hoping to hide from [her] family the new identity that the school had concocted for her." *Id.* Had Mr. Heaps "known about the school's actions," he "could've intervened and sought" additional clinical and professional help for his daughter, *id.*, especially since he was already partnering with a nurse practitioner and therapist, *see* JA.181, 187. As in *Gruenke*, "any discreet measures that [Mr. Heaps] would have taken" to address Jane's mental distress "were no longer feasible." *Gruenke*, 225 F.3d at 306.

Contrary to the district court's conclusion, it makes no difference that "the school advised Plaintiff about Jane's request upon receiving an inquiry from Plaintiff." JA.31. School staff treated Mr. Heaps's

daughter as a boy for months while concealing it from him. JA.184–85.
The deception only ended when he discovered their actions despite their
concealment. JA.121.

Defendants' admission came too late. A child who lies about eating
a forbidden cookie before dinner might admit to doing so once his
mother confronts him with the crumbs hidden under his pillow. But
that doesn't make his earlier deception any less false, nor his act any
less wrong.

Worse, Defendants have since insisted that they would do the
same thing again—secrecy and all—because NJLAD, state guidance,
and School Board policy require it. *See* JA.78–79, 84–85, 97–98, 121,
126.

Concealing such an important decision from Mr. Heaps is "beyond
troubling." *Kaltenbach*, 2025 WL 1147577, at *1 (Thapar, J.,
concurring). It amounts to the sort of "manipulative, coercive, or
restraining conduct by the State" from which the Constitution protects
him. *Anspach*, 503 F.3d at 266.

> ii.   *The government must not second-guess a parental
> decision simply because an adolescent dislikes it.*

The district court reasoned that Defendants could not have
violated Mr. Heaps's fundamental rights as a parent because "Jane
made her own request to socially transition and that her request not be
disclosed to" him. JA.32. But that reasoning misunderstands both the

nature of parents' fundamental rights and the coercion inherent to public schooling. The government cannot constitutionally override parental decisionmaking under the guise of honoring a child's wishes. *Parham*, 442 U.S. at 603. And both the Supreme Court and this Court have recognized the "direct, coercive" nature of the public-school setting. *Mahmoud*, 2025 WL 1773627, at *19; *see Anspach*, 503 F.3d at 265–66, 270–71.

Regardless of whether "Defendants acted only at Jane's affirmative request," that fact doesn't neutralize their infringement of Mr. Heaps's parental rights. JA.30. A school couldn't give a child medicine without parental consent just because the child wants it. And the same principle holds true here.

The government lacks a general power to override parental decisionmaking authority upon a child's request. "Simply because the decision of a parent is not agreeable to a child … does not automatically transfer the power to make that decision from the parents to some agency or officer of the state." *Parham*, 442 U.S. at 603. Yet Defendants have established state guidance and district policy—and applied them to Mr. Heaps—that prioritize a "Student-Centered Approach" at the expense of parental decisionmaking. *See* JA.84–85 (making clear that New Jersey expects its schools to honor student requests even over parental objections); *see also* JA.78–79 (adopting that state guidance as official School Board policy); JA.182–87 (describing how Defendants

48

applied law, guidance, and policy to infringe Mr. Heaps's rights). Defendants' law, guidance, policy, and conduct transferred decisionmaking power from Mr. Heaps to school staff.

Taking from a parent the decision whether to treat a minor as the opposite sex is just as inconsistent with common sense as it is with the Constitution. "Most children, even in adolescence, simply are not able to make sound judgments concerning many decisions, including their need for medical care or treatment." *Parham*, 442 U.S. at 603. "[A]s any parent knows," adolescents regularly make "impetuous and ill-considered actions and decisions." *Roper v. Simmons*, 543 U.S. 551, 569 (2005) (citation modified). And because the "natural bonds of affection lead parents to act in the best interests of their children," our society's "concept of the family rests on a presumption that parents," not government actors, are best suited to "mak[e] life's difficult decisions" for their children. *Parham*, 442 U.S. at 602.

The facts of this case bear out the wisdom of that presumption. Ms. Miranda began a school-wide social transition of Jane without asking basic questions about her mental-health history or current treatment. JA.184. Even the World Professional Association for Transgender Health, a pro-transition advocacy group, insists that "a comprehensive clinical approach" is necessary when considering transition. JA.182. As Jane's father, Mr. Heaps could find her the healthcare professionals necessary to comprehensively address her

struggles. JA.182–83. Ms. Miranda could not. *Id.* In fact, by intentionally cutting parents out, New Jersey's guidance and the School District's policy made such a comprehensive approach impossible. *See* JA.181–82.

