**No. 24-3278**

---

**In the United States Court of Appeals for the Third Circuit**

---

Christian Heaps,
*Plaintiff-Appellant,*

*v.*

Delaware Valley Regional High School Board of
Education, *et al.*,
*Defendants-Appellees.*

---

On Appeal from the United States District Court
for the District of New Jersey
Case No. 3:24-cv-00107

---

**BRIEF OF *AMICUS CURIAE* FOUNDATION FOR MORAL
LAW IN SUPPORT OF PLAINTIFF-APPELLANT AND
REVERSAL**

---

Talmadge Butts
FOUNDATION FOR MORAL LAW
P.O. Box 148
Gallant, AL 35972
(334) 262-1245
talmadge@morallaw.org

June 30th, A.D. 2025                Counsel for *Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Under Rule 26.1 and Rule 29(a)(4)(A) of the Federal Rules of Appellate Procedure, the *Amicus* Foundation for Moral Law, Inc., certifies that it is not a subsidiary or affiliate of a publicly owned corporation.

/s/ *Talmadge Butts*

Talmadge Butts
FOUNDATION FOR MORAL LAW
P.O. Box 148
Gallant, AL 35972
(334) 262-1245
talmadge@morallaw.org

Counsel for *Amicus Curiae*

June 30th, A.D. 2025

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ....................................................C-1

TABLE OF CONTENTS..........................................................................................i

TABLE OF AUTHORITIES ................................................................................ ii

INTEREST OF THE *AMICUS* ..............................................................................1

ARGUMENT ..........................................................................................................2

I.     The history of the fundamental right of parents to direct and control their children's education and upbringing ........................................................2

    A.    The common law origin of parental rights and *in loco parentis* ...............3

    B.    The Supreme Court's recognition of parental rights and *in loco parentis* .........................................................................................................6

II.    Gender identity ideology is incorrect as a matter of fact and the practice of gender transitioning is harmful in practice ...................................8

III.   The school board's policy violates the right of parents to make decisions concerning the lives of their children ...........................................12

CONCLUSION .....................................................................................................14

CERTIFICATE OF COMPLIANCE......................................................................16

CERTIFICATE REGARDING SERVICE.............................................................17

# TABLE OF AUTHORITIES

## Cases

*Farrington v. Tokushige*,
    273 U.S. 284 (1927)......................................................................6

*Fed. Commc'n Comm'n v. Pacifica Found.*,
    438 U.S. 726 (1978)......................................................................7

*Ginsberg v. New York*,
    390 U.S. 629 (1968)......................................................................7

*Mahanoy Area Sch. Dist. v. B. L.*,
    141 S. Ct. 2038 (2021)..................................................................8

*Mahmoud v. Taylor*,
    606 U.S. __ (2025).......................................................................

*Meyer v. Nebraska*,
    262 U.S. 390 (1923)..................................................................2, 6

*Moore v. East Cleveland*,
    431 U.S. 494 (1977)......................................................................7

*Morrow v. Wood*,
    35 Wis. 59 (Wis. 1874)..................................................................5

*Parham v. J.R.*,
    442 U.S. 584 (1979).................................................................. 6-7

*Pierce v. Society of Sisters*,
    268 U.S. 510 (1925)............................................................... 2-3, 6

*Sheehan v. Sturges*,
    53 Conn. 841 (Conn. 1885) ........................................................ 5-6

*Troxel v. Granville*,
    530 U.S. 57 (2000)................................................................... 6-7

*United States v. Skrmetti*,
  605 U.S. __ (2025).........................................................................14

*Wisconsin v. Yoder*,
  406 U.S. 205 (1972)........................................................................6

## Other Authorities

Aldous Huxley, *Brave New World* (Chatto & Windus 1932) ....................................2

Am. Psychiatric Ass'n, <u>Gender Dysphoria</u>, <u>in</u> <u>Diagnostic and Statistical Manuel of Mental Disorders</u> 432 (Am. Psychiatric Publ'g., 5th ed. 2013) ...................................................10

Am. Psychiatric Ass'n, <u>Gender Identity Disorder</u>, <u>in</u> <u>Diagnostic and Statistical Manuel of Mental Disorders</u> 435 (Am. Psychiatric Publ'g., 4th ed. text rev. 2000) ......................................10

*Do Children Grow Out of Gender Dysphoria?*, TRANSGENDER TREND, https://www.transgendertrend.com/children-change-minds/ ................. 15-16

