# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

CHRISTIAN HEAPS,

*Plaintiff-Appellant*,

v.

DELAWARE VALLEY REGIONAL HIGH SCHOOL BOARD OF EDUCATION; SCOTT MCKINNEY, individually and in his official capacity as Superintendent of Schools; ASHLEY MIRANDA, individually and in her official capacity as school counselor; ANGELICA ALLEN-MCMILLAN, in her official capacity as Acting Commissioner of the New Jersey Department of Education; JOHN ROES 1-10, said names being fictitious, individually and in their official capacities; MATTHEW J. PLATKIN, in his official capacity as Attorney General of New Jersey,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of New Jersey
Case No. 3:24-cv-00107

## BRIEF OF THE MANHATTAN INSTITUTE
## AND DR. LEOR SAPIR AS *AMICI CURIAE* IN SUPPORT OF
## PLAINTIFF-APPELLANT AND REVERSAL

Ilya Shapiro
  *Counsel of Record*
John Ketcham
MANHATTAN INSTITUTE
52 Vanderbilt Ave.
New York, NY 10017
(212) 599-7000
ishapiro@manhattan.institute

July 7, 2025

**CORPORATE DISCLOSURE STATEMENT**

The Manhattan Institute has no parent companies, subsidiaries, or affiliates, and does not issue shares to the public.

Dated: July 7, 2025                                      */s/ Ilya Shapiro*
                                                         Ilya Shapiro

# TABLE OF CONTENTS

Corporate Disclosure Statement ................................................................. i

Table of Authorities ........................................................................ iiiiii

Identity and Interest of *Amici Curiae* ...................................................1

Summary of Argument .......................................................................2

Argument......................................................................................4

I. Social Transition Constitutes a Mental-Health Intervention for Children Who Would Otherwise Likely Desist in Their Adopted Gender Identity Before Adulthood ..........................................................................4

   A. Medical Research Worldwide Demonstrates That Social Transition Is a Mental-Health Intervention with Medical Implications for Children and Adolescents ..........................................................................5

      1. In most cases, childhood-onset gender dysphoria remits naturally by adulthood, but social transition may contribute to the persistence of gender dysphoria. ..........................................................................6

      2. Transgender identity in adolescents is also likely unstable. ....................11

   B. Objections to the Persistence and Desistence Literature Do Not Withstand Scrutiny ..........................................................................16

   C. Clinicians Have Not Demonstrated a Consistent Ability to Distinguish between Transgender and Gender-Nonconforming Youths........................20

   D. U.S.-Based Medical Groups Are Out of Step with World Health Authorities' Recognition of the Risks of Pediatric Social Transition..........21

II. Courts Have Recognized Social Transition as a Medical Intervention..............24

III. The Delaware Valley Regional High School Board's Policy Prevents Parents from Exercising Their Parental Rights ...................................25

CONCLUSION....................................................................................27

COMBINED CERTIFICATIONS.................................................................28

CERTIFICATE OF SERVICE .................................................................29

# TABLE OF AUTHORITIES

**Cases**

*Adams v. Sch. Bd. of St. Johns Cnty.*, No. 18-13592, (11th Cir. 2022) .................25

*Colon v. Collazo*, 729 F.2d 32 (1st Cir. 1984).........................................................27

*Dodds v. U.S. Dep't of Educ.*, 845 F.3d 217 (6th Cir. 2016)...................................25

*Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518 (3d Cir. 2018) ...........................25

*Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020).......................25

*Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18 (1981) ..............................................26

*Parents for Privacy v. Dallas Sch. Dist. No. 2*, 949 F.3d 1210 (9th Cir. 2020)......25

*Parham v. J.R.*, 442 U.S. 584 (1979)......................................................................27

*Prince v. Massachusetts*, 321 U.S. 158 (1943).......................................................27

*Santosky v. Kramer*, 455 U.S. 745 (1982) ..............................................................26

*Stanley v. Illinois*, 405 U.S. 645 (1972).................................................................26

*Troxel v. Granville*, 530 U.S. 57 (2000) ................................................................26

*Whitaker v. Kenosha Unified Sch., Dist.*, 858 F.3d 1034 (7th Cir. 2017) ........ 24, 25

**Statutes**

20 U.S.C. §§ 1681–1688 ..........................................................................................24

**Other Authorities**

Am. Psych. Ass'n, DSM-5.........................................................................................17

Am. Psych. Ass'n, DSM-IV ......................................................................................18

Annelou L. C. de Vries & Peggy T. Cohen-Kettenis, *Clinical Management of Gender Dysphoria in Children and Adolescents: The Dutch Approach*, 59 J. Homosexuality 301 (2012).......................................................................5

Annelou L. C. de Vries et al., *Reliability and Clinical Utility of Gender Identity-Related Diagnoses: Comparisons Between the ICD-11, ICD-10, DSM-IV, and DSM-5*, 8 LGBT Health 133 (2021) ........................19

Annika Mutanen, *A Professor Who Treats Adolescent Gender Anxiety Says No to Minors' Legal Gender Correction*, Helsingin Sanomat, Jan. 27, 2023 ....22

Benjamin Freedman, *Equipoise and the Ethics of Clinical Research*, 317 New Eng. J. Med. 141 (1987)................................................................10

Christina Jewett, *Women Fear Drug They Used To Halt Puberty Led To Health Problems*, KFF Health News (Feb. 2, 2017) ................................2, 27

Christina M. Roberts et al., *Continuation of Gender-Affirming Hormones Among Transgender Adolescents and Adults*, 107 J. Clinical Endocrinology & Metabolism 3937 (2022) ........................14

Dep't Health & Hum. Servs., *Treatment for Pediatric Gender Dysphoria Review of Evidence and Best Practices* 13 (2025) ....................................3, 21

E. Abbruzzese et al., *The Myth of "Reliable Research" in Pediatric Gender Medicine: A Critical Evaluation of the Dutch Studies—and Research that Has Followed*, J. Sex & Marital Therapy 1 (2023)......................... 11, 12

