APPEAL NO. 24-3278

# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

CHRISTIN HEAPS,
*Plaintiff-Appellant,*

*v.*

DELAWARE VALLEY REGIONAL HIGH SCHOOL BOARD OF EDUCATION;
et al.,
*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of New Jersey
Case No. 3:24-cv-00107

**AMICUS BRIEF OF THE STATE OF MONTANA, 21 OTHER STATES & THE ARIZONA LEGISLATURE IN SUPPORT OF PLAINTIFF-APPELLANT and REVERSAL**

AUSTIN KNUDSEN
  *Attorney General of Montana*
CHRISTIAN B. CORRIGAN
  *Solicitor General*
MONTANA DEPARTMENT OF JUSTICE
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
(406) 444-2026
christian.corrigan@mt.gov

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................ii

AMICI'S IDENTITY, INTEREST, AND AUTHORITY TO FILE ...............................1

BACKGROUND............................................................................1

SUMMARY OF ARGUMENT ...........................................................7

ARGUMENT.............................................................................10

I.   Parents have a fundamental right to direct the care and custody of their children....................................................................10

   A.   Parental rights are among the longstanding rights protected by the Due Process Clause....................................................11

   B.   The district court erred in denying Mr. Heaps' motion for preliminary injuctionand applying rational basis review....23

   C.   The policy is part of a trend by school districts across the country to exclude parents from social transitioning decisions. ...........................................................................28

CONCLUSION .........................................................................31

CERTIFICATE OF COMPLIANCE WITH FED. R. APP. 32(A)(7) .......................34

CERTIFICATE OF SERVICE .....................................................35

# TABLE OF AUTHORITIES

**Cases**

*Anspach v. City of Phila., Dept. of Pub. Health*,
   503 F.3d 256 (3d Cir. 2007) ........................................................... 6, 23

*C.N. v. Ridgewood Bd. of Educ.*,
   430 F.3d 159 (3d Cir. 2005) ................................................................. 5

*Dobbs v. Jackson Women's Health Org.*,
   142 S. Ct. 2228 (2022) ....................................................................... 11

*Doe v. Pub. Health Tr.*,
   696 F.2d 901 (11th Cir. 1983) ........................................................... 19

*Finch v. Finch*,
   22 Conn. 411 (1853) ........................................................................... 16

*Furman v. Van Sise*,
   56 N.Y. 435 (1874) ............................................................... 15, 16, 18

*Gonzales v. Carhart*,
   550 U.S. 124(2007) ............................................................................ 20

*Gruenke v. Seip*,
   225 F.3d 290 (3d Cir. 2000) ................................................. 21, 25, 26

*Jenness v. Emerson*,
   15 N.H. 486 (1844) ........................................................................... 16

*Jones v. Tevis*,
   14 Ky. (4 Litt.) 25 (1823) ................................................................. 16

*L.W. v. Skrmetti*,
   83 F.4th 460 (6th Cir. 2023) ....................................................... 19, 20

*Mahmoud v. McKnight,*
102 F. 4th 191 (2024) ........................................................................ 24

*Mahmoud v. Taylor*, No. 24-297,
2025 U.S. LEXIS 2500 (June 27, 2025) .............................................. 23

*Marbury v. Madison,*
5 U.S. (1 Cranch) 137 (1803) .............................................................. 31

*May v. Anderson,*
345 U.S. 528 (1953) .............................................................................. 1

*Meachum v. Fano,*
427 U.S. 215 (1976) ............................................................................ 12

*Meyer v. Nebraska,*
262 U.S. 390 (1923) ..................................... 1, 5, 10, 12, 16, 17, 18, 23

*Morse v. Frederick,*
551 U. S. 393 (2007) ........................................................................... 25

*Parham v. J.R.,*
442 U.S. 584 (1979) ........................................... 7, 9, 17, 18, 19, 20, 28

*Pierce v. Soc'y of Sisters,*
268 U.S. 510 (1925) ............................................. 5, 16, 18, 19, 23, 25

*Porter v. Powell,*
44 N.W. 295 (Iowa 1890) ................................................................... 16

*Prince v. Massachusetts,*
321 U.S. 158 (1944) ....................................................... 16, 18, 19, 22

*Sch. Bd. Dist. No. 18 v. Thompson,*
103 P. 578 (Okla. 1909) ..................................................................... 15

*Smith v. Org. of Foster Families for Equal. & Reform,*
431 U.S. 816 (1977) ........................................................................... 12

*Stanley v. Illinois,*
405 U.S. (1972) ............................................................... 1, 17

*Thompson v. Oklahoma,*
487 U.S. 815 (1988) ............................................................ 17

*Troxel v. Granville,*
530 U.S. 57 (2000) ............................................ 8, 10, 11, 12, 18, 19, 31

*United States v. Skrmetti,* No. 23-477,
2025 U.S. LEXIS 2377 (June 18, 2025) ................................. 20

*Washington v. Glucksberg,*
521 U.S. 702 (1997) ............................................................ 11

*Wisconsin v. Yoder,*
406 U.S. 205 (1972) ................................................... *passim*

## Statutes

10 U.S.C. § 505 ................................................................... 18

23 U.S.C. § 158 ................................................................... 18

U.S. Const. amend. XIV ..................................................... 11

U.S. Const. amend. XXVI ................................................... 18

## Rules

Fed. R. App. 32(a)(7) ......................................................... 34

Fed. R. App. P. 32(a)(5) ..................................................... 34

Fed. R. App. P. 32(a)(6) ..................................................... 34

Fed. R. App. P. 32(a)(7)(B) ............................................... 34

Fed. R. App. P. 32(f) ............................................................... 34

Fed. R. App. Proc. 29(a)(2) ....................................................... 1

## Other Authorities

1 William Blackstone, *Commentaries on the Laws of England*,
  *446 (1753) ...................................................................... 11

2 Baron de Montesquieu, *The Spirit of the Laws*,
  69 (1749) ......................................................................... 12

