# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

---

No. 24-3278

---

CHRISTIN HEAPS,
*Plaintiff-Appellant*,

v.

DELAWARE VALLEY REGIONAL HIGH SCHOOL BOARD OF EDUC.,
SCOTT MCKINNEY, individually and in his official capacity as Superintendent
of Schools, ASHLEY MIRANDA, individually and in her official capacity as
school counselor, MATTHEW J. PLATKIN, in his official capacity as Attorney
General of the State of New Jersey, and KEVIN DEHMER, in his official capacity
as Commissioner of the New Jersey Department of Education,
*Defendants-Appellees.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY (No. 3:24-cv-00107 (GC))

---

## BRIEF OF APPELLEES MATTHEW J. PLATKIN AND KEVIN DEHMER

---

MATTHEW J. PLATKIN
*Attorney General of New Jersey*

JEREMY M. FEIGENBAUM
*Solicitor General*

SUNDEEP IYER
*Chief Counsel*

DONNA ARONS
*Assistant Attorney General*

VIVIANA M. HANLEY
MATTHEW LYNCH
JUSTINE LONGA
MEGHAN K. MUSSO
*Deputy Attorneys General*

Office of New Jersey Attorney General
R.J. Hughes Justice Complex
25 Market Street, P.O. Box 080
Trenton, NJ 08625-0080
(862) 350-5800
*Attorneys for Defendants-Appellees*

# <u>TABLE OF CONTENTS</u>

**Page(s)**

INTRODUCTION ...................................................................................................1

COUNTERSTATEMENT OF JURISDICTION .....................................................4

COUNTERSTATEMENT OF ISSUES ...................................................................4

RELATED CASES AND PROCEEDINGS..............................................................4

COUNTERSTATEMENT OF THE CASE...............................................................5

   A.  New Jersey's Legal Protections for Transgender Students.............................5

   B.  Factual And Procedural Background ..............................................................8

SUMMARY OF ARGUMENT ...............................................................................13

STANDARD OF REVIEW .....................................................................................15

ARGUMENT ...........................................................................................................15

  I.  Because Plaintiff Has Failed To Establish Irreparable Harm, He Is Not Entitled To A Preliminary Injunction. ..........................................................15

  II.  Heaps Is Unlikely To Succeed On The Merits. ............................................26

    A.  Heaps Has No Fundamental Unenumerated Right To Require A Public School To Reject A High School Student's Affirmative And Voluntary Request To Use A Different Name and Pronouns..................................28

    B.  Heaps Has No Fundamental Right To Affirmative Notification Of His High Schooler's Request To Use A Different Name And Pronouns, Over The Student's Own Objection. .......................................................43

    C.  A Policy That Respects A Student's Voluntarily Expressed Gender Identity Survives Any Level Of Scrutiny. ...............................................47

  II.  Even If Preliminary Relief Were Warranted, This Court Should Remand For The District Court To Determine The Proper Scope Of Relief. ....................51

CONCLUSION .......................................................................................................53

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adams v. Freedom Forge Corp.*,
  204 F.3d 475 (3d Cir. 2000) .......................................................... 17, 20

*Anspach ex rel. Anspach v. City of Phila., Dept. of Pub. Health*,
  503 F.3d 256 (3d Cir. 2007)................................................... passim

*Arnold v. Bd. of Educ. of Escambia Cnty.*,
  880 F.2d 305 (11th Cir. 1989) ..............................................46

*Bacon v. Neer*,
  631 F.3d 875 (8th Cir. 2011) ..............................................19

*Bd. of Educ. v. Purse*,
  28 S.E. 896  (Ga. 1897) ..............................................34

*Burdick v. Babcock*,
  31 Iowa 562 (1871)..............................................34

*C.N. v. Ridgewood Bd. of Educ.*,
  430 F.3d 159 (3d Cir. 2005) ..............................................33

*California v. Texas*,
  593 U.S. 659 (2021) ..............................................52

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983) ....................................... 17, 20, 24, 25

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ....................................... 23, 25

*Combs v. Homer-Ctr. Sch. Dist.*,
  540 F.3d 231 (3d Cir. 2008) ..............................................33

*Constructor Ass'n of W. Pa. v. Kreps*,
  573 F.2d 811 (3d Cir. 1978) ..............................................22

*Cont'l Grp., Inc. v. Amoco Chems. Corp.*,
  614 F.2d 351 (3d Cir. 1980) ..............................................17

*Crowley v. McKinney*,
  400 F.3d 965 (7th Cir. 2005) ..................................................................33

*Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*,
  108 F.4th 194 (3d Cir. 2024) ........................................................ passim

*Dep't of State v. Muñoz*,
  602 U.S. 899 (2024) ...................................................................... passim

*Dobbs v. Jackson Women's Health Org.*,
  597 U.S. 215 (2022) ...................................................................... 27, 30

*Doe v. Boyertown Area Sch. Dist.*,
  897 F.3d 518 (3d Cir. 2018) ..................................................... 47, 48, 50

*Doe v. Irwin*,
  615 F.2d 1162 (6th Cir. 1980) .......................................................... 30, 44

*Donovan ex rel. Donovan v. Punxsutawney Area Sch. Bd.*,
  336 F.3d 211 (3d Cir. 2003) ............................................................. 18, 21

*FBI v. Fikre*,
  601 U.S. 234 (2024) ...........................................................................21

*Ferriter v. Tyler*,
  48 Vt. 44 (1876).................................................................................34

*Foote v. Ludlow Sch. Comm*,
  128 F.4th 336 (1st Cir. 2025) ...................................................... passim

*Gruenke v. Seip*,
  225 F.3d 290 (3d Cir. 2000) ........................................................ 32, 45, 46

*Holland v. Rosen*,
  895 F.3d 272 (3d Cir. 2018) .................................................. 2, 11, 26, 27

*Kanuszewski v. Michigan Department of Health and Human Services*,
  927 F.3d 396 (6th Cir. 2019) ............................................................38

*Kidder v. Chellis*,
  59 N.H. 473 (1879)............................................................................34

*Littlejohn v. Sch. Bd. of Leon Cnty.*,
  132 F.4th 1232 (11th Cir. 2025)...................................... 27, 31, 37, 47

*Lutter v. JNESO*,
  86 F.4th 111 (3d Cir. 2023) .............................................................24

*Mahmoud v. Taylor*,
145 S. Ct. 2332 (2025) ................................................................... 22, 23, 32, 42

*Mallet & Co. Inc. v. Lacayo*,
16 F.4th 364 (3d Cir. 2021) ................................................................... 16, 19

*Meyer v. Nebraska*,
262 U.S. 390 (1923) ................................................................... 29, 33

*Morrow v. Wood*,
35 Wis. 59 (1874) ...................................................................36

*NAACP v. N. Hudson Reg'l Fire & Rescue*,
665 F.3d 46 (3d Cir. 2011) ...................................................................52

*New York State Rifle & Pistol Ass'n v. Bruen*,
597 U.S. 1 (2022) ...................................................................35

*New York v. Ferber*,
458 U.S. 747 (1982) ...................................................................48

*Parents for Priv. v. Barr*,
949 F.3d 1210 (9th Cir. 2020) ...................................................................33

*Parham v. J.R*,
442 U.S. 584 (1979). ................................................................... 37, 38, 51

*People ex rel. McCollum v. Bd. of Educ.*,
333 U.S. 203 (1948) ...................................................................41

*Pierce v. Society of Sisters*,
268 U.S. 510 (1925) ................................................................... 29, 33

*Reading v. N. Hanover Twp.*,
124 F.4th 189 (3d Cir. 2024) ................................................................... passim

*Regino v. Staley*,
133 F.4th 951 (9th Cir. 2025) ...................................................................30

*Road-Con, Inc. v. City of Philadelphia*,
120 F.4th 346 (3d Cir. 2024) ...................................................................17

*Rulison v. Post*,
79 Ill. 567 (1875) ...................................................................35

*SEC v. Gentile*,
939 F.3d 549 (3d Cir. 2019) ...................................................................53

*Spiller v. Inhabitants of Woburn*,
    12 Allen 127 (Mass. 1866) ................................................................34

*State ex rel. Andrews v. Webber*,
    8 N.E. 708 (Ind. 1886) ....................................................................35

*State v. Ferguson*,
    144 N.W. 1039 1044 (Neb. 1914) ...................................................35

*State v. Sch. Dist. No. 1 of Dixon Cnty.*,
    48 N.W. 393 (Neb. 1891) .................................................................35

*Stotts v. Cmty. Unit Sch. Dist. No. 1*,
    230 F.3d 989 (7th Cir. 2000) ...........................................................19

*Timbs v. Indiana*,
    586 U.S. 146 (2019) .........................................................................35

*Town of Chester v. Laroe Ests., Inc.*,
    581 U.S. 433 (2017) .........................................................................17

*Troxel v. Granville*,
    530 U.S. 57 (2000) ...........................................................................29

*Trs. of Sch. v. People ex rel. Van Allen*,
    87 Ill. 303 (1877) .............................................................................35

*Trump v. CASA, Inc.*,
    145 S. Ct. 2540 (2025) ............................................................... 52, 53

*United States v. Skrmetti*,
    145 S. Ct. 1816 (2025) ................................................................. 3, 43

*Vitsaxaki v. Skaneateles Cent. Sch. Dist.*,
    771 F. Supp. 3d 106 (N.D.N.Y. 2025) .................................. 31, 38, 45

*Washington v. Glucksberg*,
    521 U.S. 702 (1997) ..................................................... 3, 26, 35, 42

*West Virginia v. EPA*,
    597 U.S. 697 (2022) .........................................................................11

*Winter v. NRDC*,
    555 U.S. 7 (2008) ...................................................................... 16, 20

*Wisconsin v. Yoder*,
    406 U.S. 205 (1972) ................................................................ 29, 33, 43

**Statutes**

N.J. Stat. Ann. § 10:5-12 ..........................................................................5

N.J. Stat. Ann. §10:5-5 ..............................................................................5

N.J. Stat. Ann. §18A:36-41 ....................................................................5, 6

**Constitutional Provisions**

U.S. Const. amend. XIV, §1 .....................................................................26

**Other Authorities**

Blackstone, William, *Commentaries on the Laws of England* 450 ........................37

Johns, Michelle Marie, *Protective Factors Among Transgender & Gender Variant
    Youth: A Systematic Review by Socioecological Level*, 39 J. Primary Prevention
    (2018)...................................................................................................49

