---

**CASE NO. 24-3278**

---

# In the United States Court of Appeals for the Third Circuit

---

**CHRISTIN HEAPS**

*Plaintiff-Appellant,*

*v.*

**DELAWARE VALLEY REGIONAL HIGH SCHOOL BOARD OF EDUCATION, et al.,**

*Defendants-Appellees.*

---

Appeal from the United States District Court for the District of New Jersey

Civil Action No. 24-107 (GC-JBD)

---

**DEFENDANTS-APPELLEES DELAWARE VALLEY REGIONAL HIGH SCHOOL BOARD OF EDUATION, SCOTT MCKINNEY AND ASHLEY MIRANDA'S BRIEF**

---

Roshan D. Shah, Esq.
Ashu Verma, Esq.
SHAH LAW GROUP, LLC
1040 Broad Street, Suite 304
Shrewsbury, NJ 07702
Phone: 732-398-6545
Facsimile: 732-576-0027
*Attorneys for Defendants-Appellees Delaware Valley Regional High School Board of Education, Scott McKinney and Ashley Miranda*

# **TABLE OF CONTENTS**

COUNTERSTATEMENT OF THE ISSUES.............................................................1

CONCISE COUNTERSTATEMENT OF THE CASE ...........................................2

I.        Factual Background.....................................................................................2

          A. The Parties. ............................................................................................2

          B.  The Board Adopted Policy 5756 Based Upon NJDOE Guidance........3

          C.  Jane Sought To Be Referred To By A Male Name And Pronoun
              During Her Freshman Year ...................................................................4

          D. Heaps Demands The District Cease Jane's Social Transitioning .........5

          E.  Heaps Files Suit, Seeks Preliminary Injunctive Relief, Which The
              District Court Denies.............................................................................6

          F.  Heaps Amends His Complaint, Re-Files His Motion For Preliminary
              Injunctive Relief. ..................................................................................7

          G.  Depositions Revealed That Neither Pirozzoli Nor Ioriatti Had Any
              Competent Medical Testimony To Offer. ............................................8

          H.  The District Court Denied Heaps's Second Application For A
              Preliminary Injunction.......................................................................13

STANDARD OF REVIEW REGARDING STANDING ......................................16

SUMMARY OF THE ARGUMENT ..................................................................17

LEGAL ARGUMENT ........................................................................20

I.      Heaps's Injunctive Relief Claims Are Moot, As The Record Reveals That Jane No Longer Wishes To Socially Transition.......................................20

II.     The District Court Correctly Held That Heaps Had Failed To Establish A Likelihood Of Success On His Substantive Due Process Claim..............25

        A. Neither Precedent, Nor The Nation's History And Tradition Recognize A Substantive Due Process Right To Dictate School Policies Concerning A High School-Aged Student's Pronoun Preferences .........................................................................26

        B. The Court Should Reject Heaps's Attempt To Stretch Precedent, Revise History, And Rewrite The Factual Record To Conjure Up Novel Substantive Due Process Rights ...........................................35

            1. *Supreme Court Precedent Does Not Confer The Substantive Due Process Rights That Heaps Demands* ...........................................35

            2. *Heaps' Historical Analysis Conflates A Parent's Authority Over Their Child With A Parent's Non-Existent Authority Over School Policy*.........................................................................38

        C. Even If This Court Found That Heaps Possessed The Fundamental Right He Claims, The Board Defendants Did Not Violate It .............41

            1. *There Is No Affirmative Duty On School Officials To Notify Parents About A High School-Aged Students' Social Transition* ...............41

            2. *The Record Belies Heaps's Claims Of Any Active Concealment* ...45

            3. *The District Court's Decision Doesn't Rest Upon Jane's Diagnosis, It Rests On Heaps's Incompetent Medical Evidence* ...48

        D. Policy 5756 Easily Satisfies Rational Basis Review .........................52

ii

III.    Heaps Cannot Meet The Remaining Requirements For Injunctive Relief ........................................................................................54

A. Heaps Cannot Show An Irreparable Injury. ........................................54

B. The Balance Of Equities Weighs Against Issuing An Injunction .......56

C. The Public Interest Does Not Weigh In Favor Of An Injunction. .......57

CONCLUSION ....................................................................................58

COMBINED CERTIFICATIONS ...........................................................59

CERTIFICATE OF SERVICE ...............................................................60

# <u>TABLE OF AUTHORITIES</u>

## CASES

**Page(s)**

*Acierno v. New Castle Cnty.*,
   40 F.3d 645 (3d Cir. 1994)....................................................................54

*Albright v. Oliver*,
   510 U.S. 266, 272 (1994) ...................................................................17

*Allegheny Energy, Inc. v. DQE, Inc.*,
   171 F.3d 153 (3d Cir. 1999)...............................................................56

*Am. Home Prods. Corp. v. Barr Labs., Inc.*,
   834 F.2d 368 (3d Cir.1987)................................................................16

*Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*,
   42 F.3d 1421(3d Cir.1994)..................................................................25

*Andrews v. Webber*,
   8 N.E. 708 (Ind. 1886).......................................................................39

*Anspach ex rel. Anspach v. City of Philadelphia, Dep't of Pub. Health*,
   503 F.3d 256 (3d Cir. 2007)........................................................ *passim*

*Arnold v. Bd. of Educ. of Escambia Cnty. Ala.*,
   880 F.2d 305 (11th Cir. 1989)....................................................... 45-47

*Blau v. Fort Thomas Pub. Sch. Dist.*,
   401 F.3d 381 (6th Cir. 2005)..............................................................34

*BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.*,
   229 F.3d 254 (3d Cir. 2000)...............................................................54

*Brown v. Bd. of Ed.*,
   347 U.S. 483 (1954) ...........................................................................29

iv

*Brown v. Fauver*,
819 F.2d 395 (3d Cir. 1987)...............................................................21

*Brown v. Philadelphia Hous. Auth.*,
350 F.3d 338 (3d Cir. 2003).............................................................20

*C.N. v. Ridgewood Bd. of Educ.*,
430 F.3d 159 (3d Cir. 2005).................................................. 17, 32, 37

*Christian v. Jones*,
100 So. 99 (Ala. 1924) .....................................................................39

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983) .................................................................... 20-22

*Collins v. City of Harker Heights, Tex.*,
503 U.S. 115 (1992)...........................................................................18

*Cross v. Trustee Walton Graded School*,
110 S.W. 346 (Ky. 1908) ..................................................................39

*Delaware River Port Auth* v. *Transamerican Trailer Transp., Inc.*,
501 F2d at 919-20.................................................................... 25, 54

*Dobbs v. Jackson Women's Health Org.*
597 U.S. at 237 (2022)............................................................ 26, 34, 37

*Doe by & through Doe v. Boyertown Area Sch. Dist.*,
897 F.3d 518 (3d Cir. 2018) ................................................... *passim*

*Doe by & through Doe v. Boyertown Area Sch. Dist.*,
276 F. Supp. 3d 324 (E.D. Pa. 2017) ................................................49

*Ecosave Automation, Inc. v. Delaware Valley Automation, LLC*,
540 F. Supp. 3d 491 (E.D. Pa. 2021) ................................................54

*Edmonson v. Lincoln Nat. Life Ins. Co.*,
725 F.3d 406 (3d Cir. 2013)..............................................................16

v

*Evancho v. Pine-Richland Sch. Dist.*,
   237 F. Supp. 3d 267 (W.D. Pa. 2017) ..................................................24

*Foote v. Ludlow Sch. Comm.*,
   128 F.4th 336 (1st Cir. 2025) ...................................................... 42-43

*Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*,
   528 U.S. 167 (2000) .................................................................. 20, 23

*Gruenke v. Seip*,
   225 F.3d 290 (3d Cir. 2000) ............................................... 14, 40, 47

*H.L. v. Matheson*,
   450 U.S. 398 (1981) .................................................................. 35-36

*Hafer v. Melo*,
   502 U.S. 21 (1991) .........................................................................2

*Hardwick v. Bd. of Sch. Trustees of Fruitridge Sch. Dist., Sacramento Cnty.*,
   205 P. 49 (Cal. Ct. App. 1921) ......................................................38

*Heffner v. Murphy*,
   745 F.3d 56 (3d Cir. 2014) ............................................................51

*Instant Air Freight Co. v. C.F. Air Freight, Inc.*,
   882 F.2d 797 (3d Cir. 1989) ..........................................................54

*Kidder v. Chellis*,
   59 N.H. 473 (1879) ................................................................. 18, 39

*Kos Pharms., Inc. v. Andrx Corp.*,
   369 F.3d 700 (3d Cir. 2004) ..........................................................25

*LCN Enterprises, Inc. v. City of Asbury Park*,
   197 F. Supp. 2d 141 (D.N.J. 2002) ...............................................57

*League of Women Voters of the U.S. v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) ..........................................................25

*Lewis v. Casey*,
  518 U.S. 343 (1996) ...................................................................20

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ...................................................................20

*Mahmoud v. Taylor*,
  606 U.S.___, 145 S. Ct. 2332 (2025) ................................. 35, 36, 44, 55

*McCahon v. Pennsylvania Turnpike Commission*,
  491 F. Supp. 2d 522 (M.D. Pa. 2007) ........................................56

*McNair v. Synapse Group, Inc.*,
  672 F.3d 213 (3d Cir. 2012) ......................................................20

*Meyer v. Nebraska*,
  262 U.S. 390 (1923) ....................................................... 30, 32, 35

*N.J. Tpk. Auth. v. Jersey Cent. Power & Light*,
  772 F.2d 25 (3d Cir. 1985) .........................................................20

*O'Shea v. Littleton*,
  414 U.S. 488 (1974) ...................................................................21

*Oburn v. Shapp*,
  521 F.2d 142 (3d Cir.1975) ........................................................57

*Parenthood of Cent. Missouri v. Danforth*,
  428 U.S. 52 (1976) .....................................................................38

*Parham v. J. R.*,
  442 U.S. 584 (1979) ...................................................................40

*Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*,
  268 U.S. 510 (1925) ............................................................. *passim*

*Planned Parenthood of Se. Pa. v. Casey*,
  505 U.S. 833 (1992) ...................................................................34

*Runyon v. McCrary*,
  427 U.S. 160 (1976) ................................................................31

*Samuel Benedict Mem'l Sch. v. Bradford*,
  36 S.E. 920 (Ga. 1900) .........................................................39

*Shire US Inc. v. Barr Labs., Inc.*,
  329 F.3d 348 (3d Cir. 2003)...................................................16

*Simon v. E. Kentucky Welfare Rights Org.*,
  426 U.S. 26 (1976) .................................................................21

