# 24-3278

# United States Court of Appeals for the Third Circuit

CHRISTIN HEAPS,

*Plaintiff-Appellant,*

v.

DELAWARE VALLEY REGIONAL HIGH SCHOOL BOARD OF EDUCATION; SCOTT MCKINNEY, individually and in his official capacity as Superintendent of Schools; ASHLEY MIRANDA, individually and in her official capacity as school counselor; ANGELICA ALLEN-MCMILLAN, in her official capacity as Acting Commissioner of the New Jersey Department of Education; JOHN ROES 1-10, said names being fictitious, individually and in their official capacities; MATTHEW J. PLATKIN, in his official capacity as Attorney General of the State of New Jersey,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of New Jersey

## BRIEF FOR THE STATES OF NEW YORK, CALIFORNIA, DELAWARE, HAWAI'I, ILLINOIS, MAINE, MARYLAND, MASSACHUSETTS, MINNESOTA, OREGON, WASHINGTON, AND THE DISTRICT OF COLUMBIA AS AMICI CURIAE IN SUPPORT OF APPELLEES

BARBARA D. UNDERWOOD
  *Solicitor General*
JUDITH N. VALE
  *Deputy Solicitor General*
KARTIK NARAM
ANAGHA SUNDARARAJAN
  *Assistant Solicitors General
    of Counsel*

(*Counsel listing continues on signature pages.*)

LETITIA JAMES
  *Attorney General
  State of New York*
28 Liberty Street
New York, New York 10005
(212) 416-8073

Dated: September 9, 2025

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................ ii

INTRODUCTION AND INTERESTS OF AMICI CURIAE ................... 1

ARGUMENT ........................................................................................ 4

POINT I

POLICIES LIKE THE BOARD POLICY ENSURE SAFE AND
SUPPORTIVE SCHOOLS IN AMICI STATES .................................................. 4

    A.    Schools Need to Be Able to Design and Implement
    Policies That Ensure Safe and Supportive Environments. ....... 4

    B.    The Policies, Guidance, and Laws Issued by Defendants
    and Many Amici States Balance Important Interests. ............ 7

POINT II

THE RIGID FRAMEWORK THAT PLAINTIFF PROPOSES WOULD
UNDERMINE AMICI STATES' INTERESTS IN MAKING SCHOOLS
SAFE AND SUPPORTIVE ........................................................................ 17

POINT III

AMICI STATES HAVE STRONG INTERESTS IN SAFE AND
SUPPORTIVE SCHOOLS FOR ALL STUDENTS, INCLUDING
TRANSGENDER AND GENDER-NONCONFORMING STUDENTS ................ 21

    A.    Safe and Supportive School Policies Benefit
    All Students. ................................................................ 21

    B.    Safe and Supportive School Policies Are
    Especially Critical for Transgender and
    Gender-Nonconforming Students. ...................................... 26

CONCLUSION ..................................................................................... 32

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Anspach ex rel. Anspach v. City of Philadelphia,*
503 F.3d 256 (3d Cir. 2007) ................................................................ 15

*Arnold v. Board of Education of Escambia County,*
880 F.2d 305 (11th Cir. 1989) ....................................................... 15-16

*Bethel Sch. Dist. No. 403 v. Fraser,*
478 U.S. 675 (1986) ................................................................................ 4

*Brown v. Board of Educ.,*
347 U.S. 483 (1954) ................................................................................ 4

*Busch v. Marple Newtown Sch. Dist.,*
567 F.3d 89 (3d Cir. 2009) .................................................................. 13

*C.N. v. Ridgewood Bd. of Educ.,*
430 F.3d 159 (3d Cir. 2005) ........................................................... 5, 18

*Combs v. Homer-Ctr. Sch. Dist.,*
540 F.3d 231 (3d Cir. 2008) .................................................................. 5

*Doe ex rel. Doe v. Boyertown Area Sch. Dist.,*
897 F.3d 518 (3d Cir. 2018) ......................................... 4, 20-21, 26, 29

*Foote v. Ludlow Sch. Comm.,*
128 F.4th 336 (1st Cir. 2025) ............................................................. 19

*Gruenke v. Seip,*
225 F.3d 290 (3d Cir. 2000) ........................................................... 15-16

*Littlejohn v. School Bd. of Leon Cnty.,*
132 F.4th 1232 (11th Cir. 2025) ......................................................... 16

*Mahanoy Area Sch. Dist. v. B. L. ex rel. Levy,*
594 U.S. 180 (2021) ................................................................................ 4

| Cases | Page(s) |
|---|---|

*Mahmoud v. Taylor*,
  145 S. Ct. 2332 (2025)................................................................6

*McCauley v. University of the Virgin Islands*,
  618 F.3d 232 (3d Cir. 2010) .....................................................4

*McKinney v. University of Pittsburgh*,
  915 F.3d 956 (3d Cir. 2019) ...................................................5-6

*Parents United for Better Schs., Inc. v. School Dist. of Phila. Bd.
  of Educ.*,
  148 F.3d 260 (3d Cir. 1998) .....................................................5

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
  393 U.S. 503 (1969)..................................................................6

**Laws**

*California*

Cal. Educ. Code § 220..................................................................8

*Illinois*

775 Ill. Comp. Stat.
  5/1-102....................................................................................8
  5/1-103....................................................................................8

*Maine*

Me. Rev. Stat. Ann.
  tit. 5, § 4553 ...........................................................................8
  tit. 5, § 4601 ...........................................................................8

*Massachusetts*

Mass. Gen. Laws ch. 76, § 5 .......................................................8

| Laws | Page(s) |
|---|---|

*Minnesota*

Minn. Stat. § 363A.13.................................................................8

*New Jersey*

N.J. Stat. Ann. § 10:5-12 ..........................................................8

*New York*

N.Y. Exec. Law
    § 292 ..................................................................................8
    § 296 ..................................................................................8

*Oregon*

Or. Rev. Stat. § 659.850 ...........................................................8

*Washington*

Wash. Rev. Code Ann. § 28A.642.010 ......................................8

**Miscellaneous Authorities**

Am. Psych. Ass'n, *Safe and Supportive Schools Project* (2014),
    https://www.apa.org/pi/lgbt/programs/safe-supportive ......................21

Ann P. Haas et al., Am. Found. for Suicide Prevention &
    Williams Inst., *Suicide Attempts Among Transgender and*
    *Gender Non-Conforming Adults: Findings of the National*
    *Transgender Discrimination Survey* (Jan. 2014),
    https://williamsinstitute.law.ucla.edu/wp-
    content/uploads/Trans-GNC-Suicide-Attempts-Jan-2014.pdf ...........28

Caitlin Ryan et al., *Family Rejection as a Predictor of Negative*
    *Health Outcomes in White and Latino Lesbian, Gay, and*
    *Bisexual Young Adults*, 123 Pediatrics 346 (2009),
    https://pubmed.ncbi.nlm.nih.gov/19117902/ .......................................11