The district court's myopic focus on Jane's consent also misses the coercion inherent to the public-school context. Like all other States, New Jersey compels minors to attend school. *See* N.J. Stat. Ann. § 18A:38-25 (requiring attendance); *id.* § 18A:38-31 (providing for the imposition of fines on parents); *id.* § 18A:38-29 (providing for the arrest of truant children). And "[d]ue to financial and other constraints, … many parents have no choice but to send their children to a public school." *Mahmoud*, 2025 WL 1773627, at *14 (citation modified). Certainly, Mr. Heaps has attested that he has no choice but to enroll Jane in public school. JA.267.

As a result, the school setting "implicates direct, coercive interactions between the State and its young residents." *Mahmoud*, 2025 WL 1773627, at *19. Thus, *Anspach* distinguished cases that, like this one, involve public-school officials. There, the minor took herself to a "public health clinic." 503 F.3d at 266. Unlike a public school, the clinic "had no authority over" the girl. *Id. Anspach* relied on the clinic's lack of "custodial" authority over her as the key to distinguishing *Arnold* and *Gruenke*, which both arose in the public-school context. *Id.* In those cases, "the minors there were required by law to attend school

where they were subject to the authority of the defendants," all of whom were "public school officials." *Id.* at 265; *see id.* at 266 (noting that the defendant in *Gruenke* "took action in tandem with his authority as the minor's swim coach"). By contrast, the girl in *Anspach* "visited a public health clinic, a facility that, unlike a public school, does not require attendance or exercise authority over its visitors." *Id.* at 271.

*Anspach*'s distinction between public schools and other government institutions reflects schools' unique relationship to—and partnership with—parents. The Supreme Court has often "recognized the potentially coercive nature" of the school setting. *Mahmoud*, 2025 WL 1773627, at *17. Schools "stand[] in the place of" parents when they "cannot protect, guide, and discipline" their children. *Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 594 U.S. 180, 189 (2021). Thus, "[f]amilies entrust public schools with the education of their children," who "are impressionable" and whose "attendance is involuntary." *Edwards v. Aguillard*, 482 U.S. 578, 584 (1987).

Because Mr. Heaps's complaint relates entirely to his daughter's treatment at public school, this Court should again "recognize[] the unique ability of school officials to exert control and authority over minor students." *Anspach*, 503 F.3d at 270. Defendants "exploit[ed] their authority to persuade or coerce" Jane into "a course of action with regard to certain health decisions," namely, those regarding social transition. *Id.*

As required by NJLAD, state guidance, and School Board policy, Ms. Miranda "facilitate[d] Jane's social transition" and then "conceal[ed]" it from Mr. Heaps. JA.184–85. Then the School Board threatened to declare Jane truant if Mr. Heaps did not ensure she attended private lessons with school staff on campus or a public library. JA.117. And the School Board made clear that school staff would continue to socially transition Jane during those lessons immediately upon a request from her—despite Mr. Heaps's repeated objections. *Id.*

Like the district court, school employees focused only on whether Mr. Heaps's daughter agreed with his decisions about her upbringing. *E.g.*, JA.121–22. Far from excusing Defendants' law, guidance, policy, and conduct, that singular focus highlights how it infringes Mr. Heaps's fundamental rights.

> iii.    *Parents' fundamental right to make healthcare decisions doesn't turn on a particular diagnosis.*

Finally, the district court concluded that Defendants could not have infringed Mr. Heaps's right to direct his daughter's upbringing, education, and healthcare, because Jane was never "diagnosed … with gender confusion or dysphoria," nor "referred … to a specialist for such a diagnosis." JA.33. For one thing, that conclusion glosses over the fact that Jane "has been under the care of a therapist for depression, anxiety, and gender confusion since April 21, 2022." JA.181. In fact,

Jane's therapist testified that, in her opinion, "[Jane] suffers from gender confusion." SealedApp.19.

Regardless, the district court cited nothing from the Supreme Court, this Court, nor any other court of appeals requiring a formal diagnosis or referral before parents have a right "to seek and follow medical advice" on behalf of their children. *Parham*, 442 U.S. at 602. The Sixth Circuit has held that government action violated parental rights without considering the existence of any formal diagnosis. In *Kanuszewski*, Michigan "retain[ed] the samples" of children's blood it had taken, "transfer[red] the samples to" a third party, "and store[d] the samples indefinitely for further use by the state or third parties." 927 F.3d at 420. And Michigan took all those actions "without informed parental consent." *Id.* That sufficed to violate the parents' rights. *Id.* The Sixth Circuit never mentioned whether the blood sample in question led to any diagnosis of any child. The violation of the parents' rights began and ended with consent. *Id.*

Here, there is no question that Defendants acted without Mr. Heaps's consent. New Jersey guidance and School Board policy expressly disclaim the need for parental consent. JA.78, 84. And Ms. Miranda confirmed that school staff socially transitioned Jane without Mr. Heaps's consent. JA.121–22. Under *Kanuszewski*, that's enough to violate his fundamental rights, diagnosis or not.