James Cantor, *Do Trans Kids Stay Trans When They Grow Up?*, SEXOLOGY   TODAY   (Jan.   11,   2016), http://www.sexologytoday.org/2016/01/do-trans-kids-stay-trans-when-they-grow_99.html .............................................. 15-16

Keith L. Moore & T.V.N. Persaud, <u>The Developing Human: Clinically Oriented Embryology</u> 35 (Philadelphia: Saunders/Elsevier) (2003) ........................................ 9-10

Michelle Cretella, <u>I'm a Pediatrician. How Transgender Ideology Has Infiltrated My Field and Produced Large-Scale Child Abuse.</u>, DAILY   SIGNAL   (July   3,   2017), https://www.dailysignal.com/2017/07/03/im-pediatrician-transgender-ideology-infiltrated-field-produced-large-scale-child-abuse/......................................................12

Ryan T. Anderson, <u>When Harry Became Sally: Responding to the Transgender Movement</u> 95 (Encounter Books, paperback ed.) (2019)................................................. 10-11

S. Ernie Walton, <u>Gender Identity Ideology: The Totalitarian, Unconstitutional Takeover of America's Public Schools</u>, 34 Regent U. L. Rev. 219 (2021) ................................................................. 4-5, 9

S. Ernie Walton, <u>In Loco Parentis, the First Amendment, and Parental Rights—Can they Coexist in Public Schools?</u>, 55 Tex. Tech L. Rev. 461 (2023) ........................................................................................ 5-8

S. Ernie Walton, <u>The Fundamental Right to Homeschool: A Historical Response to Professor Bartholet</u>, 25 Tex. Rev. L. & Pol. 377 (2022).......................................................................................................... 3-4

<u>Sex and Gender Identity</u>, Planned Parenthood, https://www.plannedparenthood.org /learn/gender-identity/ sex-gender-identity (last visited October 31, 2023)................................................9

<u>Student Nondiscrimination Policies</u>, GLSEN, https://maps.glsen.org/student-nondiscrimination-policies/ (last visited October 31, 2023) .................................................................9

T.W. Sadler, <u>Langdon's Medical Embryology</u> 40 (Philadelphia: Lippencott Williams & Wilkins) (2004) .................................................. 9-10

William J. Larsen, <u>Human Embryology</u> 519 (New York: Churchill Livingstone) (2001) ...................................................................... 9-10

World Professional Association for Transgender Health, <u>Standards of Care for the Health of Transgender and Gender Diverse People, Version 8</u>, Int'l J. of Transgender Health, S5 (2022) ............................. 11-12

## INTEREST OF THE *AMICUS*[1]

*Amicus curiae* Foundation for Moral Law ("the Foundation") is a 501(c)(3) non-profit, national public interest organization based in Alabama, dedicated to defending religious liberty, God's moral foundation upon which this country was founded, and the strict interpretation of the Constitution as intended by its Framers who sought to enshrine both. To those ends, the Foundation directly assists, or files *amicus* briefs, in cases concerning religious freedom, the sanctity of life, and other issues that implicate the God-given freedoms enshrined in our Bill of Rights.

The Foundation has an interest in this case because the Foundation believes that sex is determined at conception, cannot be changed by social or medical intervention, and that the challenged policy of "secret gender transitioning" is an unconstitutional violation of the right of parents to direct and control the education and upbringing of their children. School officials encouraging gender transitions is an egregious abuse of authority and an intolerable attack on the family.

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(3) and Local Rule 29.1, *amicus* files this brief alongside a motion for leave to file. No party or party's counsel authored this brief in whole or in part, or contributed money that was intended to fund its preparation or submission; and no person other than the *amicus curiae,* its members, or its counsel, contributed money that was intended to fund the preparation or submission of this brief.

**ARGUMENT**

In Aldous Huxley's 1932 dystopian novel *Brave New World*, the words "father" and "mother" are considered obscenities, family is considered obsolete, and all children are created and raised by the state. Today, many Americans are concerned that the institution of the family is under attack and that we are heading towards a world like Huxley depicted. Policies such as the one at issue in this case are direct evidence that their concerns are warranted. The Appellees' policy of secret gender transitioning is an unconstitutional violation of Appellant's parental rights, promotes a harmful ideological belief as public doctrine, and should have no place in the public school system.