Eli Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. Transgender Health S1 (Suppl. 1) (2022) .............................. 23, 24

Eli Coleman et al., *Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People*, *Version 7*, 13 Int'l J. Transgenderism 165 (2012) .................................................. 22, 23

Florence Ashley, *Gatekeeping Hormone Replacement Therapy for Transgender Patients Is Dehumanising*, 45 J. Med. Ethics 480 (2019)........13

Hillary Cass, *The Cass Review Independent Review of Gender Identity Services for Children and Young People: Interim Report* (2022).......... 13, 21

James M. Cantor, *Transgender and Gender Diverse Children and Adolescents: Fact-Checking of AAP Policy*, J. Sex & Marital Therapy 307 (2019)............................................. 7, 11, 15, 21

James S. Morandini et al., *Is Social Gender Transition Associated with Mental Health Status in Children and Adolescents with Gender Dysphoria?*, 52 Archives Sexual Behav. 1045 (2023)............................................................2

Jason Rafferty et al., *Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents*, 142 Pediatrics 1 (2018)................................................................................21

Jiska Ristori & Thomas D. Steensma, *Gender Dysphoria in Children*, 28 Int. Rev. Psych. 1 (2016) ........................................................................20

Julia Temple Newhook et al., *A Critical Commentary on Follow-Up Studies and "Desistance" Theories about Transgender and Gender-Nonconforming Children*, 19 Int'l J. Transgenderism 212 (2018)......... 16, 18

Kenneth J. Zucker, *Adolescents with Gender Dysphoria: Reflections on Some Contemporary Clinical and Research Issues*, 48 Archives Sexual Behav. 1 (2019)............................................................12

Kenneth J. Zucker, *The Myth of Persistence*, 19 Int'l J. Transgenderism 231 (2018) .................................................. 17, 19

Kristina R. Olson et al., *Gender Identity 5 Years After Social Transition*, 150 Pediatrics 1 (2022)........................................................ 9, 10, 11

Kristina R. Olson, *Prepubescent Transgender Children: What We Do and Do Not Know*, 55 J. Am. Acad. Child & Adolescent Psych. 155 (2018)......16

Leor Sapir, *Finland Takes Another Look at Youth Gender Medicine*, Tablet (Feb. 21, 2023) ....................................................................22

Lisa Littman, *Rapid-Onset Gender Dysphoria in Adolescents and Young Adults: A Study of Parental Reports*, 13 PLoS ONE 1 (2018) ..................................12

Michael Biggs, *The Dutch Protocol for Juvenile Transsexuals: Origins and Evidence*, J. Sex & Marital Therapy 1 (2022) ..................................................7

NHS England, *Interim Specification: Specialist Service for Children and Young People with Gender Dysphoria (Phase 1 Providers)* (2022).............22

Peggy T. Cohen-Kettenis et al., *The Treatment of Adolescent Transsexuals: Changing Insights*, 5 J. Sex. Med. 1892 (2008) .............................................6

Robin Respaut & Chad Terhune, *Number of Transgender Children Seeking Treatment Surges in U.S.*, Retuers, Oct. 6, 2022...........................................19

Ruth Hall et al., *Access to Care and Frequency of Detransition among a Cohort Discharged by a UK National Adult Gender Identity Clinic: Retrospective Case-Note Review*, 7 BJPsych Open 1 (2021).......................15

Stewart L. Adelson et al., *Practice Parameter on Gay, Lesbian, or Bisexual Sexual Orientation, Gender Nonconformity, and Gender Discordance in Children and Adolescents*, 51 J. Am. Acad. Child & Adolescent Psych. 957 (2012)...............................8

T.D. Steensma & Peggy T. Cohen-Kettenis, *Gender Transitioning Before Puberty?*, 40 Archives Sexual Behav. 649 (2011) ..........................................6

Valeria P. Bustos et al., *Regret After Gender-Affirmation Surgery: A Systematic Review and Meta-Analysis of Prevalence*, 9 Plastic and Reconstructive Surgery Global Open 1 (2021).......................12

William Byne et al., *Report of the APA Task Force on Treatment of Gender Identity Disorder* 4 (2012) .............................................................................7

Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society\* Clinical Practice Guideline*, 102 J. Clinical Endocrinology & Metabolism 3869 (2017) ............... 8, 11, 21

Yolanda L.S. Smith et al., *Adolescents with Gender Identity Disorder Who Were Accepted or Rejected for Sex Reassignment Surgery: A Prospective Follow-Up Study*, 40 J. Am. Acad. Child & Adolescent Psych. 472 (2001)...............................14

## IDENTITY AND INTEREST OF *AMICI CURIAE*[1]

The Manhattan Institute (MI) is a nonprofit policy research foundation whose mission is to develop and disseminate ideas that foster individual responsibility and agency across multiple dimensions. It has sponsored scholarship and filed briefs opposing regulations that interfere with constitutionally protected liberties.

Leor Sapir, Ph.D., is a fellow at MI, where his research focuses on pediatric gender medicine and medical policy in the U.S. and abroad. His academic work, including his dissertation on Title IX, investigated how America's political culture and constitutional government shape public policy on civil rights. His scholarly work has appeared in many publications, including *Archives of Sexual Behavior*.

*Amici* file this brief because the right to direct the upbringing of one's children is among the most important liberties protected by the Constitution, one this Court has upheld repeatedly. *Amici* believe that public-school teachers and staff, as state employees, are legally required to inform parents and respect parental direction regarding their children's health, including issues of gender and social transitioning. This brief highlights important medical research in that regard.

---

[1] Pursuant to Fed. R. App. P. 29(a), counsel for *amici* states that all parties have consented to the filing of this brief. Further, no party's counsel authored any part of this brief and no person other than *amici* made a monetary contribution to fund its preparation or submission.