2 Hugo Grotius, *The Rights of War and Peace*,
  208-210 (Richard Tuck ed., 2005) (1625) ............................. 12

Adele Diamond, *Normal Development of Prefrontal Cortex from Birth to Young Adulthood: Cognitive Functions, Anatomy, and Biochemistry*,
  in D. Stuss & R. Knight eds., *Principles of Frontal Lobe Function*
  466 (2002) ....................................................................... 17

Elie Vandenbussche, *Detransition-Related Needs and Support: A Cross-Sectional Online Survey*,
  69 Homosexuality 1602 (2021) ......................................... 20

Ferdinand Schoeman, *Parental Discretion and Children's Rights: Background and Implications for Medical-Decision-Making*,
  10 *J. Med. & Phil.* 45, 46 (1985) ..................................... 17

GLSEN & Nat'l Center for Transgender Equality, *Model Local Education Agency Policy on Transgender and Non-Binary Students*
  4 (Rev. Oct. 2020) ......................................................... 26

*InDoctriNation Map*, PARENTS DEFENDING EDUC., (last accessed Oct. 23, 2023) (filtering for "incidents," "public schools," and "parents rights" yields over 150 results for school policies), https://defendinged.org/map/
  ..................................................................................... 23

*Independent Review of Gender Identity Services for Children and Young People: Interim Report* (The Cass Review), Feb. 2022,
62, https://perma.cc/D5XP-EXAL ........................................................ 19

Jean-Jacques Burlamaqui, *The Principles of Natural and Public Law*,
15 Nature Neuroscience 1184 (2012) ................................................... 12

John Locke, *The Two Treatises of Civil Government*,
243 (Thomas Hollis ed., A. Millar et al.) (1689) ................................. 12

John Witte, Jr., *The Nature of Family, The Family of Nature: The Surprising Liberal Defense of the Traditional Family in the Enlightenment*,
64 Emory L.J. 591, 658–62 (2015) ...................................................... 11

Luke Berg, *How Schools' Transgender Policies are Eroding Parents' Rights*,
3 (Mar. 2022) ....................................................................................... 20

Sarah-Jane Blakemore & Trevor W. Robbins, *Decision-Making in the Adolescent Brain*,
61 (1747) ............................................................................................... 17

## AMICI'S IDENTITY, INTEREST, AND AUTHORITY TO FILE

The States of Montana, Alabama, Alaska, Arkansas, Florida, Georgia, Idaho, Indiana, Kansas, Louisiana, Mississippi, Missouri, Nebraska, North Dakota, Ohio, Oklahoma, South Carolina, South Dakota, Texas, Utah, Virginia, West Virginia, and the Arizona Legislature ("Amici States") file this amicus brief pursuant to Fed. R. App. Proc. 29(a)(2). Amici States are entrusted with protecting fundamental rights. Here, they seek to ensure that parents retain their right to direct the upbringing of their minor children—a right the Supreme Court has described as "essential" and "far more precious … than property rights." *Stanley v. Illinois*, 405 U.S. 651 (1972) (quoting *Meyer v. Nebraska*, 262 U.S. 390, 299 (1923) and *May v. Anderson*, 345 U.S. 528, 533 (1953)).

## BACKGROUND

### A YOUNG GIRL IS SECRETLY TRANSITIONED

In 2023, Christian Heaps sent his daughter ("Jane") to Delaware Valley Regional High School ("DVRHS"). For the average student, transitioning into high school is challenging enough. Jane was not the

average student. Prior to starting her freshman year at DVRHS, Jane

had experienced the childhood trauma of the death of her mother and had

been diagnosed with Attention-Deficit/Hyperactivity Disorder, high-

functioning autism, and anxiety. Jane had also been seeing a therapist

to address her gender confusion. A loving, caring parent, Mr. Heaps

sought ongoing care from mental health professionals with whom he had

agreed to "take a cautious approach to Jane's gender confusion given her

underlying trauma and psychiatric comorbidities." ECF No. 40 ¶ 22.

Unbeknownst to Mr. Heaps and contrary to his carefully tailored

healthcare plan for his daughter, DVRHS officials had implemented their

own plan for Jane.

Adhering to the DVRHS Board of Education's ("the Board") Policy

5756, a school employee immediately affirmed Jane's expressed identity

and began to facilitate Jane's social transition, no questions asked. *Id.* ¶¶

23, 35. Without any consideration of—and, apparently, without any

concern for—Jane's underlying mental health condition, the employee

informed the DVRHS staff that they would be required to use Jane's

alternate male name. *Id.* ¶ 40. Mr. Heaps, however, would be kept in the

dark. In line with Policy 5756, school officials had "no affirmative

duty . . . to notify a student's parent of the student's gender identify or expression." *Id.* ¶ 23. Accordingly, while DVRHS staff began to use Jane's male name at school, in any communications with Mr. Heaps, the school always used Jane's given female name, directly undermining Mr. Heaps's efforts at home to help his child heal. *Id.* ¶ 41. By December, the jig was up. In a conversation with another parent from the school, Mr. Heaps learned about Jane's months-long covert social transition when the parent referred to Jane using a boy's name. *Id.* at 42. Mr. Heaps was devastated. Floored by the fact that the school administrators whom he had entrusted with his daughter's care had been systematically deceiving him and concerned by Jane's distress at living a double life, Mr. Heaps placed Jane on home instruction until he could address the Board. *Id.* ¶ 44. On December 8, 2023, Mr. Heaps met with the Board and expressed his opposition to Jane's social transition at school. *Id.* ¶ 46. Undeterred and dismissive of Mr. Heaps' rightful care and control of his daughter, the Board rejoined that it would continue to call Jane by a male name until she indicated otherwise. *Id.* ¶ 47. In other words, school officials would decide what was best for Jane, not her father.