Kent, James, *Commentaries on American Law* 200–01 (5th ed. 1844) .................36

National Association of Secondary School Principals Position on Safe Schools:
    Guiding Principles, https://www.nassp.org/top-issues-ineducation/position-
    statements/safe-schools/ .......................................................................50

Pollitt, Amanda , *Predictors & Mental Health Benefits Of Chosen Name Use
    Among Transgender Youth*, *Youth & Society*, 53(2), 320–341 (2019) ...............48

Russell, Stephen, *Chosen Name Use is Linked to Reduced Depressive Symptoms,
    Suicidal Ideation, & Suicidal Behavior Among Transgender Youth*, J. of
    Adolescent Health 503 (2018)..................................................................49

Story, Joseph, *Commentaries on Equity Juris.* § 1347, at 577 (2d. ed. 1839) ........36

**INTRODUCTION**

This appeal asks the Court to decide, on a preliminary-injunction record, whether to recognize a novel unenumerated federal constitutional right. In the fall of 2023, a high school student in the Delaware Valley School District told a school employee that the student would like to start using a male name and pronouns at school. The student also asked the school not to share the request with the student's parent, Plaintiff Christin Heaps. When Heaps found out that his high schooler had made these requests, he sought a preliminary injunction against the District, the New Jersey Attorney General, and the Commissioner of the New Jersey Department of Education (NJDOE). Heaps alleged that substantive due process protects a parent's fundamental unenumerated right to require a public high school to reject a high schooler's affirmative and voluntary request to use a different name and pronouns, and to require the school to notify the parent of the request over the student's objection. Heaps continued to press for this preliminary injunction even after it became apparent in August 2024 that his child no longer wished to use a male name and pronouns, and even as Heaps maintains more than a year later that his child does not wish to use a male name or pronouns.

In deciding Heaps's appeal from the District Court's denial of his requested preliminary injunction, this Court need not decide whether to announce any new substantive due process right because Heaps's threshold failure to show irreparable

harm is fatal to his claim. Preliminary injunctions are reserved for "extraordinary situations" in which the movant has made a "clear showing" that the failure "to preserve the status quo during the pendency of litigation" will result in harm that cannot be remedied after a final adjudication on the merits. *Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 198, 200–202 (3d Cir. 2024) ("*DSSA*"), *cert. denied* 145 S. Ct. 1049 (2025). As demonstrated by both an undisputed preliminary-injunction record and Heaps's own contentions on appeal, Heaps's child no longer wishes to use a male name or pronouns at school— and has not wished to identify in that manner for more than a year. Because the District's policies require it to comply with the child's wishes, and because the child's wishes have been aligned with Heaps's, Heaps has not shown that he will suffer irreparable harm. That alone resolves Heaps's request for a preliminary injunction as a matter of both equity and Article III.

Regardless, as the District Court correctly concluded, Heaps's substantive due process claim also fails on the merits. The Supreme Court and this Court "have repeatedly warned" against "expand[ing] the concept of substantive due process" to recognize new unenumerated rights that are not "deeply rooted in this Nation's history and tradition." *Holland v. Rosen*, 895 F.3d 272, 293 (3d Cir. 2018). Yet that is precisely what Heaps proposes here. Heaps asserts a right to dictate that a public high school reject his child's voluntary request to be addressed using a different

2

name and pronouns, as well as a right to be affirmatively notified—over the student's express objection—when his child makes such a request. But these rights are not "deeply rooted in this Nation's history and tradition." *Dep't of State v. Muñoz*, 602 U.S. 899, 910 (2024). Precedent and history make clear that while the parents' more general unenumerated rights to direct a child's education and to direct a child's medical care prohibit the state from compelling or coercing conduct by the student or parent, they nowhere encompass the novel right Heaps claims: to dictate whether a public school accepts a student's voluntary request to be addressed using a different name or pronouns. In any event, because the challenged policies are tailored to advance a compelling state interest, they withstand any level of scrutiny.

Accepting Heaps's unbounded view of parental rights would place "fierce scientific and policy debates" regarding the best way to support transgender students, *United States v. Skrmetti*, 145 S. Ct. 1816, 1837 (2025), "outside the arena of public debate and legislative action," imposing through judicial fiat what should be left to the democratic process. *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997). And it would destabilize public education and create chaos on the ground. This Court should decline Heaps's invitation on this limited preliminary-injunction record to recognize this sweeping new unenumerated right.

## COUNTERSTATEMENT OF JURISDICTION

For the reasons set forth below, *see infra* at 20–21, 24–25, this Court lacks Article III jurisdiction over Plaintiff-Appellant's preliminary injunction appeal. This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1).

## COUNTERSTATEMENT OF ISSUES

Whether the District Court properly denied Plaintiff-Appellant's motion for a preliminary injunction.

## RELATED CASES AND PROCEEDINGS

While the State has not brought suit to enforce the New Jersey Law Against Discrimination (LAD) in this case, Attorney General Platkin has filed administrative complaints against four school districts for policies that may violate the LAD: *Platkin v. Middletown Twp. Bd. of Educ.*, No. P2023-900005 (N.J. Div. on C.R. filed June 21, 2023); *Platkin v. Manalapan-Englishtown Reg'l Bd. of Educ.*, No. P2023-900004 (N.J. Div. on C.R. filed June 21, 2023); *Platkin v. Marlboro Twp. Bd. of Educ.*, No. P2023-900003 (N.J. Div. on C.R. filed June 21, 2023); *Platkin v. Hanover Twp. Bd. of Educ.*, No. P2023-900002 (N.J. Div. on C.R. filed May 17, 2023). Attorney General Platkin also sued to preliminarily enjoin these policies, and the resulting injunctions were affirmed on appeal. *See Platkin v. Middletown Twp. Bd. of Educ.*, No. A-0037-23, 2025 WL 440132 (N.J. Super. Ct. App. Div. Feb. 10,

2025); *Platkin v. Hanover Twp. Bd. of Educ.*, No. A-0371-23, 2025 WL 439969 (N.J. Super. Ct. App. Div. Feb. 10, 2025).

*Short v. N.J. Dept. of Educ.*, No. 23-cv-21105 (D.N.J.), involved a challenge to school policies similar to the District policy at issue here, as well as to NJDOE's guidance. That case was dismissed for lack of standing on July 16, 2024 as to the state defendants. *See Short*, 2024 WL 3424729, at *12.

## COUNTERSTATEMENT OF THE CASE

### A.    New Jersey's Legal Protections for Transgender Students

The New Jersey Law Against Discrimination (LAD) prohibits unlawful discrimination in "any kindergarten, primary and secondary school ... [or] high school." N.J. Stat. Ann. §10:5-5(*l*). Since 2006, the LAD has prohibited discrimination on the basis of "gender identity or expression." *Id.* §10:5-12(f); *see* An Act concerning the "Law against Discrimination," ch. 100, 2006 N.J. Laws.

In 2017, the Legislature directed the NJDOE to issue non-binding "guidelines" to "assist schools in establishing policies and procedures that ensure a supportive and nondiscriminatory environment for transgender students." N.J. Stat. Ann. §18A:36-41(a); *see* An Act concerning transgender students, ch. 137, 2017 N.J. Laws. It required that these "guidelines … include, but not be limited to, information and guidance regarding" ways to maintain "a safe and supportive learning environment that is free from discrimination and harassment for transgender

students"; use of "the name and pronoun preferred by the student"; how to address "confidentiality and privacy concerns"; and "information on organizations or other resources" to help schools "support … transgender individuals." N.J. Stat. Ann. §18A:36-41(b)–(c).

In 2018, following this mandate, NJDOE issued its Transgender Student Guidance for School Districts. *See* JA83–89.[1] NJDOE developed these non-binding guidelines after "review[ing] policies and guidance from other states and organizations" and "consult[ing] with educators, counselors, school psychologists, advocates, and parents." JA83. The Guidance sought "to help school and district administrators" ensure "that each school provides equal educational opportunities for all students," including by providing "a safe and supportive learning environment" free from "discrimination and harassment for transgender students." JA85.

The Guidance recommends a "student-centered approach" that respects the legal rights and privacy interests of transgender students. JA84–88. Thus, when a student requests to be addressed using a particular name or pronouns at school, the Guidance recommends that the school honor their request. JA84–85. The

---

[1] This brief uses these citation conventions: "JA"—Joint Appendix; "SA"—Sealed Appendix," *see infra* n.2; "DNJ.Dkt"—filings on the district court docket that are not included in the Joint Appendix; "Pl.Br."—Heaps' appellate brief, document 27-1 (for which page references follow those in this Court's stamped header).

Guidance states that schools should not require students who make such a request to "meet any threshold diagnosis or treatment requirements" or undergo "a legal or court-ordered name change." *Id.* And if a parent or guardian disagrees with the student regarding the appropriate name and pronoun for the student at school, JA85, the Guidance indicates schools should not veto the student's request, JA84. NJDOE recommends instead that schools "consult their board attorney regarding the minor student's civil rights and protections under the NJLAD"; "continue to refer to the student in accordance with the student's chosen name and pronoun"; and offer resources "regarding family counseling and support services." JA85.

The Guidance also recommends that schools ascertain the student's preference regarding whether and when school officials affirmatively notify parents about the student's request to use a particular name or pronouns. JA85. The Guidance does not prohibit schools from affirmatively notifying parents of a student's request if the student consents to that information being shared, and neither the Guidance nor the LAD requires or suggests that schools lie to parents if parents inquire about their child's gender identity. If, however, the student asks the school not to affirmatively notify their parents, the Guidance permits schools to honor the student's preference. To that end, school personnel ordinarily have "no affirmative duty" to "notify a student's parent … of the student's gender identity." JA85.

7

At the same time, the Guidance recognizes that confidentiality is not absolute. The Guidance notes that schools may disclose information about a student's transgender status "as allowed by law," JA86, and "may be obligated to disclose a student's status" in the event of "a specific and compelling need, such as the health and safety of a student or an incident of bias-related crime," JA87. In such situations, the Guidance recommends that schools provide prior notice to the student where possible and provide an opportunity for the student to personally disclose the information. JA87.