*State v. Ferguson*,
  144 N.W. 1039 (Neb. 1914) ...................................................39

*State v. Mizner*,
  32 Am.Rep. 128 (IA 1878) .....................................................39

*Steel Co. v. Citizens for a Better Env't*,
  523 U.S. 83 (1998) .................................................................20

*Swanson v. Guthrie Indep. Sch. Dist.*,
  135 F.3d 694 (10th Cir. 1998).................................................33

*Tatel v. Mt. Lebanon School District*,
  752 F. Supp. 3d 512 (W.D. Pa. 2024)....................................47

*Timbs v. Indiana*,
  586 U.S. __, 139 S.Ct. 682 (2019) .................................. 31, 39

*Troxel v. Granville*,
  530 U.S. 57 (2000) ..................................................... 30, 31, 40

*W. Virginia v. Envtl. Prot. Agency*,
  597 U.S. 697 (2022) ...............................................................23

*Washington v. Glucksberg*,
  521 U.S. 702 (1997) .................................................... 14, 41

*Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
  858 F.3d 1034 (7th Cir. 2017)................................................................52

*Willey v. Sweetwater Cnty. Sch. Dist. No. 1 Bd. of Trustees*,
  680 F. Supp. 3d 1250 (D. Wyo. 2023)........................................ 24, 50

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7, 22 (2008) ........................................................................49

*Wisconsin v. Yoder*,
  406 U.S. 205 (1972) ........................................................ 31, 32, 35, 37

## UNITED STATES CONSTITUTION

U.S. CONST. amend. XIV, § 1 ..................................................................26

## STATUTES

42 U.S.C. § 1983 ...................................................................... 6, 7, 21

20 U.S.C. § 1681 ....................................................................................3

20 U.S.C. § 3401 ................................................................... 6, 7, 15

28 U.S.C. § 2201 ...................................................................................6

N.J.S.A. § 10:5-1..............................................................................3, 6

N.J.S.A. § 10:6-2...................................................................................6

## SECONDARY AUTHORITIES

Derek Gillard, *Education in the UK: a history* (May 2018)....................................38

ELLWOOD P. CUBBERLEY, PUBLIC EDUCATION IN THE UNITED STATES
  18 (Riverside Textbooks in Educ. ed., 1919) ................................ 28-29

2 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND
  (CHASE ED. 1877). ........................................................... 27-28

x

## <u>COUNTERSTATEMENT OF THE ISSUES</u>

I.    Whether the District Court erred in finding that Plaintiff-Appellant Christin Heaps has standing to pursue claims related to a school policy that no longer impacts his daughter, Jane Doe, a student at Delaware Valley Regional High School.

II.    Whether the Fourteenth Amendment's Due Process Clause confers a fundamental right upon parents to know and consent before their transgender child seeks to socially transition during high school.

III.    Whether the District Court correctly held that Heaps was not entitled to a preliminary injunction because he could not establish a likelihood of success on the merits of his substantive due process claim or irreparable harm.

## <u>CONCISE COUNTERSTATEMENT OF THE CASE</u>

**I.     Factual Background**

A.     <u>The Parties.</u>

Plaintiff-Appellant Heaps is the father of Jane, who began attending Delaware Valley Reginal High School (DVRHS) in the fall of 2023. JA.180[1]. Jane has been diagnosed with depression, high-functioning Autism and anxiety. SA.173[2]. While born a biological female, Jane began identifying as a male in April 2022.

The Delaware Valley Regional High School Board of Education (the "Board") is a public entity that oversees DVRHS. JA.60. McKinney is the Superintendent. *Id.* Miranda is the high school counselor and staff advisor of Students Advocating for Equality ("SAFE"), a student club in which Jane participated. JA.119. SAFE "promotes discussion and awareness about modern cultures," including intersectionality. JA.120.

Heaps has also named as defendants Attorney General Matthew Platkin and Kevin Dehmer, Commissioner of the New Jersey Department of Education ("NJDOE"), but only in their official capacities. JA.60. These official capacity claims are construed as suits against the entity, the State of New Jersey. *See Hafer v. Melo*, 502 U.S. 21, 25 (1991).

---

[1] References to "JA." are from the Plaintiff-Appellant's Joint Appendix.
[2] References to "SA." are from the Sealed Appendix.

B.    The Board Adopted Policy 5756 Based Upon NJDOE Guidance.

The Board adopted Policy 5756, which concerns transgender students who wish to be referred to by certain names or pronouns. Board Policy 5756 states:

> The school district shall accept a student's asserted gender identity; parental consent is not required. A student need not meet any threshold diagnosis or treatment requirements to have his or her gender identity recognized and respected by the school district, school, or school staff members. In addition, a legal or court ordered name change is not required. There is no affirmative duty for any school district staff member to notify a student's parent of the student's gender identity or expression. [JA.181-82.]

The Board Policy comports with the NJDOE's guidance concerning social transitioning. JA.61; JA.83-89. The NJDOE's guidance "assist[s] schools in establishing policies and procedures that ensure a supportive and nondiscriminatory environment for transgender students" consistent with the New Jersey Law Against Discrimination (NJLAD), N.J.S.A. § 10:5-1, *et seq.* and Title IX of the Education Amendments of 1972. JA.83.

Policy 5756 does not permit lying to parents. JA.126. Rather, it merely states that no "affirmative duty" exists to notify a parent of the student's gender identity or expression. *Id.* The purpose of the policy is to foster an inclusive, discrimination-free atmosphere for all students, including transgender students, and promote their welfare inside the school. JA.126.

C.    Jane Sought To Be Referred To By A Male Name And Pronoun During Her Freshman Year.

Jane began her freshman year at DVHRS in September 2023. JA.180. During a SAFE meeting that same month, the students discussed gender identity. JA.120. Jane became emotional and Miranda, the club advisor, inquired why. *Id.* Jane expressed that she identified as a male and would like to "socially transition"—*i.e.*, be referred to by a male name and pronouns. *Id.* At no time did Miranda encourage or coerce Jane to identify as a different gender or social transition. JA.121. As Miranda explained, if Jane had expressed today that she identified as a female, then Miranda would immediately respect that decision and begin referring to Jane with her female name and pronouns. *Id.* Miranda was not aware of anything that would lead her to believe Jane had a diminished mental capacity or was otherwise unable to express her gender identity. JA.123. Pursuant to Board Policy 5756, once a student expresses a gender identity, the school staff accepts it. *Id.*

Generally, Miranda seeks to work with the parents of transgender students to ensure the school environment is meeting their needs. *Id.* However here, Jane expressed that she didn't want her father to know, as he was not supportive and she didn't want to deal with the fallout at home. *Id.* Miranda explained to Jane that there are limits to what she can do to respect Jane's privacy. *Id.* She also encouraged Jane to discuss her gender identity with her parents. *Id.*

Following the discussion, Miranda e-mailed Jane's teachers about her desire to socially transition. JA.122. The e-mail advised teachers to use Jane's preferred pronouns and name while in class. *Id.* The e-mail indicated that Heaps was not aware of the social transition and not supportive of Jane's gender identity. *Id.* The e-mail reiterated Jane's request for privacy, including by not changing her name in the computer system or announcing it over the PA system when summoning Jane to the office. *Id.* While Heaps contends that Miranda tried to conceal the matter from him by omitting certain teachers that he personally knew from the e-mail, JA.63, he's wrong. The two teachers in question—Ms. Hall and Ms. Gursky—were both included on the e-mail JA.122.

D.    <u>Heaps Demands The District Cease Jane's Social Transitioning</u>.

Heaps claims he learned of Jane's social transitioning from another parent. JA.185. Heaps met with DVRHS's administration and advised them that Jane was under the care of a therapist who had advised against Jane's social transition. JA.186. We later learned this is untrue, as Jane had never met with any qualified medical professional regarding her gender identity. The individual that Heaps referred to in this conversation was Debra Pirozzoli, a Pastoral Counselor who holds no State-issued medical licenses and is unqualified to diagnose or medically treat anyone. SA.9; SA.15. Heaps removed Jane from school and sent a cease-and-desist letter to the Board. JA.186. The Board's General Counsel advised Heaps that, pursuant to

applicable federal and state laws, and the NJDOE's guidance on transgender students, DVRHS would continue to accept Jane's "asserted gender identity" and would honor her "request to be called by a name or pronoun other than that which she was assigned at birth." JA.97-98.

Since December 2023, Heaps has kept Jane on home instruction. JA.187. The Board offered to provide Jane one-on-one instruction at a public library, so she wouldn't miss out on educational opportunities. JA.97-98. Heaps declined that offer.

### E. Heaps Files Suit, Seeks Preliminary Injunctive Relief, Which The District Court Denies.

On January 5, 2024, Heaps filed the instant suit alleging violations of his constitutional rights. The initial Complaint asserted three claims:

- Count I: relief under the Declaratory Judgment Act, 28 U.S.C. § 2201, including a declaration that the NJLAD, Board Policy 5756, and the NJDOE's guidance concerning transgender students is unconstitutional;

- Count II: claim under 42 U.S.C. § 1983 for violation of his substantive due process rights under the Fourteenth Amendment and for violation of the Department of Education Organization Act of 1979, 20 U.S.C. § 3401;

- Count III: claim under N.J.S.A. § 10:6-2 for violation of Heaps's "right to parent a minor child who is receiving a thorough and efficient education."

JA.66-75. Heaps sought injunctive relief, as well as compensatory and punitive damages. JA.74-75.

On the same day he filed suit, Doe sought a temporary restraining order and preliminary injunction. JA.42. Doe's provisional remedy demands included an order, *inter alia*, enjoining implementation of Policy 5756 and appointing a monitor, at Board expense, to ensure his rights were not being violated.

On February 21, 2024, the District Court denied Heaps's application. JA.10. Heaps did not appeal this decision.

F.   Heaps Amends His Complaint, Re-Files His Motion For Preliminary Injunctive Relief.

On March 15, 2024, Heaps filed an Amended Complaint. JA.48. The Amended Complaint added two additional claims, while maintaining all three prior legal theories:

- Count IV: claim under 42 U.S.C. § 1983 for violation of the Supremacy Clause, alleging Board Policy 5756 is unconstitutional, since the district receives federal funding and is required to comply with the Department of Education Organization Act of 1979, 20 U.S.C. § 3401(3), and is failing to do so;

- Count V: claim under 42 U.S.C. § 1983 for violation of the Privileges and Immunities Clause based on the district's failure to obtain Heaps's informed consent before allowing Jane to socially transition.

JA.197-205.