## Miscellaneous Authorities                                    Page(s)

Cal. Dep't of Educ., *Protections for LGBTQ+ Students: AB 1955* (last reviewed Jan. 2, 2025), https://www.cde.ca.gov/ci/pl/ab-1955-sum-of-prov.asp ............................................................... 14

Ctrs. for Disease Control & Prevention, *School Connectedness Helps Students Thrive* (Nov. 18, 2024), https://www.cdc.gov/youth-behavior/school-connectedness/?CDC_AAref_Val=https://www.cdc.gov/healthyyouth/protective/school_connectedness.htm .................................... 22

GLSEN, *School Climate for LGBTQ+ Students in New York* (2023), https://maps.glsen.org/wp-content/uploads/2024/08/GLSEN_2021_NSCS_State_Snapshots_NY.pdf ............................................................................ 27

Haw. Dep't of Educ., *Guidance on Supports for Transgender Students* (n.d.), https://hawaiipublicschools.org/wp-content/uploads/Guidance-TransgenderStudents-Supports.pdf ......................................................................... 14

Hum. Rts. Campaign, *Gender-Expansive Youth Report* (2018), https://assets2.hrc.org/files/assets/resources/Gender-expansive-youth-report-final.pdf ......................................................... 12

Isabel Brito et al., *Do You Trust Me? A Systematic Literature Review on Student-Teacher Trust and School Identification*, Conference Paper for the European Conference on Education 2021 (Sept. 2021), https://papers.iafor.org/wp-content/uploads/papers/ece2021/ECE2021_60608.pdf ...................... 24

Jenna Howard Terrell et al., *Conceptualizing and Measuring Safe and Supportive Schools*, 24 Contemporary Sch. Psych. 327 (Aug. 12, 2020), https://www.researchgate.net/publication/343619376_Conceptualizing_and_Measuring_Safe_and_Supportive_Schools ............... 22

**Miscellaneous Authorities**           **Page(s)**

Joseph G. Kosciw et al., GLSEN, *The 2019 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual, Transgender, and Queer Youth in Our Nation's Schools* (2020), https://www.glsen.org/sites/default/files/2021-04/NSCS19-FullReport-032421-Web_0.pdf ...................................... 30

Joseph G. Kosciw et al., GLSEN, *The 2021 National School Climate Survey: The Experiences of LGBTQ+ Youth in Our Nation's Schools* (2022), https://www.glsen.org/sites/default/files/2022-10/NSCS-2021-Full-Report.pdf .................................................... 26-27, 29, 31

Kristina R. Olson et al., *Mental Health of Transgender Children Who Are Supported in Their Identities*, 137 Pediatrics 1 (2016), https://pmc.ncbi.nlm.nih.gov/articles/PMC4771131/ ............. 31

Laurie Kincade et al., *Meta-Analysis and Common Practice Elements of Universal Approaches to Improving Student-Teacher Relationships*, 90 Rev. Educ. Rsch. 710 (Aug. 4, 2020), https://journals.sagepub.com/doi/abs/10.3102/0034654320946836 ............................................................................... 23-24

Linda Darling-Hammond et al., *Implications for Educational Practice of the Science of Learning and Development*, 24 Applied Developmental Sci. 97 (2020), https://www.tandfonline.com/doi/full/10.1080/10888691.2018.1537791 .................................................................. 21-22, 24

Marina Feijo et al., *Improving School Outcomes for Transgender and Gender-Diverse Youth: A Rapid Review*, 9 Pol'y Insights from Behav. & Brain Scis. 27 (2022), https://journals.sagepub.com/doi/abs/10.1177/23727322211068021 ........................................................................... 24

**Miscellaneous Authorities**                                    **Page(s)**

Mass. Dep't of Elementary & Secondary Educ., *Guidance for Massachusetts Public Schools Creating a Safe and Supportive School Environment* (2022), https://www.doe.mass.edu/sfs/lgbtq/GenderIdentity.html ................ 14

Megan Tschannen-Moran et al., *Student Academic Optimism: A Confirmatory Factor Analysis*, 51 J. Educ. Admin. 150 (Mar. 15, 2013), https://www.researchgate.net/publication/275076778_Student_Academic_Optimism_A_confirmatory_factor_analysis ............ 23-24

Michael D. Resnick et al., *Protecting Adolescents from Harm: Findings from the National Longitudinal Study on Adolescent Health*, 278 J. Am. Med. Ass'n 823 (Sept. 10, 1997), https://pubmed.ncbi.nlm.nih.gov/9293990/ ............................ 25

Michelle M. Johns et al., *Protective Factors Among Transgender and Gender Variant Youth: A Systematic Review by Socioecological Level*, 39 J. Primary Prevention 263 (2018), https://pmc.ncbi.nlm.nih.gov/articles/PMC5976555/pdf/nihms967022.pdf ......................................................................... 31

Michelle M. Johns et al., *Transgender Identity and Experiences of Violence Victimization, Substance Use, Suicide Risk, and Sexual Risk Behaviors Among High School Students — 19 States and Large Urban School Districts, 2017*, 68 Morbidity & Mortality Weekly Rep. 67 (2019), https://www.cdc.gov/mmwr/volumes/68/wr/pdfs/mm6803a3-H.pdf ......................................................................... 27-28

Monika Platz, *Trust Between Teacher and Student in Academic Education at School*, 55 J. Phil. Educ. 688 (2021), https://academic.oup.com/jope/article/55/4-5/688/6821689 ............... 18

Movement Advancement Project & GLSEN, *Separation and Stigma: Transgender Youth & School Facilities* (2017), https://www.lgbtmap.org/file/transgender-youth-school.pdf ....... 29, 31

**Miscellaneous Authorities**                    **Page(s)**

Movement Advancement Project, *Safe Schools Laws* (current
    through September 9, 2025),
    https://www.lgbtmap.org/equality-maps/safe_school_laws .............. 12

Nat'l Ctr. on Safe Supportive Learning Env'ts, *About* (n.d.),
    https://safesupportivelearning.ed.gov/about ..................................... 21

N.Y. State Educ. Dep't, *Creating a Safe, Supportive, and*
    *Affirming School Environment for Transgender and Gender*
    *Expansive Students: 2023 Legal Update and Best Practices*
    (2023),
    https://www.nysed.gov/sites/default/files/programs/student-
    support-services/creating-a-safe-supportive-and-affirming-
    school-environment-for-transgender-and-gender-expansive-
    students.pdf ................................................................................. 13, 20

N.Y. State Educ. Dep't, *Guidance to School Districts for*
    *Creating a Safe and Supportive School Environment for*
    *Transgender and Gender Nonconforming Students* (July
    2015),
    https://www.p12.nysed.gov/dignityact/documents/Transg_GN
    CGuidanceFINAL.pdf ........................................................................ 13

Off. of Elementary & Secondary Educ., *Safe & Supportive*
    *Schools*, U.S. Dep't of Educ. (last reviewed Jan. 14, 2025),
    https://www.ed.gov/about/ed-offices/oese/safe-supportive-
    schools ............................................................................................... 21