The district court also did not explain why the lack of a formal diagnosis or referral makes Defendants' actions less problematic. Social transition is a "psychosocial treatment that aims to reduce gender dysphoria." JA.140. And it "is not a neutral act." JA.182. It can "lead[] to persistence of gender dysphoria." JA.140. And that can carry the "consequence of subsequent (lifelong) biomedical treatments." *Id.*

Given all that, it's unclear why Jane's lack of a diagnosis *excuses* Defendants' choice to "supersede parental authority" regarding her social transition. *Parham*, 442 U.S. at 603. If anything, Jane's lack of a formal diagnosis or referral should have caused Defendants to seek *more* parental involvement—not *less*. What's more, those facts about the reality of social transition show that it carries long-term implications for a child's healthcare. Social transition, like all matters related to a "child's gender incongruity[,] is a matter of health." *Mirabelli v. Olson*, 761 F. Supp. 3d 1317, 1331 (S.D. Cal. 2025).

The Constitution guarantees to Mr. Heaps the right to make the best decision he can about his daughter's healthcare, including whether to socially transition her. Defendants infringed that right by engaging in actions with clear healthcare implications without his consent.

## C.   Mr. Heaps is likely to show that Defendants' law, guidance, policy, and conduct fail strict scrutiny.

Because Mr. Heaps is likely to show that Defendants' have infringed his fundamental right to direct his daughter's upbringing,

education, and healthcare, they must satisfy strict scrutiny. Their decision to secretly treat his daughter as a boy must be narrowly tailored to serve a compelling state interest. *Muñoz*, 602 U.S. at 910; *Glucksberg*, 521 U.S. at 721. Defendants come nowhere near satisfying that test.

On the compelling-interest prong of strict scrutiny, the "broadly formulated interests" they assert won't cut it. *Fulton v. City of Phila.*, 593 U.S. 522, 541 (2021) (citation modified). The district court thought it was enough that they aimed to "protect[] transgender students from discrimination at school and … foster[] a diverse learning environment." JA.35. For starters, that claimed interest is inconsistent with the district court's emphasis on Jane's lack of a formal gender-dysphoria diagnosis. JA.33. Defendants can't argue both that she is *not* transgender and that they have an interest in protecting her because she *is*.

That suggests a deeper problem with Defendants' claimed interests. Neither the district court nor Defendants have connected those broad interests with socially transitioning students in secret. Contrary to the district court's analysis, this Court's discussion of bathroom access in *Doe ex rel. Doe v. Boyertown Area School District*, 897 F.3d 518, 528–30 (3d Cir. 2018), has no bearing on which interests are relevant to hiding social transitions from parents like Mr. Heaps.

Nor did the district court explain its conclusion that Defendants law, guidance, policy, and conduct are "'specifically and narrowly framed' to accomplish those purposes." JA.36 (quoting *Boyertown*, 897 F.3d at 530). To satisfy the narrow-tailoring requirement, Defendants would need evidence to rebut "the traditional presumption that the parents act in the best interests of their child[ren]." *Parham*, 442 U.S. at 604. But there is no suggestion anywhere in the record that Mr. Heaps, in particular, would mistreat his daughter in any way. *See Yoder*, 406 U.S. at 234 (suggesting limits to the parental right if "parental decisions will jeopardize the health or safety of the child").

To the contrary, the record shows that he is a loving father who has always sought professional help for his daughter when necessary. *E.g.*, JA.181–82. Far from promoting Defendants' interests, concealing Jane's transition from Mr. Heaps is instead directly contrary to them. *Cf. Ricard v. USD 475 Geary Cnty., KS Sch. Bd.*, No. 5:22-CV-04015, 2022 WL 1471372, at *8 & n.12 (D. Kan. May 9, 2022) (calling it "illegitimate to conceal information from parents for the purpose of frustrating their ability to exercise a fundamental right").

## II. The remaining preliminary injunction factors weigh decidedly in Mr. Heaps's favor.

The remaining preliminary injunction factors only strengthen Mr. Heaps's entitlement to injunctive relief. Without an injunction, Defendants will continue to wreak irreparable, constitutional harm on Mr.