## I. The history of the fundamental right of parents to direct and control their children's education and upbringing.

The United States Supreme Court has long recognized that parents have a fundamental right to make decisions concerning the upbringing and education of their children. The Court first acknowledged parental rights in the 1923 case *Meyer v. Nebraska*, finding that parents had a right to "establish a home and bring up children." 262 U.S. 390, 399. Two years later, in *Pierce v. Society of Sisters*, the Court stated that

> the fundamental theory of liberty upon which all governments in this Union repose excludes any general power of the state to standardize its children by forcing them to accept instruction from public teachers only. *The child is not the mere creature of the state*; those who nurture

2

> him and direct his destiny have the right, coupled with the high duty,
> to recognize and prepare him for additional obligations.

268 U.S. 510, 535 (1925) (emphasis added). However, long before the Supreme Court acknowledged the fundamental right of parents to direct and control their children's upbringing, the Founding generation of Americans understood the parent-child relationship to be a basic principle of the common law.

### A. The common law origin of parental rights and *in loco parentis*.

Rooted in the common law of their English ancestors, America's Founding generation knew that the right of parents to direct the upbringing of their children is not merely fundamental, but also God-given. The influential English jurist, Sir William Blackstone recognized the parent-child relationship as "the most universal in nature"  and required parents to fulfil the fundamental duties of providing maintenance, protection, and education to their children in order to ensure a successful society. S. Ernie Walton, The Fundamental Right to Homeschool: A Historical Response to Professor Bartholet, 25 Tex. Rev. L. & Pol. 377, 401 (2022). The philosopher John Locke also believed that parents had a special duty to educate their children in order for a nation to prosper. Id. at 402. At early common law, this parental right and duty was considered so important that third parties could only educate another's child "*in loco parentis*," i.e., in place of the parents, if that child's parents chose to delegate that authority. Id.

In the colonial and Founding eras of America, the right of parents to direct their children's upbringing and education was a fundamental principle, with education almost universally conducted at home. Id. at 408-409. Even when some colonies began to pass laws to enforce parents' duty to educate their children, create public schools for those children whose parents were unable to educate them, and ensure that children were able to read and understand the Bible and law, these laws always acknowledged that parents held the primary right and responsibility of raising their children. Id. at 410-411.

The Founding generation also recognized that parents' right and responsibility of raising their children was a matter of moral right as acknowledged by Blackstone. James Wilson, a signatory of both the Declaration of Independence and Constitution, as well as one of the original Associate Justices of the Supreme Court, stated that parents had a duty to "maintain their children decently, and according to their circumstances; to protect them according to the dictates of prudence; and to educate them according to the suggestions of a judicious and zealous regard for their usefulness, their respectability, and their happiness." S. Ernie Walton, Gender Identity Ideology: The Totalitarian, Unconstitutional Takeover of America's Public Schools, 34 Regent U. L. Rev. 219, 251-52 (2021). St. George Tucker, who was a professor of law at William & Mary during the Founding era and appointed to a federal judgeship by President Madison, stated

that parents' foremost obligation is to educate their children in "moral character, the most essential object of education." Id. at 252.

Two state cases decided in the immediate wake of the Fourteenth Amendment illustrate the right of parents to direct and control the upbringing of their children before the twentieth century and universal compulsory education. S. Ernie Walton, In Loco Parentis, the First Amendment, and Parental Rights—Can they Coexist in Public Schools?, 55 Tex. Tech L. Rev. 461 (2023). In the 1885 case, *Sheehan v. Sturges*, the Connecticut Supreme Court upheld the use of corporal punishment of a student by a teacher on the common law principles of *in loco parentis*. *See* 53 Conn. 841. However, in the 1874 case *Morrow v. Wood*, the Wisconsin Supreme Court recognized that, where a parent has refused to delegate authority to a teacher, the teacher has no authority or right *in loco parentis*. *See* 35 Wis. 59, 62.

In *Wood*, a father sent his son to public school to study spelling and the "three Rs," but the teacher insisted the student was also required to study geography. *Id.* After the father expressly told the teacher that his son was not permitted to study geography, the teacher nevertheless disciplined the son when he refused to study the subject. *Id.* at 63. In response, the father filed criminal charges of assault and battery against the teacher, and the teacher sued for malicious prosecution. *Id.* The court reasoned that the teacher had no authority to discipline

5

the child, by either rule of law, "rule of morals or social usage." *Id.* at 64. Ultimately, the court held that "the law gives parents the exclusive right to govern and control the conduct of his minor children, and he had the right to enforce obedience to his commands by moderate and reasonable chastisement." *Id.* As such, the court found that the father's directions to his son were reasonable, and that the teacher was liable for acting without authority. *Id.* 65-67.