Decades of research have consistently shown that most children with gender dysphoria and most children clinically referred for gender-variant behavior come to terms with their natal sex ("desist") by adulthood. Minors who are automatically "affirmed" in their assumed gender identity, particularly through social transition, however, are more likely to persist in their cross-gender feelings and, in time, seek medical interventions in the form of gonadotropin-releasing analogues (puberty blockers), cross-sex hormones, and surgeries. These interventions carry known and anticipated risks, including lifelong sterility, sexual dysfunction, mood disorders, and increased risk of cancer and heart disease. *See, e.g.*, Christina Jewett, *Women Fear Drug They Used To Halt Puberty Led To Health Problems*, KFF Health News (Feb. 2, 2017), https://bit.ly/3HfE7b9.

In short, social transition is not a neutral act but an active intervention. But is it a beneficial one? Some research suggests short-term benefits. One recent study, and arguably the best-controlled, shows "no significant effects of social transition or name change on mental health status." James S. Morandini et al., *Is Social Gender Transition Associated with Mental Health Status in Children and Adolescents with Gender Dysphoria?*, 52 Archives Sexual Behav. 1045, 1045 (2023). A comprehensive assessment of over four decades of research suggests that social

transition can lock in a temporary phase of identity development, leading to unnecessary medicalization and iatrogenic harm.

As the Department of Health and Human Services revealed in a May 2025 systematic review of treatments for pediatric gender dysphoria, "the overall quality of evidence concerning the effects of any intervention on psychological outcomes, quality of life, regret, or long-term health, is very low. This indicates that the beneficial effects reported in the literature are likely to differ substantially from the true effects of the interventions." Dep't Health & Hum. Servs., *Treatment for Pediatric Gender Dysphoria Review of Evidence and Best Practices* 13 (2025) (hereinafter "HHS Comprehensive Review").

By facilitating social transition without parental knowledge, the Delaware Valley Regional High School Board Policy 5756 infringes on this fundamental right. This Court should make clear to parents, schools, and other courts across the nation that school policies and staff may not withhold critical information from parents about their children's mental health and well-being. Accordingly, this Court should reverse the decision below and grant the Plaintiff-Appellant's Motion for a Preliminary Injunction.

## ARGUMENT

### I. Social Transition Constitutes a Mental-Health Intervention for Children Who Would Otherwise Likely Desist in Their Adopted Gender Identity Before Adulthood

"Social transition" refers to the use of youths' preferred names and pronouns, access to sex-specific accommodations, and, in some cases, practices such as breast-binding and genital-tucking. Medical experts worldwide have recognized social transition as an active mental health intervention. Research strongly suggests that the vast majority of gender-dysphoric youths will naturally "desist" over time, growing to feel comfortable with their natal sex. But social transition risks inhibiting this ordinary development, solidifying an otherwise passing phase of identity discordance past adolescence and, in turn, raising the potential for unnecessary medicalization. In other words, far from relieving gender-related discomfort, social transition may prolong it.

The school board policy at issue automatically accepts a student's asserted gender identity without parental input. This essentially requires school staff to participate in an active mental-health intervention with uncertain and potentially enormous ramifications for the long-term well-being of children and adolescents.

**A. Medical Research Worldwide Demonstrates That Social Transition Is a Mental-Health Intervention with Medical Implications for Children and Adolescents**

The risks of early social transition were acknowledged by the Dutch clinicians who pioneered pediatric gender transition. In 2012, they recommended that young children not socially transition before puberty on two grounds: (1) that most gender-dysphoric children will not persist in their adopted gender identity through adolescence; and (2) that such non-persisting youths should be prevented "from having to make a complex change back to the role of their natal gender," which research had suggested would be difficult. Annelou L. C. de Vries & Peggy T. Cohen-Kettenis, *Clinical Management of Gender Dysphoria in Children and Adolescents: The Dutch Approach*, 59 J. Homosexuality 301, 320 (2012).

The Dutch clinicians also noted the danger of early social transition even for minors who *do* go on to full medical transition. Because medical transition cannot literally change a person's sex, they reasoned, it is important to ground the patient in reality and lower expectations about what drugs and surgeries can accomplish. The problem with "early transitions," they warned, "is that some children who have done so (sometimes as preschoolers) barely realize that they are of the other natal sex. They develop a sense of reality so different from physical reality that acceptance of the protracted treatments they will later need is made unnecessarily difficult." *Id.* at 308. *See also* T.D. Steensma & Peggy T. Cohen-Kettenis, *Gender Transitioning*

*Before Puberty?*, 40 Archives Sexual Behav. 649, 649–50 (2011) (predicting "that the drawbacks of having to wait until early adolescence . . . may be less serious than having to make a social transition twice").

Strikingly, in a 2008 article, the Dutch clinicians suggested that, given a "80-95%" desistence rate for gender dysphoria in children, a "real life test" or "real life experience" (*i.e.*, social transition) should be postponed until adolescence, and then only after an initial diagnosis of "gender identity disorder." Peggy T. Cohen-Kettenis et al., *The Treatment of Adolescent Transsexuals: Changing Insights*, 5 J. Sex. Med. 1892, 1893 (2008). Social transition and pharmacological puberty suppression, they suggested, are both part of a prolonged *diagnostic* phase in the clinical management of youth gender dysphoria. *Id.* Both are used to discern the need for additional, more invasive, interventions—such as surgery. It follows that the Dutch researchers viewed social transition as less reversible than the administration of puberty blockers, an obvious medical intervention.

1. **In most cases, childhood-onset gender dysphoria remits naturally by adulthood, but social transition may contribute to the persistence of gender dysphoria.**

The Dutch researchers' cautious approach to social transition and their warnings about its risks are buttressed by <u>decades of research</u> finding that most children with gender identity issues come to terms with their natal sex, typically during adolescence. Those studies found <u>desistence rates of between 61 and 100</u>

percent, with specific percentages as follows in chronological order of publication: 75; 87.5; 100; 95.5; 90; 98; 87.5; 61; 87.7. James M. Cantor, *Transgender and Gender Diverse Children and Adolescents: Fact-Checking of AAP Policy*, J. Sex & Marital Therapy 307, 313 (2019) (collecting 11 studies from 1972 to 2019).