At the recommendation of Jane's therapist and doctor, Mr. Heaps pulled Jane from school. *Id.* ¶ 44. The Board Defendants' insistence on socially transitioning Jane was causing her significant depression and anxiety that was damaging to her health. *Id.* ¶ 60. In response, the Board threatened to have Jane deemed truant. *Id.* Mr. Heaps also received a surprise visit from the State's child protective services—undoubtedly dispatched by Board representatives—out of a concern that he was mistreating Jane. *Id.* ¶ 61. On the contrary, since pulling Jane from DVRHS, Mr. Heaps had observed improvement in Jane's mental health and well-being. *Id.*

Mr. Heaps' Complaint alleged that the Board infringed upon his fundamental right to control various aspects of his child's upbringing, healthcare, and education. ECF No. 40 ¶¶ 72–74. He also sought, among other things, a declaration that Policy 5756 is unconstitutional to the extent that it interferes with parental rights, an order from the court enjoining its future enforcement, and monetary damages for the Due Process violation.

The district court, despite recognizing the "well-established" precedent that the Fourteenth Amendment protects the liberty interest

of parents in the care, custody, and control of their children, ECF 88 at 22 (hereinafter "Op."), held that Mr. Heaps had failed to "provide[] … any historical or legal precedent or authority demonstrating that the Fourteenth Amendment's protections extend to the circumstances of this case and that the scope of [his] claimed substantive due process right is deeply rooted in our Nation's history and tradition and concept of ordered liberty." *Id.* at 23 (internal quotations omitted). The court characterized Mr. Heaps' claims as a "significant expan[sion of] the scope of parental rights" that would "break new ground in the field of substantive due process." *Id.* at 24. The court also located the school district's don't-ask-don't-tell social transitioning policy within the state's power to compel attendance, *id.* at 23, make reasonable regulations, *id.*, determine the kind of education, *id.* n.10, and impose educational requirements, *id.* at 24 n.11, that the Supreme Court blessed in *Meyer*, *Pierce*, and *Yoder*. Parental rights in school settings are not absolute, the court reasoned, therefore Mr. Heaps' claims are without constitutional support.

Before citing a flurry of Third Circuit precedent, the court stressed the state's power to exercise "a degree of supervision and control [over minor students] that could not be exercised over free adults." *Id.* at 25

(citing *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 182 (3d Cir. 2005)). Yet in the same breath that it acknowledged student's lesser rights in schools, the court paradoxically reinforced Jane's autonomy, reasoning that because she had "initiated the request to socially transition," the Board's hands were tied. *Id.* at 28. The key, the district court held, when evaluating the right of parents to control a child's upbringing and education is whether the state was "requiring or prohibiting some activity." *Id.* at 25 (citing *Anspach ex rel. Anspach v. City of Phila., Dept. of Pub. Health*, 503 F.3d 256, 263–64 (3d Cir. 2007)). Because the child in this case was a high school student—as opposed to a younger elementary student—and because she was the one that had requested the social transition the court found that the Board had not engaged in the kind of "proactive intrusion into private family matters" that the Third Circuit has found dispositive in parents' favor in other cases. *Id.* at 28–29. The court determined that the Board was not coercive because Policy 5756 "does not permit staff members to lie to parents … if they inquire about their child's gender identity or expression." *Id.* at 30. It only permits them to affirmatively deceive, mislead, and, when parents speak up, contradict—as DVRHS did here.

Neither, according to the court, did the Board interfere with Mr. Heaps' right to make medical decisions for Jane. *Id.* at 31. The court supported this conclusion by trading its black robe for a white coat: It critiqued Jane's healthcare providers, emphasizing that they had not officially diagnosed Jane with gender dysphoria, and for that matter, they were not medically authorized to do so. *Id.* at 31–32. Therefore DVRHS officials could not have been making healthcare decisions for Jane by enforcing district policy. Never mind the fact that Policy 5756 doesn't require a medical diagnosis. Faculty and staff are required to "accept a student's asserted gender identity." *Id.* at 3.

Finding that Mr. Heaps had failed to allege any fundamental parental right to direct the upbringing and healthcare decisions of his daughter, the court applied rational basis review. *Id.* at 33. Policy 5756 passed the lowest level of scrutiny on the grounds that the Board's goals of protecting transgender students from discrimination at school and of fostering a diverse learning environment were compelling justifications. *Id.*

## SUMMARY OF ARGUMENT

Parents the world over tell their children: "if a grownup tells you not to tell mom and dad, telling mom and dad is the first thing you should do." As our constitutional system (and common experience) recognizes, this is because "the natural bonds of affection lead parents to act in the best interests of their children." *Parham v. J.R.*, 442 U.S. 584, 602 (1979). Assisting a child in concealing important life changes from his or her parents introduces mistrust and anxiety into the parent-child relationship, leading to worsening mental health for the child—the very result Jane experienced here. *See* Compl., Dkt. 40 ¶ 44.

Thus, absent a reason to believe a parent is unfit, courts presume the state may not "inject itself into the private realm of the family [and] question the ability of that parent to make the best decisions concerning the rearing of [parents'] children." *Troxel v. Granville*, 530 U.S. 57, 68-69 (2000) (plurality op.). But the district court ignored all of this and decided that a state entity socially transitioning a mentally and emotionally vulnerable child and hiding that information from her concerned father was not a proactive interference with the parent-child relationship. Op. at 30. If it were not an intrusion, there would have been no reason to hide

that information from Jane's father. State and federal rules of evidence allow deceptive statements made after a wrongful act to be considered as evidence of a guilty conscious. *See , e.g.*, *United States v. Levy*, 594 F. Supp. 2d 427, 437 (S.D.N.Y. 2009). The decent and lawful thing to do was to share with Mr. Heaps—the person who knows and loves his daughter most—that the school was treating his daughter as a boy at her request and what they had observed of her struggles.