### B.   Factual And Procedural Background

1. Christin Heaps is the father of a high school student in the Delaware Valley School District. JA180 ¶10. The District adopted District Policy 5756, which seeks to "provide a safe and supportive learning environment" free from "discrimination and harassment for transgender students." *Id.* ¶23; JA78–81. Policy 5756 does not require parental consent or a medical diagnosis for the District to honor a student's request to use a particular name or pronouns, and it employs a flexible approach to handling disputes between students and parents on this score. JA78–79.

In September 2023, during Heaps's child's freshman year, the student told a District employee that the student wished to use a male name and pronouns at school. JA184 ¶34–35; JA120 ¶¶7–12. The employee agreed to respect the student's request. JA184 ¶¶34–35, 38; JA120 ¶¶7–12. The employee did not initiate, prompt, or

pressure the student into making this disclosure. JA120–21 ¶¶13–18. The student requested that this disclosure not be shared with Heaps, noting that Heaps "was not supportive." JA121 ¶¶22–23. The employee then advised the child's teachers of the child's requested name and pronouns. JA121–22 ¶¶28–35.

In December 2023, Heaps learned from another parent that his child was using a male name and pronouns at school. JA185 ¶42. Heaps reached out to District staff and informed them of his objection to using a male name and pronouns to address his child. *Id.* ¶46. The District indicated that, consistent with its policies, it would address Heaps's child using the name and pronouns the child requested. *Id.* ¶¶47, 50, 52; JA97–98; JA121 ¶¶19–20; JA126 ¶¶5–6, 9–10.

Heaps withdrew his child from school, JA185 ¶44, allegedly based on advice from the child's healthcare providers, JA187 ¶54. After Heaps submitted notes from a nurse practitioner requesting home instruction for the child based on symptoms of depression and anxiety that were reportedly heightened at school, *see* JA115; JA101, the District provided virtual home instruction, *see* JA111–12.

2. In January 2024, Heaps sued various District employees, officials, and board of education members (collectively, the District), and the New Jersey Attorney General and NJDOE Commissioner (collectively, the State). JA58–76. As to the State, Heaps claimed that the LAD and the Guidance violate substantive due

9

process and are unenforceable to the extent they "preclude parental knowledge and consent of social transitioning of their minor children in schools." JA68–69 ¶¶14–15.

After unsuccessfully seeking a TRO, Heaps sought a preliminary injunction. *See* DNJ.Dkt.3. The parties engaged in limited discovery. During a deposition of Heaps's child's pastoral counselor on August 16, 2024, the counselor testified that Heaps's child no longer wished to use a male name or pronouns at school. JA9–10, JA20; *see* SA22.[2] There is no contrary evidence in the record, and Heaps has confirmed that his child does not wish to use a male name and pronouns. Pl.Br.16.

Limited discovery also revealed that the nurse practitioner who provided notes to the school excusing the child's absence never diagnosed Heaps' child with gender dysphoria. JA8; *see* SA37, 43. The nurse practitioner submitted the notes requesting home instruction for the child solely because Heaps had called her and requested them; she did not "ma[k]e an independent medical assessment that [the child] needed to be kept out of school to avoid any harm caused by" using "a masculine name and pronouns." JA32; *see* JA8; SA39–40, 42.

3. In November 2024, the District Court denied Heaps's motion for a preliminary injunction. JA3–40.

---

[2] This brief cites to the Sealed Appendix only to direct this Court to the record evidence supporting the District Court's factual findings. The facts discussed in the brief are limited to those discussed in the District Court's opinion, which was unsealed with the consent of all parties. *See* DNJ.Dkt.91.

The District Court first concluded that Heaps had standing and that his claims were not moot. JA13–17. The court noted that Heaps's child no longer wished to be addressed by a male name and pronouns. JA20. Nonetheless, the court applied the standard that governs whether a *defendant's* voluntary cessation of challenged conduct moots a case, asking whether it was "absolutely clear the alleged wrongful behavior could not reasonably be expected to recur." JA21 (quoting *West Virginia v. EPA*, 597 U.S. 697, 700 (2022)). The court held that Heaps's child's wish to no longer use a male name or pronoun did not meet this high bar. JA17–20.

On the merits, the District Court determined that Heaps had failed to provide "any historical or legal precedent or authority" for the substantive due process right Heaps claimed. JA24–25. The District Court explained that courts have "repeatedly warned" against "expand[ing] the concept of substantive due process" to encompass new unenumerated rights "having little or no cognizable roots in the language or design of the Constitution." JA24 (quoting *Holland*, 895 F.3d at 293). It then analyzed a quartet of U.S. Supreme Court cases regarding parental rights, explaining that these cases have found violations of substantive due process only where "the state was either requiring or prohibiting some activity." JA27 (citing *Anspach ex rel. Anspach v. City of Phila., Dept. of Pub. Health*, 503 F.3d 256, 263–64 (3d Cir. 2007)).

The District Court found that "Plaintiff has not offered any evidence that the school district engaged in the type of proactive, coercive interference with the parent-

11

child relationship that the Third Circuit has found to violate parents' constitutional rights" in other cases. JA28, 31–32. The court found that "Defendants did not coerce [the child] into making the request or prevent or discourage [the child] from discussing [the child's] request with Plaintiff." JA30. The court also found that "the record demonstrates that the Board Defendants acted only at [the child's] affirmative request." JA30. And the court found that "the school advised Plaintiff about [the child's] request upon receiving an inquiry from Plaintiff." JA31. The court therefore concluded that Heaps was unlikely to succeed on his claim that Defendants violated Heaps's fundamental right to direct the upbringing of his child. JA32.

The District Court also rejected Heaps's claim that Defendants interfered with his fundamental right to make medical decisions for his child. The court found Heaps's child was not "suffering or diagnosed with a mental health condition related to gender identity," and that the school had not "actively encouraged" the child to adopt a male name and pronouns at school, but had merely "passively recogniz[ed]" the child's own voluntary request to do so. JA34.

The court then held that Defendants' actions would survive under any level of constitutional scrutiny. JA35–36. It explained that the District's policy was narrowly tailored to achieve its compelling interests in protecting transgender students from discrimination at school and fostering a diverse learning environment. *Id*.

12

Finally, the District Court also found that Heaps would not suffer irreparable harm if the school continued to honor his child's requested name and pronouns. JA39. Because the court found against Heaps both based on likelihood of success and the lack of an irreparable harm, it denied Heaps's request for a preliminary injunction without addressing the remaining injunctive relief factors. JA39.

This appeal followed. JA1.

## <u>SUMMARY OF ARGUMENT</u>

I.     Because Heaps will not likely suffer irreparable harm while this lawsuit proceeds, he is not entitled to a preliminary injunction. A preliminary injunction is an extraordinary remedy that may be awarded only where the movant shows that failing to preserve the status quo during the pendency of the litigation will result in harm that cannot be remedied after a final adjudication. Heaps seeks to prohibit the District from addressing his high schooler using a male name and pronouns. But the record indicates that the student no longer wishes to use that name or pronouns— and has not wished to do so for over a year. Because the challenged policies direct the school to comply with the child's wishes, Heaps's child would be addressed at school in the manner that Heaps wishes. So Heaps has no need for emergency relief under both hornbook principles of equity and Article III.

II.    Heaps's substantive due process claim is unlikely to succeed. Heaps cannot establish that the State has infringed any right that is "deeply rooted in this Nation's history and tradition." *Muñoz*, 602 U.S. at 910.

A.    Heaps lacks a fundamental unenumerated right to require a public school to reject his high school student's voluntary request to use a different name and pronouns at school. Heaps incorrectly asserts that this right is encompassed within the general unenumerated right of parents to direct a child's education. But Supreme Court and Circuit precedent, building on history and tradition, make clear that this general right bars the State only from compelling or coercing conduct by the school. Nor does the fundamental right to direct a child's medical care—drawn from cases involving intrusions upon a child's bodily integrity—support the right Heaps asserts. Complying with a student's request to use a name and pronouns does not involve an intrusion on a student's bodily integrity and is not medical care. And strikingly, Heaps offers no limiting principle that would distinguish student requests that require parental consent from those that do not.

B.    Heaps also lacks a fundamental right to affirmative notification of his high schooler's request to use a different name and pronouns when the student objects to disclosure—a policy that does not impact him. This Court's precedents make clear that the State infringes fundamental parental rights only if it interferes

with the parent-child relationship through coercion or compulsion, not where it declines to affirmatively provide information about a child's own voluntary choice.

C.    A policy that respects a student's voluntary request to use a particular name and pronouns survives any level of scrutiny. The District policy, NJDOE Guidance, and the LAD are narrowly tailored to advance compelling state interests.

III.    If this Court concludes that preliminary relief is warranted, it should remand to the District Court to craft an appropriately tailored injunction.

## STANDARD OF REVIEW

When reviewing the denial of a preliminary injunction, this Court reviews "the District Court's factual findings for clear error, its legal rulings de novo, and its ultimate decision for abuse of discretion." *DSSA*, 108 F.4th at 198. "[B]ecause the denial of a preliminary injunction is almost always based on an abbreviated set of facts, requiring a delicate balancing that is the responsibility of the district judge," overall review "[a]t this early stage" is "deferential[]." *Id.* (quotation omitted).

## ARGUMENT

### I.    Because Plaintiff Has Failed To Establish Irreparable Harm, He Is Not Entitled To A Preliminary Injunction.

"Preliminary injunctions are not automatic. Rather, tradition and precedent have long reserved them for extraordinary situations." *DSSA*, 108 F.4th at 198. That remedy is ordinarily justified only where "an alleged injury jeopardizes the court's ability to see a case through." *Id.* at 197. In other words, even if "a plaintiff will

likely succeed on the merits of a constitutional claim," an emergency preliminary injunction is unwarranted absent irreparable harm that "threaten[s] the court's ability to decide the case or to give meaningful relief later on." *Id.* Given Plaintiff's representation that his child does not identify as transgender and has not so identified for more than a year, no such harm is present here. That resolves this appeal.

1. A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. NRDC*, 555 U.S. 7, 22 (2008); *see DSSA*, 108 F.4th at 202. A party seeking preliminary relief must make "a clear showing" that failure "to preserve the status quo during the pendency of litigation" will result in harm that cannot be remedied meaningfully after a final adjudication on the merits or that "threaten[s] to moot the case." *DSSA*, 108 F.4th at 200–02, 205 (cleaned up). The movant bears the burden of showing that it is "more likely than not" that they would "suffer irreparable harm" during the pendency of the action "in the absence of preliminary relief." *Mallet & Co. Inc. v. Lacayo*, 16 F.4th 364, 380 (3d Cir. 2021) (quotation omitted). A mere "possibility of irreparable harm" does not suffice, *Winter*, 555 U.S. at 22, and even "the threat of irreparable harm" does not "automatically trigger a preliminary injunction." *DSSA*, 108 F.4th at 201.