Almost one month later, Heaps filed another application for preliminary injunctive relief. JA.49. This application sought substantially similar, if not identical, relief, as the first motion, including an injunction barring enforcement of Board Policy 5756. With his reply brief, Heaps provided a declaration from Pirozzoli

purporting to provide a medical basis for why Jane should remain out of school so long as Board Policy 5756 remained in effect. JA.209-13. In addition, Heaps submitted a letter, dated April 24, 2024, from Lori Ioriatti, APN, stating that Jane suffers from anxiety and depression and that social transitioning at school significantly increases her stress. JA.218. According to Ioriatti's letter, so long as Board Policy 5756 remained in place, Jane should not return to school. *Id.*

In response, the Board Defendants sought limited discovery, including records from Pirozzoli and Ioriatti, and depositions. JA.219-20. Also, we raised the prospect of a hearing, as we believed then—and maintain now—that neither Pirozzoli nor Ioriatti could offer competent medical testimony. *Id.*

The court permitted limited discovery, first with respect to documents and then as to a time-limited deposition of Pirozzoli and Ioriatti. JA.51-54.

G.    Depositions Revealed That Neither Pirozzoli Nor Ioriatti Had Any Competent Medical Testimony To Offer.

Pirozzoli is a Pastoral Counselor. SA.9. She is not a licensed clinical social worker and admittedly doesn't hold any state-issued license that would permit her to provide any medical treatment. SA.9. Rather, Pirozzoli tries to "listen[] to people" and "help[] them find their way" by recommending activities such as writing, reading or "working through grief." SA.12-14. She admits she doesn't diagnose patients. SA.12. And she isn't authorized to prescribe medications. SA.10.

Despite signing a sworn statement stating that, in her "twenty (20) years of experience as a therapist," she has "had the opportunity to treat *many young people who have experienced sexual and gender confusion*," JA.210 (emphasis added), Pirozzoli admitted that Jane was the only transgender person she had ever treated. SA.14.

Pirozzoli began seeing Jane in April or May of 2022, which is before Jane entered DVRHS in September 2023. SA.13. At the time, Jane was suffering from "[a]nger, sadness, isolation" and was lashing out at her family in frustration. SA.14. Pirozzoli didn't diagnose Jane with any mental condition. SA.14.

When pressed on the certification she submitted, Pirozzoli either provided evasive answers, flat out admitted she had no basis for the statements offered, or made clear that Jane's issues don't pertain to social transitioning per se, but her newfound lack of trust in Miranda for disclosing the transition to two of Jane's teachers. For example, Pirozzoli was shown paragraph 7, which states:

> 7.    It is extremely unhealthy for a child to hide behind an adult under any circumstance, much less one which involves potentially permanent and irreparable damage to mental health and wellness in the case of a child with underlying psychological conditions and trauma who is suffering with gender confusion. Such actions often lead to actual gender dysphoria and to further psychological and emotional trauma.

JA.210. Pirozzoli stated that the "permanent and irreparable damage" she was referring to here was a "[l]ack of trust." SA.20. That lack of trust originated from the

9

disputed allegation that Miranda promised Jane she wouldn't tell certain teachers about her social transition and then did so anyway. *Id.*

She was then shown paragraph 10, which states:

> 10.    Children need to know that the path beginning with social transition often leads to physical transitioning. Physical transitioning usually results in irreversible physical, psychological, and emotional results. Those who go through physical transition when young, as their brains become fully mature, or if their experience turns out to be bad, often wish to detransition. Unfortunately, after years of puberty blockers and sometimes surgeries, the ability truly to detransition and to be the person one was at birth is usually impossible; the physical and emotional scars become permanent and the ability to have families and the types of relationships and intimacy that such individuals wish for becomes extremely difficult and, in many instances, impossible.

JA.211. Pirozzoli could not identify any scientific data or literature to support either the first or second sentence of her certification. SA.22. Instead, she claimed the sentences were supported by her experience—which, again, has consisted solely of treating Jane. *Id.*

Significantly, Pirozzoli testified that Jane no longer wishes to socially transition. *Id*. Pirozzoli made this assessment based on then-current information, which included a meeting with Jane during the week beginning August 11, 2024. *Id*.

Ioriatti was also deposed. SA.25-45. Ioratti is an Advanced Practice Nurse. SA.27. She has been employed by Hunterdon Pediatric Associates for 12 years. SA.26.

Ioriatti treats patients who present for annual physical exams and sick visits. SA.27. She also treats adolescent patients for ADHD and anxiety. *Id*. When it comes to specialty areas—such as, for example, gender dysphoria—Ioriatti refers those patients to other providers. SA.28.

Ioriatti confirmed that the American Psychiatry Association's ("APA") guidelines recommended social affirmation when interacting with transgender persons—*i.e.*, adopting a transgender person's preferred pronouns to affirm their gender identity or expression. SA.29. She acknowledged that the APA also says that familial and societal rejection of a transgender person's gender identity is a strong predictor of a mental health crisis or mental health episode. *Id*.

Ioriatti has been treating Jane for several years and is her primary caregiver. SA.30. Ioratti's notes indicate Jane has been having behavioral issues as far back as 2019, when she was 10-years-old. SA.30-31. On August 8, 2023—before she entered high school—Jane was diagnosed with having mild anxiety. SA.33.

On November 28, 2023, Jane presented to Ioriatti with Heaps and her stepmother. SA.34. Jane had a cough, but her parents also expressed concern about Jane's social transition. SA.35. Both parents claimed that Jane was not mature enough to understand what it meant to be transgender. *Id*. Ioriatti didn't make any diagnosis or make any professional judgment about whether Jane was mature enough to express her gender identity. *Id*. However, she noted that Jane told her she

11

was "very comfortable using male pronouns and a male name." *Id*. Ioriatti discussed counseling.

During her deposition, Ioriatti was shown a series of letters she issued to excuse Jane's absence from school. SA.36-40. One of those letters, dated April 24, 2024, was submitted with Heaps's application for a preliminary injunction and states:

> The above referenced patient continues to have difficult with Anxiety and depression which significantly increased with social transitioning in the school setting increasing emotional stress a strain. At this time based on my evaluation and continue counseling it is in ████████ best intereste continue home instruction setting until this is resolved.

SA.165. On its face, this letter indicates that Jane's anxiety and depression are being negatively impacted by her decision to socially transition and, thus, "based on [Ioratti's] evaluation and continue[d] counseling," Jane should remain out of school. *Id*. On the basis of this letter and others like it, Jane was excused from having to attend school.

But Ioriatti admitted that all of these letters were based on phone conversations she had with Heaps, who asked for a letter and told Ioriatti that Jane was treating with a "psychologist." SA.36. For example, after the November 28, 2023, visit where Jane said she is "very comfortable" socially transitioning, Ioriatti prepared and signed a letter, dated December 9, 2023, stating that Jane's anxiety is being exacerbated by the use of pronouns at school. *Id*. But the records do not

indicate that any visit took place between November 28th and December 9th. In fact, over the course of writing five different letters—dated December 9, 2023, January 4, 2024, February 27, 2024, March 28, 2024, and April 24, 2024—Ioriatti saw Jane precisely once, on February 27, 2024. SA.36-40.

After this limited discovery, the parties submitted supplemental papers. The Board Defendants also argued that, based on Pirozzoli's claim that Jane no longer desires to socially transition, Heaps's demand for injunctive relief was moot.

### H. The District Court Denied Heaps's Second Application For A Preliminary Injunction.

On November 27, 2024, the District Court denied Heaps's motion for a preliminary injunction. JA.3. While the court rejected the Board Defendants' argument that the injunctive relief claims were moot, it also found that Heaps failed to meet his burden to attain such relief.

The District Court first found that no substantive due process violation occurred. JA.33 The court recognized that Heaps was claiming a substantive due process right "to direct the upbringing of his child." JA.24 (citations omitted). However, the District Court found that the "Supreme Court decisions recognizing and defining the scope of parental rights, particularly in the school setting, do not support the type of unqualified right that Plaintiff asserts in this matter." JA.25. "To find that a policy directing a school district to respect an individual student's preferred name and pronouns infringes on Plaintiff's constitutional due process

rights," the court reasoned, would require it to "significantly expand the scope of parental rights," despite the Supreme Court's warning "that courts are to 'exercise the utmost care' when asked to break new ground in the field of substantive due process." JA.26 (citing *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997)).

The District Court also found that Heaps had failed to "offer[] any evidence that the school district engaged in the type of proactive, coercive interference with the parent-child relationship" that this Court had found violative of parents' constitutional rights, such as in *Gruenke v. Seip*, 225 F.3d 290, 296 (3d Cir. 2000), where the student's swim coach pressured her into taking a pregnancy test. JA.28. The court found significant that Jane had initiated the request to socially transition, and that the Board Defendants "did not coerce Jane into making the request or prevent or discourage Jane from discussing her request with Plaintiff." JA.30.

Finally, in rejecting the substantive due process theory, the court found he had failed to show the Board Defendants interfered with his right to make medical decisions for Jane. JA.33. The court noted that Pirozzoli "has not (and indeed, is not authorized to) formally diagnose Jane with any mental health condition related to gender identity." JA.34. Similarly, the court found that Ioriatti's letters indicating that social transitioning increased Jane's anxiety "were based on information she received from Plaintiff," not her own independent assessment of Jane. JA.34. The

14

court found the absence of medical evidence dispositive of any claim that the Board Defendants interfered with Heaps's right to direct Jane's medical care. JA.34-35.

Because Heaps could not establish infringement of a fundamental right, the court found the Board Defendants need only satisfy rational basis review. JA.35. The Board Defendants' stated goal of protecting transgender youth from discrimination and fostering an inclusive learning environment easily met this test. *Id.* In fact, the District Court noted that this Court had previously held in *Doe by & through Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 525 (3d Cir. 2018), that protecting transgender students from discrimination served a compelling governmental interest. *Id.* For these reasons, the District Court found that Heaps was unable to establish a likelihood of success on the merits of his substantive due process claim.[3] Because he was unable to establish a likelihood of success on the merits, the District Court also found Heaps could not establish any irreparable harm. JA.39.

On December 6, 2024, Heaps filed the instant appeal.

---

[3] The District Court also found Heaps could not establish a successful likelihood of success on the merits under the New Jersey Constitution's "Thorough and Efficient Education" clause (Count III), or the Department of Education Organization Act of 1979, 20 U.S.C. § 3401 (Count IV). JA.36-37.

## **STANDARD OF REVIEW REGARDING STANDING**

The Board Defendants raised Heaps's standing as a defense to his demand for preliminary injunctive relief. The Board Defendants renew that argument here.