Riley J. Steiner et al., *Adolescent Connectedness and Adult*
    *Health Outcomes*, 144 Pediatrics e20183766 (July 2019),
    https://pmc.ncbi.nlm.nih.gov/articles/PMC9125410/pdf/nihms
    -1801768.pdf ...................................................................................... 25

**Miscellaneous Authorities**                                                        **Page(s)**

Roxanne M. Mitchell et al., *Student Trust in Teachers and
Student Perceptions of Safety: Positive Predictors of Student
Identification with School*, 21 Int'l J. Leadership Educ. 1
(May 2016),
https://www.tandfonline.com/doi/full/10.1080/13603124.2016.
1157211 ....................................................................................22-24

Russell M. Viner et al., *Adolescence and the Social
Determinants of Health*, 379 Adolescent Health 1641
(Apr. 2012),
https://www.thelancet.com/journals/lancet/article/PIIS0140-
6736(12)60149-4/abstract ................................................................ 24

Sandy E. James et al., Nat'l Ctr. for Transgender Equal., *The
Report of the 2015 U.S. Transgender Survey* (2016),
https://transequality.org/sites/default/files/docs/usts/USTS-
Full-Report-Dec17.pdf ............................................................... 11, 28

Sara Rimm-Kaufman & Lia Sandilos, *Improving Students'
Relationships with Teachers to Provide Essential Supports
for Learning*, Am. Psych. Ass'n (updated Mar. 2025),
https://www.apa.org/education-career/k12/relationships .................. 18

Stephen T. Russell et al., *Promoting School Safety for LGBTQ
and All Students*, 8 Pol'y Insights from Behav. & Brain Scis.
160 (Oct. 2021),
https://pmc.ncbi.nlm.nih.gov/articles/PMC8454913/pdf/nihms
-1740286.pdf........................................................................................ 30

Trevor Project, *2024 U.S. National Survey on the Mental Health
of LGBTQ+ Young People* (2024),
https://www.thetrevorproject.org/survey-2024/ .................... 12, 26, 28

Trevor Project, *The Trevor Project Research Brief: LGBTQ &
Gender-Affirming Spaces* (Dec. 2020),
https://www.thetrevorproject.org/wp-
content/uploads/2021/07/LGBTQ-Affirming-Spaces_-
December-2020.pdf .............................................................................. 31

**Miscellaneous Authorities**                                    **Page(s)**

Whitney W. Black et al., *Effects of "Safe School" Programs and
    Policies on the Social Climate for Sexual-Minority Youth: A
    Review of the Literature*, 9 J. LGBT Youth 321 (Oct. 5, 2012),
    https://www.researchgate.net/publication/266731411_Effects_o
    f_Safe_School_Programs_and_Policies_on_the_Social_Climate
    _for_Sexual-Minority_Youth_A_Review_of_the_Literature ..... 23, 26, 28

## INTRODUCTION AND INTERESTS OF AMICI CURIAE

The Delaware Valley Regional High School Board of Education, located in New Jersey, has implemented a policy ("Board Policy") which mirrors New Jersey state guidance regarding students who request that school officials refer to them using a name and pronouns corresponding with their gender identity. Here, plaintiff-appellant Christin Heaps alleges (among other things) that the Board Policy and New Jersey guidance violate his constitutional rights because they allowed the Delaware Valley Regional High School to use the name and pronouns requested by plaintiff's child without first notifying him or obtaining his consent.[1] The U.S. District Court for the District of New Jersey (Castner, J.) denied Heaps's motion to preliminarily enjoin defendants-appellees from enforcing the policy and guidance.[2]

Amici States of New York, California, Delaware, Hawai'i, Illinois, Maine, Maryland, Massachusetts, Minnesota, Oregon, Washington, and

---

[1] Plaintiff's child is identified in this action as Jane Doe. (Joint Appendix (J.A.) 3.)

[2] Defendants-appellees include the Delaware Valley Regional High School Board of Education, two officials at Delaware Valley Regional High School, the Acting Commissioner of the New Jersey Department of Education, and the New Jersey Attorney General. (*See* J.A. 11.)

the District of Columbia submit this brief in support of affirmance and to explain policies, guidance, and laws issued by many of our States regarding student gender identity issues. Amici States have strong interests in ensuring that public schools within our respective jurisdictions remain safe and supportive places for all students regardless of their gender identity. Safe school environments benefit all students and enrich amici States as a whole.

Amici States write to emphasize three points. *First*, we write to explain how the Board Policy and state guidance at issue here, like similar measures implemented by many amici States, foster a safe and supportive school environment for all students, including transgender and gender-nonconforming students. These measures encourage schools to engage with students' parents and to craft a plan that accommodates the students' needs at school. But amici States recognize that it is not always safe to immediately inform a student's parents about a student's asserted gender identity. Many of amici States' policies, guidelines, and laws therefore emphasize the importance of respecting a student's wishes, including a student's wish not to immediately disclose their gender identity to parents out of concerns about their personal safety or about

disapproval or rejection. At the same time, these policies, guidelines, and laws recognize that student gender identity issues should be addressed on a case-by-case basis with the paramount focus on the student's safety.

*Second*, we also write to underscore the dangers of the inflexible approach urged by plaintiff, which would prohibit schools from using the name and pronoun that a student affirmatively requests, or from discussing gender identity issues that the student affirmatively raises, without first notifying parents and obtaining their consent. The Constitution requires no such rigid rule. *See* Br. for Defs.-Appellees Matthew J. Platkin and Kevin Dehmer (Defs. Br.) at 43-47, ECF No. 107. And such a categorical rule would severely harm students' safety and well-being as well as impose significant burdens on public schools in amici States.

*Third*, and finally, a wealth of social science research confirms that safe and supportive school environments catalyze student success. For transgender and gender-nonconforming students in particular, who are often subject to discrimination, harassment, and bullying, an affirming school environment improves learning and overall well-being.

# ARGUMENT

## POINT I

### POLICIES LIKE THE BOARD POLICY ENSURE SAFE AND SUPPORTIVE SCHOOLS IN AMICI STATES

### A.    Schools Need to Be Able to Design and Implement Policies That Ensure Safe and Supportive Environments.

Public schools play a foundational role in American society. They are the "nurseries of democracy," *Mahanoy Area Sch. Dist. v. B. L. ex rel. Levy*, 594 U.S. 180, 190 (2021), where students are taught "'by example the shared values of a civilized social order,'" *McCauley v. University of the Virgin Islands*, 618 F.3d 232, 243 (3d Cir. 2010) (quoting *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 683 (1986)). "Public education must prepare pupils for citizenship in the Republic, and inclusive classrooms reduce prejudices and promote diverse relationships which later benefit students in the workplace and in their communities." *Doe ex rel. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 529 (3d Cir. 2018) (quotation marks and footnotes omitted). Indeed, the Supreme Court has often extolled the importance of public schools in preparing and training successive generations of students. *See, e.g., Bethel Sch. Dist. No. 403*, 478 U.S. at 681; *Brown v. Board of Educ.*, 347 U.S. 483, 493 (1954). As a result,

4

"'education is perhaps the most important function of state and local governments.'" *Combs v. Homer-Ctr. Sch. Dist.*, 540 F.3d 231, 243 (3d Cir. 2008) (quoting *Brown*, 347 U.S. at 493).