Heaps. Like "many parents," Mr. Heaps "cannot afford … a substitute" for public school. *Mahmoud*, 2025 WL 1773627, at \*20; *see* JA.267. Yet Defendants have insisted that he forfeit his right to make decisions about his daughter's upbringing, education, and healthcare to send her to public school. JA.116–17. Jane has already spent her freshman and sophomore years in remote learning to prevent further constitutional violations by Defendants. JA.273–74. She won't get those years back.

The School Board's actions since the filing of this lawsuit demonstrate that, absent a preliminary injunction, Mr. Heaps "will more likely than not suffer irreparable injury while proceedings are pending." *Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 204 (3d Cir. 2024). For example, though the School Board initially allowed him to place her in its home-instruction program, it then threatened to deem her truant unless she completed her lessons "on school premises after school on a 1:1 basis with a staff member." JA.117; *see* JA.103. Additionally, it insisted that if she attended those lessons, its employees would "continue socially transitioning" her immediately upon her request, contrary to Mr. Heaps's instructions. JA.117. And then, at the last minute, the School Board threatened to prohibit Jane from taking final exams, which would have forced her to repeat her freshman year. JA.244–46, 248.

Without a preliminary injunction, Defendants are likely to con-tinue putting Mr. Heaps to the choice of whether to cede important

decisions about his daughter's upbringing, education, and healthcare to Defendants in exchange for a public education. The School Board "has clearly stated how it intends to proceed." *Mahmoud*, 2025 WL 1773627, at *20. So the Court "do[es] not need to 'wait and see'" whether it is likely to continue harming Mr. Heaps. *Id.*

The balance of equities and the public interest also favor an injunction. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (holding that when the government is the nonmovant, these factors merge). Although Defendants invoke a nondiscrimination interest, that generic goal cannot hinder the "most universal relation in nature"—the bond between parent and child. 1 Blackstone, *supra*, at *446. Severing a fit parent from core decisions about his child's upbringing, education, and healthcare does not serve the public interest. And as this Court has recognized, school officials "must not lose sight" that they "are state actors," and their law, guidance, policies, and conduct, however well intentioned, "must yield to the Constitution." *Gruenke*, 225 F.3d at 307.

"In the absence of an injunction," Mr. Heaps "will continue to be put to a choice: either risk" the continued social transition of his daughter over his objection, "or pay substantial sums for alternative educational services." *Mahmoud*, 2025 WL 1773627, at *24. Because the Constitution doesn't allow Defendants to put him to that choice, this Court should reverse.

# CONCLUSION

This Court should reverse the district court's order denying his motion for a preliminary injunction.

Dated: June 30, 2025

Respectfully submitted,

/s/ Vincent M. Wagner

John J. Bursch
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(616) 450-4235
jbursch@ADFlegal.org

Katherine L. Anderson
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
kanderson@ADFlegal.org

Ronald A. Berutti
Gwyneth K. Murray-Nolan
MURRAY-NOLAN BERUTTI LLC
136 Central Avenue
2nd Floor
Clark, NJ 07066
(980) 588-2111
ron@murray-nolanberutti.com
gwyneth@murray-nolanberutti.com

James A. Campbell
Vincent M. Wagner
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707-4655
jcampbell@ADFlegal.org
vwagner@ADFlegal.org

David A. Cortman
Chloe K. Jones
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Road NE,
Suite D-1100
Lawrenceville, GA 30043
(770) 339-0774
dcortman@ADFlegal.org
cjones@ADFlegal.org

*Attorneys for Plaintiff-Appellant*

## COMBINED CERTIFICATIONS

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,992 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), as determined by the word counting feature of Microsoft Office 365.

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using 14-point Century Schoolbook.

3.      Vincent M. Wagner is a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

4.      In accordance with L.A.R. 31.1(c), this brief has been scanned for viruses with the most recent version of a commercial virus scanning program, Cortex XDR, Agent version 7.8.1, and is free of viruses according to this program.

5.      In accordance with L.A.R. 31.1(c), the text of the electronic copy of this brief filed using this Court's CM/ECF system is identical to the text in the paper copies filed with the Clerk.


*/s/ Vincent M. Wagner*
Vincent M. Wagner

June 30, 2025

**CERTIFICATE OF SERVICE**

I hereby certify that on June 30, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the CM/ECF system, which will accomplish service on counsel for all parties through the Court's electronic filing system.

*/s/ Vincent M. Wagner*
Vincent M. Wagner