*Sheehan*, *Wood*, and many similar cases across the country show that the doctrine of *in loco parentis* was the guiding principle of the parent-child relationship after ratification of the Fourteenth Amendment and leading into the twentieth century. Walton, <u>In Loco Parentis</u>, <u>supra</u> 474-76.

### B. The Supreme Court's recognition of parental rights and *in loco parentis*.

This common law heritage formed the foundation on which the Supreme Court would later recognize parental rights beginning in *Meyer* and continuing to the present. These cases limit the power of the state to intrude upon parental rights in a variety of ways. A state may not: prohibit parents from having their children instructed in languages other than English (*Meyer*); force parents to send their children to public schools (*Pierce*); require private education to be substantially the same as public education (*Farrington v. Tokushige*, 273 U.S. 284 (1927); *Wisconsin v. Yoder*, 406 U.S. 205 (1972)); disregard the authority of parents in committing their children to mental hospitals (*Parham v. J.R.*, 442 U.S. 584

(1979)); require parents to allow visitation with grandparents (*Troxel v. Granville*, 530 U.S. 57 (2000)).

Throughout the last century, the Supreme Court reiterated the importance and common law lineage of parental rights often. *Parham*, 442 U.S. at 602 (1979) ("Our jurisprudence historically has reflected Western civilization concepts of the family as a unit with broad parental authority over minor children."); *Fed. Commc'n Comm'n v. Pacifica Found.*, 438 U.S. 726, 769 (1978) (Brennan, J., dissenting) ("[There is a] time-honored right of a parent to raise his child as he sees fit—a right this Court has consistently been vigilant to protect."); *Moore v. East Cleveland*, 431 U.S. 494, 503-04 (1977) ("[T]he institution of the family is deeply rooted in this Nation's history and tradition. It is through the family that we inculcate and pass down many of our most cherished values, moral and cultural."); *Ginsberg v. New York*, 390 U.S. 629, 639 (1968) ("[C]onstitutional interpretation has consistently recognized that the parents' claim to authority in their own household to direct the rearing of their children is basic in the structure of our society.").

These cases reflect the Supreme Court's strong commitment to the right of parents to direct and control the education and upbringing of their children. By reasoning based on our common law tradition, each of these cases also deals with principles of the *in loco parentis* doctrine. While these cases evince a strong

7

foundation of *in loco parentis* regarding the right of parents to direct and control the education and upbringing of their children, there have been recent Supreme Court cases involving students' individual rights such as the freedom of speech that revealed tensions on the Court regarding the proper function of *in loco parentis*. Walton, In Loco Parentis, supra 476-82.

However, the Supreme Court's most recent case involving the doctrine, *Mahanoy Area Sch. Dist. v. B. L.*, indicates that *in loco parentis* is a fundamental doctrine of law that is implicated even when a student is asserting their own individual rights. 141 S. Ct. 2038, 2042-43, 2048 (2021). As explained by Justice Alito in concurrence, under the doctrine of *in loco parentis* applied to the contemporary twenty-first century American education system, public schools should only have the authority "to carry out their state-mandated educational mission, as well as the *authority to perform any other functions to which parents expressly or implicitly agree.*" *Id.* at 2048 (Alito, J., concurring) (emphasis added). In other words, the state via the public school system can only exercise authority and make decisions regarding children pursuant to a delegation of that authority and decision making from the parents.

## II.    Gender identity ideology is incorrect as a matter of fact and the practice of gender transitioning is harmful in practice.

Gender identity ideology and the practice of gender transitioning are topics central to moral and religious beliefs, norms, and practices that parents have the

ultimate right of control and direction for the upbringing of their children. The main beliefs of gender identity ideology are that the biological sex binary of male and female is not real, that there are innumerable genders beyond male and female, that a person's "gender" is different from their sex "assigned by a doctor at birth based on the genitals you're born with and the chromosomes you have."[2]

Twenty states and the District of Columbia now have a law or regulation on the books that "prohibits discrimination based on sexual orientation and gender identity."[3] Most of these operate in practice like the law at issue in the present case, that is, to require schools to accept a student's asserted gender identity and hide this information from the child's parents. See Walton, Gender Identity Ideology, supra, at 256. Unfortunately, these laws are premised on a falsehood because gender identity is a faith-based ideology, not a matter of scientific truth.