Of note, the studies found not only that most gender-dysphoric children eventually desist, but that a majority of natal males (63–100 percent) and a substantial minority of natal females (32–50 percent) who desisted later turned out to be gay or lesbian, not transgender. This finding suggests that cross-gender feelings and behaviors in children are more predictive of later same-sex attraction than of lifelong gender dysphoria and trans identity. Early social transition may hinder healthy development of gender-nonconforming homosexual children. *See also* Michael Biggs, *The Dutch Protocol for Juvenile Transsexuals: Origins and Evidence*, J. Sex & Marital Therapy 1, 5 (2022).

The American Psychiatric Association observed in a 2012 literature review that "only a minority" of those diagnosed with childhood gender identity disorder "will identify as transsexual or transgender in adulthood (a phenomenon termed *persistence*), while the majority will become comfortable with their natal gender over time (a phenomenon termed *desistence*)." William Byne et al., *Report of the APA Task Force on Treatment of Gender Identity Disorder* 4 (2012). That same year, the American Academy of Child and Adolescent Psychiatry acknowledged

"longitudinal evidence that gender discordance persists in only a small minority of untreated cases arising in childhood," and warned that "further research is needed on predictors of persistence and desistence of childhood gender discordance as well as the long-term risks and benefits of intervention before any treatment to eliminate gender discordance can be endorsed." Stewart L. Adelson et al., *Practice Parameter on Gay, Lesbian, or Bisexual Sexual Orientation, Gender Nonconformity, and Gender Discordance in Children and Adolescents*, 51 J. Am. Acad. Child & Adolescent Psych. 957, 968 (2012).

A major concern among researchers and clinicians who treat gender-diverse youth is that social transition will inhibit that natural remission and solidify an otherwise passing phase of identity discordance. For example, the Endocrine Society cautions that children who have socially transitioned "may have great difficulty in returning to the original gender role upon entering puberty," and that social transition "has been found to contribute to the likelihood of persistence." Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline,* 102 J. Clinical Endocrinology & Metabolism 3869, 3879 (2017).

One study found that childhood social transition was a factor associated with persistence. Thomas D. Steensma et al., *Factors Associated With Desistence and Persistence of Childhood Gender Dysphoria: A Quantitative Follow-Up Study*, 52

J. Am. Acad. Child Adolescent Psych. 582, 588 (2013). The most relevant question, however, concerns the nature of that association. Are children more likely to be identified as transgender early on and then socially transitioned, or does social transition lock in cross-gender feelings and make it harder for gender-dysphoric kids to come to terms with their bodies?

A 2022 study, published in *Pediatrics*, challenges the conventional wisdom about desistence described above. Kristina R. Olson et al., *Gender Identity 5 Years After Social Transition*, 150 Pediatrics 1, 1 (2022) (special article). Based on their observation of 317 children, psychologist Kristina Olson and her colleagues claim to show that young children who are socially transitioned and "supported" in their new gender identity rarely change their minds. *Id.* at 6.

To be eligible for participation in the study, candidates had to have completed a full "binary" (male to female or female to male) social transition. *Id.* at 2. By the end of the study's five-year follow-up term, 3.5 percent of the children had replaced their male or female self-identification with a "non-binary" one, while 2.5 percent had "retransitioned" (*i.e.*, come to terms with and learned to accept their natal sex). *Id.* at 3. For the study's authors and supporters of the "gender-affirmative" approach, this was good news: it confirmed the oft-repeated claim that "trans kids know who they are" and that children benefit from having adults agree with ("affirm") their asserted gender.

The serious problem with this interpretation is that it lacks "equipoise," which refers to the requirement that investigators show genuine uncertainty about an intervention's effects. *See, e.g.*, Benjamin Freedman, *Equipoise and the Ethics of Clinical Research*, 317 New Eng. J. Med. 141, 141 (1987). Olson et al. failed to consider alternative explanations for why their findings conflicted with all previous research on persistence/desistence. With one partial exception, the children in the earlier studies did not undergo social transition and, with no exception, the studies yielded high rates of desistence. In Olson's study, however, all the children had been fully socially transitioned, and almost none desisted.

One interpretation of this discrepancy, favored by Olson and her colleagues, is that virtually all the children who participated in the 2022 study were "true transgender" children. *See* Olson, *supra*, at 4–6. But another explanation, overlooked by the authors, is that social transition itself caused them to persist, creating a self-fulfilling prophecy. Recall the Dutch clinicians' warnings that social transition can disrupt a child's grasp of reality and make coming to terms with his or her natal sex more difficult. *See* de Vries & Cohen-Kettenis, *supra*, at 308.

Despite its authors' interpretation, the Olson study suggests that social transition may in fact be a powerful mental-health intervention with potential to lock in gender incongruence. If true, the consequences are serious: at least 60 percent of the children in the study had commenced hormonal interventions, which carry

significant health risks, at the five-year follow-up. *Id.* at 2. If some of these children might have desisted and avoided unnecessary medicalization, then their social transition was the cause of iatrogenic harm.

## 2. Transgender identity in adolescents is also likely unstable.

Proponents of social and medical gender reassignment for minors argue that when gender dysphoria begins in childhood and intensifies at the outset of puberty, the chances of desistence are very slim. This belief is not supported by evidence.