The policy the school district relied upon to keep Mr. Heaps in the dark was not a mere "passive recognition" designed to "benefit all students by promoting acceptance." The district used the policy as a cover to keep his child in its clutches through fraudulent representations. The policy denied Mr. Heaps his right to  substantive due process. Parents like Mr. Heaps have a legal duty as well as a biological imperative to keep their children safe. Correspondingly, the constitution recognizes that parents have a fundamental right to direct the upbringing of their children and to instill in them moral standards and beliefs.

The U.S. Constitution has offered strong protection for parental rights since our nation's founding. Those rights are not granted by any man-made institutions or documents; rather, they are natural rights that

have been the subject of philosophical thought at least since the eighteenth century, with roots dating to Greco-Roman times. Parental rights are not cast aside "[s]imply because the decision of a parent [about a child's medical treatment] is not agreeable to [the] child or because it involves risks." *See Parham*, 442 U.S. at 603. *See* Section I.

Here, however, the school district decided that it knew better than Jane's father and healthcare providers when it secretly began calling Jane a masculine name.  Doing so not only deepened Jane's distress, it denied Mr. Heaps the right to direct Jane's upbringing. It also denied Mr. Heaps' due process rights by first withholding information about his daughters social transition at school, and then deliberately persisting in the transition after Mr. Heaps had demanded an end to it. The district's actions are not justified because Jane requested the use of the name and pronouns or because it thought Mr. Heaps wasn't supportive enough of Jane's gender transition. Nor are they justified by the number of school districts across the nation that have adopted similar policies. *See* Part II(C).

## ARGUMENT

## I. Parents have a fundamental right to direct the care and custody of their children.

The right of parents to direct the care and custody of their children is perhaps the oldest of the fundamental liberty interests recognized by the [Supreme] Court." *Troxel*, 530 U.S. at 65 (citing *Meyer*, 262 U.S. at 399). But the right preexists the constitution itself and is an intrinsic human right.

### A. Parental rights are among the longstanding rights protected by the Due Process Clause.

Start with the basics. States may not "deprive any person of … liberty … without due process of law." U.S. Const. amend. XIV. This Due Process Clause "provides heightened protection against government interference with certain fundamental rights and liberty interests," *see Troxel*, 530 U.S. at 65 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997))—including those unenumerated rights that are "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty," *see Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2242 (2022) (quoting *Glucksberg*, 521 U.S. at 721). To

conduct this inquiry, courts must "engage[] in a careful analysis of the history of the right at issue." *Id.* at 2246.He

re, the district court engaged in a flawed analysis of the history that misconstrued the nature and scope of the parental liberty interests at stake. It framed Mr. Heaps' complaint as seeking to challenge a policy aimed at respecting students' preferred name and pronouns. Op, Dkt. 88 at 24. That description is wholly detached from Mr. Heaps' actual claims, and its characterization displays its lack of understanding of both the right at issue and the infringement. While this Court could remand to allow the court to undertake the historical analysis of her claimed parental rights, the more efficient approach would be for this Court to undertake that analysis.

To that end, it is important that the right of parents to direct the care and custody of their children "is perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court." *Troxel*, 530 U.S. at 65 (citing *Meyer*, 262 U.S. at 399). But parents' liberty interest in the care and custody of their minor children has a much earlier origin than *Meyer*. That interest  is "older than the Bill of Rights" and "has its source … not in state law, but in intrinsic human rights." *See*

*Smith v. Org. of Foster Families for Equal. & Reform*, 431 U.S. 816, 845 (1977); *see also Meachum v. Fano*, 427 U.S. 215, 230 (1976) (Stevens, J., dissenting) ("[N]either the Bill of Rights nor the laws of sovereign States create the liberty which the Due Process Clause protects.").

During the late-eighteenth and early-nineteenth century, Sir William Blackstone's writings greatly influenced the American common-law understanding of the reciprocal rights and duties that the natural law imposes on parents and children. *See* John Witte, Jr., *The Nature of Family, The Family of Nature: The Surprising Liberal Defense of the Traditional Family in the Enlightenment*, 64 Emory L.J. 591, 598, 658–62 (2015). Blackstone defined the parent-child relationship as "the most universal relation in nature" and explained that parents have a duty to provide for their children's maintenance, protection, and education. 1 William Blackstone, *Commentaries on the Laws of England* *446 (1753). While recognizing that municipal laws reinforce these duties, he argued that "Providence has done it more effectually … by implanting in the breast of every parent that natural … affection, which not even the deformity of person or mind, … wickedness, ingratitude, … [or] rebellion of children[] can totally suppress or extinguish." *Id. at* *447. Parental

authority stems from parents' duties to provide for their children's maintenance, protection, and education and includes, as a necessary incident, the authority to perform those duties without unreasonable state interference.  *See id. at* *452–53.

Blackstone was not writing on a blank slate.  Instead, he drew from influential natural law thinkers like Samuel Pufendorf and Baron Montesquieu.  *See id.* *447 (arguing, by reference to Pufendorf, that parents' duty to "provide for the *maintenance* of their children is a principle of natural law … laid on them not only by nature herself, but by their own proper act[] in bringing them into the world"); *see id.* ("[T]he establishment of marriage in all civilized states is built on this natural obligation for the father to provide for his children." (citing 2 Baron De Montesquieu, *The Spirit of the Laws* 69 (1749))).  Similar views on the parent-child relationship can be found in the earlier writings of Hugo Grotius, John Locke, Jean-Jacques Burlamaqui, and others.  *See, e.g.*, 2 Hugo Grotius, *The Rights of War and Peace* 208–12 (Richard Tuck ed., 2005) (1625) ("Children need to be educated and conducted by the Reason of another.  And none but Parents are naturally [e]ntrusted with this Charge."); John Locke, *The Two Treatises of Civil Government* 243

(Thomas Hollis ed., A. Millar et al.) (1689) ("The *power … that parents have* over their children arises from that duty which is incumbent on them to take care of their offspring during the imperfect state of childhood." (cleaned up)); Jean-Jacques Burlamaqui, *The Principles of Natural and Politic Law* 61 (1747) (arguing that "Providence … has inspired parents with that instinct or natural tenderness … for the preservation and good of those whom they have brought into the world").