The circumstances justifying a preliminary injunction are limited. "[I]njunctions will not be issued merely to allay the fears and apprehensions or to

16

soothe the anxieties of the parties." *Cont'l Grp., Inc. v. Amoco Chems. Corp.*, 614 F.2d 351, 359 (3d Cir. 1980) (quotation omitted). Past exposure to harm does not support a preliminary injunction absent evidence substantiating a "real or immediate threat that the plaintiff will be wronged again." *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983). And preliminary injunctions cannot be issued just to "eliminate a possibility of a remote future injury." *Amoco*, 614 F.2d at 359; *see Adams v. Freedom Forge Corp.*, 204 F.3d 475, 488 (3d Cir. 2000).

In these ways, the irreparable harm requirement for issuance of preliminary relief mirrors Article III limits. "[T]he requirements for standing and irreparable harm are similar, and courts often discuss them together." *Reading v. N. Hanover Twp.*, 124 F.4th 189, 196 (3d Cir. 2024); *see Lyons*, 461 U.S. at 103. As this Court has explained, "the likelihood of harm concerns justiciability, while the character of that harm is a question of remedies." *Reading*, 124 F.4th at 196. But no matter how the failure to show harm is described, "the result is the same": a plaintiff who merely speculates that they will suffer future harm during the litigation "will not receive [their] injunction." *Id.* at 196 n.2. A "plaintiff must demonstrate standing separately for each form of relief sought." *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017). So "when a plaintiff seeks … an injunction," "they must show that they are likely to suffer *future* injury." *Road-Con, Inc. v. City of Philadelphia*, 120 F.4th 346, 354 (3d Cir. 2024) (quotation omitted). And when a plaintiff seeks a

17

*preliminary* injunction in particular, they must show they are likely to suffer injury "while proceedings are pending." *DSSA*, 108 F.4th at 204.

There are good reasons why "[t]radition and precedent have long reserved" preliminary injunctions for the rare circumstances in which irreparable injury would occur during the pendency of the challenge. *Id.* at 198. Preliminary injunctions carry "inherent risks" and can themselves "inflict harm." *Id.* at 200. They restrain action "not because the law requires it, but because the law *might* require it." *Id.* (quotation omitted). And in deciding what the law *might* require, the court risks "cementing [its] hasty first impressions" of the law. *Id.* at 206. The risk of ossifying snap judgments is coupled with the risks inherent in finding facts based on incomplete records, without the benefits of "discovery, live testimony, and cross-examination." *Id.* at 200. And those risks are further compounded when a movant asks a court to enjoin "democratically enacted state laws" or policies—a request that "threatens federalism and the separation of powers." *Id.* at 205.

For these reasons, this Court and others routinely deny preliminary relief where movants fail to show that they would suffer irreparable harm during the litigation. *See DSSA*, 108 F.4th at 200–01. For example, courts have denied preliminary relief where the plaintiff's own changed status or conduct obviates any need for the requested injunction. *See, e.g.*, *Donovan ex rel. Donovan v. Punxsutawney Area Sch. Bd.*, 336 F.3d 211, 216–17 (3d Cir. 2003) (denying

injunction where student challenged school policy but graduated during the litigation); *see also, e.g.*, *Stotts v. Cmty. Unit Sch. Dist. No. 1*, 230 F.3d 989, 991 (7th Cir. 2000); *Bacon v. Neer*, 631 F.3d 875, 877 (8th Cir. 2011). And this Court has likewise affirmed the denial of preliminary relief where the plaintiff failed to show the defendant's conduct would likely recur. *See Reading*, 124 F.4th at 192.

2. The absence of irreparable harm to Heaps during the pendency of these proceedings dooms Heaps's request for a preliminary injunction. Heaps fails to explain why the District Court would be unable "to decide the case or to give meaningful relief later on" absent the "extraordinary remedy" of a preliminary injunction. *DSSA*, 108 F.4th at 197, 201. And Heaps fails to grapple with intervening events that have eliminated continuing harm based on the challenged policies: Because Heaps's child no longer wishes to use a male name and pronouns, there is no evidence that he will be harmed by the challenged policies during the pendency of this litigation. As a result, Plaintiff cannot carry his burden of establishing that it is "more likely than not" that he would "suffer irreparable harm" "in the absence of preliminary relief." *Lacayo*, 16 F.4th at 380.

The record evidence demonstrates that as of mid-August 2024—over one year ago—his child no longer wished to use a male name and pronouns. JA9–10, JA20; *see* SA22. There has been no contrary evidence introduced in the year since. And indeed, Heaps concedes on appeal that his child does not identify as a boy. Pl.Br.16.

Because the challenged policies direct compliance with the child's wishes, JA78–79; JA84–85, and because the child's wishes have been aligned with Heaps's for more than a year now, JA20, a preliminary injunction would have no practical effect. Heaps wants the school to address his child as a girl, and the record shows the child wishes the same thing. The challenged policies therefore require the school to address the child as a girl.

While Heaps suggests that it is *possible* that his child could again request to use a male name and pronouns (like any other child could), the mere "possibility of irreparable harm" is insufficient for preliminary relief. *Winter*, 555 U.S. at 22. Heaps has introduced no evidence that his child will likely renew the now-withdrawn request to use a male name and pronouns while this litigation is pending. In other words, Heaps has produced no evidence substantiating a "real or immediate threat" that history will repeat itself. *Lyons*, 461 U.S. at 111; *see Adams*, 204 F.3d at 487 (even "common sense" or "widely believed facts" cannot substantiate irreparable harm absent record evidence "through affidavits, deposition testimony, or other documents").

Indeed, for the same reasons that Heaps has failed to show harm warranting preliminary relief as an equitable matter, Heaps's request for preliminary relief is also moot under Article III. *See Reading*, 124 F.4th at 196 & n.3 (evaluating standing to seek preliminary injunction and "limit[ing]" the "standing inquiry to that form of

relief"). This Court has held that where independent events outside of the defendant's control "eliminate [the] plaintiff's personal stake" in the requested relief or "prevent [the] court from being able to grant" it, that request for relief is moot. *Donovan*, 336 F.3d at 216–17. Here, mootness flows from the undisputed fact that Heaps's child no longer wishes to use a male name or pronouns, which eliminates Heaps's personal stake in obtaining the preliminary injunction he requests.

The District Court nonetheless mistakenly applied the standard for when a *defendant's* "voluntary cessation" of a challenged policy moots a case. JA20. In that context, defendants must prove that they will not resume the challenged conduct because courts are appropriately skeptical that a defendant could "suspend its challenged conduct after being sued, win dismissal, and later pick up where it left off." *FBI v. Fikre*, 601 U.S. 234, 241 (2024). This heightened burden, however, does not apply when mootness flows from independent events outside of the defendant's control. *See, e.g.*, *Donovan*, 336 F.3d at 217. Such is the case here: Heaps's child's wish to no longer use a male name and pronouns happened wholly independently of any conduct by Defendants. So the voluntary cessation standard does not apply, and Heaps's emergency request is moot under ordinary Article III principles.

3. Given the absence of imminent harm, the bases Heaps offers to justify a preliminary injunction fall far short of the mark.

*First*, Heaps's primary argument—that preliminary relief is necessary to avoid an abstract "constitutional harm"—squarely conflicts with this Court's cases. Pl.Br.66. Aside from First Amendment harms, this Court does not presume that constitutional harms are "synonymous with the irreparable harm necessary for issuance of a preliminary injunction." *DSSA*, 108 F.4th at 203 (quoting *Hohe v. Casey*, 888 F.2d 69, 73 (3d Cir. 1989)). Indeed, this Court's precedents already make clear that Fourteenth Amendment claims do not benefit from such a presumption. *See DSSA*, 108 F.4th at 204 (declining to extend presumption that First Amendment violations constitute irreparable harm to other constitutional violations); *Constructor Ass'n of W. Pa. v. Kreps*, 573 F.2d 811, 819–20 (3d Cir. 1978) (irreparable harm not presumed for Fourteenth Amendment violation). It would be especially strange to presume that an *unenumerated* constitutional right supports automatic irreparable injury when a wide range of enumerated-rights claims afford no such presumption.

Heaps mistakenly attempts to analogize his own "constitutional harms" to those faced by the parents in *Mahmoud v. Taylor*, 145 S. Ct. 2332 (2025). Pl.Br.60–61, 67–68. But the Mahmouds had raised First Amendment claims, which carry a presumption of "irreparable injury." *Id.* at 2364. Substantive due process claims, by contrast, come with no such presumption. Nor are the facts here comparable to *Mahmoud*: While the children in *Mahmoud* would have been subject to the books

the plaintiffs found objectionable absent preliminary relief, *see id.* at 2363, Heaps's child will be addressed using a female name and pronouns, just as Plaintiff wishes.

*Second*, the record does not support Heaps's claim that the challenged policies have forced him to withdraw his child from school and are responsible for the harms his child allegedly has experienced based on remote learning. Pl.Br.67. Because Heaps's child no longer wishes to use male pronouns (as Heaps wishes) and the District's policy is to follow the child's requests, Heaps is not stuck in the catch-22 he alleges. Though Heaps apparently fears that his child may again ask to use a male name and pronouns, nothing in the record substantiates this speculation, *see supra* at 10, and Heaps cannot "manufacture" injury "merely by inflicting harm on [himself] based on [his] fears of hypothetical future harm that is not certainly impending.'" *Reading*, 124 F.4th at 198 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013)).

The harms that Heaps claims have necessitated remote learning also lack the requisite causal connection to the challenged policies. The notes from the child's nurse indicate that the child needs remote learning because of anxiety and depression that is heightened at school. JA101, 111–12, 115. But the child's nurse has never treated the child for any mental health condition apart from anxiety—and the only time the nurse had discussed gender with the child, the child had indicated feeling

"very comfortable using male pronouns and a male name." JA8; *see* SA35, 39, 173.[3] The nurse's notes indicate that, independent of the challenged policies, the child may suffer from mental health conditions indicating a need for remote schooling. JA; *see* SA166–170. So there is no record support for Heaps's conclusory assertion that the challenged policies themselves necessitated remote learning.