A district court's decision on subject matter jurisdiction presents mixed questions of law and fact. *Edmonson v. Lincoln Nat. Life Ins. Co.*, 725 F.3d 406, 414 (3d Cir. 2013). The legal conclusions are subject to plenary review. *Id.* Any factual findings are subject to a "clear error" standard. *Id.* "Under the clearly erroneous standard, 'a finding of fact may be reversed on appeal only if it is completely devoid of a credible evidentiary basis or bears no rational relationship to the supporting data.'" *Shire US Inc. v. Barr Labs., Inc.*, 329 F.3d 348, 352 (3d Cir. 2003) (citing *Am. Home Prods. Corp. v. Barr Labs., Inc.*, 834 F.2d 368, 370–71 (3d Cir.1987)).

## SUMMARY OF THE ARGUMENT

The Fourteenth Amendment's Due Process clause enshrines certain fundamental rights, including those related to "marriage, family, procreation, and the right to bodily integrity." *Albright v. Oliver*, 510 U.S. 266, 272 (1994). Within the concept of family is the right of parents "to direct the upbringing and education of children under their control." *Pierce v. Society of Sisters,* 268 U.S. 510, 534–35 (1925). But this right is "neither absolute nor unqualified." *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 182 (3d Cir. 2005).

Yet, Heaps insists otherwise. He urges this Court to adopt the view that the concept of substantive due process embraces the right of parents to dictate whether a high-school aged student can socially transition in school. Heaps contends his rights under the Due Process Clause grant him rights of notice and consent over Jane's voluntary decision concerning her name and pronouns. Based on this contention, Heaps demands an injunction disabling Policy 5756. The District Court rejected that claim and this Court should affirm.

There is simply no precedent that supports the broad constitutional rights that Heaps demands here. No precedent of the U.S. Supreme Court or this Court recognizes a substantive due process right by which parents are entitled to notice and veto power over a high-school aged student's preferred pronouns or name. In fact, on matters of an arguably more personal nature—such as terminating a pregnancy—

17

this Court has declined to find a due process right to know and consent. *Anspach ex rel. Anspach v. City of Philadelphia, Dep't of Pub. Health*, 503 F.3d 256, 263 (3d Cir. 2007).

The Court should decline Heaps's invitation to expand substantive due process rights. The Supreme Court has cautioned against such expansion "because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 125 (1992). There is nothing in our Nation's history or tradition that recognizes a deeply-rooted right of parents to dictate the school environment on the issues presented here. Contrary to Heaps's claims, there is no "unbroken lineage—from Blackstone, through the Founding and the Reconstruction eras, to today," AB.31[4], that recognizes any such right. In fact, several courts from the relevant era routinely rejected parents' objections to school districts trying to teach children subjects of which they did not approve. Those courts recognized, as did the District Court below, that "the power of each parent to decide the question what studies the scholars should pursue, or what exercises they should perform, would be a power of disorganizing the school, and practically rendering it substantially useless." *Kidder v. Chellis*, 59 N.H. 473, 476 (1879). The District Court correctly declined to expand fundamental rights under the substantive due process clause.

---

[4] References to "AB." are to the Plaintiff-Appellant's brief.

But even if this Court recognizes the fundamental right of Heaps to dictate Jane's pronouns within school, the District Court's decision should still be affirmed. That's because the Board Defendants did not infringe upon any such rights. Despite what Heaps claims, the factual record doesn't reveal that the Board Defendants engaged in any coercive behavior or active concealment of Jane's desire to socially transition.

Because Heaps cannot show the Board Defendants infringed on any of his fundamental rights, Policy 5756 and its implementation are subject to rational basis review. It easily meets that standard. The policy is aimed at creating an inclusive and safe environment for transgender students who are at increasing risk of mental health illness, isolation, and suicide. This Court recognized that such policies further a compelling governmental interest. *Boyertown.*, 897 F.3d at 525.

The District Court correctly held that Heaps had failed to show a substantial likelihood of success on his substantive due process claim. And as we point out below, he also can't show any irreparable harm, or that the balance of equities and the public interest weigh in favor of the relief he seeks. Thus, this Court should affirm the District Court's decision.

## LEGAL ARGUMENT

### I.    Heaps's Injunctive Relief Claims Are Moot, As The Record Reveals That Jane No Longer Wishes To Socially Transition.

"[The] triad of injury in fact, causation, and redressability constitutes the core of Article III's case-or-controversy requirement, and the party invoking federal jurisdiction bears the burden of establishing its existence." *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 103–04 (1998). Mootness is "not a waiveable (sic) defense" because it implicates the court's subject matter jurisdiction. *Brown v. Philadelphia Hous. Auth.*, 350 F.3d 338, 346 (3d Cir. 2003).

"The doctrine of mootness requires that 'an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed.'" *N.J. Tpk. Auth. v. Jersey Cent. Power & Light*, 772 F.2d 25, 31 (3d Cir. 1985). Also, "a plaintiff must demonstrate standing separately for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*, 528 U.S. 167, 185 (2000); *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996) ("standing is not dispensed in gross"). A plaintiff seeking injunctive or declaratory relief "must show that he is 'likely to suffer future injury' from the defendant's conduct." *McNair v. Synapse Group, Inc.*, 672 F.3d 213, 223 (3d Cir. 2012) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983)). "[I]t must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555,

561 (1992) (citing *Simon v. E. Kentucky Welfare Rights Org.*, 426 U.S. 26, 38 (1976)).

"While a § 1983 plaintiff's allegation that he has suffered from unconstitutional practices may be sufficient to establish standing to sue for damages, '[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief. . . .'" *Brown v. Fauver*, 819 F.2d 395, 400 (3d Cir. 1987)(citing *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974))(alteration and ellipses in original). Rather, to obtain prospective relief, plaintiff must show a "real and immediate threat" of again suffering violation of his constitutional rights. *City of Los Angeles v. Lyons*, 461 U.S. at 105. On this score, "plaintiff's subjective apprehensions" are irrelevant. *Id.* at 107 n.8. "The emotional consequences of a prior act simply are not a sufficient basis for an injunction absent a real and immediate threat of future injury by the defendant." *Id.*

*Lyons* remains useful for evaluating a plaintiff's standing to pursue injunctive relief. There, plaintiff Adolph Lyons alleged he was stopped by officers from the Los Angeles Police Department (LAPD) and, without justification, placed in a chokehold. *Id.* at 98. Lyons brought constitutional claims and sought: monetary relief; a judgment declaring "that use of the chokeholds absent the threat of immediate use of deadly force is a per se violation of various constitutional rights";

and an injunction prohibiting such chokeholds absent situations where the suspect "reasonably appears to be threatening the immediate use of deadly force." *Id.* at 98.

After obtaining preliminary injunctive relief in the district court and having that relief affirmed by the Ninth Circuit Court of Appeals, the U.S. Supreme Court reversed, holding that Lyons lacked standing. *Id.*

The Court reasoned that, while "Lyons may have been illegally choked by the police on October 6, 1976," that only "afford[ed] Lyons standing to claim damages against the individual officers and perhaps against the City[.]" *Id.* at 105. That fact "does nothing to establish a real and immediate threat that he would again be stopped for a traffic violation, or for any other offense, by an officer or officers who would illegally choke him into unconsciousness without any provocation or resistance on his part." *Id.*

Here, Heaps seeks injunctive relief disabling Policy 5756. His concern is that, if Jane returns to school, the Board Defendants will honor her wishes and refer to Jane by her preferred name and pronouns.

But the record reveals this is no longer a live concern and, thus, Board Policy 5756 does not pose a real and immediate threat to any rights Heaps may possess. That's because Pirozzoli testified that Jane no longer wants to socially transition. SA.22. Board Policy 5756 only applies to students who wish to voluntarily

transition. JA.181. Heaps has no need for a court order to prevent Jane from socially transitioning, as Jane no longer wishes to do so. His claim is moot.

The District Court erred in holding that Heaps had standing to pursue injunctive relief claims in light of Pirozzoli's unrebutted testimony. The District Court focused on the fact that Board Policy 5756 remains in effect and the administrators and staff would "continue to comply with the Policy, regardless of whether Jane's preferences align or conflict with Plaintiff's preferences." JA.21. Thus, the court found it "is not 'absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur.'" JA.21. (citing *W. Virginia v. Envtl. Prot. Agency*, 597 U.S. 697, 700 (2022).

However, the heightened "absolutely clear" standard only applies where the *defendant* has voluntarily ceased the harmful conduct and then seeks to have the matter declared moot. *W. Virginia*, 597 U.S. at 720; *see also Friends of the Earth*, 528 U.S. 167, 169–70 ("Thus, the standard for determining whether a case has been mooted by the defendant's voluntary conduct is stringent: A case might become moot if subsequent events make it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur"). That standard doesn't apply here. The Board Defendants did not cease any conduct. Rather, *Jane* declared that she no longer wishes to socially transition. JA.20. That election by Jane means Board Policy 5756 has no application to her.

The District Court's decision effectively rests on the assumption that Jane is likely to flip a switch and seek to socially transition when back in school, thereby reviving Heaps's concerns and alleged injury. This is the same assumption underlying the court's decision in *Willey v. Sweetwater Cnty. Sch. Dist. No. 1 Bd. of Trustees*, 680 F. Supp. 3d 1250, 1270 (D. Wyo. 2023)("The Policy's inapplicability is the result of a third party's request, which could change at any time, triggering the Policy"). But such an assumption rings hollow and treats Jane's gender identity as continually fluid. There is no evidence to support such a belief. As another court recognized with respect to the plaintiffs before it, gender identity can be "deeply ingrained and inherent in their very beings" and is "neither transitory nor temporary." *Evancho v. Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267, 289 (W.D. Pa. 2017). A single reversal doesn't portend future reversals. Respectfully, the District Court erred in finding a live controversy as to Heaps's prospective relief claims. At a minimum, the District Court should have conducted an in-person hearing to understand whether there was anything beyond a speculative basis to find that Jane may change her mind again. For this reason alone, the Court should dismiss Heaps's appeal.