Recognizing public schools' critical educational mission, this Court has explained that a parent's right to control their child's upbringing "is neither absolute nor unqualified" and, in certain circumstances, "must give way" to a public school's ability to shape "the school environment." *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 182 (3d Cir. 2005). (*See* Joint Appendix (J.A.) 25 (rejecting "the type of unqualified right that Plaintiff asserts").) Schools regularly implement practices that go beyond the formal education curriculum, and may do so without infringing on parents' constitutional right to child-rearing. For example, this Court has rejected constitutional challenges brought by parents against a school conducting a student survey that contained sensitive topics, *see C.N.*, 430 F.3d at 185, and organizing a voluntary program to distribute contraceptives, *see Parents United for Better Schs., Inc. v. School Dist. of Phila. Bd. of Educ.*, 148 F.3d 260, 262 (3d Cir. 1998). Such examples reflect the broader principle that, "[b]y and large, public education in our Nation is committed to the control of state and local authorities.'" *McKinney v.*

*University of Pittsburgh*, 915 F.3d 956, 963 (3d Cir. 2019) (quoting *Goss v. Lopez*, 419 U.S. 565, 578 (1975)).

Of course, a public school's ability to shape the school environment is subject to restraints imposed by federal law. *See, e.g.*, *Mahmoud v. Taylor*, 145 S. Ct. 2332, 2350 (2025). Public schools must adhere to federal prohibitions against discrimination contained in the Equal Protection Clause and Title IX of the Education Amendments of 1972, for example. *See Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 507 (1969).

Here, many of plaintiff's arguments, if accepted, would strip school officials of the ability to ensure that students remain safe and respected when a student affirmatively requests that school officials not disclose the student's gender identity to the student's parents. Under plaintiff's proposed categorical rule, school officials would be constitutionally required to divulge a student's gender identity to parents in all circumstances regardless of the student's own concerns about their safety, security, and well-being. That is not what the Constitution requires, as defendants explain. *See* Defs. Br. at 43-47. It would also corrode student-teacher

6

relationships while imposing ill-defined and potentially boundless disclosure obligations on schools.

## B.  The Policies, Guidance, and Laws Issued by Defendants and Many Amici States Balance Important Interests.

The Board Policy and New Jersey state guidance at issue, which build on requirements in the New Jersey Law Against Discrimination (NJLAD), support balancing parents' involvement in their children's education with the recognition that not all students feel safe or comfortable revealing their gender identity at home. Many Amici States have enacted similar policies, guidance, and laws in their own jurisdictions, while others give individual school districts discretion to implement such policies. As explained below, such measures protect students who choose to express their gender identities to school teachers, staff, or administrators. In doing so, they do not compel or constrain students in making personal decisions about their own gender identity in the first instance, including deciding when to disclose gender identity to parents. As a result, plaintiff's constitutional challenges to the Board Policy and corresponding New Jersey guidelines are unlikely to succeed on the merits.

The NJLAD "generally makes it unlawful for schools to subject individuals to differential treatment based on gender identity or expression." (J.A. 78; *see* J.A. 83.) *See* N.J. Stat. Ann. § 10:5-12(f)(1). Other amici States have codified similar protections to achieve safe and supportive school environments and to ensure that students of all gender identities can receive a public education free from discrimination, harassment, and intimidation. In New York, for example, the Gender Expression Non-Discrimination Act prohibits public schools from discriminating against students on the basis of their gender identity or expression.[3]

Like many local school boards in many of amici States' jurisdictions, the Delaware Valley Regional Board of Education adopted its policy to "assist schools in establishing policies and procedures that ensure a supportive and nondiscriminatory environment for transgender students." (J.A. 78 (Board Policy); *see* J.A. 83 (New Jersey guidance).) The Board Policy and the New Jersey guidelines on which it is based recommend a "student-centered approach" that accepts a student's "internal, deeply

---

[3] *See* N.Y. Exec. Law §§ 292(35), 296(4); *see also* Cal. Educ. Code § 220; 775 Ill. Comp. Stat. 5/1-102, 103(O-1); Me. Rev. Stat. Ann. tit. 5, §§ 4553(9-C), 4601; Mass. Gen. Laws ch. 76, § 5; Minn. Stat. § 363A.13; Or. Rev. Stat. § 659.850; Wash. Rev. Code Ann. § 28A.642.010.

held sense of gender" without requiring parental consent. (J.A. 78, 83-84.) They encourage school officials to "have an open, but confidential discussion with the student to ascertain the student's preference on matters such as chosen name, chosen pronoun to use, and parental communications." (J.A. 79, 85.) As to confidentiality, the Board Policy and New Jersey guidelines advise school officials "to work with the student to create an appropriate confidentiality plan." (J.A. 79, 86.) And in general, school officials must comply with the student's request that information be kept confidential.[4] (J.A. 79-80, 86-88.)

Even where the student does not consent to disclosure, however, the Board Policy and New Jersey guidelines permit disclosure when "a specific and compelling need" arises, such as when the student's health or safety is at risk. (J.A. 79, 87.) In these situations, the Board Policy and New Jersey guidelines first give the student "the opportunity to personally disclose" information about gender status to their family. (J.A. 79, 87.) This intermediate step underlines the school's interest in facilitating

---

[4] Amici States take no position on the local and state policies insofar as defendants apply them to continue using Jane's preferred name and pronouns against plaintiff's instructions if Jane so requests. *See* Br. for Pl.-Appellant (Br.) at 40. (*See* J.A. 6-7, 21-22.)

conversations between students and their parents about gender identity. To assist these conversations, moreover, schools may provide for counseling services "to facilitate the family's acceptance and support of the student's transgender status." (J.A. 79, 87.) On their face, the policies' overarching goal is respecting the emotional, physical, and psychological safety of students.

Like similar local and state policies in many of amici States' jurisdictions, the Board Policy and New Jersey guidelines ultimately center on student safety and well-being. Plaintiff is incorrect to suggest (Br. at 25) that the Board Policy and New Jersey guidelines "require" schools to keep parents uninformed. Plaintiff's brief fails to acknowledge the provision allowing disclosure when needed to ensure student health and safety. And, as the district court noted, the Delaware Valley Regional High School Board of Education does not interpret the policy to permit school officials to "lie to parents or guardians if they inquire about their child's gender identity or expression." (J.A. 6 (quotation marks omitted).) Here, when plaintiff asked Jane's high school about her social transitioning, "the school confirmed that Jane had requested to be referred by a male name and pronouns." (J.A. 6.) The school's practice is consistent

10

with the approach that amici States endorse. These policies strive to honor a student's privacy while at the same time encouraging parental disclosure to protect a student's well-being.