The basic reality of biological sex is that there are only two sexes, male and female, and that anything else is mutation. T.W. Sadler, Langdon's Medical Embryology 40 (Philadelphia: Lippencott Williams & Wilkins) (2004); William J. Larsen, Human Embryology 519 (New York: Churchill Livingstone) (2001); Keith

---

[2] See Sex and Gender Identity, Planned Parenthood, https://www.plannedparenthood.org/learn/gender-identity/sex-gender-identity (last visited June 10, 2025).

[3] Student Nondiscrimination Policies, GLSEN, https://maps.glsen.org/student-nondiscrimination-policies/ (last visited June 10, 2025).

L. Moore & T.V.N. Persaud, <u>The Developing Human: Clinically Oriented Embryology</u> 35 (Philadelphia: Saunders/Elsevier) (2003). Biological sex is not "assigned;" it is determined at the exact moment of fertilization whereby a sperm cell that carries an X chromosome produces a female (XX) embryo, while a sperm cell that carries a Y chromosome produces a male (XY) embryo. <u>Id.</u>

While there are some people that do experience a discordance between their body's biological sex and their mental perception of what their gender is, this is a medical condition that needs compassionate treatment based in reality, not to be exacerbated by a rejection of it. The distress this discordance causes is now called "gender dysphoria." Am. Psychiatric Ass'n, <u>Gender Dysphoria,</u> <u>in</u> <u>Diagnostic and Statistical Manuel of Mental Disorders</u> 432 (Am. Psychiatric Publ'g., 5th ed. 2013). The Diagnostic and Statistical Manuel of Mental Disorders (DSM-5) defines gender dysphoria as "incongruence between one's experienced/expressed gender and assigned gender" that causes "clinically significant distress or impairment in social, occupational, or other important areas of functioning." <u>Id.</u> However, the DSM used to list "gender identity disorder" instead and defined it as incongruence between a person's experienced gender and their biological sex itself—no mention of "assigned gender." Am. Psychiatric Ass'n, <u>Gender Identity Disorder,</u> <u>in</u> <u>Diagnostic and Statistical Manuel of Mental Disorders</u> 435 (Am. Psychiatric Publ'g., 4th ed. text rev. 2000).

10

Dr. Paul McHugh, former director of Johns Hopkins University's Department of Psychiatry and psychiatrist-in-chief of Johns Hopkins Hospital, has explained that gender identity disorder is the proper clinical conception of the condition because it emphasizes the patient's discordance with the reality of their natural body. Ryan T. Anderson, <u>When Harry Became Sally: Responding to the Transgender Movement</u> 95 (Encounter Books, paperback ed.) (2019). However, advocates for gender identity ideology reject biological sex entirely and seek only to affirm the feelings of those suffering distress from gender dysphoria. Far from being compassionate, this kind of response is like agreeing with a person suffering from Anorexia Nervosa when they assert that they are overweight.

The World Professional Association for Transgender Health (WPATH) is one of the major advocates for gender identity ideology and gender transitioning. WPATH regularly publishes a Standards of Care report which WPATH states in the eighth edition (SOC-8) has the purpose of providing "clinical guidance to health care professionals to assist transgender and gender diverse (TGD) people." World Professional Association for Transgender Health, <u>Standards of Care for the Health of Transgender and Gender Diverse People, Version 8,</u> Int'l J. of Transgender Health, S5 (2022). WPATH includes "social transitioning" like what is at issue in the present case as a clinical treatment for health care professionals to discuss with families considering it. <u>Id.</u> at S75-79. The SOC-8 specifically details

11

that social transitioning is clinical treatment that should be "individualized based on both a child's wishes and other psychosocial considerations, and is a decision for which possible benefits and challenges should be weighted and discussed." Id. at S77 (internal citations omitted).

Michelle Cretella, executive director of the American College of Pediatricians, has explained that this psychological treatment frequently leads to further medical intervention including puberty blockers, cross-sex hormones, and physical amputations.[4] These medical interventions carry significant known risks for adults and do not ultimately aid mental health outcomes. Id. The risks are even worse for children who are unable to consent to such irreversible life-altering procedures and is tantamount to child abuse. Id.

## III. The school board's policy violates the right of parents to make decisions concerning the lives of their children.

The Delaware Valley School Board's policy of secrecy regarding children gender transitioning intrudes upon parental rights far beyond anything contemplated by the Supreme Court's parental rights jurisprudence. Not only does the policy allow school officials to withhold critical information from parents

---

[4] I'm a Pediatrician. How Transgender Ideology Has Infiltrated My Field and Produced Large-Scale Child Abuse., DAILY SIGNAL (July 3, 2017), https://www.dailysignal.com/2017/07/03/im-pediatrician-transgender-ideology-infiltrated-field-produced-large-scale-child-abuse/ (last visited June 10, 2025).

concerning their children's mental and physical health, but the fact that school officials encourage and facilitate gender transitions for children without the notification and consent of parents shocks the conscience.