First, in the 11 desistence studies discussed above, some of the minors who desisted did so after they had entered adolescence. Cantor, *supra*, at 5. That's why the Endocrine Society's guidelines mention that "childhood GD/gender incongruence does not invariably persist into adolescence *and adulthood*." Hembree et al., *supra*, at 3876 (emphasis added). Second, gender clinics in a variety of countries and researchers who study gender dysphoria in youth have observed a new patient cohort that does not fit the profile of the youth who participated in the original Dutch study and for whom the Dutch pioneered pediatric gender transition. *See* E. Abbruzzese et al., *The Myth of "Reliable Research" in Pediatric Gender Medicine: A Critical Evaluation of the Dutch Studies—and Research that Has Followed*, J. Sex & Marital Therapy 1, 12–13 (2023). This new cohort of minors, which accounts for most of the meteoric increase in the number of minors seeking gender transition services over the past decade, is composed of young people who did not have gender-

identity issues in childhood and whose gender-dysphoric symptoms began, often suddenly, after the start of puberty. *Id.* Most are natal girls with comorbid mental-health problems. *Id.* The very fact that these teenagers exist suggests that transgender identity is neither innate nor immutable. *See also* Kenneth J. Zucker, *Adolescents with Gender Dysphoria: Reflections on Some Contemporary Clinical and Research Issues*, 48 Archives Sexual Behav. 1, 7 (2019); Lisa Littman, *Rapid-Onset Gender Dysphoria in Adolescents and Young Adults: A Study of Parental Reports*, 13 PLoS ONE 1, 30–33 (2018).

Third, researchers are increasingly acknowledging the phenomenon of regret and detransition. Claims that regret and detransition are extremely rare—less than 2 percent, by some accounts—rely on studies performed mainly on adults who transitioned as adults. *See* Valeria P. Bustos et al., *Regret After Gender-Affirmation Surgery: A Systematic Review and Meta-Analysis of Prevalence*, 9 Plastic & Reconstructive Surgery Global Open 1, 34 (2021). The very few adolescents included in these statistics were all transitioned under the Dutch protocol, a relatively conservative approach that contrasts with the affirmative approach practiced in American clinics. *See* Abbruzzese et al., *supra*, at 14–15. As a result, it is irresponsible to say that the extremely low rates of regret/detransition observed in earlier studies apply to the majority of minors seeking social or medical gender

transition today. These are distinct clinical cohorts with different presentations and clinical needs, and there is no high-quality research on the adolescent-onset group.

Unlike the more conservative Dutch protocol, which requires a childhood diagnosis of gender dysphoria that intensifies in adolescence and no serious psychological comorbidities, the affirmative approach regards adolescent-onset gender dysphoria—even when it appears abruptly and develops rapidly—as a valid transgender identity and considers co-occurring mental health problems as secondary to gender identity problems.

In her report to the U.K.'s National Health Service, Dr. Hilary Cass called this problem "diagnostic overshadowing": once the clinician identifies gender as a source of distress, all other problems, including ones that might be causing the gender distress, are ignored. Hilary Cass, *The Cass Review Independent Review of Gender Identity Services for Children and Young People: Interim Report* 17 (2022). Some prominent proponents of the gender-affirmative model for youth in the United States have argued that there should be no "gatekeeping" at all, only "informed consent." *See*, *e.g.*, Florence Ashley, *Gatekeeping Hormone Replacement Therapy for Transgender Patients Is Dehumanising*, 45 J. Med. Ethics 480, 480–81 (2019). Lowering the thresholds for medical treatment is likely to increase the rate of false positives and, with it, the rate of regret.

A lesser-known study published by Dutch researchers in the 2000s provides a lesson in contrast to the affirmative model. It followed clinically referred adolescents who were not offered hormones or surgeries because they had disqualifying mental-health conditions and found that, up to seven years after being rejected, 80 percent did not pursue transition as adults. Yolanda L.S. Smith et al., *Adolescents with Gender Identity Disorder Who Were Accepted or Rejected for Sex Reassignment Surgery: A Prospective Follow-Up Study*, 40 J. Am. Acad. Child & Adolescent Psych. 472, 477 (2001). Two of the 14 rejected subjects expressed slight regret at not being able to transition as minors, and only one continued to want to transition as an adult. *Id*. In short, at least 11 and arguably all 14 of the adolescents benefited from not being allowed to transition as minors.

More recent studies have shown higher rates of regret and detransition. A study using data from the U.S. military healthcare system found that 30 percent of those who started treatments discontinued them within four years. *See* Christina M. Roberts et al., *Continuation of Gender-Affirming Hormones Among Transgender Adolescents and Adults*, 107 J. Clinical Endocrinology & Metabolism 3937, 3937 (2022). Another study from the U.K. in 2021 found that 10 percent of those treated at an adult transgender clinic detransitioned within 16 months of receiving treatment. Ruth Hall et al., *Access to Care and Frequency of Detransition among a Cohort Discharged by a UK National Adult Gender Identity Clinic: Retrospective Case-*

*Note Review*, 7 BJPsych Open 1, 7 (2021). An additional 22 percent disengaged from the clinic before completing their treatment. *Id.* at 5. Another study on adults found a rate of regret or detransition of 12 percent and a rate of discontinuation of 20 percent. Isabel Boyd et al., *Care of Transgender Patients: A General Practice Quality Improvement Approach*, 10 Healthcare 11 (2022). The authors of the study noted that "the detransition rate found in this population is novel and questions may be raised about the phenomenon of overdiagnosis, overtreatment, or iatrogenic harm as found in other medical fields." *Id.* at 13.

In sum, today's evidence suggests that transgender identity is less stable in adolescents, and perhaps even adults, than social-transition advocates assert. High-quality research is necessary, especially on teenagers with complex presentations of gender-related distress, to know how many will experience regret or detransition.