State courts have leaned on Blackstone's collected wisdom to resolve questions about the nature of parental rights and duties—including parent-school disputes and parental support cases—thus incorporating these natural law conceptions of parental rights into the corpus of early American common law. *See* Witte, Jr., *Nature of Family*, *supra* at 597–98 (arguing that the views of the Enlightenment thinkers like Grotius, Pufendorf, Locke, Montesquieu, and others "penetrated deeply into the Anglo-American common laws of the eighteenth and nineteenth centuries, courtesy especially of William Blackstone"); *see also, e.g.*, *Sch. Bd. Dist. No. 18 v. Thompson*, 103 P. 578, 581–82 (Okla. 1909) (parents may exclude their child from some courses of study because, under the common law, they retained authority "sufficient to

keep the[ir] child in order and obedience" and "the common law presum[ed] that the[ir] natural love and affection … for their children would impel them to faithfully perform th[e] duty [to provide an education]" (citing Blackstone, *Commentaries*, *supra* at *451–53)); *Furman v. Van Sise*, 56 N.Y. 435, 439–40 (1874) (grounding parents' right to the services of their children in their natural law obligation to "maintain, educate and take care of [their minor] children," which entitles parents to "the custody and control of such children" and "to the services of the children").[1]

A century ago, the Supreme Court grounded the common-law right of parents to direct the care and custody of their minor children in the "liberty" protected by the Fourteenth Amendment's Due Process Clause. *See Meyer*, 262 U.S. at 399–400 (Due Process Clause secures parents' right to "establish a home and bring up children"). In doing so, the Court drew on "the natural duty of the parent"—which "[c]orrespond[ed] to the right of control"—"to give his children education suitable to their station

---

[1] *See also, e.g., Porter v. Powell,* 44 N.W. 295, 297 (Iowa 1890) (parents' "right to exercise care, custody and control over the[ir] child" arises out of their natural law duty to "provide for the maintenance of their children" (citing Blackstone, *Commentaries*, *supra* at *446)); *Finch v. Finch*, 22 Conn. 411, 415 (1853) (same); *Jenness v. Emerson*, 15 N.H. 486, 488–89 (1844) (same); *Jones v. Tevis*, 14 Ky. (4 Litt.) 25, 27 (1823) (same).

in life." *Id.* at 400. And over the last century, the Court has reaffirmed that right time and again. *See Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534–35 (1925) ("liberty of parents and guardians" includes the right "to direct the upbringing and education of children under their control"); *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944) ("It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder."); *Stanley*, 405 U.S. at 651 (raising one's children has been treated as an "essential" and "basic civil right[] of man" (citation and quotation marks omitted)); *see Dobbs*, 142 S. Ct. at 2257 (identifying, among a list of longstanding rights, "the right to make decisions about the education of one's children"). A century after *Meyer*, this much is clear: "Th[e] primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition." *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972).

That parental right is rooted in part in the commonsense recognition "that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult

decisions." *Parham*, 442 U.S. at 602. The law thus makes a basic assumption about children as a class: "[It] assumes that they do not yet act as adults do, and thus [it] act[s] in their interest by restricting certain choices that … they are not yet ready to make with full benefit of the costs and benefits attending such decisions." *Thompson v. Oklahoma*, 487 U.S. 815, 826 n.23 (1988). That basic assumption justifies many restrictions on minor children's rights, including their right to vote, *see* U.S. Const. amend. XXVI, enlist in the military without parental consent, *see* 10 U.S.C. § 505, or to drink alcohol, *see* 23 U.S.C. § 158.  And that same principle is traditionally at work in public schools, which routinely require parental consent before a student can receive medication or participate in certain school activities.

This authority is based also—and perhaps more importantly—on the idea that parents are best suited to "prepar[e their children] for obligations the state can neither supply nor hinder." *Prince*, 321 U.S. at 166; *see also Pierce*, 268 U.S. at 535 (declaring that "[t]he child is not the mere creature of the State," but "those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations"). Indeed, Blackstone explained

that "the *power* of parents over their children is derived from … their duty." *Commentaries*, *supra* at *452. And Blackstone's understanding of the reciprocal rights and duties that the natural law imposes on parents and children permeates the Court's decisions in cases like *Meyer*, *Pierce*, *Prince*, *Yoder*, *Parham*, and *Troxel*. *See, e.g.*, *Meyer*, 262 U.S. at 400 ("natural duty of the parent"—which "[c]orrespond[s] to the right of control"—is "to give his children education suitable to their station in life"); *Pierce*, 268 U.S. at 535 (parents have "the right" and "high duty" to prepare [their children] "for additional obligations");[2] *Prince*, 321 U.S. at 166 ("[C]ustody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.").

Of course, parental authority is not absolute. Courts have recognized that parents have no license to abuse or neglect their children. *Parham*, 442 U.S. at 602–04. Nor does the parental relationship give parents the right to control public-school curriculum or disregard lawful limitations on the use of medical procedures or drugs. *See Doe v. Pub.*

---

[2] *Parham, Yoder*, and *Troxel* rely on this principle from *Pierce*. *See Parham*, 442 U.S. at 602; *Yoder*, 406 U.S. at 233; *Troxel*, 530 U.S. at 68–69.