*Third,* Heaps's asserted imminent harm from the District's purported failure to affirmatively notify Heaps of his child's request to use a male name and pronouns, *see* Pl.Br. 45–48, cannot support a preliminary injunction—and, indeed, Heaps lacks Article III standing to pursue injunctive relief on this basis. Heaps must show that the requested injunction redresses an ongoing or imminent injury. *Lutter v. JNESO*, 86 F.4th 111, 126–28 (3d Cir. 2023). An allegation of a past injury that has "already occurred and [is] not likely to reoccur" is not enough. *Id.* at 129; *see Lyons*, 461 U.S. at 102. Here, Heaps has been on notice since late 2023 that his child had used a male name and pronouns at school. *See* JA184–85 ¶¶ 35, 38, 42. And his own verified complaint asserted his belief that his child has experienced "gender confusion" since

---

[3] Although the nurse provided one note associating the child's mental health struggles with the "social transition[]" at school, JA7; *see* SA165, discovery revealed that this note was based solely on information provided by Heaps by phone, and not on the nurse's direct observations of the child, JA8, 34; *see* SA42–43. The District Court found that the nurse "does not recall [the child] ever informing her that [the child] was more anxious at school than at home due to social transitioning." JA8.

April 2022. JA61 ¶13. So an injunction requiring notification would not redress any ongoing injury to Heaps.

The District Court incorrectly held that Heaps had Article III standing to seek an injunction requiring the school to notify Heaps if his child requests to use a male name and pronouns. But the District Court offered no reason why Heaps's claimed lack-of-notice injury was "certainly impending," *Clapper*, 568 U.S. at 416, apart from the bare fact that Heaps's child would be a student in the District and, without an injunction, the challenged policies would remain in place. JA16–19. But for this injury to materialize, the child would again need to request to use a male name and pronouns—something the child has not requested in over a year. *See supra* at 10. And even if the child makes such a request, Heaps would easily be able to obtain notice of it, as the District has represented that it will not lie if Heaps inquires about the student's name and pronouns. *See* JA121 ¶25. In short, the challenged policies regarding affirmative notice have no "continuing, present adverse effects" on Heaps. *Lyons*, 461 U.S. at 102. Thus, whether as a matter of standing or irreparable harm, Heaps is not entitled to a preliminary injunction based on his purported lack of notice. *See Reading*, 124 F.4th at 196.

Ultimately, "[w]ithout a presumption" of irreparable harm in Heaps's favor, Heaps's "claim of irreparable harm collapses." *DSSA*, 108 F.4th at 204. Indeed, in light of the absence of any continuing harm to Heaps, it is unsurprising that Plaintiff

has not pursued the sort of "drastic, speedy action" one would expect from a litigant facing irreparable harm. *DSSA*, 108 F.4th at 206. Heaps learned his child had requested to be addressed as a boy at school in November 2023. JA6. Now, almost two years later, the parties are still briefing this preliminary injunction appeal. This perfectly illustrates the very risk this Court has warned against—that Heaps is using a preliminary injunction appeal as "a first bite at the merits" and an attempt to obtain a "snap judgment[] in the abstract" instead of seeking a final judgment on the merits. *Id.* This Court should hold, under principles of equity or under Article III, that Heaps is not entitled to this preliminary injunction, and it can leave Heaps to continue pressing his case in the District Court.

## II.    Heaps Is Unlikely To Succeed On The Merits.

The Due Process Clause of the Fourteenth Amendment prohibits States from depriving "any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, §1. In interpreting this Clause, "the Supreme Court and [this] Court have repeatedly warned" against reading it "too broadly," so as to unduly "expand the concept of substantive due process." *Holland*, 895 F.3d at 293. Courts must "exercise the utmost care" in evaluating any claim that a particular *unenumerated* right warrants heightened substantive—not procedural— constitutional protection under the Due Process Clause. *Glucksberg*, 521 U.S. at 720. After all, "because guideposts for" identifying unenumerated rights "are scarce and

open-ended," courts must be careful to avoid "transform[ing]" the "liberty protected by the Due Process Clause" into "the policy preferences of the … Court." *Id*. And the consequences when courts recognize a new substantive due process right are far-reaching: "extending constitutional protection to an asserted right" puts it "outside the arena of public debate and legislative action." *Id*.; *see Littlejohn v. Sch. Bd. of Leon Cnty.*, 132 F.4th 1232, 1280 (11th Cir. 2025) (Newsom, J., concurring).

To avoid removing contested policy disputes from the political process on a theory of unenumerated constitutional rights, the Supreme Court has identified two important guardrails. *See Muñoz*, 602 U.S. at 910. First, this Court must consider a "careful description of the asserted fundamental liberty interest"—that is, it must consider the right at a fine-grained level of specificity, rather than relying on generalities. *Id*.; *see Holland*, 895 F.3d at 292. In *Muñoz*, the Supreme Court rejected a plaintiff's attempt to invoke the established "fundamental right of marriage" where the plaintiff in fact sought "something distinct" and more specific: the right "to reside with her noncitizen spouse in the United States." *Muñoz*, 602 U.S. at 910. *Dobbs* likewise explained that the right to bodily autonomy was defined at too high a "level of generality," asking instead whether there is a "right to obtain an abortion." *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 256–57 (2022). Second, once the Court identifies the specific right, it asks if that asserted right is, "objectively, deeply rooted in this Nation's history and tradition." *Muñoz*, 602 U.S. at 910.

Heaps cannot establish that the State violated his unenumerated constitutional rights. Heaps repeats the same error that the Supreme Court and this Court have long warned against: he asserts a general fundamental right to direct the education and medical care of his child. But carefully described, Heaps in fact claims a right to dictate that a public high school reject his child's affirmative and voluntary request to be addressed using a different name and pronouns, as well as a right to be affirmatively notified—over the student's express objection—when his child makes such a request. Defined at the proper level of specificity, Heaps cannot show that Defendants have infringed any right that is "deeply rooted in this Nation's history and tradition." *Id*. at 910. So rational basis review applies, and the State's policies easily clear that bar. Even if strict scrutiny applied, the challenged policies would withstand such scrutiny.

### A.     Heaps Has No Fundamental Unenumerated Right To Require A Public School To Reject A High School Student's Affirmative And Voluntary Request To Use A Different Name and Pronouns.

Heaps's first claim—that if a high school student voluntarily requests to be addressed at school by a different name and pronouns, the parent has a fundamental unenumerated right to override the student's own voluntary request—falls short. No one seriously contends that such a right, at that level of specificity, is "deeply rooted in this Nation's history and tradition." *Muñoz*, 602 U.S. at 910. That should end the inquiry. Heaps instead says that this right is contained within the general

unenumerated rights to direct a child's education and to direct a child's medical care. Precedent and history do not support Heaps's sweeping view of these rights.

> 1.    The Fundamental Right to Direct a Child's Education Does Not Encompass the Specific Right Heaps Asserts.

a. Precedent demonstrates that the fundamental right to direct a child's education does not support Heaps's asserted right.

Plaintiff's argument rests on a quartet of Supreme Court cases on parents' rights, but each turned on whether the state was compelling or coercing parents or students. Pl.Br.33–37. *Meyer v. Nebraska*, 262 U.S. 390 (1923), invalidated a law that prohibited teaching foreign languages to young students. *Pierce v. Society of Sisters*, 268 U.S. 510 (1925), invalidated a measure that prohibited students from attending private school. *Wisconsin v. Yoder*, 406 U.S. 205 (1972), held that a compulsory school attendance law could not be applied to Amish students who had completed middle school. And *Troxel v. Granville,* 530 U.S. 57 (2000), held that a State could not require a fit parent to send her child to visit a grandparent without giving substantial weight to the parent's contrary preference. In each case, the Court found a constitutional violation because "the state was either requiring or prohibiting some activity" by the parents or their children. *Anspach*, 503 F.3d at 263.

*Anspach* underscores that the lack of coercion defeats a parental rights claim. In that case, parents claimed that a city health center violated their fundamental rights by providing their child with emergency contraception. 503 F.3d at 259–60.

This Court rejected the claim, holding that the minor was not "in any way compelled, constrained or coerced" because the center was simply accommodating her affirmative choice. 503 F.3d at 266. The parents' "inability to opt out" did not change the analysis because the clinic's services were "wholly voluntary" and provided only on the daughter's request. *Id.* at 269. As this Court explained, recognizing the parents' claims "would [have] stretch[ed] the parental liberty interest well beyond its previously defined borders." *Id.* at 269.[4] Other circuits have read the Supreme Court's parental rights cases the same way. *See Doe v. Irwin*, 615 F.2d 1162, 1169 (6th Cir. 1980); *Foote v. Ludlow Sch. Comm*, 128 F.4th 336, 353–57 (1st Cir. 2025); *Regino v. Staley*, 133 F.4th 951, 966 (9th Cir. 2025).

The policies challenged here do not implicate the parental right to direct a child's education because they do not compel Heaps or his child to do anything. Rather, they instruct the *school* to defer to a student's voluntary request to be addressed by a specific name and pronouns. *See* JA78; JA84–85. Heaps's child informed a teacher that the child wished to use a male name and pronouns; the school honored that request. JA184–85 ¶¶35; JA121 ¶¶17–26; JA126 ¶¶5–10. The school has made clear that if the child asked to be treated as a girl, the school would comply

---

[4] Contrary to Heaps's claims, Pl.Br.55–56, *Anspach*'s discussion of the contours of parental rights remains good law after *Dobbs*. *Anspach* addressed the scope of the same parental rights that Heaps claims are implicated here, an issue *Dobbs* did not address. *See Anspach*, 503 F.3d at 263-64.

with that request too. JA186 ¶47; JA121 ¶19. Because this conduct is "devoid of any form of constraint or compulsion," it does not infringe any fundamental right. *Anspach*, 503 F.3d at 264. This student was not "in any way compelled, constrained or coerced into" choosing to be addressed by a different name or pronouns. *Id.* at 266.