**II.    The District Court Correctly Held That Heaps Had Failed To Establish A Likelihood Of Success On His Substantive Due Process Claim.**

The issuance of a preliminary injunction is "'an extraordinary remedy' and 'should be granted only in limited circumstances.'" *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004)(citing *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir.1994)). To obtain such relief, the movant must first show: (1) a reasonable likelihood of success on the merits; and (2) irreparable injury in the absence of preliminary relief. *Delaware River Port Auth. v. Transamerican Trailer Transp., Inc.*, 501 F.2d 917, 919-20 (3d Cir. 1974). If the movant makes this "gateway" showing, *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017), *as amended* (June 26, 2017), then the court must consider the following two factors: (3) "the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest." *Delaware River Port Auth.*, 501 F.2d at 920. The movant must "'make a clear showing that [the] four factors, *taken together*, warrant relief[.]'" *Reilly*, 858 F.3d at 178 (citing *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 6–7 (D.C. Cir. 2016))(emphasis in original)). While Heaps asserted multiple claims, his arguments for preliminary injunctive relief on appeal are predicated on his substantive due process theory. Heaps alleges that the Board Defendants violated his fundamental right to direct his daughter's "upbringing, education, and healthcare" by implementing Policy 5756

without his consent. AB.22. He argues strict scrutiny applies and the Board cannot satisfy that exacting standard. *Id.*

Heaps's view of substantive due process and its intersection with policies concerning social transitioning finds no support in constitutional jurisprudence or our Nation's history. His argument fails on the very first requirement for a preliminary injunction—a likelihood of success on the merits.

A.    Neither Precedent, Nor The Nation's History And Tradition Recognize A Substantive Due Process Right To Dictate School Policies Concerning A High School-Aged Student's Pronoun Preferences.

The Fourteenth Amendment provides that "no State 'shall deprive any person of life, liberty, or property, without due process of law.'" *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (citing U.S. Const. amend. XIV, § 1). This guarantee of due process contains both a procedural and substantive component. *Washington*, 521 U.S. at 719-20. Substantive due process—the only component at issue here— "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Id.* at 720.

The U.S. Supreme Court has "held that the Due Process Clause protects two categories of substantive rights." *Dobbs v. Jackson Women's Health Org.* 597 U.S. 215, 237 (2022). The first category consists of those rights found in the first eight amendments, which the Court has incorporated into the Due Process Clause and made applicable to the States. *Id.* The second category consists of those

26

"fundamental rights that are not mentioned anywhere in the Constitution," but which are recognized to fall within the Due Process Clause because they are "'deeply rooted in [our] history and tradition'" and "essential to our Nation's 'scheme of ordered liberty.'" *Id.* (citing *Timbs v. Indiana*, 586 U.S. 146, 149 (2019)(alteration in original)). This case concerns the second category.

To determine whether an asserted right receives substantive due process protection, courts must undertake a historical analysis. *Id.* at 238. This includes examining historical authorities, such as Blackstone's Commentaries, and even decisional law at the time of the amendment's adoption. *See Id.* These "[h]istorical inquiries" are essential to avoid conflating "the Fourteenth Amendment's reference to 'liberty,'" with "our own ardent views about the liberty that Americans should enjoy." *Id.* at 239.

The rights of parents "in the care, custody, and control of their children" is one of the "oldest of the fundamental liberty interests" encompassed by the Due Process Clause. *Troxel*, 530 U.S. at 65-66. The Board Defendants endorse this view. However, the historical analysis of how far this right extends does not support the broad power that Heaps believes he wields—*i.e.*, the power to dictate the school environment and the policies governing it.

The duties of parents to children consist of "three particulars": their maintenance, their protection and their education. 2 WILLIAM BLACKSTONE,

COMMENTARIES ON THE LAWS OF ENGLAND, *160 (Chase Ed. 1877). But even here, Blackstone spoke in terms of the parent's obligation to the child, not their power over school districts and curriculum. For example, Blackstone commented that parents had a duty to provide their child with a proper "culture and education" so that he avoids "grow[ing] up like a mere beast, to lead a life useless to others, and shameful to himself." *Id.* at *165. Yet after sharing this view, Blackstone acknowledged that the "municipal laws of most countries seem to be defective in this point, by not constraining the parent to bestow a proper education upon his children." *Id.* In other words, far from a world where parents were directing school curriculum—thereby evincing some right to do so—Blackstone observed a world where parents neglected their duty to educate children with legal impunity.

In the same vein, in the mid-17th century, the colony of Massachusetts enacted the Law of 1647—the bedrock of public education today. ELLWOOD P. CUBBERLEY, PUBLIC EDUCATION IN THE UNITED STATES 18 (Riverside Textbooks in Educ. ed., 1919). The law required every town with at least 50 households to appoint a reading and writing teacher, and pay appropriate wages. *Id.* In addition, towns with at least 100 households were required to provide a grammar teacher who would prepare children for "university." *Id.* As articulated by historian George Martin, this law recognized that the "obligation to furnish [] education rests primarily upon the parent," but that the State has a "right to enforce this obligation" and—most critically

here—"***determine the kind of education***, and the minimum amount." *Id.* at 19 (emphasis added). The Massachusetts Law of 1647 became the basis for legislation in all other American colonies (except Rhode Island). *Id.* at 19.

Further evidence of the government's power to regulate the school curriculum and environment is gleamed from the public debate in the early 19th century over whether schools should be taxpayer-funded. *See Id.* at 121-22. One of the chief concerns raised by opponents of taxpayer-funded schools was that schools may teach non-English classes, thereby "supplant[ing] instruction" in the parents' preferred language. *Id.* at 122. If schools "had only as much power over a child as a parent might delegate," AB.28, then this wouldn't have been a concern at all. The parent could simply, as Heaps contends, exempt the student from non-English classes.

Indeed, at the time of the Fourteenth Amendment's passage, American schools were almost unrecognizable when compared to schools today. "The curriculum was usually rudimentary; ungraded schools were common in rural areas; the school term was but three months a year in many states; and compulsory school attendance was virtually unknown." *Brown v. Bd. of Ed.*, 347 U.S. 483, 490 (1954). If parents actually had a constitutional right to administer the schools and the curriculum, it's hard to believe they would have neglected exercising it and simply settled for "rudimentary" curriculum.

Even the U.S. Supreme Court has refrained from conferring upon parents the broad rights that Heaps claims. The Court recognized the "natural duty of the parent to give his children education suitable to their station in life" in *Meyer v. Nebraska*, 262 U.S. 390, 400 (1923). In doing so, the Court overturned a private school teacher's criminal conviction for teaching in German, thereby running afoul of a Nebraska law that prohibited teaching subjects in any "modern" language—*i.e.*, German, French, Spanish, Italian—until students graduated the eighth grade. *Id.* at 398-400. The Court reasoned that the teacher's "right [] to teach and the right of parents to engage him so to instruct their children" fell within the right of liberty conferred by the amendment. *Id.* at 400.

But in the same breath that it recognized this right, the Court tempered its breadth by recognizing that States have the power "to make reasonable regulations for all schools, including a requirement that they shall give instructions in English" and "prescribe a curriculum for institutions which it supports." *Id.* at 402. Nebraska ran afoul of the Constitution because its statute "interfere[s] only with teaching . . . a modern language, leaving complete freedom as to other matters," thereby rendering the law arbitrary and capricious. *Id.*

Two years later, in *Pierce,* 268 U.S. at 510, the Court returned to the intersection between parents and schools. The Court struck down an Oregon statute that required parents to send their kids to public schools between the ages of 8 and

16. *Id.* at 535. The suit was brought by private institutions that sought to provide educational opportunities to students of the same age covered by the law. *Id.* at 531-32. The Court found that the statute unconstitutionally infringed upon "the liberty of parents and guardians to direct the upbringing and education of children under their control" by eliminating their ability to send them to private school. *Id.* at 534.

*Pierce* recognizes the right of parents to select which schools to attend. It says nothing about parents dictating board policy or curriculum choices within that school.

The Court would revisit the issue of parental rights and schooling in *Wisconsin v. Yoder*, 406 U.S. 205 (1972). There, the Court affirmed the right of Amish families to withdraw their students from the educational system after the eighth grade. *Id.* at 234-35. The Court found that Wisconsin's compulsory education statute requiring students to attend schools until age 16 violated the First Amendment's Free Exercise Clause and the Amish parents' liberty interest protected by the Fourteenth Amendment. *Id.* at 234. Significantly here, the *Yoder* Court "stressed the limited scope of *Pierce*, pointing out that it lent 'no support to the contention that parents may replace state educational requirements with their own idiosyncratic views of what knowledge a child needs to be a productive and happy member of society' but rather 'held simply that while a State may posit (educational) standards, it may not

pre-empt the educational process by requiring children to attend public schools.'" *Runyon v. McCrary*, 427 U.S. 160, 177 (1976) (citing *Yoder*, 406 U.S. at 239).

*Yoder* turned on the parents' right to remove their child from school after a certain age. Nothing in *Yoder* grants parents the right over how schools operate, their policies, or their curriculum.

Taken together, *Meyer*, *Pierce* and *Yoder* recognize parents' rights to attend private versus public schools, *Pierce*, 268 U.S. at 535; to remove a child from school after a certain age based on religious teachings, *Yoder*, 406 U.S. at 234; and receive certain curriculum that "is not injurious to the health, morals or understanding of the ordinary child" and which *both* the parent and local school district approve, even though the State may disagree, *Meyer*, 262 U.S. at 403. Running this precedent through the fastest of centrifuges will not distill any rule that remotely suggests parents have a substantive due process right to dictate how schools foster the environment in which students learn and interact with others.

Similarly, this Court has recognized that the right of parents to "control a child's upbringing and education" is "neither absolute nor unqualified." *C.N.*, 430 F.3d at 182. Rather, in "certain circumstances the parental right to control the upbringing of a child must give way to a school's ability to control curriculum and the school environment." *Id.* at 182.

For example, in *Boyertown,* 897 F.3d at 528–29, the court rejected a substantive due process claim—one predicated on privacy grounds—that took issue with a school policy permitting transgender students to use locker rooms associated with their gender identity, not their biology. The court held that the district had a compelling interest in protecting transgender students, as "[m]istreatment of transgender students can exacerbate gender dysphoria, lead to negative educational outcomes, and precipitate self-injurious behavior." *Id.* at 529. The court didn't mince words about what's at stake: "[w]hen transgender students face discrimination in schools, the risk to their wellbeing cannot be overstated—indeed, it can be life threatening." *Id.*

Similarly, in *Swanson v. Guthrie Indep. Sch. Dist.*, 135 F.3d 694, 703 (10th Cir. 1998), the court rejected the substantive due process claim of a parent and student who desired to attend school on a part-time basis. The plaintiffs complained that the school policy directing students to attend school full-time infringed on the familial relationship, as well as the free exercise of their religion. *Id.* at 697. The court rejected this argument, finding that "parents simply do not have a constitutional right to control each and every aspect of their children's education and oust the state's authority over that subject." *Id.* at 699.