This balanced approach benefits students. Amici States recognize that schools must be careful when disclosing a student's gender identity. One in ten transgender individuals experience overt violence from a household member, and fifteen percent are forced to leave their home because of their transgender identity.[5] Lesbian, gay, and bisexual young adults who experience parental rejection are more than eight times more likely to report having attempted suicide and nearly six times more likely to report major depressive symptoms.[6]

Although many transgender and gender-nonconforming youth have supportive families, many others face rejection if forced to "out" themselves at home prematurely. According to the Trevor Project's 2024

---

[5] Sandy E. James et al.*,* Nat'l Ctr. for Transgender Equal., *The Report of the 2015 U.S. Transgender Survey* 65 (2016). (For sources available online, all URLs appear in the Table of Authorities. All websites were last visited on September 9, 2025.)

[6] Caitlin Ryan et al., *Family Rejection as a Predictor of Negative Health Outcomes in White and Latino Lesbian, Gay, and Bisexual Young Adults*, 123 Pediatrics 346, 346 (2009).

mental health survey, only forty percent of LGBTQ+ young people in the U.S. found their home to be an "affirming" space—compared with more than half (fifty-two percent) who found school to be an affirming space.[7] And according to a 2018 Human Rights Campaign report, nearly two-thirds (sixty-four percent) of all gender-nonconforming youth surveyed reported that their families made them feel bad about their gender identity.[8] The "real and perceived fears of rejection" make sharing gender identities with family members "incredibly stressful" for gender-expansive youth.[9]

Several Amici States have put forward policies similar to the Board Policy and the New Jersey guidance.[10] For example, the New York State Department of Education (NYSED) has issued nonbinding guidelines

---

[7] Trevor Project, *2024 U.S. National Survey on the Mental Health of LGBTQ+ Young People* (2024).

[8] Hum. Rts. Campaign, *Gender-Expansive Youth Report* 8 (2018) (using "gender-expansive" to describe all respondents whose gender identity did not align with "what is typically associated with the sex they were assigned at birth").

[9] *Id.*

[10] *See* Movement Advancement Project, *Safe Schools Laws* (current through September 9, 2025) ("nondiscrimination" tab compiling laws of all states).

recommending that disclosure "should be addressed on a case-by-case basis, accounting for the student's age and maturity."[11] As this Court has suggested, a student's age may be a consideration in evaluating whether the parent's constitutional rights have been violated. *See Busch v. Marple Newtown Sch. Dist.*, 567 F.3d 89 (3d Cir. 2009). (*See also* J.A. 30-31.) And NYSED guidance makes clear that a school's topmost concern in such situations should always be "protecting the health and safety of the student, assuring that the student's gender identity is affirmed and that their privacy and confidentiality are safely maintained."[12]

Likewise, California's Department of Education has explained that state law forbids *requiring* school employees to disclose a student's gender identity without the student's consent but, at the same time, "does not

---

[11] NYSED, *Creating a Safe, Supportive, and Affirming School Environment for Transgender and Gender Expansive Students: 2023 Legal Update and Best Practices* 7 (2023) ("NYSED Guidelines"). An earlier edition of NYSED guidance emphasized the same point: "These situations must be addressed on a case-by-case basis and will require schools to balance the goal of supporting the student with the requirement that parents be kept informed about their children." NYSED, *Guidance to School Districts for Creating a Safe and Supportive School Environment for Transgender and Gender Nonconforming Students* 5 (July 2015).

[12] NYSED Guidelines, *supra*, at 16.

mandate non-disclosure."[13] The Hawai'i Department of Education has issued guidance noting that "[t]ransgender students' needs can be highly individualized depending upon the circumstances of the student," and that "[e]ach student's needs should be assessed on a case-by-case basis."[14] The Massachusetts Department of Elementary and Secondary Education advises that the best practice is to speak with the student about their name and pronoun usage before discussing a student's gender nonconformity with that student's guardians, while observing that "the needs of each transgender or gender-nonconforming student should be assessed and addressed on a case-by-case basis."[15]

As the district court correctly explained here (J.A. 28-33), a policy respecting students' affirmative choices in this way is not a coercive practice that infringes on parents' fundamental right under the Due Process Clause to direct their children's upbringing, as plaintiffs suggest.

---

[13] Cal. Dep't of Educ., *Protections for LGBTQ+ Students: AB 1955* (last reviewed Jan. 2, 2025).

[14] Haw. Dep't of Educ., *Guidance on Supports for Transgender Students* 1 (n.d.).

[15] *See* Mass. Dep't of Elementary & Secondary Educ., *Guidance for Massachusetts Public Schools Creating a Safe and Supportive School Environment* (2022).

Br. at 45-47. The court's conclusion follows from *Anspach ex rel. Anspach v. City of Philadelphia*, 503 F.3d 256 (3d Cir. 2007). In *Anspach*, this Court held that a public health clinic providing a minor with emergency contraception without her parents' knowledge or consent did not violate the parents' substantive due process rights. *See id.* at 264. The minor in *Anspach* "requested the morning after pill," and "no one prevented" her from informing her parents about it. *Id.* at 264-65. *Anspach* underscored that parents' rights in raising their children are not violated "where there is no manipulative, coercive, or restraining conduct by the State." *Id.* at 266. On that basis, *Anspach* also distinguished two of the cases on which plaintiff here relies, *Gruenke v. Seip*, 225 F.3d 290 (3d Cir. 2000), and *Arnold v. Board of Education of Escambia County*, 880 F.2d 305 (11th Cir. 1989), which both contained allegations that state actors pressured students into making reproductive healthcare decisions, *see Anspach*, 503 F.3d at 265.

Here, just as in *Anspach*, the evidence fails to show that Jane Doe "was in any way compelled, constrained or coerced into a course of action she objected to." *Id.* at 266. To the contrary, the district court concluded that the record establishes that Jane "initiated the request to socially

transition" (J.A. 30) and "did not want school staff to report her social transition to" plaintiff (J.A. 4 (quotation marks omitted)). And the court concluded that nothing in the record suggests that defendants "coerced Jane into socially transitioning, or that they prevented or discouraged Jane from discussing the issue with Plaintiff." (J.A. 31.) So, unlike in *Gruenke* and *Arnold*, there is no evidence that defendants forced Jane Doe to submit to medical testing, *see Gruenke*, 225 F.3d at 306-07, or coerced Jane Doe "to refrain from discussing" anything with plaintiff, *see Arnold*, 880 F.2d at 312. As the Eleventh Circuit recently noted in rejecting a challenge to a similar school policy, the school did "not force the [plaintiff's] child to do anything at all." *Littlejohn v. School Bd. of Leon Cnty.*, 132 F.4th 1232, 1245 (11th Cir. 2025). Accordingly, as the district court properly held, plaintiff "has not established an infringement of a fundamental right" and is therefore unlikely to succeed on the merits of his constitutional claim.[16] (J.A. 35-36.)

---

[16] The district court did not address the remaining preliminary injunction factors "[b]ecause a failure to show a likelihood of success on the merits 'must necessarily result in the denial of a preliminary injunction.'" (J.A. 39 (quoting *American Exp. Travel Related Servs., Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 366 (3d Cir. 2012).)