Few decisions, if any, are more life-altering than a decision to change one's gender identification. Not only will this permanently change the child's life in substantial ways; it will alter the family as well. As parents and siblings discover that they no longer have a daughter and sister but rather a "son" and "brother" instead, the entire family dynamic is upheaved. Dr. James Cantor reports that, according to a consensus of ten scientific studies, "[t]he exact number varies by study, but roughly 60-90% of trans-kids turn out no longer to be trans by adulthood."[5] One can only imagine how much damage can be done to children and to their families by facilitating or encouraging children to identify with the opposite gender. For example, a child who identifies with the opposite sex may decide to take puberty blockers or undergo surgery, only to change his/her mind later. The physical, psychological, social, and/or emotional damage to children and their families may be severe and irreparable.

_____

[5] James Cantor, *Do Trans Kids Stay Trans When They Grow Up?*, SEXOLOGY TODAY (Jan. 11, 2016), http://www.sexologytoday.org/2016/01/do-trans-kids-stay-trans-when-they-grow_99.html; *See also*, *Do Children Grow Out of Gender Dysphoria?*, TRANSGENDER TREND, https://www.transgendertrend.com/children-change-minds/.

That the Delaware Valley School Board would encourage and facilitate children to make this drastic life change in secret without parental consent is an egregious violation of parental rights as identified by the Supreme Court. This very term, the Supreme Court has ruled on two landmark cases that protect the rights of parents to make decisions to protect their children from transgender content in schools (*Mahmoud v. Taylor*, 606 U.S. __ (2025)) as well as transgender reassignment procedures (*United States v. Skrmetti*, 605 U.S. __ (2025)). Secret gender transition policies like that at issue in this case are clear violations of these parental rights.

Children cannot consent to such life-altering procedures themselves, and the state certainly should not have the power *in loco parentis* to consent for them. Such a policy is an unconstitutional intrusion into the foundational parent-child relationship that indicates the beginnings of totalitarian control, and ultimately destruction, of the family. The Constitution is our bulwark against a world where children are mere creatures of the state to be used to further ideological ends. We must defend parental rights under the Constitution in order to protect our most innocent and vulnerable citizens.

## CONCLUSION

The Delaware Valley School Board's policy violates the fundamental right of parents to direct and control the upbringing and education of their children.

Biological sex is scientific fact, and it has critical real world effects. Gender identity ideology portrays this reality as inconsequential and proclaims that one's gender is a matter of mere personal preference, no different from a favorite color or fashion style. But it doesn't stop there. The "social transitioning" advocated by gender identity ideologues frequently leads to irreversible medical intervention that leads to lifelong harms to health. This ideology of self-harm and its practices should have no place in our schools.

This Court should reverse the decision of the District Court and uphold the fundamental right of parents to direct and control the upbringing and education of their children.

Respectfully submitted,

Talmadge Butts
FOUNDATION FOR MORAL LAW
One Dexter Avenue
Montgomery, AL 36104
(334) 262-1245
talmadge@morallaw.org

Counsel for *Amicus Curiae*

June 30th, A.D. 2025

**CERTIFICATE OF COMPLIANCE**

1. This document complies with the word limit of Rule 32(a)(7), Fed. R. App. P.,
   because, excluding the parts of the document exempted by Rule 32(f), Fed. R.
   App. P., and 6th Cir. R. 32(b)(1), this document contains 3,364 words.

2. This document complies with the typeface requirements of Fed. R. App. P.
   32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it
   was prepared using Microsoft Word in 14-point Times New Roman.

*/s/ Talmadge Butts*

Talmadge Butts
FOUNDATION FOR MORAL LAW
P.O. Box 148
Gallant, AL 35972
(334) 262-1245
talmadge@morallaw.org

Counsel for *Amicus Curiae*

June 30th, A.D. 2025

## CERTIFICATE REGARDING SERVICE

I certify that on June 30th, A.D. 2025, a true copy of this document is being filed electronically (via CM/ECF) and will thereby be served on all counsel of record.

/s/ *Talmadge Butts*

Talmadge Butts
FOUNDATION FOR MORAL LAW
P.O. Box 148
Gallant, AL 35972
(334) 262-1245
talmadge@morallaw.org

Counsel for *Amicus Curiae*

17