Due to the high likelihood of desistence and the danger of inappropriate social transition, clinicians and medical associations used to endorse—many still do—a therapeutic approach known as "watchful waiting." *See generally* Cantor, *supra*. This approach does not actively encourage or discourage expression of incongruent gender, but allows the youth to engage in nonconforming behavior while using therapy as needed to address psychological problems. It is only very recently, and in light of a serious misreading of the scientific literature (discussed below), that "watchful waiting" has been recast as a form of harmful "conversion therapy." *Id.*

**B. Objections to the Persistence and Desistence Literature Do Not Withstand Scrutiny**

To interpret away the overwhelming evidence that childhood gender dysphoria typically remits by adulthood, some researchers and transgender activists have raised methodological objections to the above studies. These all fail upon close scrutiny. One such objection is that many or most of the children in the desistence studies were not "truly transgender." As a result, the objection asserts, this desistence finding is artificially inflated. *See, e.g.*, Julia Temple Newhook et al., *A Critical Commentary on Follow-Up Studies and "Desistance" Theories about Transgender and Gender-Nonconforming Children*, 19 Int'l J. Transgenderism 212, 214–16 (2018); Kristina R. Olson, *Prepubescent Transgender Children: What We Do and Do Not Know*, 55 J. Am. Acad. Child & Adolescent Psych. 155, 155–56 (2016).

This argument is built on two claims. First, earlier studies inappropriately included not just children diagnosed with gender-identity disorder—or GID, as it was called at the time—but also children who were merely gender-nonconforming. Newhook et al., *supra*, at 215–16. Second, even the children who were diagnosed with GID were not necessarily transgender because the diagnostic criteria under the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* (DSM) Edition III (1980), III-R (1987), and IV (1994) were not as demanding as those for gender dysphoria in DSM-5 (2013). *Id.*

The first claim fails because subsequent research has borne out the durability of the desistence literature. Dr. Kenneth Zucker, an internationally renowned expert in pediatric gender dysphoria who chaired the DSM-5's Work Group on Sexual and Gender Identity Disorders and helped write the diagnostic guidelines for "gender identity disorder" in the DSM-III-R and DSM-IV, conducted a re-analysis of the earlier studies in the light of the criticism about the validity of their findings. *See* Kenneth J. Zucker, *The Myth of Persistence*, 19 Int'l J. Transgenderism 231, 233–34 (2018). He divided the children in these studies into two groups: those who did not meet the thresholds for GID but were still dysphoric enough to require referral to a specialized gender clinic, and those who did meet the diagnostic threshold. Over 90 percent of those who were subthreshold desisted, while almost 70 percent of those who met the threshold desisted. *Id.* at 234–35.

The second claim does not fare any better. The DSM-5 includes two criteria for diagnosing gender dysphoria in children: at least six months of "marked incongruence between one's experienced/expressed gender and assigned gender" and "clinically significant distress or impairment in social, school, or other important areas of functioning." Am. Psych. Ass'n, DSM-5, at 452.

The DSM-5's innovation on previous editions is its inclusion, within the first of these two criteria ("marked incongruence"), of sub-criterion A1: "A strong desire to be of the other gender or insistence that one is the other gender (or some

alternative gender different from one's assigned gender)." *Id.* Critics of the desistence literature argue that A1 represents a raising of the diagnostic threshold, and consequently, many or most of the children diagnosed with GID under previous DSM editions would not have met the DSM-5's threshold. Newhook et al., *supra*, at 214–15.

But the addition of A1 is of no real clinical significance, and the objection is misguided. The diagnostic criteria from the DSM-IV include "a strong and persistent cross-gender identification" and, in children, a "[r]epeatedly stated desire to be, or insistence that he or she is, the other sex." Am. Psych. Ass'n, DSM-IV, at 581 (DSM-IV-TR: Gender Identity Disorder in Children (302.6) and Gender Identity Disorder in Adolescents or Adults (302.85)). And the criticism largely ignores the crucially important guideline accompanying the text of the diagnostic criteria, advising that the "disorder is not meant to describe a child's nonconformity to stereotypic sex-role behavior" and that it instead "represents a profound disturbance of the individual's sense of identity with regard to maleness or femaleness." *Id.* at 580. It is thus wrong to infer that the DSM-IV included mere gender-nonconformity in its description of gender identity disorder.

A recent analysis of the differences between the DSM-IV and DSM-5 by the Dutch team that pioneered pediatric gender transition concludes that "both editions . . . of gender-identity related diagnoses seem reliable and convenient for clinical

use." Annelou L. C. de Vries et al., *Reliability and Clinical Utility of Gender Identity-Related Diagnoses: Comparisons Between the ICD-11, ICD-10, DSM-IV, and DSM-5*, 8 LGBT Health 133, 133 (2021). Dr. Zucker, who helped write the diagnostic guidelines for both DSM editions, has written: "It is my clinical opinion that the similarities across the various iterations of the DSM are far greater than the differences." Zucker, *The Myth of Persistence*, *supra*, at 234.

It should finally be noted that the assumption that the DSM-5's diagnostic threshold is higher than that of earlier editions is itself dubious. The number of minors receiving a gender dysphoria diagnosis has skyrocketed since the publication of the DSM-5. In the United States, according to data collected by Komodo Health and reported by *Reuters*, diagnoses in youth ages 6-17 rose by approximately 20 percent annually between 2017 and 2020, and by approximately 70 percent between 2020 and 2021, for a total of 121,882 new diagnoses added during these years. Robin Respaut & Chad Terhune, *Number of Transgender Children Seeking Treatment Surges in U.S.*, Reuters, Oct. 6, 2022. Since these data are based on insurance claims, they likely represent an undercount of the true number. It seems that the DSM-5 makes it easier, not harder, to receive a diagnosis. In short, there is no basis to believe that four decades of research have yielded an artificially inflated rate of desistence.

### C. Clinicians Have Not Demonstrated a Consistent Ability to Distinguish between Transgender and Gender-Nonconforming Youths

Some supporters of social transition argue that clinicians can reliably distinguish persisters from desisters in childhood. Children who express gender identity in a way that is "insistent, persistent, and consistent" (IPC), these supporters argue, can be regarded as "true transgender" children. The ability to avoid false positives means that clinicians can recommend social transition even if many or most children desist, and even if social transition is inappropriate for children who appear to be, but are not, transgender.