*Health Tr.*, 696 F.2d 901, 903 (11th Cir. 1983) ("John Heaps' rights to make decisions for his daughter can be no greater than his rights to make medical decisions for himself."); *L.W. v. Skrmetti*, 83 F.4th 460, 473 (6th Cir. 2023) ("State governments have an abiding interest in protecting the integrity and ethics of the medical profession and preserving and promoting the welfare of the child.  These interests give States broad power, even broad power to limit parental freedom when it comes to medical treatment.") (quotations and citations omitted), *aff'd on other grounds*, *United States v. Skrmetti*, No. 23-477, 2025 U.S. LEXIS 2377 (June 18, 2025).[3]  Relatedly, some parental decisions about their child's medical care may be "subject to a physician's independent examination and medical judgment." *Parham*, 442 U.S. at 604. But even then, parents "retain a substantial, if not the dominant, role in the decision, absent a finding of neglect or abuse, and the traditional presumption that the parents act in the best interests of their child should apply." *Id.*

---

[3] Legislative authority to regulate medical treatments for minors—particularly those that are irreversible and life-altering—"gains strength in areas of 'medical and scientific uncertainty.'" *Skrmetti*, 83 F.4th at 473 (quoting *Gonzales v. Carhart*, 550 U.S. 124, 163(2007)).

Parents are not stripped of their authority to act in the best interest of their children "[s]imply because the[ir] decision … is not agreeable to a child or because it involves risks." *See Parham*, 442 U.S. at 603–04. Courts, consistent with medical and social-science literature, recognize that "[m]ost children, even in adolescence, simply are not able to make sound judgments concerning many decisions, including their need for medical care or treatment." *Id.*; *see, e.g.*, Sarah-Jayne Blakemore & Trevor W. Robbins, *Decision-Making in the Adolescent Brain*, 15 Nature Neuroscience 1184 (2012) (exploring neurological basis for adolescence being "characterized by making risky decisions"); Ferdinand Schoeman, *Parental Discretion and Children's Rights: Background and Implications for Medical-Decision-Making*, 10 J. Med. & Phil. 45, 46 (1985) (children are not able to "deliberate maturely" towards their own best interests). Because a child's prefrontal cortex is undeveloped and because children lack life experience, they cannot fully appreciate the implications of their decisions. *See* Adele Diamond, *Normal Development of Prefrontal Cortex from Birth to Young Adulthood: Cognitive Functions, Anatomy, and Biochemistry*, in D. Stuss & R. Knight, eds., *Principles of Frontal Lobe*

*Function* 466 (2002) (noting that the prefrontal cortex takes over two decades to reach full maturity).

When a school district's policies "conflict with the fundamental right of parents to raise and nurture their child," "the primacy of the parents' authority must be recognized and should yield only where the school's action is tied to a compelling interest." *Gruenke v. Seip*, 225 F.3d 290, 305 (3d Cir. 2000). But school districts have no interest—much less a compelling one—in concealing minor students' social gender transitions from their parents.

Parents' obligation to care and provide for their minor children requires that they not be denied access to information necessary for them to perform those functions. It is quite simply impossible for parents to exercise their right and obligation to prepare their children "for obligations the state can neither supply nor hinder" when the state is hiding information that more properly belongs in "the private realm of family which the state cannot enter." *See Prince*, 321 U.S. at 166.

**B. The district court erred in denying Mr. Heaps' motion for a preliminary injunction and applying rational basis review.**

The district's policy upends centuries of natural and constitutional law. The policy gives ultimate decision-making authority to children and displaces parents of their longstanding, primary role in ensuring their child's safety and well-being. In doing so, the district grants itself control over managing the child's gender confusion or dysphoria—a role it has neither the qualifications, rights, nor emotional interest in serving.

The district court erred both in applying rational basis review to Mr. Heaps' constitutional claims. The court mischaracterized his claims as seeking to direct *how* a public school teaches his child. Op. at 24. But his claims were aimed at the policy's denial of his rights to make educational and healthcare decisions for his daughter. Those rights are firmly established. *See* Part I.

The district court, moreover, mistakenly relied on this Court's decision in *Anspach*, where a public health center that provided a minor with emergency contraceptive pills without her parents' knowledge or consent was found not to have violated the parents' substantive due process rights.  503 F.3d at 264-65. Because "[t]he Third Circuit reasoned that the state in *Anspach* was not constraining or compelling any action

by the parents, in contrast to the laws at issue in the Supreme Court cases such as *Meyer*, *Pierce*, and *Yoder*," the district court found no violation of Mr. Heaps' parental rights.  Op. at 25.

The Supreme Court just rejected that reasoning in *Mahmoud v. Taylor*, No. 24-297, 2025 U.S. LEXIS 2500 (June 27, 2025). There, a group of parents challenged a school board's no-opt-out policy for "LGBTQ+-inclusive" storybooks as an infringement on the parents' right to the free exercise of their religion.  *Id.* at *2.  Relying heavily on *Yoder*, the *Mahmoud* plaintiffs asked for a preliminary injunction permitting their children to opt out of the challenged instruction pending the completion of their lawsuit.  *Id.* at *31.  A divided panel of the Fourth Circuit suggested the parents "could succeed on their free exercise claim only if they could 'show direct or indirect coercion arising out of the exposure' to the storybooks. *Id.* at *32 (quoting *Mahmoud v. McKnight*, 102 F. 4th 191, 212 (2024)).

*Mahmoud*, however, rejected the "characterization of the 'LGBTQ+-inclusive' instruction as mere 'exposure to objectionable ideas,'" pointing out that the "storybooks unmistakably convey a particular viewpoint" and teachers were encouraged "to reinforce this viewpoint and to

reprimand any children who disagree." *Id.* at *18, *21. It further made clear that the protections of the First Amendment do not "extend only to policies that *compel* children to depart from the religious practices of their parents." *Id.* at *38 (emphasis in original). "To the contrary, [] *Yoder*, [] held that the Free Exercise Clause protects against policies that impose more subtle forms of interference with the religious upbringing of children." *Id.* The Court explained that "[i]n *Yoder* ... there was no suggestion that the compulsory-attendance law would compel Amish children to make an affirmation that was contrary to their ... religious beliefs… [or] that Amish children would be compelled to commit some specific practice forbidden by their religion*." Id.* at *39. Rather, the threat to their fundamental rights "was premised on the fact that high school education would 'expos[e] Amish children to worldly influences in terms of attitudes, goals, and values contrary to [their] beliefs' and would 'substantially interfer[e] with the religious development of the Amish child.'" *Id.* at 40 (quoting *Yoder*, 406 U. S., at 218); *see also id.* at *52 ("We have never confined *Yoder* to its facts. To

the contrary, we have treated it like any other precedent. We have at times relied on it as a statement of general principles").[4]