Heaps's "inability to opt out" for that child makes no difference because, as in *Anspach*, the student's decision was "wholly voluntary," and the school merely chose to honor the voluntary request. *Id.* at 269. Said another way, the school compelled neither the student nor the parents to do anything. *See Foote*, 128 F.4th at 353–57; *Vitsaxaki v. Skaneateles Cent. Sch. Dist.*, 771 F. Supp. 3d 106, 121 (N.D.N.Y. 2025); *cf. Littlejohn*, 132 F.4th at 1245. Given the lack of coercion, that result follows from Supreme Court and Third Circuit precedent.

Heaps's attempt to recharacterize the challenged policies as coercive falls flat. As to the facts, although Heaps makes the conclusory assertion that school officials "exploited their authority" to "coerce" his child into asking to use a male name and pronouns, Pl.Br.61, Heaps cites nothing in the preliminary-injunction record to support it—and indeed, the District Court found to the contrary. JA30–32. If Heaps believes his child was coerced, he may proceed to the merits and build a record to support his claim. But on this preliminary-injunction record, there is no basis for concluding that the District Court clearly erred in making this finding.

31

As to the law, Heaps likewise comes up empty. Invoking *Mahmoud*, 145 S. Ct. 2332, Heaps asserts that this school policy is coercive because school attendance is mandatory. Pl.Br.60–61. Initially, the breadth of that argument is stunning, as it would make every public-school policy "coercive" for constitutional purposes. *See infra* at 40–43 (discussing the lack of limiting principles). But even on its face, Heaps's substantive due process challenge is hardly analogous to the First Amendment claims in *Mahmoud*. There, the books the parents objected to were selected by the teacher, 145 S. Ct. 2344–45, so the child's presence at school subjected the student to those books. By contrast, nothing about this student's attendance at school compelled the child to request a particular name and pronouns. As the record demonstrates, the student made this request freely, without prompting by the school. JA184–85 ¶¶35, 38–40; JA121 ¶¶17–26; JA126 ¶¶5–10. The school merely accommodated it. That is not compulsion.

For the same reason, Heaps's attempt to analogize this case to *Gruenke v. Seip*, 225 F.3d 290 (3d Cir. 2000), falls flat. There, a coach exercised his "authority as the minor's swim coach" to force her to take a pregnancy test "against her express wishes," a plainly coercive act. *Anspach*, 503 F.3d at 266 (discussing *Gruenke*). But the facts there do not render coercive every interaction between school and student, let alone interactions premised—as here—on deference to a *student's* own wishes.

Because the challenged policies merely regulate how the school responds to voluntary choices made by students, case law cuts squarely against Heaps's claim. As the cases on which Heaps rely make clear, the State has broad authority "to make reasonable regulations for all schools." *Meyer*, 262 U.S. at 402; *see Pierce*, 268 U.S. at 534; *Yoder*, 406 U.S. at 213–214. This Court has recognized the same. *See, e.g.*, *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 182 (3d Cir. 2005). That is logical: while parents need not send their children to public school, *Pierce*, 268 U.S. at 535, they lack a "constitutional right to avoid reasonable state regulation of their [child's] education." *Combs v. Homer-Ctr. Sch. Dist.*, 540 F.3d 231, 249 (3d Cir. 2008); *see Parents for Priv. v. Barr*, 949 F.3d 1210, 1232 (9th Cir. 2020) (declining to recognize fundamental parental right "to direct the … policies of public schools"). A contrary rule would be "inconsistent with preserving the autonomy of educational institutions, which is itself … an interest of constitutional dignity." *Crowley v. McKinney*, 400 F.3d 965, 971 (7th Cir. 2005).

b. Heaps also has failed to establish that his asserted right is "deeply rooted in this Nation's history and tradition." *Muñoz*, 602 U.S. at 910. Heaps, however, did not provide the District Court "with any historical … precedent or authority" supporting a parental right to dictate how schools respond to a student's request to

be addressed in a particular manner. JA24–25. Nor do the sources Heaps presses for the first time on appeal support the purported historical tradition he asserts.[5]

History underscores schools' authority to enact reasonable regulations over parental objections to the contrary. American courts have long held that the authority to maintain "all reasonable rules and regulations for the government, discipline and management of the public schools" is "clear and unquestionable." *Spiller v. Inhabitants of Woburn*, 12 Allen 127, 128 (Mass. 1866). The notion that "parental authority" overrode such regulations was considered a "disintegrating principle … unknown to the law." *Kidder v. Chellis*, 59 N.H. 473, 476 (1879). Thus, courts have repeatedly held that the parent must "submit himself to the reasonable rules, regulations, practices, and customs" of public schools. *Bd. of Educ. v. Purse*, 28 S.E. 896, 900 (Ga. 1897); *see Spiller*, 12 Allen at 128; *Burdick v. Babcock*, 31 Iowa 562, 568 (1871); *Ferriter v. Tyler*, 48 Vt. 444, 471 (1876); *Kidder*, 59 N.H. at 476.

Heaps identifies no historical source that supports the asserted right he now claims. Heaps cites decisions from five state courts granting parents the ability to opt their children out of certain classes. *See* Pl.Br.39 & n.5; Pl.Br.37 (citing Eric DeGroff article, relying on same cases); Pl.Br.38 (Joseph Griffith article, citing

---

[5] That Heaps has presented new historical evidence on appeal, Pl.Br.37–43, illustrates the dangers that come with making a "rushed judgment" in this preliminary posture, when the parties have developed only an "initial sketch" of their evidence, *DSSA*, 108 F.4th at 203, rather than allowing the case to play out at summary judgment.

same). But each of these cases relied on a lack of statutory authority for, or arbitrariness of, the school board's refusal to allow a parent to opt a child out of certain studies. *See Trs. of Sch. v. People ex rel. Van Allen*, 87 Ill. 303, 309 (1877) (high school's expulsion of student for declining to participate in certain studies at father's request was "unauthorized by the statute"); *see Rulison v. Post*, 79 Ill. 567, 571 (1875) (similar); *State v. Sch. Dist. No. 1 of Dixon Cnty.*, 48 N.W. 393, 394–95 (Neb. 1891) (school board's refusal to allow parent to opt child out of course of study was "arbitrary and unreasonable"); *State v. Ferguson*, 144 N.W. 1039, 1044 (Neb. 1914) (similar). None involved a school's response to a voluntary student request. And five isolated decisions postdating the Fourteenth Amendment's ratification in 1868 hardly suffice to establish a "deeply rooted" tradition. *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 35 (2022) (cautioning against giving undue weight to "postenactment history"); *cf. Glucksberg*, 521 U.S. at 710–15 (identifying historical tradition based primarily on pre-1868 American history); *Timbs v. Indiana*, 586 U.S. 146, 150–55 (2019) (same).

In any event, courts have held for more than a century that where the school's refusal to allow an opt-out is not arbitrary or unreasonable—where, in other words, the school has a rational basis—parents' objections cannot trump. *See, e.g.*, *State ex rel. Andrews v. Webber*, 8 N.E. 708, 712 (Ind. 1886) (upholding requirement over parent's objection where parent failed to show requirement "was not a reasonable

and valid exercise" of school's authority). Indeed, the seminal case Heaps cites made clear that it did "not intend to lay down any rule which will interfere with any reasonable regulation adopted for the management and government of the public schools." *Morrow v. Wood*, 35 Wis. 59, 65 (1874).

The commentators Heaps invokes get him no further. Pl.Br.28–29. Justice Story proclaimed that "[i]t is impossible to say . . . that the father has any … absolute right to the care and custody of his children." 2 Joseph Story, *Commentaries on Equity Juris.* § 1347, at 577 (2d. ed. 1839). In Justice Story's view, if the government lacked the ability to "control the conduct of the father in the education of his children," it "would strike all civilized countries with astonishment." *Id*. at 578. As for James Kent's commentaries, although Heaps suggests that Kent supported a parental right to control how schools educate children, Pl.Br.28–29, the cited source says no such thing. Kent's comment that "[t]he true province of a school fund, is not to supersede, but to encourage and stimulate the proper efforts of parents," meant only that parents should not rely solely on publicly funded common schools to educate their children. 2 James Kent, *Commentaries on American Law* 200–01 (5th ed. 1844); *see id.* (cautioning that parents "ought not to remain contented with the means the state fund affords" because public schools were "confined to very humble teaching"). Meanwhile, Blackstone's commentaries establish that, at English common law, parents had a *duty* to educate their kids. *See* 1 William Blackstone,

*Commentaries on the Laws of England* 450. If a parent was exercising that duty, the parent had certain rights of control *over their minor child*—but the parent could delegate his duty to educate his child and his right "of restraint and correction" to a "tutor or schoolmaster." Blackstone at 453. This says nothing of the parent's right to a force a school to treat the child in a manner objectionable to the child.

In sum, nothing in precedent or tradition supports Heaps's right to demand that a school reject his child's voluntary request to be addressed by a particular name and pronouns at school. *See Foote*, 128 F.4th at 352; *cf. Littlejohn*, 132 F.4th at 1245.

> 2. The Fundamental Right To Direct A Child's Medical Care Does Not Encompass The Specific Right Heaps Asserts.

To the extent Heaps grounds his challenge in a right to direct his child's medical care, *see* Pl.Br.31, 49, complying with a student's request to use a particular name and pronouns is not medical care. *See Foote*, 128 F.4th at 349–50; JA33–35.

The few cases to recognize a fundamental right to direct medical care all "involved intrusions upon the bodily integrity of the child or other conduct with clinical significance—whether through a medical procedure, examination, or hospitalization." *Foote*, 128 F.4th at 350. This is true in the only two such cases Heaps cites. In *Parham v. J.R.*, the Supreme Court considered whether committing a child to a mental health facility violated substantive due process. 442 U.S. 584 (1979). And in *Kanuszewski v. Michigan Department of Health and Human*

*Services*, the Sixth Circuit considered whether a child's blood samples could be retained without parental consent. 927 F.3d 396 (6th Cir. 2019).

Unlike the "medical procedure[s], examination[s], or hospitalization" at issue in cases like *Parham* and *Kanuszewski*, the "allegations here do not involve clinical conduct at all." *Foote*, 128 F.4th at 350. Addressing a person by their chosen name and pronouns is "something people routinely do with one another, and which requires no special training, skill, medication, or technology," and therefore cannot "be reasonably viewed as" medical treatment. *Id.* Instead, it simply "extends the kind of decency students should expect at school: such as being called the name they ask to be called." *Vitsaxaki*, 771 F. Supp. 3d at 121; *see Foote*, 128 F.4th at 349–50. It certainly does not qualify as medical treatment where, as here, there is no "evidence that the school actively encouraged" Heaps's child "to socially transition as opposed to 'passively recognizing' [the child's] wishes." JA34.