Even in matters of an extremely personal or sensitive nature affecting minors, courts have not recognized a "right to know and consent" under its substantive due

process jurisprudence. For instance, in *Planned Parenthood of Cent. Missouri v. Danforth*, the Court struck down that portion of a Missouri statute that required an unmarried minor to obtain the "consent of a parent or person *in loco parentis* as a condition for abortion[.]" 428 U.S. 52, 74 (1976), overruled on other grounds in part by *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833 (1992). The Court found that "the State does not have the constitutional authority to give a third party an absolute, and possibly arbitrary, veto over the decision" by the minor to terminate a pregnancy. *Id.* Even when the Court later upheld a statute requiring parental consent, it did so on the basis that such a requirement didn't impose an undue burden on the minor's right to an abortion—and not because the parent had a constitutional right to know and approve. *See Casey*, 505 U.S. at 899.

The intersection between parental rights and education leads to one inescapable conclusion in the substantive due process context: "[w]hile parents may have a fundamental right to decide *whether* to send their child to a public school, they do not have a fundamental right generally to direct *how* a public school teaches their child." *Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 395 (6th Cir. 2005).

The District Court correctly determined that Heaps had failed to demonstrate a fundamental right to override high school policies concerning what pronouns to use when referring to high school-aged transgender students. Neither the Supreme Court, nor this Court, has ever recognized such a right. And there is nothing deeply-

rooted in the Nation's history and tradition, *Dobbs*, 597 U.S. at 237, which would warrant recognizing such a right now.

> **B.** **The Court Should Reject Heaps's Attempt To Stretch Precedent, Revise History, And Rewrite The Factual Record To Conjure Up Novel Substantive Due Process Rights.**

Heaps argues that both U.S. Supreme Court precedent and history recognize the fundamental right he espouses here—*i.e.*, the right to dictate whether Jane can choose her name and pronouns in high school. AB.23-29. But to make these arguments, Heaps has to repackage First Amendment precedent as substantive due process jurisprudence, revise history, and rewrite the factual record. Heaps's desire to inhabit a different legal and factual framework to support his claim speaks volumes about how far he is asking this Court to go. The Court should decline to join him on this journey.

> **1.** *Supreme Court Precedent Does Not Confer The Substantive Due Process Rights That Heaps Demands.*

Heaps begins his argument by citing to a string of Supreme Court decisions—*Pierce*, *Meyer*, *Yoder*, *Troxel, H.L. v. Matheson*, 450 U.S. 398 (1981), *Parham v. J. R.*, 442 U.S. 584, 620 (1979), *Mahmoud v. Taylor*, 606 U.S.___, 145 S. Ct. 2332 (2025)—to posit that parental consent is necessary before a student can socially transition. AB.23. But as explained above, neither *Meyer,* nor *Pierce*, nor *Yoder*, recognize any substantive due process right by which parents can dictate or commandeer the in-school environment.

35

*Troxel* dealt with a Washington statute concerning nonparental visitation and had nothing to do with schools. 530 U.S. at 67. The Court held that the statute impermissibly infringed on the mother's right to raise her children by permitting the children's grandparents to establish visitation rights by successfully petitioning a court over the mother's objection. *Id.* at 74-75.

*H.L.* concerned a Utah statute requiring physicians to notify the parents of any minor, unmarried female prior to performing an abortion. 450 U.S. at 400. The Court held that the notice requirement—especially because it did not permit parents or a court to veto the minor's decision—did not infringe upon the minor's rights. *Id.* at 412-13.

In *Parham*, the Court confronted "what process is constitutionally due a minor child whose parents or guardian seek state administered institutional mental health care" for the child. 442 U.S. at 587. The Court found the Georgia statute at issue provided sufficient due process. *Id.*

Finally, we come to *Mahmoud*. There, the Court recognized the right of parents to exclude their elementary-aged children from the schools' LGBTQ+ curriculum—but it did so on First Amendment grounds. *Mahmoud*, 145 S. Ct. at 2342 ("[a] government burdens the religious exercise of parents when it requires them to submit their children to instruction that poses a very real threat of undermining the religious beliefs and practices that the parents wish to instill"

36

(quotations and internal citations omitted)). The Court found that young children are impressionable, inherently trust their teachers and, therefore, curriculum undermining the religious beliefs the parents sought to instill at home "'carries with it precisely the kind of objective danger to the free exercise of religion that the First Amendment was designed to prevent.'" *Id.* at 2356 (citing *Yoder*, 406 U.S. at 218).

But there's no First Amendment claim here (nor are there any elementary-aged children). Heaps has never asserted that he has a religious objection to Policy 5756. Rather, Heaps maintains the Due Process clause grants him the fundamental right to direct Jane's in-school pronouns. JA.193-95. But the cases do not support such a theory.

In fact, none of the cited authority stands for anything beyond the general principle that parents have a right to control a child's upbringing. But nobody disputes that. The issue is the scope of such a right. As this Court recognized 20 years ago, a parent's right to "control a child's upbringing and education" is "neither absolute nor unqualified." *C.N.*, 430 F.3d at 182. Contrary to Heaps's argument, the Supreme Court has never held that the substantive due process clause confers a right upon parents to dictate the educational curriculum or environment.

2.      *Heaps' Historical Analysis Conflates A Parent's Authority Over Their Child With A Parent's Non-Existent Authority Over School Policy.*

As noted above, to analyze whether substantive due process embraces a purported right, courts must undertake a historical analysis. *Dobbs*, 597 U.S. at 237. Heaps's presentation of the Nation's history concerning parental rights and schools rests on a distorted factual picture. He argues that "[t]he view that parents maintained the primary role in decisions about their children, even while those children attended public school, persisted through the Reconstruction Era and into the early 20th Century." AB.29. Respectfully, this is incorrect.

Heaps posits that Blackstone recognized a parent's obligation to provide an education for their children. AB.28. The District Court (and the Board Defendants) acknowledged Blackstone's recognition of this duty. JA.25, n.10. But the presence of such a *duty* doesn't define the scope of a parental *right*. Blackstone doesn't speak to a parent's right to influence or otherwise direct school curriculum or policies. Indeed, during that time period, English grammar schools faced falling enrollment figures, "as parents, unhappy with the schools' outdated curriculum, began sending their sons to private academies which offered a wider range of subjects." Derek Gillard, *Education in the UK: a history* – Chapter 5 (May 2018), https://education-uk.org/history/chapter05.html (last visited September 2, 2025).

The removal of children seems an unnecessarily drastic remedy if parents could simply rewire the school curriculum.

Moreover, Heaps's contention that courts in the late 19th and early 20th century "honored parental objections to diverse subjects," AB.29, doesn't tell the full story. Some courts honored such opt-out decisions by parents. *See*, *e.g.*, *Hardwick v. Bd. of Sch. Trustees of Fruitridge Sch. Dist., Sacramento Cnty.*, 205 P. 49 (Cal. Ct. App. 1921); *State v. Ferguson*, 144 N.W. 1039, 1041 (Neb. 1914); AB.29 n.5 (citing additional cases from Nebraska, Oklahoma, Illinois and Wisconsin). But several courts went the other way, rejecting parents' desires to superimpose their will on school curriculum. *Andrews v. Webber*, 8 N.E. 708 (Ind. 1886)(rejecting parent's desire to have son opt out of music class); *Cross v. Trustee Walton Graded School*, 110 S.W. 346 (Ky. 1908) (upholding expulsion after student and parent objected to participation in the school play); *Kidder*, 59 N.H. at 476 (1879) (rejecting parents' objection to dramatic public speaking coursework, and recognizing that the "power of each parent to decide the question what studies the scholars should pursue, or what exercises they should perform, would be a power of disorganizing the school, and practically rendering it substantially useless"); *Christian v. Jones*, 100 So. 99 (Ala. 1924) (rejecting argument that parent could have daughter opt out of music class); *State v. Mizner*, 32 Am.Rep. 128 (IA 1878) (holding that school could not inflict corporal punishment upon student for refusing to participate in Algebra class

due to parent's objection, but that the school could expel the pupil for such refusal); *Samuel Benedict Mem'l Sch. v. Bradford*, 36 S.E. 920 (Ga. 1900) (rejecting parent's objection to debate topic and upholding school's right to discipline student for non-compliance with assignment). Thus, historical precedent does not show that parents had an unqualified right to direct the school environment or curriculum.

Heaps's citation to *Gruenke* also doesn't help him. There, the court found that a high school swim coach improperly interfered with a student and family's "right to be free from state interference with family relations" when he pressured the student into taking a pregnancy test in front of teammates. 225 F.3d at 305-06. The test results spread throughout the school, making it impossible for the family to deal with the matter privately. *Id.* at 306. The court held that school-sponsored counseling and testing that "pry[s] into private family activities can overstep the boundaries of school authority and impermissibly usurp the fundamental rights of parents to bring up their children, as they are guaranteed by the Constitution." *Id.* at 307.

At most, *Gruenke* stands for the proposition that schools may not pry into, or compel students to divulge, sensitive personal and family matters. *See Id.* at 307. None of that has any application here, as nobody at DVRHS coerced or compelled Jane to socially transition. As Heaps admits, Jane approached the school district and expressed her gender preferences, not the other way around. JA.62; JA.120; JA.184.

Thus, there is no "unbroken lineage—from Blackstone, through the Founding and the Reconstruction eras, to today," AB.31, recognizing a parent's fundamental right to dictate school policies or influence the environment. And considering the Supreme Court's caution to "exercise the utmost care whenever we are asked to break new ground" in the area of substantive due process, "lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of the Members of this Court, *Glucksberg*, 521 U.S. at 720, the Court should decline to recognize such a right now.

C.    Even If This Court Found That Heaps Possessed The Fundamental Right He Claims, The Board Defendants Did Not Violate It.

While we maintain that Heaps cannot show he possesses a fundamental right to dictate Policy 5756's application to Jane, even if this Court disagrees, the decision below should be affirmed. That is because Heaps cannot show the Board Defendants violated any such right.

Heaps argues that the Board Defendants violated his rights by: 1) socially transitioning Jane without his notice and consent; and 2) "actively conceal[ing]" Jane's social transition. AB.34-39. Heaps also complains that the District Court's decision incorrectly 3) requires a "particular diagnosis" before a parent's right to make medical decisions is triggered. AB.47-54. Heaps is both factually and legally incorrect.