## POINT II

### THE RIGID FRAMEWORK THAT PLAINTIFF PROPOSES WOULD UNDERMINE AMICI STATES' INTERESTS IN MAKING SCHOOLS SAFE AND SUPPORTIVE

In place of the case-by-case approach recommended by amici States, which protects the interests of both students and parents, plaintiff argues for a rigid constitutional mandate. Plaintiff's constitutional rule would require school officials to always obtain parental consent before discussing gender identity issues with a student who raises such issues or who wishes to be called by a different name. But forcing school officials to divulge a student's gender identity to parents in all circumstances— regardless of the student's own concerns about their safety, security, and well-being—would have damaging effects on students and schools in amici States.

*First*, a compulsory disclosure-and-consent rule would chill open communication between students and school officials. If school faculty and staff must always immediately notify parents about a student's gender identity—heedless of the student's concerns about negative reactions or personal safety—then students are less likely to confide such information in school officials. That breakdown in communication would

17

hurt students. When students can be open with their teachers, they are more engaged in learning and confident in their own abilities.[17] They also benefit from mentorship by school staff, including coaches and guidance counselors. By contrast, disincentivizing discussion about gender identity issues with trusted adults would compound the stresses that transgender and gender-nonconforming youth already experience at school.

*Second*, the constitutional rule that plaintiff proposes threatens to impose on public schools an ill-defined disclosure regime. In plaintiff's view, the Constitution requires school officials to disclose a student's gender identity to parents because it implicates the student's "care," "upbringing," and "moral standards." *See* Br. at 35 (quotation marks omitted). But the same could be said about many other actions that a student decides to take during a school day. *See C.N.*, 430 F.3d at 185 ("[A] myriad of influences surround middle and high school students everyday, many of which are beyond the strict control of the parent or

---

[17] *See* Monika Platz, *Trust Between Teacher and Student in Academic Education at School*, 55 J. Phil. Educ. 688, 694-95 (2021); Sara Rimm-Kaufman & Lia Sandilos, *Improving Students' Relationships with Teachers to Provide Essential Supports for Learning*, Am. Psych. Ass'n (updated Mar. 2025).

even abhorrent to the parent."). A student who voices support for transgender rights during a classroom debate or utters profanities on stage in a school play could similarly offend their parents' personal, moral, or religious beliefs. If school officials were constitutionally required to track every parent's objections to such activities and then share with parents every piece of information about their children's participation in those activities, the administrative burdens of that protocol would overwhelm school officials.

Plaintiff fails to justify such a burdensome rule by arguing that respecting a student's chosen name and pronouns amounts to a "psychotherapeutic" intervention requiring parental involvement. Br. at 25; *see id.* at 52-54. As the district court correctly held, this claim is unlikely to succeed because plaintiff has not shown "evidence that Jane is suffering or diagnosed with a mental health condition related to gender identity" that the school was trying to treat. (J.A. 33-35.) *See Foote v. Ludlow Sch. Comm.*, 128 F.4th 336, 349 (1st Cir. 2025) (per curiam) ("labeling, without more, cannot transform the alleged conduct into a medical intervention"). Rather, the school's policy endorsed "passively recognizing her wishes." (J.A. 34 (quotation marks omitted).) That practice requires no

prescription or professional license. And it is different from *medical* transitions, which may include hormone therapy or gender-affirming surgery. The Board Policy and New Jersey guidelines, like those of many amici States, recognize the distinction between social and medical transitioning. (*See* J.A. 78 (differentiating between "social[] transition" and "physical transition, which might include hormone treatments and surgery"), 84 (same).)[18] *See also Boyertown Area Sch. Dist.*, 897 F.3d at 522.

In the end, school faculty and staff may take different approaches to communicating with parents about a student's gender identity, depending on the student's individual needs and circumstances, including inter alia the student's age and maturity. No single approach is always the right one, which is why amici States endorse a case-by-case framework. To command notification in all cases as soon as possible without regard to the possible consequences would be counterproductive, unworkable, and unwise, and it is not required by the Constitution.

---

[18] *See* NYSED Guidelines, *supra*, at 14-15.

## POINT III

### AMICI STATES HAVE STRONG INTERESTS IN SAFE AND SUPPORTIVE SCHOOLS FOR ALL STUDENTS, INCLUDING TRANSGENDER AND GENDER-NONCONFORMING STUDENTS

### A. Safe and Supportive School Policies Benefit All Students.

Amici States understand that safe and supportive schools are indispensable to student success.[19] A policy protecting transgender and gender-nonconforming students "benefits all students by promoting acceptance." *Boyertown Area Sch. Dist.*, 897 F.3d at 529. Both amici States' experience and research across multiple scientific fields demonstrate the important role that a safe and supportive educational environment plays in student's development.[20] Schools must ensure not only physical safety but also emotional well-being, connectedness of staff and

---

[19] This consensus is supported by governmental institutions, *see, e.g.*, Off. of Elementary & Secondary Educ., *Safe & Supportive Schools*, U.S. Dep't of Educ. (last reviewed Jan. 14, 2025); Nat'l Ctr. on Safe Supportive Learning Env'ts, *About* (n.d.), as well as medical organizations, *see, e.g.*, Am. Psych. Ass'n, *Safe and Supportive Schools Project* (2014).

[20] *See* Linda Darling-Hammond et al., *Implications for Educational Practice of the Science of Learning and Development*, 24 Applied Developmental Sci. 97, 97-98 (2020).

students, and appropriate school policies.[21] A sense of physical and emotional safety enables learning, while fear and anxiety weaken a student's cognitive capacity and "short circuit the learning process."[22]

At their core, safe and supportive schools rely on strong and authentic relationships between students, faculty, and staff. These school environments foster a student's understanding that both adults and peers at school care about their education and about them as individuals.[23] Schools depend on interpersonal relationships that set students up to succeed.[24]

The student-teacher relationship in particular holds enormous importance in the school environment and significantly influences a student's educational experience. Researchers recommend that "school professionals should promote inclusivity and act as advocates for students

---

[21] *See* Jenna Howard Terrell et al., *Conceptualizing and Measuring Safe and Supportive Schools*, 24 Contemporary Sch. Psych. 327, 327-28 (Aug. 12, 2020).

[22] Darling-Hammond et al., *supra*, at 102.

[23] *See* Ctrs. for Disease Control & Prevention, *School Connectedness Helps Students Thrive* (Nov. 18, 2024).

[24] *See* Roxanne M. Mitchell et al., *Student Trust in Teachers and Student Perceptions of Safety: Positive Predictors of Student Identification with School*, 21 Int'l J. Leadership Educ. 1 (May 2016).

who are in need of support."[25] Yet strong and supportive student-teacher relationships do not arise automatically. As the research indicates, teachers must first demonstrate caring and goodwill by showing concern about students as people outside of the school context and communicating openly.[26] And after student-teacher trust is developed, a subsequent breach in that relationship is difficult to repair.[27]

When students share warm, strong, and independent relationships with their teachers, there is a positive effect on the overall school climate and on the students' optimism, academic outcomes, and identification with their school.[28] These positive relationships have been shown to benefit student engagement, academic achievement, self-esteem, and

---

[25] Whitney W. Black et al., *Effects of "Safe School" Programs and Policies on the Social Climate for Sexual-Minority Youth: A Review of the Literature*, 9 J. LGBT Youth 321, 336 (Oct. 5, 2012).