Proponents of IPC point to research showing that some factors—including age, natal sex, and diagnosis of GID/GD—are associated with a higher rate of persistence. They argue that children in whom one or more of these factors appear are "true transgender." The problem with this argument is that it tries to infer *individual* predictions from *population* data. As one group of experts explains:

> Factors predictive for the persistence of GD have been identified on a group level, with higher intensity of GD in childhood identified as the strongest predictor for a future gender dysphoric outcome. The predictive value of the identified factors for persistence are, however, on an individual level less clear cut, and the clinical utility of currently identified factors is low.

Jiska Ristori & Thomas D. Steensma, *Gender Dysphoria in Children*, 28 Int. Rev. Psych. 1, 6 (2016) (internal citations omitted). The Endocrine Society's 2017 guidelines on treatment of gender dysphoric youth likewise recognize

that "[w]ith current knowledge, we cannot predict the psychosexual outcome for any specific child." Hembree et al., *supra*, at 3876. As HHS's review states, "there are no reliable methods to distinguish which patients will experience long-term GD." HHS Comprehensive Review at 70.

### D. U.S.-Based Medical Groups Are Out of Step with World Health Authorities' Recognition of the Risks of Pediatric Social Transition

The American Academy of Pediatrics has called for automatic gender affirmation (social transition) of minors, irrespective of their age, since 2018. Jason Rafferty et al., *Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents*, 142 Pediatrics 1, 57 (2018) (statement adopted by the AAP Committee on Psychosocial Aspects of Child and Family Health; AAP Committee on Adolescence; and AAP Section on Lesbian, Gay, Bisexual, and Transgender Health and Wellness). The AAP statement has been subjected to thorough criticism for its inaccuracies and misrepresentations, *see* Cantor, *supra*, at 313, and contrasts sharply with medical authorities abroad.

For example, the U.K.'s Cass Interim Report observed that social transition is "an active intervention because it may have significant effects on the child or young person in terms of their psychological functioning." Cass, *supra*, at 62. The NHS later incorporated this observation into draft guidance, adding that adolescent social transition should require a gender-dysphoria diagnosis and informed consent. NHS

England, *Interim Specification: Specialist Service for Children and Young People with Gender Dysphoria (Phase 1 Providers)* 14–15 (2022).

Dr. Riittakerttu Kaltiala, chief psychiatrist at Tampere University's pediatric gender clinic in Finland, recently confirmed that "four out of five" children with gender dysphoria desist by adulthood. Leor Sapir, *Finland Takes Another Look at Youth Gender Medicine*, Tablet (Feb. 21, 2023), https://bit.ly/3YVwxZp. Asked to comment on a proposed law that would grant minors the ability to define their gender for purposes of government documents, Dr. Kaltiala said that while it is "important to accept [children] as they are," "negating the body" by confirming that a child's gender self-perception is real can send the child "a message that there is something wrong with him or her." Annika Mutanen, *A Professor Who Treats Adolescent Gender Anxiety Says No to Minors' Legal Gender Correction*, Helsingin Sanomat, Jan. 27, 2023 (translated from Finnish using Google Translate). The Finnish Paediatric Society and Finnish Medical Association both objected to legal gender self-identification for minors, and the proposal was defeated. *See* Sapir, supra.

The U.S.-based World Professional Association for Transgender Health (WPATH), meanwhile, has long viewed social transition in children as "a controversial issue" among "health professionals." Eli Coleman et al., *Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People*, *Version 7*, 13 Int'l J. Transgenderism 165, 176 (2012). Until 2022, when the

eighth version of its Standards of Care was published, WPATH recognized that "[t]he current evidence base is insufficient to predict the long-term outcomes of completing a gender role transition," and that the desire for social transition "may reflect an expression of their gender identity" but it could also "be motivated by other forces." *Id.* Because "[a] change back to the original gender role can be highly distressing," parents should rely on "[m]ental health professionals" to help them "make decisions regarding the timing and process of any gender role changes for their young children." *Id.*

WPATH's Version 8 has drawn criticisms for omitting the proposed chapter on ethics; including a chapter on eunuchs (and claiming children can know they are eunuchs); claiming that a systematic review of evidence is "not possible" (Sweden, the U.K., and Florida have done them); and eliminating age minimums for drugs and surgeries. On the question of social transition, WPATH now recommends it for children but only "when it would be beneficial." Eli Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. Transgender Health S1, S76 (Suppl. 1) (2022). Who determines that? According to WPATH, "health care professionals [should] discuss the potential benefits and risks of a social transition with families who are considering it" (emphasis added). *Id.* at S69, S77. For adolescents, WPATH recommends that "family members . . . work collaboratively" with "community members" such as school officials, "unless

[families'] involvement is considered harmful to the adolescent." *Id*. at S52. Inexplicably, given that most of the research on social transition came out before Version 7 was published in 2012, and that health authorities in the U.K. and Finland now acknowledge the risks of social transition in children and adolescents, Version 8 discusses only the benefits of adolescent social transition.

## II. Courts Have Recognized Social Transition as a Medical Intervention

Lawsuits over the past decade have raised the question of how schools must accommodate transgender-identified students under Title IX of the 1972 Education Amendments, 20 U.S.C. §§ 1681–1688, and the Equal Protection Clause, U.S. Const. amend. XIV § 1. Transgender-identified plaintiffs and their counsel have argued, and in most cases, courts have agreed, that using restrooms and other sex-specific facilities are a crucial part of a treatment protocol for a "medically diagnosed and documented condition." *Whitaker v. Kenosha Unified Sch., Dist.*, 858 F.3d 1034, 1050 (7th Cir. 2017).