The district court also referenced *Gruenke v. Seip*, 225 F.3d 290, 304 (3d Cir. 2000), for the proposition that "the state's power is custodial and tutelary, permitting a degree of supervision and control that could not be exercised over free adults." ECF 88 at *25. But it left out the very next line of *Gruenke,* which made clear that although "in order to maintain order and the proper educational atmosphere" schools "may impose standards of conduct that differ from those approved of by some parents," "court[s] will require the State to demonstrate a compelling interest that outweighs the parental liberty interest in raising and nurturing their child." *Id.* at 304-05.

Here, "social transitioning" of a minor constitutes an even greater interference with parental rights than the curriculum in *Mahmoud*. Social transitioning is not a matter of mere "passive recognition." It is "an active intervention because it may have significant effects on the

---

[4] The district court's coercion analysis also ignores the unique nature of the public school setting. *See* Appellant's Op. Brief at 50-51; *Mahmoud*, 2025 U.S. LEXIS at *36.

child or young person in terms of their psychological functioning."[5]  The district presumably doesn't treat a child's depression or other mental health issues without involving parents, and it has no duty or right to keep parents in the dark about gender-related distress either. Put bluntly, the district has no knowledge or relationship with the child that warrants its usurpation of parental authority.

Worse, the district's approach to support social transitioning lacks any solid, scientific foundation. No medical organization recommends subjecting children or adolescents to social transition without the knowledge of their parents, no doubt because of the severe and often irreversible effects of such transition. *See* Compl., Dkt. 1 ¶ 221. In fact, many medical professionals believe that this approach "can become self-reinforcing and do long term harm." Luke Berg, *How Schools' Transgender Policies Are Eroding Parents' Rights* 3 (Mar. 2022). Given the recent explosion of students dealing with gender identity issues, caution is needed.  *See id.*  Not only that, but existing research suggests that these feelings eventually recede for most children—that is, for those

---

[5] Independent Review of Gender Identity Services for Children and Young People: Interim Report (The Cass Review), Feb. 2022, at 62, https://perma.cc/D5XP-EXAL.

who don't transition. *See id.* And there is a spike in "detransitioners," which lends further support to caution. *See id.* (citing Elie Vandenbussche, *Detransition-Related Needs and Support: A Cross-Sectional Online Survey*, 69 J. Homosexuality 1602 (2021)). Particularly because children and adolescents are still developing judgment and maturity, parental involvement is critical in the context of gender conditions.

Hiding this information from parents removes their ability to intervene at a time where parental involvement is needed most.

### C. The policy is part of a trend by school districts across the country to exclude parents from social transitioning decisions.

Regrettably, the policy is neither groundbreaking nor unique. In recent years, school districts nationwide have quietly implemented similar gender transition guidelines.[6] These parental exclusion policies differ in execution—*i.e.*, whether they place students or school officials in

---

[6] Parents Defending Education ("PDE"), a nationwide membership organization that seeks to prevent the politicization of K-12 education and to protect parental rights, has compiled a list of public school districts across the country with similar policies. *See InDoctriNation Map*, PARENTS DEFENDING EDUC., (last accessed Oct. 23, 2023) (filtering for "incidents," "public schools," and "parents rights" yields over 150 results for school policies), https://defendinged.org/map/.

the driver's seat—but they both relegate parents to the back seat. All such policies thus prevent parents from helping their children make crucial decisions about their identity and mental health, in direct violation of parents' fundamental rights. *Parham*, 442 U.S. at 603.

Some policies, like the one at issue in this case, leave parental involvement to the student's discretion. These policies forbid school officials from disclosing information about a student's transgender status to parents unless the student has authorized the disclosure. Policies like this have shown up in large cities like Washington, D.C.,[7] Philadelphia,[8] Chicago,[9] and Los Angeles,[10] as well as smaller cities like Eau Claire, Wisconsin.[11]  And, most relevant here, the New Jersey Department of

---

[7] *See* D.C. Pub. Schs., *Transgender and Gender-Nonconforming Pol'y Guidance*, at 8 (2015) (instructing educators not to share transgender status with parents without permission from the child), https://perma.cc/G94K-YQ9C.

[8] *See* Sch. Dist. of Phila., *Transgender and Gender Non-Conforming Students*, at 3 (June 16, 2016) ("School personnel should not disclose … a student's transgender identity … to others, including parents … unless the student has authorized such disclosure."),                        https://www.philasd.org/src/wp-content/uploads/sites/80/2017/06/252.pdf.

[9] *See* Chi. Pub. Schs., *Guidelines Regarding the Support of Transgender and Gender Nonconforming Students*, at 4 (2019) (asserting that children have a right to keep their transgender status from their parents), https://perma.cc/WT5W-E52T.

[10] *See* L.A. Unified Sch. Dist., Pol'y Bulletin BUL-2521.3, *Title IX Policy/Nondiscrimination Complaint Procedures*, at 18 (Aug. 14, 2020) (describing gender identity as confidential), https://perma.cc/2LLZ-5XAH.

[11] *See* M.D. Kittle, *Wisconsin School District: Parents are not 'Entitled to Know' if Their Kids are Trans*, FEDERALIST (Mar. 9, 2022),

Education has issued similar guidance to all public-school districts in the State.[12]

Other policies require school officials to determine whether it is appropriate to disclose the student's transgender status to their parents. These policies give school officials discretion to determine whether parents should be part of a student's transition plan. Policies like this have shown up in school districts in Charlotte[13] and New York,[14] as well as Hawaii's Department of Education.[15]  While these policies condition parental involvement on school officials' consent, they still impair parents' fundamental right to raise their children.