Heaps's argument that a parent's right to direct his child's medical care can be implicated absent "a formal diagnosis or referral" is a red herring. Pl.Br.53. The primary defect with Heaps's claim is not that a medical diagnosis is a prerequisite to a violation of his right to direct his child's medical care.[6] The defect instead is that

---

[6] It nonetheless bears mention that the District Court found that Heaps's child has not been diagnosed with any mental health condition related to gender identity; that the record does not reflect that his child has received care from any licensed mental health professional during the pendency of this case; and that the opinion of the

the school has not made any medical decision for Heaps's child or taken away any medical decision from Heaps. The school merely decided not to disregard the student's voluntary request to be addressed by a particular name and pronouns.

Accepting Heaps's capacious view of medical care would have destabilizing consequences. If addressing a student by a different name and pronouns (on the student's own request) is medical care, teachers or school officials would be required to have a medical license to honor that request, even if a parent consented. Beyond the facts of this case, if Heaps is correct that any kind of interaction with students that might touch on a future medical diagnosis implicates the right to direct medical care, *see* Pl.Br.54, that would mean a teacher interferes with the parent's right to direct medical care when she listens to the concerns of a student who comes into her office crying, just because that student might raise the same concerns in therapy. And it would mean that a cafeteria worker interferes with the right to direct medical care when filling lunch orders, just because eating a particular lunch might be part of the care plan of a student with anorexia. In short, Heaps's position would imbue with constitutional significance a large swath of everyday conduct in schools.

---

pastoral counselor that Heaps's child suffers from "gender confusion" lacks a scientific or medical basis. *See* JA8–9, 33–34.

### 3.    Heaps's Expansive View Of Unenumerated Parental Rights Would Be Disruptive And Lacks Limiting Principles.

That neither precedent nor history supports Heaps's asserted right is unsurprising, as a contrary result would be untenable. Heaps does not provide any principle for distinguishing which student requests require parental consent and which do not—and because the unenumerated right he asserts lacks a historical pedigree, his position lacks a limiting principle that is "deeply rooted in this Nation's history and tradition." *Muñoz*, 602 U.S. at 910. Heaps's boundless view of unenumerated rights would seemingly require schools to defer to every parent's preference for their child, even when that preference conflicts with their child's requests. That would destabilize our system of public education, disrupt learning, and place school administrators in a flatly untenable position.

Some examples underscore the chaos that would result from accepting Heaps's position. Consider a student who orders chicken nuggets at lunch, but his parents inform the school that they have an ethical objection to eating meat and thus that their high schooler must not do so. Does the Constitution require the cafeteria worker to refuse to honor the student's order based on the parent's purported fundamental right to direct the child's education by controlling the requests the school can accept? Or consider a student who asks a teacher for permission to go to the bathroom to change out of jeans and into a skirt, even though the parents oppose their daughter wearing a skirt. Does the Constitution require the teacher to tell the

student she is not welcome in class if she wears a skirt? Or consider the student who requests to be addressed by her middle name, even though the student's parent wishes for the student to be addressed by her first name. Does the school violate the parent's constitutional rights by honoring the student's request?

The problem is twofold. On Heaps's expansive view of substantive due process, and without a limiting principle, a school would risk infringing the parent's constitutional rights any time it honored these students' requests over the parent's objections. Educators would be subject to disruptive and inconsistent demands, undermining uniformity and predictability at school. *See, e.g.*, *People ex rel. McCollum v. Bd. of Educ.*, 333 U.S. 203, 235 (1948) (Jackson, J., concurring) (if courts were "to eliminate everything that is objectionable to any [group] or inconsistent with any of their doctrines, we will leave public education in shreds."). Administrators would have to develop systems for soliciting and tracking parental preferences on a broad range of day-to-day issues, and then be responsible for informing teachers of those parental preferences. Teachers would have to accommodate each parent's vision for how the classroom should operate. Schools would need bespoke, student-by-student approaches to handling issues like lunches and dress codes. They would face vexing problems if the parents (including divorced parents) disagree about their preferences. And all of this will hurt students. Faced with uncertainty, schools may strip schools of policies and practices likely to

generate parental objections, giving a small subset of parents power "to veto the curricular and administrative decisions" of schools. *Foote*, 128 F.4th at 352.

Moreover, any limiting principle that seeks to distinguish these examples (or any other) from the facts at hand would be untenable. To the degree Heaps argues that parents have a right to weigh in on only certain "important" issues, or ones that touch on parents' "values," it is unclear why those limits would distinguish the examples above. Nor is it clear how a court could decide that one parent's views on gender identity have greater weight than another's on vegetarianism, modest dress, or sci-fi novels. It is not just that edge cases are unclear. It is also unclear where the distinguishing line comes from in the first place: because Heaps's underlying right finds no support in text, history, or precedent, those sources offer no limiting principles. And with no legal source to rely on, identifying the choices that are important enough (or values-laden enough) to allow a "parental veto" becomes the very exercise in "policy preferences" the Supreme Court has warned against. *Glucksberg*, 521 U.S. at 720.

To be sure, the First Amendment—an enumerated right—may require maintaining parents' ability to opt their children, particularly "very young children," out of aspects of the school curriculum based on a religious objection. *Mahmoud v. Taylor*, 145 S. Ct. 2332, 2353 (2025). As *Mahmoud* explained, the young children there were subject to "coercive" instruction that "explicitly contradict[ed] their

parents' religious views." *Id.* at 2355. But bare disagreement with a school regulation, without any religious basis or coercion, does not violate the Constitution. And no precedent supports a fundamental right to demand that schools refuse a high school student's voluntary request merely because their parent objects.

The harms stemming from a contrary rule would be significant. The questions that schools face when confronted with significant disagreement between their students and their parents are difficult—and schools across the country have differing views on how to resolve them. These are matters on which courts have less expertise than school boards and legislatures. *See Yoder*, 406 U.S. at 235 ("courts are not school boards or legislatures, and are ill-equipped" to determine school policy). Recognizing the constitutional right Heaps asserts here would short-circuit "fierce scientific and policy debates" about how best to support transgender students and their parents. *Skrmetti*, 145 S. Ct. at 1837. Precisely because these issues are challenging and controversial, this Court should "leave [them] to the people, their elected representatives, and the democratic process." *Id.*

### B.    Heaps Has No Fundamental Right To Affirmative Notification Of His High Schooler's Request To Use A Different Name And Pronouns, Over The Student's Own Objection.

Heaps also incorrectly says that a high school is constitutionally obligated to affirmatively notify parents of a student's request to use a different name or pronouns, even if the student requests that this information not be disclosed to the

parents. The dispute on this score is narrow. The challenged policies make clear that Heaps's school can disclose a student's gender identity when the parent or guardian inquires and in a number of other circumstances. *See* JA78–79; JA84–87; *see supra* at 8. So the dispute is whether due process requires an affirmative notification by the school, without a request from a parent, and despite the student's request for confidentiality. Heaps's contention on that issue fails. For one, because Heaps already knows that his child requested to use a male name and pronouns and states that his child no longer wishes to maintain that request, Heaps suffers no ongoing harm from this policy and is not entitled to an emergency preliminary injunction on this basis. *See supra* at 24–25. But even if this Court reaches the merits, Heaps's asserted right lacks support in precedent and history.

No precedent suggests that the Constitution requires a school to affirmatively notify parents over the student's objection. *Anspach* says the opposite. This Court held there that parents do not have a fundamental right to have a clinic affirmatively notify them that their child had requested emergency contraception. 503 F.3d at 266. This Court noted that the state infringes fundamental parental rights only if it actively "compel[s] interference in the parent-child relationship," not where the state declines to "foster the parent/child relationship." *Id.* at 262, 266. For that reason, the clinic's failure to affirmatively provide information to parents did not violate substantive due process. *Id.* at 270–71; *see Irwin*, 615 F.2d at 1169 (same).

The same principle applies here. Heaps's child requested that the school not affirmatively disclose the child's gender identity to Heaps. In following the student's wish, the school did not compel the student to do anything and did not "interfere[] in the parent-child relationship." 503 F.3d at 266; *see supra* at 8–9. There is no evidence that the school encouraged this high schooler to withhold information from Heaps. And there is no evidence that the school would have ignored, or lied in response to, a question from Heaps as to the child's name or pronouns at school. If anything, a contrary ruling—that a school must share information the student asks to keep private—itself invites more "interference in the parent-child relationship," placing the school in the middle between parents and children. 503 F.3d at 266.

Heaps cites only *Gruenke* in support of an asserted right to affirmative school notification, Pl.Br.44, 50–52, but that fails twice over. This Court already concluded that *Gruenke* "did not … recognize a parent's constitutional right to notification by school officials." *Anspach*, 503 F.3d at 270–71; *see Vitsaxaki*, 771 F. Supp. 3d at 122. And in any event, the facts of *Gruenke* are far afield of this case, because the school's conduct here involved none of the coercion present in *Gruenke*. *Supra* at 32. Accordingly, neither the holding nor facts of *Gruenke* support Heaps.

Heaps incorrectly claims this case is akin to *Gruenke* because the District allegedly engaged in "manipulative" conduct. Pl.Br.51, 57. But the District merely honored a student's own voluntary requests to use a particular name and pronouns

at school and not to disclose as much to Heaps. Nothing in the record suggests—nor does Heaps contend on appeal—that the District pressured the student to conceal that information from Heaps. Indeed, the District would have honored the student's request if the student wished to share this information with Heaps. JA121; JA126. The District Court, moreover, found that the District did not lie to Heaps when he asked the school about his child's name and pronouns. JA6; *see* JA31–32; JA 121–22; JA126. So there is nothing "manipulative" about the District's conduct—a far cry from the coach in *Gruenke* who pressured the student to take a pregnancy test by threatening her, 225 F.3d at 306, or from the officials in *Arnold* who pressured a pregnant student to obtain an abortion, paid for it, drove the student to the clinic, and "coerced" the student "to refrain from notifying [her] parents," *Arnold v. Bd. of Educ. of Escambia Cnty.*, 880 F.2d 305, 309 (11th Cir. 1989).