1.    *There Is No Affirmative Duty On School Officials To Notify
Parents About A High School-Aged Students' Social Transition.*

This Court has already rejected the notion that the Due Process clause obligates "state actors to contact parents of a minor or to encourage minors to contact their parents" and notify them about sensitive matters. *Anspach,* 503 F.3d at 262. In *Anspach*, the court considered claims by parents (and separate claims by their daughter) that the City of Philadelphia violated their substantive due process rights by giving their 16-year-old daughter emergency contraceptive pills without their knowledge or consent. *Id.* at 259-60. The court rejected that claim, recognizing that the state actors' decision not to notify the parents before dispensing the morning-after-pill did not interfere with their parental rights. *Id.* at 266. Critical to the court's holding was that the minor "entered the Center voluntarily and *requested* the morning after pill" and "did not avail herself of the opportunity that she had, prior to taking the medicine or requesting it, to call her parents or to tell the Center staff that she wanted to delay taking the medication to contact her parents." *Id.* at 267 (emphasis in original). The gravamen of the parents' complaints, the court reasoned, was that the clinic staff *"did not assist* the Anspachs as parents or affirmatively *foster* the parent/child relationship." *Id.* (emphasis in original). The court found the Due Process clause did not impose any such requirements. *Id.*

In a more factually-analogous case from a different circuit, *Foote v. Ludlow Sch. Comm.*, 128 F.4th 336, 355 (1st Cir. 2025), the court found that a school policy

directing staff not to disclose a student's social transitioning without the minor's consent didn't run afoul of the parents' substantive due process rights. The court reasoned that, inside the school, "parents have less authority over decision-making concerning their children" and remain free to "obtain information about their children's relationship to gender in many ways, including communicating with their children and making meaningful observations of the universe of circumstances that influence their children's preferences, such as in clothing, extracurricular activities, movies, television, music, internet activity, and more." *Id.* While the court was "sympathetic to the [p]arents' interest," its "survey of Due Process Clause jurisprudence" did not reveal a requirement for "governments to assist parents in exercising their fundamental right to direct the upbringing of their children[.]" *Id.*

The same rationale applies here. Policy 5756 states that "[t]here is no affirmative duty" to notify a student's parents about his or her gender identity or expression. JA78. It effectively leaves up to staff members whether they want to disclose such information to the parent. This provides more flexibility than the policy in *Foote*, which prohibited the disclosure of a student's gender identity to parents absent the student's permission. *Foote*, 128 F.4th at 340. The court found that policy

didn't infringe upon the parents' substantive due process rights. *Id.* at 355[5]. This Court should similarly find here.

Moreover, the record doesn't reveal that Miranda or McKinney infringed upon Heaps's rights. Jane initiated the discussion about social transitioning by approaching Miranda. JA.120-21. Miranda encouraged Jane to disclose the transitioning to her parents. JA.121. Jane expressed reluctance because she was afraid it would cause issues for her at home. JA.121. There's no evidence indicating that Miranda or McKinney advised Jane to hide the transitioning from her parents, or that they sought to coerce her into transitioning. Thus, as in *Anspach*, the crux of Heaps's claim is that the Board Defendants didn't affirmatively contact him and disclose what Jane had asked Miranda to keep confidential. The non-disclosure doesn't constitute an infringement on any substantive due process right.

Finally, we note: imposing a requirement upon schools to affirmative disclose such information places the rights of parents on a collision course with the privacy interests of students. We are not dealing here with young, impressionable students. *See Mahmoud*, 145 S. Ct. at 2356 n.8 (recognizing "that the age of the children involved is highly relevant in any assessment of the likely effect of instruction on the subjects in question"). Jane is a high school-aged student and there are no facts—

---

[5] Notably, the court found that the parents' fundamental right to direct the upbringing of their children was implicated by the school's policy, but ultimately found such right was not infringed by the district's nondisclosure. *Foote*, 128 F.4th at 348-57.

and certainly none that Miranda or McKinney knew about at the time—that indicate she has diminished mental faculties and lacks agency. "[P]arental interests must be balanced with the child's right to privacy, which is also protected under the Due Process Clause." *Anspach,* 503 F.3d at 261. Heaps's position leaves no space for this balancing. He ignores that the desire to maintain confidentiality originated with Jane. His argument effectively demands that school officials ignore the student's request in all instances no matter the consequences. The Constitution doesn't impose such a Hobson's choice upon school officials.

2.    *The Record Belies Heaps's Claims Of Any Active Concealment.*

Heaps also accuses the Board Defendants of "actively conceal[ing]" Jane's social transition from him. AB.40. This accusation is belied by the record.

Miranda *encouraged* Jane to disclose her social transition to her parents. JA.121. This is undisputed. When Jane asked Miranda to conceal her social transition from two teachers who knew her father—thereby risking disclosure—Miranda declined and included them on the e-mail to staff. JA.122. Indeed, Heaps submitted an affidavit from Pirozzoli stating that Miranda's disclosure of such information constituted a betrayal and emotionally injured Jane (which underscores why requiring such disclosure can be problematic in the first instance). JA.212.

Heaps's reliance upon *Arnold v. Bd. of Educ. of Escambia Cnty. Ala.*, 880 F.2d 305, 309 (11th Cir. 1989), doesn't assist him at all. He claims that the facts here "resemble[]" those in *Arnold*. AB.41. Respectfully, they do not.

In *Arnold*, the plaintiffs—a minor male and female student who had together conceived a pregnancy, as well as both of their respective parents—sued the school district and certain staff members for coercing the female student into having an abortion. 880 F.2d at 309. When the female student couldn't afford to travel to the abortion clinic, the school staff made arrangements and provided pocket money. *Id*. In addition, the school staff "coerced" the minor plaintiffs "to refrain from consulting with their parents" about whether to abort the pregnancy. *Id.* at 312. Based on these facts, the court found that the parents and the female student had sufficiently stated "a cause of action for invasion in the familial right to privacy" and that the male student had stated a cause of action for violation of his First Amendment rights. *Id.* at 314-15. Notably, however, the court said it is "not . . . constitutionally mandating that counselors notify the parents of a minor who receives counseling regarding pregnancy." *Id.* Instead, it was only holding that "counselors must not coerce minors to refrain from communicating with their parents." *Id.* "The decision whether to seek parental guidance, absent law to the contrary, should rest within the discretion of the minor." *Id.*

There are no facts here that approach the conduct in *Arnold*. Nobody coerced Jane into social transitioning. And nobody told her she should conceal it from her parents. In fact, Miranda encouraged her to tell her parents. JA.121.

Even Miranda's failure to change Jane's name in the system, or on correspondence (if any) that was sent home, doesn't rise to the level of active concealment. There's no law, policy, or other directive that obligates school officials to make such changes when a student opts to socially transition. Her conduct is tantamount to doing nothing, which is far below the affirmative acts of concealment in *Arnold*.

Also, Heaps's argument that the school district treated Jane as a female when her father was around, but as a male when he wasn't, AB.46, finds no support in the factual record. Even in Heaps's Verified Amended Complaint he cites no well-pled facts in support of this allegation. There's nothing there about any meeting that he had with Miranda, McKinney or any other school official where Jane was discussed and which her female name was used so as to avoid detection. *See* JA.185.

This misconstruing of the facts leads Heaps to accuse the District Court of "overrid[ing] parental decisionmaking authority" based "upon a child's request."[6] AB.48. Heaps argues the District Court "reasoned that Defendants could not have

---

[6] Heaps also writes that "[a] school couldn't give a child medicine without parental consent just because the child wants it." That's incorrect, though. *See Anspach*, 503 F.3d at 262 (allowing clinic to dispense emergency contraception without parental consent).

violated Mr. Heaps's fundamental rights as a parent because 'Jane made her own request to socially transition and that her request not be disclosed to' him." AB.48 (citing JA.32). That's not what the District Court did at all.

Rather, the District Court appreciated that none of the coercive acts present in *Arnold, Gruenke*, or *Tatel v. Mt. Lebanon School District*, 752 F. Supp. 3d 512, 526 (W.D. Pa. 2024), which involved instruction on transgender topics to elementary students, existed here. JA.32. The District Court explained there is nothing before it to suggest that the Board Defendants coerced Jane into socially transitioning, or that they prevented or discouraged Jane from discussing the issue with Heaps. JA.32. Because the record revealed that "Jane made her own request to socially transition and that her request not be disclosed to Plaintiff," JA.32, the court found the case wasn't comparable to any of the precedent Heaps cited. That's far from stating a child can always override parental decision-making authority.

The Board Defendants did not coerce Jane into concealing her transition from her parents. Thus, there was no infringement on any right that Heaps may possess.

> 3. *The District Court's Decision Doesn't Rest Upon Jane's Diagnosis, It Rests On Heaps's Incompetent Medical Evidence.*

Heaps also tries to recast his claim as one involving Jane's medical care. AB.52. He argues the District Court incorrectly "concluded that Defendants could not have infringed Mr. Heaps's right to direct his daughter's upbringing, education, and healthcare, because Jane was never 'diagnosed . . . with gender confusion or

dysphoria,' nor 'referred … to a specialist for such a diagnosis.'" *Id.* (citing JA.33). He claims that "conclusion" ignores that Jane "has been under the care of a therapist for depression, anxiety, and gender confusion since April 21, 2022" and that her "therapist testified that, in her opinion, '[Jane] suffers from gender confusion.'" AB.52-53 (citing JA.181 and SA.19). This is a mischaracterization of both the factual record and the District Court's reasoning.

The District Court does not hinge its analysis on whether Jane has an actual diagnosis of gender dysphoria or gender confusion. Rather, what the District Court opined is that, at this preliminary stage, Heaps had failed to meet his evidentiary burden of showing that Jane's medical care was being interfered with through social transitioning. JA.33. The court recounted the medical evidence, including the fact that Pirozzoli is admittedly not qualified to diagnose gender confusion or dysphoria (or any medical condition); Pirozzoli doesn't know what "gender confusion" means from a medical perspective; and Ioriatti's letters excusing Jane from school were issued without conducting any medical examination. JA.33-34. Based on that absence of evidence, the Court found that Heaps had failed to show any medical care was even at issue. *Id.*

The District Court's factual findings on this point are correct. Heaps failed to show that Jane's avoidance of social transitioning was related to any ongoing medical care. The so-called medical evidence he provided—including a certification

49

from Pirozzoli that included misstatements about her experience with transgender youth, and broad-brush statements about transgender youth for which she could not identify any medical source—was wholly lacking. Heaps bears the burden of showing "clear evidence" that he is entitled to an injunction. *Doe by & through Doe v. Boyertown Area Sch. Dist.*, 276 F. Supp. 3d 324, 375 (E.D. Pa. 2017) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). His failure to submit competent proofs was fatal to him.