[26] *See* Megan Tschannen-Moran et al., *Student Academic Optimism: A Confirmatory Factor Analysis*, 51 J. Educ. Admin. 150, 153 (Mar. 15, 2013).

[27] *See* Mitchell et al., *supra*, at 138.

[28] *See* Tschannen-Moran et al., *supra*, at 168-69; Mitchell et al., *supra*, at 138-39, 148-49; Laurie Kincade et al., *Meta-Analysis and Common Practice Elements of Universal Approaches to Improving Student-Teacher Relationships*, 90 Rev. Educ. Rsch. 710, 711-12 (Aug. 4, 2020).

social skills, while reducing a student's likelihood of being suspended or dropping out.[29] Indeed, the presence of a strong, supportive connection to any adult at school (such as a mentor or advisor) is also connected to a greater likelihood that a student will attend, graduate, and succeed academically.[30] Strong relationships between students and school faculty and staff affect students beyond the individuals involved in the relationship, as students who trust their teachers and administrators are more likely to report unsafe situations involving others and prompt interventions.[31]

A student's sense of connectedness to their school affects much more than just academic achievement.[32] Over two decades of research

---

[29] *See* Kincade et al., *supra*, at 712; Tschannen-Moran et al., *supra*, at 151-54, 157-58, 167-71; Isabel Brito et al., *Do You Trust Me? A Systematic Literature Review on Student-Teacher Trust and School Identification*, Conference Paper for the European Conference on Education 2021 (Sept. 2021).

[30] Darling-Hammond et al., *supra*, at 103.

[31] Mitchell et al., *supra*, at 5.

[32] *See* Russell M. Viner et al., *Adolescence and the Social Determinants of Health*, 379 Adolescent Health 1641, 1647 (Apr. 2012); Marina Feijo et al., *Improving School Outcomes for Transgender and Gender-Diverse Youth: A Rapid Review*, 9 Pol'y Insights from Behav. & Brain Scis. 27, 28 (2022).

has demonstrated that school connectedness directly promotes positive outcomes and buffers the negative effects of risk factors related to mental health, violence, sexual behavior, and substance use.[33] Recent work has demonstrated that the influence of school connectedness experienced as an adolescent continues to impact students as they become adults, resulting in reduced emotional distress and suicidal ideation, a lower likelihood of physical violence victimization and perpetration, and less prescription or illicit drug use in adulthood.[34]

---

[33] *See* Riley J. Steiner et al., *Adolescent Connectedness and Adult Health Outcomes*, 144 Pediatrics e20183766, at 1-2, 6 (July 2019) (author manuscript); Michael D. Resnick et al., *Protecting Adolescents from Harm: Findings from the National Longitudinal Study on Adolescent Health*, 278 J. Am. Med. Ass'n 823, 831 (Sept. 10, 1997).

[34] *See* Steiner et al., *supra*, at 1-2.

**B.    Safe and Supportive School Policies Are Especially Critical for Transgender and Gender-Nonconforming Students.**

Providing a safe and supportive school environment is especially important to transgender and gender-nonconforming students. "[I]t is known that schools are not typically safe places for sexual-minority students."[35] This Court has recognized the "compelling state interest in protecting transgender students," in particular, because of the "extra-ordinary social, psychological, and medical risks" they face from discrimination. *Boyertown Area Sch. Dist.*, 897 F.3d at 528-29. "When transgender students face discrimination in schools, the risk to their wellbeing cannot be overstated—indeed, it can be life threatening." *Id.* at 529.

Transgender and gender-nonconforming students experience discrimination and violence at an unusual and alarmingly high rate.[36] In a 2024 mental health survey, sixty-five percent of transgender and nonbinary young people reported feeling discriminated against due to their gender identity.[37] In New York, survey data show that fifty-one

---

[35] Black et al., *supra*, at 321.

[36] *See* Joseph G. Kosciw et al., GLSEN, *The 2021 National School Climate Survey: The Experiences of LGBTQ+ Youth in Our Nation's Schools* xxvii, 93 (2022).

[37] Trevor Project, *supra*.

percent of LGBTQ+ students have experienced verbal harassment in school based on their gender expression, while significant portions of this group have faced online harassment (twenty-eight percent) and physical harassment (sixteen percent).[38] Overall, transgender students are more likely than other students to report that they feel unsafe at or traveling to and from school, have experienced bullying at school, and have been threatened or injured with a weapon at school.[39] This discrimination, violence, and harassment has been shown to reduce transgender and gender-nonconforming students' sense of connection to their schools and their own sense of belonging as compared to other students.[40]

Discrimination in educational settings can result in severe consequences for transgender and gender-nonconforming youth. Such students who have had negative experiences at school such as bullying

---

[38] GLSEN, *School Climate for LGBTQ+ Students in New York* 2 (2023).

[39] *See* Michelle M. Johns et al., *Transgender Identity and Experiences of Violence Victimization, Substance Use, Suicide Risk, and Sexual Risk Behaviors Among High School Students — 19 States and Large Urban School Districts, 2017*, 68 Morbidity & Mortality Weekly Rep. 67, 69 (2019).

[40] *See* Kosciw et al., *supra*, at xix-xx, 41.

and harassment are more likely to be under serious distress, to have experienced homelessness, and to have attempted suicide.[41] Transgender and gender-nonconforming youth also experience significantly higher rates of suicidal thoughts and attempts than the overall U.S. population.[42] A 2024 mental health survey found that forty-six percent of transgender and nonbinary young people reported having "seriously considered attempting suicide in the past year," and twelve percent attempted suicide during that time.[43]

Discrimination, harassment, and stigma based on gender identity also hurt transgender and gender-nonconforming students in the classroom. One study found that "students who were frequently harassed because of their sexual orientation or gender expression had grade point averages . . . almost half a grade lower than students who were less often harassed."[44] Overall, transgender students who experienced higher

---

[41] Johns et al., *supra*, at 70-71; *see* James et al., *supra*, at 131-35.

[42] *See* Ann P. Haas et al., Am. Found. for Suicide Prevention & Williams Inst., *Suicide Attempts Among Transgender and Gender Non-Conforming Adults: Findings of the National Transgender Discrimination Survey* 2 (Jan. 2014).

[43] Trevor Project, *supra*.