A therapeutic rationale for social transition and gender identity-based access to restrooms in schools has been stated by transgender-identified students and their representatives in multiple circuits. *See, e.g.*, Br. of *Amici Curiae* Am. Acad. Pediatrics in Support of Defendants-Appellees and Affirmance at 6, *Soule v. Ct. Ass'n of Schs.*, No. 3:20-cv-00201 (2nd Cir. 2022); Br. of *Amici Curiae* Am. Acad. of Pediatrics at 14, *Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518 (3d Cir. 2018);

Br. of *Amici Curiae* Med., Pub. Health, and Mental Health Orgs. in Support of Plaintiff-Appellee at 3, *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020); Complaint at 21–24, *Bd. of Educ. of the Highland Local Sch. Dist. v. U.S. Dep't of Educ.*, 208 F. Supp. 3d 850 (S.D. Ohio 2016); *Whitaker v. Kenosha Unified Sch. Dist.*, 858 F.3d 1034, 1050 (7th Cir. 2017); Br. of *Amici Curiae* Am. Acad. of Pediatrics at 3–4, *Parents for Privacy v. Dallas Sch. Dist. No. 2*, 949 F.3d 1210 (9th Cir. 2020); *Adams v. Sch. Bd. of St. Johns Cnty.*, No. 18-13592, at *7–9 (11th Cir. 2022) (Pryor, J., dissenting). Five circuit courts agreed that social transition and, by extension, use of accommodations designated for the sex students identify with is important for therapeutic treatment. *See Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 529–31 (3d Cir. 2018); *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 615, 619 (4th Cir. 2020); *Dodds v. U.S. Dep't of Educ.*, 845 F.3d 217, 221–22 (6th Cir. 2016); *Whitaker v. Kenosha Unified Sch. Dist.*, 858 F.3d 1034, 1050 (7th Cir. 2017); *Parents for Privacy v. Dallas Sch. Dist. No. 2*, 949 F.3d 1210, 1210 (9th Cir. 2020).

## III. The Delaware Valley Regional High School Board's Policy Prevents Parents from Exercising Their Parental Rights

Youth gender affirmation is not an indisputably helpful, passive, or neutral show of respect and support, but an active mental-health intervention that may inhibit a child's ordinary development and prolong feelings of gender-related discomfort. *See supra* § I.A. The district court thus erred in its characterization of Delaware Valley High School officials who "passively recognized students by their

preferred gender identities." Dist. Ct. Op. at 30. Indeed, social transition at school without parental knowledge or consent constitutes precisely the kind of "proactive intrusion into private family matters," *id.* at 28, that the Third Circuit has found incompatible with parents' rights under the Due Process Clause. *See id.* at 25–31.

When social transition is properly understood as an active mental-health intervention, it becomes clear that it is a decision that should be made by, or in consultation with, students' parents or legal guardians. This decision falls squarely within the ambit of parents' fundamental right to make healthcare decisions for their children. *See, e.g.*, *Stanley v. Illinois*, 405 U.S. 645, 651 (1972) (affirming parents' rights "in the companionship, care, custody, and management" of their children); *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 27 (1981) (quoting *Stanley* and reaffirming that parents' interest over their children "undeniably warrants deference and, absent a powerful countervailing interest, protection").

The Supreme Court has been clear and consistent in stressing that parents or legal guardians are the ones best positioned to understand and address the needs of children and adolescents, including unique mental health needs. *See*, *e.g.*, *Troxel v. Granville*, 530 U.S. 57, 66–69 (2000). Overriding that discretion requires an exceedingly persuasive justification, such as compelling evidence that physical or emotional abuse will ensue if a student's desire for social transition is disclosed. *See Santosky v. Kramer*, 455 U.S. 745, 752–54 (1982). Even in these very limited

circumstances, school staff should not be at liberty to perform social transitions but should instead consult the appropriate state child welfare services.

By facilitating the active psychological intervention of social transition without parental knowledge or consent, the board policy here prevents parents from exercising their fundamental right to determine their children's healthcare decisions. *See Parham v. J.R.*, 442 U.S. 584, 604 (1979); *Colon v. Collazo*, 729 F.2d 32, 34 (1st Cir. 1984). That right prevails even when children or school officials dislike or disagree with fit parents' exercise of their discretion. This Court has consistently protected the "cardinal" principle that "that the custody, care and nurture of the child reside first in the parents" and "respected the private realm of family life which the state cannot enter." *Prince v. Massachusetts*, 321 U.S. 158, 166 (1943).

Notifying parents or legal guardians of changes to their child's asserted gender identity enables them to exercise reasonable caution against long-term risks, which may include lifelong sterility, sexual dysfunction, mood disorders, and increased risk of cancer and heart disease. *See, e.g.*, Jewett, *supra*. As such, denying this notification directly infringes on Plaintiff-Appellant's ability to exercise such caution, and thus to direct the medical care of his child.

When school staff make decisions about social transition in secret, they usurp the authority of parents and violate their well-established constitutional rights. Most importantly, they put the mental and physical health of minors at risk.

**CONCLUSION**

For the foregoing reasons, and those stated by the Plaintiff-Appellant, this Court should reverse the judgment below.

Respectfully submitted,

/s/ *Ilya Shapiro*

Ilya Shapiro
John Ketcham
Manhattan Institute
52 Vanderbilt Ave.
New York, NY 10017
(212) 599-7000
ishapiro@manhattan.institute

July 7, 2025

## COMBINED CERTIFICATIONS

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 29(A)(5) and Fed. R. App. P. 32(a)(7)(B) because it contains 6,196 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), as determined by the word counting feature of Microsoft Office 365.

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using 14-point Times New Roman.

3.     Ilya Shapiro is a member in good standing of the bar of the U.S. Court of Appeals for the Third Circuit.

4.     In accordance with L.A.R. 31.1(c), this brief has been scanned for viruses with the most recent version of a commercial virus scanning program, Cortex XDR, Agent version 7.8.1, and is free of viruses according to this program.

5.     In accordance with L.A.R. 31.1(c), the text of the electronic copy of this brief filed using this Court's CM/ECF system is identical to the text in the paper copies filed with the Clerk.

Dated: July 7, 2025

                                     */s/ Ilya Shapiro*
                                     Counsel for *Amici Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 7, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the Third Circuit for filing and transmittal of a Notice of Electronic Filing to the participants in this appeal who are registered CM/ECF users.


DATED: July 7, 2025

/s/ *Ilya Shapiro*
Counsel for *Amici Curiae*