---

https://thefederalist.com/2022/03/08/wisconsin-school-district-parents-are-not-entitled-to-know-if-their-kids-are-trans/.

[12] *See* N.J. Dep't of Educ., *Transgender Student Guidance for Sch. Dists.*, at 2–3 ("A school district shall accept a student's asserted gender identity; parental consent is not                                                         required."), https://nj.gov/education/students/safety/sandp/transgender/Guidance.pdf.

[13] *See* Charlotte-Mecklenburg Schs., *Supporting Transgender Students*, at 34 (June 20, 2016) (describing a case-by-case approach to involve parents in transition plans), https://perma.cc/3GAV-UHHM.

[14] *See* N.Y.C. Dep't of Educ., *Guidelines to Support Transgender and Gender Expansive Students: Supporting Students* ("[S]chools [must] balance the goal of supporting the student with the requirement that parents be kept informed about their children."), https://perma.cc/RT86-YQXT.

[15] *See* Haw. Dep't of Educ., *Guidance on Supports for Transgender Students*, at 5 ("[I]nitial meeting[s] may or may not include the student's parents."), https://perma.cc/ECZ6-NJGE.

The explosion of these policies appears to stem from ideologically driven advocacy groups claiming that federal law requires this result.[16] One such group, the Gay, Lesbian, and Straight Education Network (GLSEN), promotes a so-called "model" policy—similar to the district's—which falsely claims that disclosing a student's "gender identity and transgender status" without the student's consent may violate the Family Education Rights Privacy Act (FERPA).  *See* GLSEN & Nat'l Ctr. for Transgender Equality, *Model Local Education Agency Policy on Transgender and Nonbinary Students*, at 4 (Rev. Oct. 2020).  Even if that strained interpretation of FERPA had any merit (it doesn't), rights created by federal statute yield to those grounded in the U.S. Constitution whenever there is a conflict.  *See, e.g., Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 177 (1803) ("It is a proposition too plain to be contested, that the constitution controls any legislative act repugnant to it.").  These federal statutes—no matter how

---

16 *See, e.g.*, Nat'l Educ. Ass'n, *Legal Guidance on Transgender Students' Rights*, at 19–20 (2016) (arguing that FERPA precludes sharing transgender status in most circumstances), https://perma.cc/V7U5-ZXGK; GLSEN & ACLU, Know *Your Rights: A Guide for Transgender and Gender Nonconforming Students, at* 5 (2016) ("If your school reveals [transgender status] to anyone without your permission, it could be violating federal law."), https://perma.cc/RPD4-UFJJ.

laudable their aims—cannot displace parents' longstanding right to care for their children.

## CONCLUSION

When a student considers transitioning genders, parents have a fundamental, constitutional right to not be shut out of that decision-making process. *See Troxel*, 530 U.S. at 65. Yet school districts across the country, strong-armed by ideologically driven advocacy groups, have done just that, trampling on parents' fundamental right to be informed of critical information about their child's mental health and well-being. *Mahmoud*, 2025 U.S. LEXIS *6; *Yoder*, 406 U. S. at 218.  This Court should reject the district court's "chilling vision of the power of the state to strip away the critical right of parents," *Mahmoud*, 2025 U.S. LEXIS at *54, and reverse.

Dated: July 7, 2025.                    Respectfully submitted,


                                                      AUSTIN KNUDSEN
                                                        *Montana Attorney General*

                                                     CHRISTIAN B. CORRIGAN
                                                        *Solicitor General*

                                                   */s/ Christian B. Corrigan*
                                                   MONTANA DEPT. OF JUSTICE
                                                   215 North Sanders
                                                   P.O. Box 201401
                                                   Helena, MT 59620-1401
                                                   p. 406.444.2026
                                                   christian.corrigan@mt.gov

# ADDITIONAL SIGNATORIES

STEVE MARSHALL
Attorney General
*State of Alabama*

TREG TAYLOR
Attorney General
*State of Alaska*

STEVE MONTENEGRO
*Speaker of the Arizona
House of Representatives*

WARREN PETERSEN
*President of the
Arizona Senate*

TIM GRIFFIN
Attorney General
*State of Arkansas*

JAMES UTHMEIER
Attorney General
*State of Florida*

CHRIS CARR
Attorney General
*State of Georgia*

RAÚL LABRADOR
Attorney General
*State of Idaho*

THEODORE E. ROKITA
Attorney General
*State of Indiana*

KRIS KOBACH
Attorney General
*State of Kansas*

LIZ MURRILL
Attorney General
*State of Louisiana*

LYNN FITCH
Attorney General
*State of Mississippi*

ANDREW BAILEY
Attorney General
*State of Missouri*

MICHAEL T. HILGERS
Attorney General
*State of Nebraska*

DREW WRIGLEY
Attorney General
*State of North Dakota*

DAVE YOST
Attorney General
*State of Ohio*

GENTNER DRUMMOND
Attorney General
*State of Oklahoma*

ALAN WILSON
Attorney General
*State of South Carolina*

MARTY J. JACKLEY
Attorney General
*State of South Dakota*

DEREK BROWN
Attorney General
*State of Utah*

KEN PAXTON
Attorney General
*State of Texas*

JASON MIYARES
Attorney General
*State of Virginia*

JOHN B. MCCUSKEY
Attorney General
*State of West Virginia*

## Certificate of Compliance
## with Fed. R. App. 32(a)(7)

Certificate of Compliance with Type-Volume Limitation, Typeface Requirements, and Type Style Requirements:

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

This brief contains 6,459 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Century Schoolbook font.

Executed on July 7, 2025.


*/s/ Christian B. Corrigan*

## Certificate of Service

I hereby certify that on July 7, 2025, I electronically filed the foregoing with the Clerk of the United States Court of Appeals for the Second Circuit using the CM/ECF system, which will provide notification of such filing to all who are ECF-registered filers.

*/s/ Christian B. Corrigan*