Nor can Heaps source his alleged right to affirmative notice by claiming that he needs this information to exercise his constitutional right to participate in his child's "decision" regarding gender identity. Pl.Br.45–46, 59–60. As noted, Heaps does not have an unenumerated right to control his child's request to use a different name and pronouns at school, *see supra* at 28–37, and so he lacks a corollary right to affirmative information to exercise that purported veto. Although other cases may involve *medical* decisions that could fall within a parent's control and thus may

require informing the parents, such medical decisions are far afield of the policies here, which have nothing to do with treatment. *See supra* at 38–39.

Of course, that is not to say schools should not try to involve parents in these decisions and provide them information when possible. NJDOE Guidance recommends not that schools exclude parents, but that they ascertain the student's preference on affirmative disclosure—so that disclosure can happen if the student does not object. JA85. But there are cases, like this one, where the student's request for privacy runs headlong into the parent's demand for affirmative notification. *See Anspach*, 503 F.3d at 261 (noting a parent's claimed rights may conflict with "the child's right to privacy"). And however a judge might weigh these difficult policy questions if they were a school administrator, these are not questions the Due Process Clause decides. *See Littlejohn*, 132 F.4th at 1280 (Newsom, J., concurring).

### C.    A Policy That Respects A Student's Voluntarily Expressed Gender Identity Survives Any Level Of Scrutiny.

As the District Court concluded, the challenged policies do not implicate a fundamental right and need only a rational basis to pass muster. JA35. But the court also rightly found these policies would survive strict scrutiny. JA35–36.

New Jersey has multiple compelling state interests here. The State has a "compelling state interest in shielding [transgender students] from discrimination." *Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 528 (3d Cir. 2018). Transgender students face "extraordinary social, psychological, and medical risks" at least in part

47

because they "face discrimination, harassment, and violence because of their gender identity." *Id*. When they face discrimination in schools, "the risk to their wellbeing cannot be overstated—indeed, it can be life threatening." *Id.* at 529; *see id*. at 523 (describing survey of 27,000 transgender individuals, in which "40% reported a suicide attempt (a rate nine times higher than the general population)"). Indeed, the "mistreatment of transgender students" at school can "lead to negative educational outcomes" or even "precipitate self-injurious behavior." *Id.* at 529. Moreover, because the State more generally has a "compelling" "interest in safeguarding the physical and psychological well-being of a minor," *New York v. Ferber*, 458 U.S. 747, 756–57 (1982), it also has a compelling interest in protecting transgender students from harm, *Doe*, 897 F.3d at 527–28.

Critical to creating the sort of affirming school environment that secures these benefits is respecting the student's decision to be addressed by a particular name and pronouns. When "transgender students are addressed with gender appropriate pronouns," alongside other related measures, such "students reflect the same, healthy psychological profile as their peers." *Doe*, 897 F.3d at 523. Indeed, students whose names and pronouns are respected describe higher self-esteem and reduced depression. *See, e.g.*, Amanda Pollitt, *Predictors & Mental Health Benefits Of Chosen Name Use Among Transgender Youth*, *Youth & Society*, 53(2), 320–341 (2019). Critically, such policies can significantly reduce the risk of suicidal behavior.

Stephen Russell, *Chosen Name Use is Linked to Reduced Depressive Symptoms, Suicidal Ideation, & Suicidal Behavior Among Transgender Youth*, J. of Adolescent Health 503, 3 (2018). And students who have their identity respected have higher GPAs and are less likely to be absent at school. Michelle Marie Johns, *Protective Factors Among Transgender & Gender Variant Youth: A Systematic Review by Socioecological Level*, 39 J. Primary Prevention 263–301 (2018).[7]

The challenged policies are tailored to advance the state's interests. The policy requires schools to respect a student's name and pronouns—to capture the academic and safety benefits associated with respecting the student's affirmatively-shared identity. *See supra* at 47–49. And because the state interests turn on the benefits to students of respecting their gender identity at school, the policies only apply to the school, and only where the student affirmatively requests the use of a particular name and pronouns. JA83. The policies do not instruct school officials to encourage or coerce students to use a particular name or pronouns. *See, e.g.*, JA78–80; JA83–87. And the policies authorize disclosure of a student's request where there is a "specific and compelling need, such as the health and safety of a student or an incident of bias-related crime." JA79; JA87. The *only* time these policies put the schools and parents in conflict is if the student voluntarily requests to be addressed in a certain way over a parent's objection—the very situation in which a student would experience their

---

[7] These sources were cited in the preliminary injunction filings below.

identity as disregarded, with all the attendant harms, including "negative educational outcomes" and "self-injurious behavior." *Doe*, 897 F.3d at 529.

Heaps incorrectly asserts that Defendants' interests are not "connected" with "socially transitioning students in secret." Pl.Br.65. But the policy of honoring the student's request as to whether and how a student wishes to notify their parents regarding their name and pronouns bears a direct connection to these interests. As noted, the school's decision to respect a student's affirmatively expressed name and pronouns protects students against self-harm and negative school outcomes. If a student who is unwilling to share their identity with their parents knows that the school would do so, the student will withhold that information from the school, exacerbating the risk of harm the policy addresses. *See, e.g.*, National Association of Secondary School Principals Position on Safe Schools: Guiding Principles, https://www.nassp.org/top-issues-ineducation/position-statements/safe-schools/ ("[t]rusting relationships in school are the most effective means of ensuring school safety"). The challenged policy is tailored to that concern. It does not bar students from sharing information with their parents; stop school officials from contacting parents absent student objections; or suggest that officials should counsel students against telling their parents. It just limits when schools affirmatively contact parents over students' objections, the very activity that deters students from coming forward.

Heaps also misunderstands the narrow tailoring inquiry and the impact of *Parham*, 442 U.S. at 604. Invoking *Parham*, Heaps claims Defendants have not rebutted the "presumption that the parents act in the best interests of their child[ren]." Pl.Br.66. Initially, *Parham* is relevant only in defining the "rights and prerogatives of the child and parent in the voluntary commitment setting." *Id.* It is not relevant in other contexts—and Heaps identifies no case that supports that expansion of *Parham*. But even more fundamentally, Heaps misunderstands the challenged policies. Defendants' interest in allowing students to guide whether their school affirmatively contacts a parent applies no matter how the parent would react. So long as the student does not wish for their parent to yet know, a mandatory notification policy would deter the student from coming forward at school. The District's policy is narrowly tailored to removing that deterrent, and its application does not turn on any assessment of whether a parent would act in a child's best interests.

In short, the LAD, state guidance, and District policy are narrowly tailored to serve Defendants' compelling interests. They survive any level of scrutiny.

## III.    Even If Preliminary Relief Were Warranted, This Court Should Remand For The District Court To Determine The Proper Scope Of Relief.

If this Court determines that Heaps is entitled to preliminary relief, it should remand for the District Court to craft an appropriately tailored injunction. The District Court must ensure that Heaps's proposed injunction is not "broader than required to provide a full remedy to the injured party." *NAACP v. N. Hudson Reg'l*

*Fire & Rescue*, 665 F.3d 464, 485 (3d Cir. 2011); *see Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2557 (2025) ("injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief *to the plaintiffs*" (quotation omitted)). Remand as to the proper scope of injunctive relief is necessary here because Heaps's requested relief is overbroad in at least two key respects.

*First*, Heaps's attempt to enjoin the NJDOE Commissioner's promulgation of non-binding, unenforceable Guidance, *see* DNJ.Dkt.44-4 ¶6, would not redress any harm to him. The NJDOE Guidance does not require the District to maintain the policy Heaps challenges, so enjoining this Guidance would not remedy Heaps' asserted injuries. In other words, because the challenged policy is "unenforceable," "[t]here is no one, and nothing, to enjoin." *California v. Texas,* 593 U.S. 659, 669, 673 (2021). Heaps therefore lacks standing to pursue this relief.

*Second*, Heaps has not explained how a broad injunction against the New Jersey Attorney General—specifically, an injunction against "any and all further efforts to enforce [the LAD] … by not permitting full disclosure to parents of their minor child's desire to socially transition," DNJ.Dkt.44-4 ¶5—is necessary to provide complete relief. Heaps has no cognizable interest in controlling how the District addresses other children, let alone how *other schools* address other children. So granting his requested injunction would be "more burdensome to the defendant

than necessary to provide complete relief *to the plaintiffs*." *CASA*, 145 S. Ct. at 2557; *see SEC v. Gentile*, 939 F.3d 549, 560 (3d Cir. 2019).

In short, if this Court determines that preliminary relief is warranted, it should remand for the District Court to fashion an appropriately tailored injunction.

## CONCLUSION

This Court should affirm.

Respectfully submitted,

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY

By:  /s/ Viviana Hanley
Viviana M. Hanley (N.J. Bar No. 401572022)
Deputy Attorney General
R.J. Hughes Justice Complex
25 Market Street
P.O. Box 112
Trenton, New Jersey 08625-0112
(862) 350-5800

Dated: September 2, 2025

## CERTIFICATION OF BAR MEMBERSHIP

I certify that I am a member in good standing of the bar of the U.S. Court of

Appeals for the Third Circuit.

> By:    /s/ Viviana Hanley
> Viviana M. Hanley
> N.J. Bar No. 401572022
> Deputy Attorney General

Dated: September 2, 2025

## <u>CERTIFICATION OF COMPLIANCE</u>

Under Fed. R. App. P. 32(g) and L.A.R. 31.1(c), I certify that:

1.     This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7) because the brief contains 12,972 words.

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in a proportionally spaced 14-point typeface using the Microsoft Word processing system.

3.     The text of this brief complies with L.A.R. 31.1(c) because it is identical to the text of the paper copies.

4.     This brief complies with L.A.R. 31.1(c) because the electronic file was scanned with anti-virus software: Crowdstrike Falcon Sensor version 7.27.19907.0.


By:     /s/ Viviana Hanley
         Viviana M. Hanley
         N.J. Bar No. 401572022
         Deputy Attorney General


Dated: September 2, 2025

## <u>CERTIFICATION OF SERVICE</u>

I hereby certify that on September 2, 2025, I caused the Brief for Appellees to be

filed with the Clerk of the U.S. Court of Appeals for the Third Circuit via electronic

filing. Counsel of record will receive service via the Court's electronic filing system.


By:    /s/ Viviana Hanley
       Viviana M. Hanley
       N.J. Bar No. 401572022
       Deputy Attorney General

Dated: September 2, 2025