The District Court's approach aligns with that of other courts. In *Willey*, parents brought suit against the school district and its employees after they used a student's preferred pronouns without obtaining parental consent. 680 F. Supp. 3d at 1266. This was consistent with board policy. *Id.* The court rejected the parents' claim that the school's policy and the staff's actions violated their right to direct their child's medical care. *Id.* at 1274. The court reasoned the parents had failed to allege that the student suffered from any medical condition. *Id.* The court rejected the Willeys' conclusory allegation that the student "had been diagnosed with AHDH and PTSD and was an individual for 'whom affirming a discordant gender identity is antithetical to [the child's] health and well-being.'" *Id.* (alteration in original). The court also found insufficient the "expert affidavit of Dr. Erica Anderson" because she had never examined the student. *Id.* Thus, the court held, "[a]bsent evidence the [s]tudent was suffering or diagnosed with a mental health condition related to gender

identity" it was unlikely the plaintiffs could succeed on their substantive due process claim based on their right to direct medical care for their child. *Id.*

Sensing the problem with the lack of medical evidence to show that social transitioning will interfere with Jane's health, Heaps resorts to arguing that social transitioning is itself a form of medical treatment that requires his approval. AB.53. His sole basis for this claim is an article from the American College of Pediatricians which claims "[s]ocial transition is a 'psychosocial treatment that aims to reduce gender dysphoria.'" AB.54 (citing JA.140). This also misses the target.

At the outset, Heaps omits that the article he cites deems social transitioning as a form of "psychosocial treatment" for "prepubertal children." JA.140. Jane is not prepubertal; she was 14 when she started attending DVRHS. SA.107.

But more importantly, the sheer fact that social transitioning can be used to reduce gender dysphoria doesn't mean it's a form of therapy or treatment in every context. Exercise may reduce the risk of heart disease, but that hardly transforms every 5k race into a medical event.

There's simply nothing in Policy 5756 that purports to medically treat students. It is a policy aimed at creating an inclusive environment for transgender students.

D.    Policy 5756 Easily Satisfies Rational Basis Review.

Because Heaps cannot demonstrate the Board Defendants violated his substantive due process rights, the Board's policy receives rational basis review. *Heffner v. Murphy*, 745 F.3d 56, 79 (3d Cir. 2014). This is easily met. Policy 5756 is intended to create an inclusive, discrimination-free environment for transgender students and promote their well-being inside the school environment. JA.126. The Court deemed these interests compelling in *Boyertown*, 897 F.3d at 528-29. It follows that those interests easily meet rational basis review here.

Even if this Court were to apply strict scrutiny—as Heaps demands—the policy and its implementation pass muster. Strict scrutiny requires the government to identify a compelling interest and show that the government's means are specifically and narrowly tailored to achieve that interest. *Shaw v. Hunt*, 517 U.S. 899, 908 (1996).

As noted, in *Boyertown*, this Court recognized that "transgender students face extraordinary social, psychological, and medical risks," as well as "'discrimination, harassment, and violence because of their gender identity.'" 897 F.3d at 528 (citing *Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017)). The court found that discrimination against transgender students posted "life threatening" risks. *Id.* The Court, therefore, found that school

districts had a compelling governmental interest "in protecting transgender students from discrimination" and promoting acceptance by their peers. *Id.* at 528-29.

While the policy in *Boyertown* concerned transgender students' use of bathrooms consistent with their gender identity (as opposed to their biological sex), its recognition of the governmental interest applies with equal force here. Policy 5756 allows transgender students to experience the entire school environment, not just a bathroom or locker room, consistent with their gender identity. It promotes a discrimination-free school environment and exposes other students to persons who may differ from them on the surface, but who they may find are similar if they look beyond.

Policy 5756 is specifically and narrowly tailored to achieve its intended purpose. The policy doesn't coerce students into social transitioning. JA.121; JA.126. The policy respects the students' wishes. If those wishes change, then the policy demands that the district respect that change. *Id.*

The policy doesn't condone lying or misleading parents. JA.126. In fact, the policy doesn't even prohibit teachers or staff from disclosing the transition to parents if they want. JA.121. Rather, the policy merely states that there is no "affirmative" obligation to disclose such information. JA.126 In other words, it's up to the individual staff member.

Thus, even if the Court applied strict scrutiny, the Board Defendants' actions in enacting Policy 5756 and implementing it do not run afoul of the Constitution.

For these reasons, the District Court's holding that Heaps cannot establish a likelihood of success on the merits—and the resulting denial of his application for injunctive relief—should be affirmed.

## III.    Heaps Cannot Meet The Remaining Requirements For Injunctive Relief.

In addition to a likelihood of success on the merits, a plaintiff seeking injunctive relief must also show an (2) irreparable injury in the absence of preliminary relief. *Delaware River Port Auth.*, 501 F.2d at 919-20.  If the movant makes this "gateway" showing, *Reilly*, 858 F.3d at 179, then the court must consider the following two factors: (3) "the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest."  *Delaware River Port Auth.*, 501 F.2d at 920. All of these factors also decidedly weigh against granting preliminary relief here.

### A.    Heaps Cannot Show An Irreparable Injury.

Demonstrating irreparable injury requires showing that the injury "cannot be redressed by a legal or an equitable remedy following a trial." *Acierno v. New Castle Cnty.*, 40 F.3d 645, 653 (3d Cir. 1994) (internal quotations and citations omitted).

The injunctive relief "must be the only way of protecting the plaintiff from harm." *Instant Air Freight Co. v. C.F. Air Freight, Inc.,* 882 F.2d 797, 801 (3d Cir.

1989). The harm "cannot be remote or speculative; it must be poised to occur before the District Court can hold a trial on the merits." *Ecosave Automation, Inc. v. Delaware Valley Automation, LLC*, 540 F. Supp. 3d 491, 500 (E.D. Pa. 2021) (citing *BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.*, 229 F.3d 254, 263-64 (3d Cir. 2000)).

Here, Heaps cannot establish any irreparable injury. To the extent Heaps claims that Jane being held out of school constitutes irreparable harm to her, he runs into the reality that Jane isn't a party.

Moreover, Heaps's claim that the Board Defendants are putting him to the "choice of whether to cede important decisions about his daughter's upbringing . . . in exchange for a public education," is not supported by this record. As Pirozzoli testified, Jane doesn't seek to socially transition. SA.22. *Id.* at Tr. 63:20-25. There's no evidence that she will suddenly decide to do so once she returns to school. Indeed, when Jane took her final exams under the supervision of a proctor, she didn't make any demands to be referred to by a male name or pronoun. JA.271.

This case doesn't implicate the same concerns as in *Mahmoud*, where the school district's compulsory curriculum would expose elementary school students to LGBTQ+ curriculum, thus placing the curriculum in conflict with the parents' First Amendment rights. 145 S. Ct. at 2345–46. The record shows that Jane doesn't

seek to socially transition, SA.022, thereby removing any such conflict. Thus, Heaps cannot demonstrate irreparable harm.

B.    The Balance Of Equities Weighs Against Issuing An Injunction.

The third factor examines whether the balance of equities weighs in favor of granting the injunction. *Allegheny Energy, Inc. v. DQE, Inc.*, 171 F.3d 153, 167 (3d Cir. 1999). The Board Defendants have a "compelling state interest in protecting transgender students from discrimination," *Boyertown*, 897 F.3d at 529. Schools that provide inclusive, safe environments for transgender students foster "inclusivity, acceptance, and tolerance." *Id.* "For transgender individuals, an important part of social gender transition is having others perceive them as being the gender the transgender individual most strongly identifies with." *Boyertown*, 897 F.3d at 522.

Board Policy 5756 seeks no less than to address these concerns and create the type of school environment that permits all students, no matter their background, to thrive. JA.126. Nothing in Board Policy 5756 interferes with Heaps's own interactions with Jane or how Jane is addressed outside the school environment.

Heaps has not shown that allowing Jane to be referred to by her preferred name and pronoun elevates his harm to such a level that it would support injunctive relief. Thus, Heaps cannot meet the third factor either.

C.    <u>The Public Interest Does Not Weigh In Favor Of An Injunction.</u>

"Among the more nebulous concepts of equitable relief is the public interest factor of injunction analysis." *McCahon v. Pennsylvania Turnpike Commission*, 491 F. Supp. 2d 522, 528 (M.D. Pa. 2007). "This factor requires the court to look beyond the parties' respective interests and to gauge the injunction's potential effects on the community as a whole." *Id.* In particular, the court "must also consider the hardship to any interested third parties." *LCN Enterprises, Inc. v. City of Asbury Park*, 197 F. Supp. 2d 141, 153 (D.N.J. 2002)(citing *Oburn v. Shapp,* 521 F.2d 142, 152 (3d Cir.1975)).

What Heaps asks is for an injunction that prohibits school officials from addressing transgender students with that student's preferred names and pronouns unless the parent consents.  But despite his heavy-handed demand for relief, Heaps never once addresses the rights of the third parties who will actually be directly impacted by the injunction. Because Jane doesn't seek to transition, we can place her aside. If Heaps's demand for injunctive relief is granted, the Board would be required to disregard the gender identity of all transgender students who had disapproving parents. That places them at risk also. What are the risks? "In a survey of 27,000 transgender individuals, 40% reported a suicide attempt (a rate nine times higher than the general population)." *Boyertown*, 897 F.3d at 523. However, "when transgender students are addressed with gender appropriate pronouns and permitted

to use facilities that conform to their gender identity, those students reflect the same, healthy psychological profile as their peers." *Id.* (citations and internal quotations omitted). We respectfully submit that these concerns should not be disregarded or taken lightly. Heaps has failed to develop the type of record that would justify the extraordinary relief he seeks. Accordingly, this factor also weighs against him.

## CONCLUSION

For the foregoing reasons, the District Court's order denying preliminary injunctive relief should be affirmed.

**SHAH LAW GROUP, LLC**
*Attorneys for Defendants-Appellees*
*Delaware Valley Regional High*
*School Board of Education,*
*Scott McKinney and Ashley Miranda*

By: */s/Roshan D. Shah*
　　ROSHAN D. SHAH, ESQ.
　　ASHU VERMA, ESQ.

Dated: September 2, 2025

**CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF
APPELLATE PROCEDURE 32(A) AND LOCAL RULE 31.1**

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify the following:

1.      This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because this brief contains 12,963 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii) of the Federal Rules of Appellate Procedure.

2.      This brief complies with the typeface requirements of Rule 32(a)(5) of the Federal Rules of Appellate Procedure and the type style requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure because this brief has been prepared in a proportionally spaced typeface (Times New Roman in 14 point) using Microsoft Office 365.

3.      This brief complies with the electronic filing requirements of Local Rule 31.1(c) because the text of this electronic brief is identical to the text of the paper copies, and the Sentinel One Agent Anti-Virus Software, Application Version 25.1.3.334, has been run on the file containing the electronic version of this brief and no viruses have been detected.

Dated: September 2, 2025                            */s/Roshan D. Shah*
                                                   Roshan D. Shah, Esq.

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 2, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: September 2, 2025                          */s/Roshan D. Shah*
                                                 Roshan D. Shah, Esq.