[44] Black et al., *supra*, at 323.

levels of victimization in school as a result of their gender expression have lower grades, are less likely to plan to graduate high school, and are three times more likely to have missed school in a given month.[45] Students who are questioning their gender identity are also more likely than non-transgender students to miss school because they feel unsafe.[46] Without safe and supportive school environments, transgender and gender-nonconforming students also frequently avoid attending school functions and participating in extracurricular activities.[47]

Safe and supportive school practices can alleviate such harms. Robust data confirm that transgender and gender-nonconforming students who feel safe expressing their gender identity at school are happier, healthier, and more academically successful. *See Boyertown Area Sch. Dist.*, 897 F.3d at 523 ("[W]hen transgender students are addressed with gender appropriate pronouns and permitted to use facilities that conform to their gender identity, those students reflect the same, healthy psych-

---

[45] Movement Advancement Project & GLSEN, *Separation and Stigma: Transgender Youth & School Facilities* 4 (2017); Kosciw et al., *supra*, at xix, 35.

[46] Kosciw et al., *supra*, at 84, 88.

[47] *Id.* at xv, 11, 84.

ological profile as their peers" (quotation marks omitted)). Supportive educators have been shown to have an immensely positive influence on transgender and gender-nonconforming students' academic success and emotional well-being. LGBTQ+ students with support from many (eleven or more) supportive staff at their school were less likely to feel unsafe because of their gender expression and sexual orientation, were less likely to miss school because they felt unsafe or uncomfortable, had higher GPAs, were less likely to say they might not graduate high school, and felt greater belonging to their school community.[48] Students at schools with more supportive staff also experience higher levels of self-esteem and lower levels of depression.[49]

Strong and supportive interactions with school personnel have been found to be an important factor in the academic success of transgender and gender-nonconforming youth specifically, in part because such adult

---

[48] Joseph G. Kosciw et al., GLSEN, *The 2019 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual, Transgender, and Queer Youth in Our Nation's Schools* xxiii (2020).

[49] *Id.* at xxii; Stephen T. Russell et al., *Promoting School Safety for LGBTQ and All Students*, 8 Pol'y Insights from Behav. & Brain Scis. 160 (Oct. 2021) (author manuscript).

interactions were associated with feelings of safety.[50] Transgender and gender-nonconforming youth who had a relationship with a supportive educator were less likely to miss school and less likely to drop out.[51] Transgender students who reported being supported, such as by being addressed by their chosen name and pronouns, also reported mental health outcomes analogous to their non-transgender peers.[52] Indeed, gender-affirming environments generally are associated with reduced suicide risk among transgender and gender-nonconforming youth, and gender-affirming school environments in particular were found to have the strongest association with reduced odds of reporting a suicide attempt within the past year of all the spaces studied.[53]

---

[50] *See* Kosciw et al., *supra*, at xxii, 66-67.

[51] Michelle M. Johns et al., *Protective Factors Among Transgender and Gender Variant Youth: A Systematic Review by Socioecological Level*, 39 J. Primary Prevention 263 (2018) (author manuscript).

[52] Movement Advancement Project & GLSEN, *supra*, at 4; *see* Kristina R. Olson et al., *Mental Health of Transgender Children Who Are Supported in Their Identities*, 137 Pediatrics 1, 5 (2016) (finding similar results for transgender children based on parental reports).

[53] Trevor Project, *The Trevor Project Research Brief: LGBTQ & Gender-Affirming Spaces* 1 (Dec. 2020).

That is why amici States are committed to fostering inclusive, supportive school environments within our jurisdictions that benefit all students, including—as shown by the policy and state guidelines at issue here—transgender and gender-nonconforming youth.

## CONCLUSION

For the foregoing reasons, the Court should affirm the district court's order declining to issue a preliminary injunction.

Dated:   New York, New York
         September 9, 2025

Respectfully submitted,

LETITIA JAMES
   *Attorney General*
   *State of New York*

BARBARA D. UNDERWOOD
   *Solicitor General*
JUDITH N. VALE
   *Deputy Solicitor General*
KARTIK NARAM
ANAGHA SUNDARARAJAN
   *Assistant Solicitors General*
      *of Counsel*

By:   */s/ Anagha Sundararajan*
ANAGHA SUNDARARAJAN
KARTIK NARAM
Assistant Solicitors General

28 Liberty Street
New York, NY 10005
(212) 416-8073

*(Counsel listing continues on next page.)*

ROB BONTA
  *Attorney General*
  *State of California*
1300 I St.
Sacramento, CA 95814

KATHLEEN JENNINGS
  *Attorney General*
  *State of Delaware*
820 N. French St.
Wilmington, DE 19801

ANNE E. LOPEZ
  *Attorney General*
  *State of Hawai'i*
425 Queen St.
Honolulu, HI 96813

KWAME RAOUL
  *Attorney General*
  *State of Illinois*
115 South LaSalle St.
Chicago, IL 60601

AARON M. FREY
  *Attorney General*
  *State of Maine*
6 State House Station
Augusta, ME 04333

ANTHONY G. BROWN
  *Attorney General*
  *State of Maryland*
200 Saint Paul Pl.
Baltimore, MD 21202

ANDREA JOY CAMPBELL
  *Attorney General*
  *Commonwealth of*
    *Massachusetts*
One Ashburton Pl.
Boston, MA 02108

KEITH ELLISON
  *Attorney General*
  *State of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther
  King Jr. Blvd.
St. Paul, MN 55155

DAN RAYFIELD
  *Attorney General*
  *State of Oregon*
1162 Court St. N.E.
Salem, OR 97301

NICHOLAS W. BROWN
  *Attorney General*
  *State of Washington*
P.O. Box 40100
Olympia, WA 98504

BRIAN L. SCHWALB
  *Attorney General*
  *District of Columbia*
400 6th St., N.W., Ste. 8100
Washington, D.C. 20001

## COMBINED CERTIFICATIONS OF COUNSEL

I, Anagha Sundararajan, certify under penalty of perjury under 28 U.S.C. § 1746 that:

1. I am a member of the bar of this Court and counsel of record for the State of New York et al.

2. The brief for the State of New York et al., filed on September 9, 2025, complies with the typeface requirements and length limits of Rule 32(a)(5)-(7) of the Federal Rules of Appellate Procedure and contains 5,989 words.

3. The brief for the State of New York et al. was prepared on a system using CrowdStrike Falcon Sensor anti-virus software and no viruses were identified in these documents.

4. The text of the electronic file of the brief for the State of New York et al. is identical to the text of the paper copies being submitted to the court.

Dated:     New York, New York
           September 9, 2025

 /s/ *Anagha Sundararajan*
Anagha Sundararajan
*Assistant Solicitor General*

## CERTIFICATE OF SERVICE

I, Anagha Sundararajan, affirm upon penalty of perjury that, on September 9, 2025, the accompanying Brief for the State of New York et al. was served on the following Filing Users electronically by the Notice of Docket Activity pursuant to Third Circuit L.R. 113.4:

Katherine L. Anderson
Ronald A. Berutti
John J. Bursch
James A. Campbell
David A. Cortman
Chloe K. Jones
Vincent M. Wagner
Valentina Recchhia
Roshan D. Shah
Vivian M. Hanley
Matthew J. Lynch

Dated:   New York, New York
         September 9, 2025

_/s/ Anagha Sundararajan_
Anagha Sundararajan
Assistant Solicitor General